UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | Criminal Case No. 06-357 (CKK) |
| | : | |
| KHAN MOHAMMED | : | |

OPPOSITION TO DEFENDANT'S MOTION TO SUPPRESS STATEMENTS

The United States, by and through undersigned counsel, respectfully opposes Defendant's Motion to Suppress Statements. In short, the bases of the defendant's motion are the claims that the defendant's statement was involuntary, and that he was not adequately apprised of his rights prior to speaking with authorities. In support of its opposition, the government states as follows:

I) Factual Summary

On October 29, 2006 at approximately 8:35 am, the defendant, an approximately 35 year old man and a tribal elder, was arrested at a roadside checkpoint by members of Afghanistan's National Interdiction Unit (NIU) for his involvement in the distribution of drugs in Nangarhar Province, Afghanistan. The arrest was without incident, and no force was used against the defendant. Upon his arrest, the defendant was taken by an NIU officer, accompanied by 2 special agents with the U.S. Drug Enforcement Administration (DEA), to a detention center located at the Jalalabad Airfield in Jalalabad. Once there, he was first placed in a holding cell, and then, after being permitted to use the restroom, in an interview room.

At 10:22 am, DEA Special Agent Jeffrey Higgins, through a Pashto interpreter, advised the

defendant of his rights pursuant to Miranda v. Arizona, 382 U.S. 436 (1966) by reading verbatim from his agency-issued advice of rights card (DEA form 13A "Advice of Rights"- attached as Exhibit A).[1] The defendant indicated that he understood what the agent told him, and stated that he was willing to answer questions. In Special Agent Higgins' opinion, based on his training and experience, the defendant was not under the influence of either alcohol or drugs. From 10:22 am to 11:30 am, DEA Special Agents Higgins and Tucker Cowles interviewed the defendant through the interpreter. The agents then took a break, permitting the defendant to use the restroom, pray and eat lunch. At 12:42 pm, the agents continued their interview of the defendant, which concluded at 1:20 pm.[2]

Throughout the interview, the agents maintained a conversational tone. At no time during the interview did the defendant request an attorney or indicate that he wished to stop answering questions, nor did the agents make any threats or promises to induce him to speak with them.

At the conclusion of the interview, the defendant was escorted by an NIU officer back to a holding cell. Special Agent Higgins then notified U.S. military authorities of the defendant's arrest, and they subsequently took custody of him.

II) Legal Analysis

In the defendant's motion, he asserts that the government bears the burden of showing that

---

[1]The defendant speaks Pashto. The Pashto interpreter, and officer with the NIU, translated both the advice of rights as well as the entirety of the ensuing interview. During the interview, the interpreter asked the defendant several times if he understood what the interpreter was telling him, and the defendant responded that he did.

[2]A copy of Special Agent Higgins' report summarizing the interview is attached as Exhibit B.

the statement was voluntarily given, and alleges that he was inadequately apprised of his right against self-incrimination. As a result, he argues that his statement should be suppressed.

A) The Defendant's Statement Was Voluntarily Given

Rather than allege that the statement was involuntary, the defendant simply notes the government's burden of showing that the statement was voluntary. The totality of the circumstances clearly demonstrate that it was.

In assessing the voluntariness of a statement, the Court must determine under the totality of the circumstances whether the defendant's will has been overborne or his capacity for self-determination is critically impaired. United States v. Pelton, 835 F.2d 1067, 1071 (4th Cir. 1987). As a general rule, a statement is not voluntary if it is the result of "coercive police activity," that is, if it is obtained by any sort of threats or violence, . . . by any direct or implied promises, or the exertion of improper influence." Hutto v. Ross, 429 U.S. 28, 30 (1976).

Nothing in this case suggests that the defendant's statement was involuntary. In fact, the record suggests the contrary. The defendant, who is an adult and a tribal elder was fully apprised of his rights, as further discussed below. The questioning was brief, lasting approximately one hour and 45 minutes, and occurred in the middle of the day. He was allowed a break during the interview, at which time he was fed, allowed to use the restroom and to pray. According to the agent, at the time of the statement the defendant was alert and sober. Moreover, the defendant, having been advised of his rights, provided a statement that was primarily exculpatory in nature. There were no threats, promises, or other inducements made by any government employee to induce the statement.

B. The Statement Was Given After Full Compliance With the Requirements of Miranda v. Arizona.

The United States Supreme Court in Miranda v. Arizona required that those facing custodial

interrogation first be advised of certain rights. Specifically, the Court stated that:

> . . . we hold that an individual held for interrogation must be clearly informed that he has the right to consult with a lawyer and to have the lawyer with him during interrogation . . . As with the warnings of the right to remain silent and that anything stated can be used in evidence against him, this warning is an absolute prerequisite to interrogation. . . Only through such a warning is there ascertainable assurance that the accused was aware of this right.

Id. at 471-2.[3]

A defendant must be in custody and interrogated before he is entitled to the warnings. California v. Beheler, 463 U.S. 1121 (1983). A defendant may request that questioning end at any time, and may also request an attorney at any time during the interrogation with law enforcement. A defendant also may waive, or give up, his rights. United States v. Pelton, 835 F.2d 1067 (4th Cir. 1987).

In any event, a reviewing court will consider the "totality of the circumstances" in deciding whether (1) custodial interrogation took place, and whether (2) the defendant knowingly, intelligently and voluntarily waived his rights before speaking to police. Beheler, *supra.*

The government concedes that the defendant was in custody a the time of the statement, and that he gave the statement in response to questions asked by the agents. That said, prior to such "custodial interrogation", the agents abided by the Miranda requirement, using the attached advice of rights card to advise the defendant of each of his four enumerated rights. Further, the defendant affirmatively stated that he understood these rights, and freely agreed to waive them and answer the agent's questions, never requesting to consult with an attorney or stop questioning. The defendant

[3] In the following paragraph, the Court noted that financial ability of the defendant has no bearing on the right of the defendant to consult with counsel.

was treated respectfully, and was never promised or threatened in any way to induce him to waive his rights. When viewed under the totality of the circumstances, it is plain that the government abided by its responsibilities and that the defendant knowingly, intelligently and voluntarily waived his rights.

III) Conclusion

For all of the foregoing reasons, the Government respectfully requests that the defendant's motion be denied.

Respectfully submitted

KENNETH A. BLANCO, Chief
Narcotic and Dangerous Drug Section

______/s/ Matthew Stiglitz__________
Matthew Stiglitz
Julius Rothstein
Trial Attorneys
Narcotics and Dangerous Drug Section
U.S. Department of Justice
1400 New York Avenue, N.W., 8th Floor
Washington, D.C. 20530
(202) 305-3646
matthew.stiglitz@usdoj.gov

Certificate of Service

I hereby certify that a copy of the foregoing motion was electronically filed this 16th day of January 2008 via ECF, which will forward a copy to Carlos Vanegas, Esq., counsel for the defendant.

_____/s/ Matthew Stiglitz_____
Matthew Stiglitz

Before we ask you any questions, you must understand:

— You have the right to remain silent.

— Anything you say can be used against you in court.

— You have the right to talk to a lawyer for advice before we ask you any questions and to have a lawyer with you during questioning.

— If you cannot afford a lawyer, one will be appointed for you before any questioning if you wish.

Do you understand ?

Are you willing to answer some questions ?

UNCLASSIFIED EFTO
DEA 10/30/2006





SUBJECT: Post-Arrest Statements of Taliban Operator Khan MOHAMMED, on October 29, 2006





DRUG RELATED INFORMATION

(SBU) 1. Reference is made to the DEA cable, titled "Arrest of Taliban Operator Khan MOHAMMED and the Acquisition of Exhibits N-32 through N-34, on October 29, 2006," by SA Jeffrey J. Higgins, dated October 30, 2006. Reference is also made to the DEA cable titled "Translation of Exhibits N-32, N-33 and N-34, Seized from Taliban Operator Khan MOHAMMED, on October 29, 2006," by SA Gregory T. Cowles, dated October 30, 2006.

(SBU) 2. On October 29, 2006, at approximately 0835 hours, Taliban Operator Khan MOHAMMED was arrested during a joint operation by the DEA Foreign-deployed Advisory Support Team Echo Squad (hereafter "FAST-Echo"), the Afghan Counter Narcotics Police National Interdiction Unit Team Four (hereafter "NIU"), and their Blackwater trainers. After his arrest, the NIU transported MOHAMMED to a secure facility located at the Jalalabad Airfield (hereafter "JAF") for processing and interrogation.

(SBU) 3. At approximately 1022 hours, SA Higgins verbally advised MOHAMMED of his Miranda warning. NIU Officer number 001 (hereafter "NIU-001") acted as a Pashto translator during this interview. MOHAMMED stated that he understood his rights and he agreed to be interviewed. SA Higgins, SA Cowles and NIU-001 then interrogated MOHAMMED, from approximately 1022 hours to 1130 hours and from approximately 1242 hours to 1320 hours. The following, in substance an in part, is the information provided by MOHAMMED during his interrogation.

(SBU) 4. MOHAMMED stated that his name was Khan MOHAMMED, son of Ghula JAN. He is approximately 35 to 36 years of age. His only language is Pashto. He is a member of the Shinwari Tribe and the Edyakhel Clan. He was born in the Pande Neighborhood, Garatak Village, Chaparhar District, Nangarhar Province, Afghanistan. He is a citizen of Afghanistan. He has seven children, including girls the ages of 12, 10, 7 and 5. He has two boys, Rafiullah, age 13, and Bilal, age 4. He has one brother, Bismullah. MOHAMMED's wife is named Zaheda. MOHAMMED lives in the Tooribaba neighborhood, Garatak Village, Chaparhar District, Nangarhar Province, Afghanistan. Thirteen people live in his residence, including: his wife; his seven children; his brother; his mother; his two sisters; and himself. He has an AK-47 assault rifle in his residence. His cellular telephone number is 93-70-626-689. He had an Afghan identification card, number 00077535, and a District Administration card.

(SBU) 5. SA Higgins showed a photograph of Khan MOHAMMED taken from a digital video recording of MOHAMMED at the beginning of an 11 kilogram opium sale to CS-06-123608 (Exhibit N-23). MOHAMMED stated that he was the person depicted in the photograph.

(SBU) 6. MOHAMMED stated that the only country other than Afghanistan that he has visited is Pakistan. He has visited Pakistan a total of two or three times. He was last in Pakistan two years ago. His father-in-law, Moorid KHAN, lives in Pakistan and MOHAMMED said he visited him there. When MOHAMMED last visited KHAN, KHAN lived in the Nasir Bagha Refugee Camp, in the vicinity of the city of Peshawar, Pakistan. KHAN now lives in a residence inside Peshawar. KHAN does not own a telephone. MOHAMMED's two sisters were married in Pakistan, but they traveled to Afghanistan to celebrate with MOHAMMED after the wedding, in accordance with his culture. His sisters married Dowa JAN and Sayed MOHAMMED. Other than KHAN, JAN and Sayed MOHAMMED, he doesn't know anyone else in Pakistan. SA Higgins discovered two Pakistan telephone numbers in a telephone book found on MOHAMMED at the time of his arrest (Exhibit N-33). MOHAMMED said those telephone numbers, 00923015939539 and 00923334284440, belonged to his brother-in-laws.

(SBU) 7. MOHAMMED said he has been a farmer for all of his life. Until two years ago, he grew poppies on one to one and a half hectares of land. On this land he produced 12 to 15 seyer of opium depending on a variety of agricultural factors. He sold the poppy only when he needed money. He said opium traffickers came to the bazaar one day a week and that is where he sold his poppy. He never kept records of his poppy transactions. He stopped poppy when the Government of Afghanistan (hereafter "GoA") told him it was illegal. He now grows wheat.

(SBU) 8. MOHAMMED said he sold opium only one time in the past. He keeps opium in his residence and if there is a wedding or death in his family, he sells the opium for money to finance the celebration. He last sold opium four or five months ago. He sold ten kilograms of opium to Jalat. MOHAMMED's mother was sick so he sold the opium to Jalat to get money to help her her. The opium he sold was produced by him two years ago from his own poppy. He received 125,000 Pakistani rupees (approximately $2,083.00 at a conversion rate of 60 to 1) for that transaction. With this money, he co-purchased a white Toyota Corolla station wagon with Dr. Babarak, his tribal doctor.

(SBU) 9. MOHAMMED said he doesn't know the names of any drug dealers in the Chaparhar District. There are a lot of people in his village who sell heroin, but he doesn't know

who they are. He never sold or purchased morphine or heroin. He said he doesn't know what heroin is. He then said he knows what it is, but he doesn't know what it looks like. Later in the interview, he again said he doesn't know what heroin is or what it looks like. MOHAMMED was told there were pictures of him holding heroin. He said if someone gave something to him and he didn't know what it was, then that would explain it. When asked to give an example of someone giving him something that he didn't know what it was, MOHAMMED said Jalat had asked him for heroin. He said he responded that he didn't know anything about heroin.

(SBU) 10. SA Cowles told MOHAMMED that MOHAMMED's hands tested positive for heroin and MOHAMMED said he may have touched something. When asked what he meant, MOHAMMED said he had touched something in plastic packs, but he didn't know what was in them. He said 45 days ago, Jalat came to his house and asked him for heroin, then gave him two packages. Jalat told him to find something like these, but MOHAMMED didn't know what was in the packages. The packages were in a bag and he didn't see the color of the packages. He said when Jalat gave him the packages and told him to find two more like them; he responded that he couldn't do that. During this conversation, MAJIBOOD was also in the room. MAJIBOOD is from the same village as MOHAMMED. MAJIBOOD is a short man with white hair and a white beard. MOHAMMED repeated that Jalat said he needed heroin and told him to get these types of things. MOHAMMED did not know where Jalat was going to sell the heroin.

(SBU) 11. MOHAMMED supports the new GoA and is happy with the involvement of American in Afghanistan. He appreciates Americans for building wells, clinics and roads. He thanked SA Higgins for killing the Taliban and stopping the fighting in Afghanistan. He is a member of the National Peace Committee. He recently worked as a team leader for a 20 man team working for DIA (a non-governmental agency) building roads. He also worked as a guard for a DIA storage warehouse. He is no longer employed by DIA. Two months ago, he became a Tribal Chief in the Shinwari Tribe, in charge of his village elders. He is paid 200 Afghani per day for this position and his job is going well.

(SBU) 12. MOHAMMED claimed that no one in his village is working with or for the Taliban. He said no one in the Chaparhar District is working for the Taliban. He said

Habib ZAI was the Chaparhar District leader under the Taliban regime, but ZAI left the village and is living in Pakistan. He hasn't seen ZAI since the Taliban controlled Afghanistan. During that time, he had social conversations with ZAI, but he never spoke to ZAI about official business. He doesn't know who ZAI is working with now.

(SBU) 13. When MOHAMMED was accused of being a Taliban operator, he said whoever told SA Higgins about his involvement with the Taliban was lying. He said if there is evidence against him then we should cut off his arms and arrest him. He said he wants peace in Afghanistan. He said he didn't know who Mullah Abdul RAHMAN was. He didn't know the names of anyone working with the Taliban.

(SBU) 14. At approximately 1130 hours, MOHAMMED was given a break from the interrogation. The interrogation continued again at approximately 1242 hours. The following, in substance and in part is the information provided by MOHAMMED during the second part of the interrogation.

(SBU) 15. SA Cowles played a digital audio recording of MOHAMMED talking to CS [redacted] (Exhibit N-15). During the recording, MOHAMMED discussed acquiring rockets for attacks against the U.S. military. When he heard the recording, MOHAMMED denied that the voice on the tape was his.

(SBU) 16. SA Cowles then played the audio portion of a video tape of MOHAMMED selling two kilograms of heroin to CS-[redacted] and discussing using the proceeds to purchase rockets (Exhibit N-30). MOHAMMED again denied that the voice on the recording was his. MOHAMMED was then shown the video and the audio recording of the same incident. MOHAMMED admitted that he was the person on the video recording, but said the voice was not his. He said on the video Jalat brought him two kilograms of heroin and asked MOHAMMED to being Jalat something like them. MOHAMMED said on the recording, JALAT and MAJIBOOD's voices are theirs, but his voice is not on the recording. MOHAMMED said Jalat may have told him the heroin was going to the United States, but he doesn't remember.

(SBU) 17. The interview was concluded by SA Higgins, SA Cowles and NIU-001 at approximately 1320 hours.

(SBU) 18. This cable is submitted as a permanent record in lieu of a DEA-6, Report of Investigation (ROI), in accordance with DEA manual, Section 6642.11. SA Higgins and SA Cowles can attest to the information contained within this cable. This cable was reviewed by A/GS Derek Duncan.

(SBU) 19. Please direct all inquires to FAST-Echo SA Higgins, SA Cowles, A/GS Derek Duncan or Country Attaché Edward L. Follis, via the Kabul Country Office.



Decontrol upon receipt by DEA only.

Edward L. Follis
Country Attaché
Kabul Country Office