UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA | : |
| | : |
| v. | : Criminal Case No. 06-357 (CKK) |
| | : |
| KHAN MOHAMMED | : |

**OPPOSITION TO DEFENDANT'S SUPPLEMENTAL
MOTION TO SUPPRESS STATEMENTS**

The United States, by and through Matthew Stiglitz and Julius Rothstein, Trial Attorneys with the U.S. Department of Justice, Criminal Division, Narcotic and Dangerous Drug Section, respectfully opposes Defendant's Supplemental Motion to Suppress Statements. In support of its opposition, the government states as follows:

I) Factual Summary[1]

On October 29, 2006, after concluding their interview of the defendant, the DEA and Afghan authorities turned the defendant over to U.S. military authorities, who subsequently transferred him to the detention facility at Bagram Airfield, where he remained until shortly before his transfer to the United States on November 5, 2007.

During this approximate year of detention, two interrogators were successively assigned to interview the defendant about his various activities and the evidence that was provided to them by the DEA. Over the course of approximately 14 interviews between November 6, 2006 and March

---

[1] In the first instance, the government would refer the court to the factual summary in its initial opposition to defendant's first motion on the subject.

1

3, 2007, the contents of which were described in reports that have been provided to the defendant, the defendant provides statements on a range of issues, including his home life and employment, his involvement in the drug world and knowledge of the Taliban, as well as his take on the evidence in this case.

II) Legal Analysis

In the defendant's motion, he asks the Court to suppress statements made to military officials while in their custody on two grounds: first, that they were involuntary, and second, that they were obtained in violation of Miranda v. Arizona.[2]

A)    The Court should deny the motion without prejudice as moot or, in the alternative, reserve judgment on this supplemental motion until such time as the defendant has testified.

As indicated when it notified the defense (and the Court) of these statements, the government does not intend to offer them in its case-in-chief. In a similar scenario, Judge Lamberth denied outright a defense motion to suppress statements on the grounds that it was moot. In re Sealed Case 96-3167, 153 F.3d 759, 763 n.1 (DC Cir.1998).

At the least, the government believes that the motion is not ripe for consideration until such time the defendant has testified, and, more to the point, has testified inconsistently with a prior statement he made while in detention. Should that occur, the government would be prepared to make a formal proffer, or, if need be, make the relevant interrogator available for a hearing out of

---

[2] 382 U.S. 436 (1966).

the presence of the jury to determine the voluntariness of the statements before cross-examination concerning the statements were to occur.[3]

B)  <u>Statements made in violation of Miranda v. Arizona can be used for impeachment purposes</u>[4]

Addressing the defendant's second argument first, the lack of an advice of rights does not render subsequent statements inadmissible for purposes of impeachment. <u>United States v. Harris</u>, 401 U.S. 222 (1971). In <u>Harris</u>, the Supreme Court held that if a defendant takes the stand in his own defense, any voluntary statement that the defendant has made, even if it bears directly on the crimes charged and was obtained in violation of <u>Miranda</u>, can be used for impeachment purposes. <u>Id.</u> at 225. As the Court explained, "[t]he shield provided by <u>Miranda</u> cannot be perverted into a license to use perjury by way of a defense, free from risk of confrontation with prior inconsistent statements." <u>Id.</u> at 226. <u>See also</u>, <u>United States v. Knox</u>, 396 U.S. 77 (1969) (while every criminal defendant is privileged to testify in his own defense, that privilege does not include a right to commit perjury); <u>United State v. Woody</u>, 379 F.2d 130 (D.C. Cir. 1967) (explaining that a defendant should not be allowed to affirmatively resort to perjurious testimony in reliance on the Government's

---

[3]Because of the speculative nature of the defendant testifying, and given the security concerns involved and the sensitive nature of their position, the government below sets out in proffer form what the interrogators would say concerning the nature and circumstances of their interviews, should the Court be inclined to rule on the motion pre-trial.

[4]The government does not concede that there was a violation in this case, as the defendant was advised of his rights by the DEA upon his arrest, and he knowingly and voluntarily waived them. However, the government recognizes that after a certain time in custody without a renewed admonition and waiver, the initial waiver may cease to be valid. For purposes of this opposition, the government treats the facts as if <u>Miranda</u> had not been complied with.

disability to challenge his credibility and therefore he can be impeached with evidence that has been "illegally secured").

In this case, the government is not attempting to enter these statements in its case-in-chief, and they only become relevant should the defendant testify in a manner inconsistent with them. Just as the defendant has no right to take the stand and commit perjury, he likewise has no right to use Miranda as a shield to enable him to do so.

C) The Defendant's Statements to Military Interviewers Were Voluntary.

Statements must be voluntary in order to be admissible. In determining whether a statement is made voluntarily, the failure of the police (or, in this case, military personnel) to advise the accused of his rights is only one factor in determining whether a statement is made voluntarily - the lack of Miranda warnings is not determinative. Schneckloth v. Bustamonte, 412 U.S. 227 (1973). A statement must be the product of the defendant's free will, and not a product of his will being overborne and his capacity for self-determination critically impaired. Id. at 2047. Whether a statement is voluntary is a question of fact to be determined from the totality of the circumstances. Id at 2048. See also United States v. Richardson, 903 F.2d 844 (D.C. Cir. 1990) (finding, after a review of the totality of the circumstances, that the defendant's statement was given voluntarily, and was not the result of oppressive or overreaching behavior, despite the use of interrogation tactics such as using unfavorable results from a polygraph examination against the defendant, threatening to follow the defendant until incriminating evidence turned up, using "good guy/bad guy" tactics, or false claims of leniency).

The totality of the circumstances is determined by an examination of different factors. Such factors include: the characteristics of the accused and the details of the interrogation, the youth of accused, his lack of education or low intelligence, the lack of any advice to the accused of his constitutional rights, the length of detention, the repeated and prolonged nature of the questioning, and the use of physical punishment such as the deprivation of food or sleep. Procunier v. Atchley, 400 U.S. 446 (1971). See also Houston v. Lockhart, 866 F.2d 264 (8th Cir. 1989), where the defendant unsuccessfully argued that his statement to police officers was involuntary, alleging that he had been denied the right to make a telephone call, was moved to a maximum security section of the jail, denied the right to see his attorney, and harassed by police officers. Despite these facially coercive allegations, the court found the resulting statements voluntary given, for at no time during his confinement was the defendant beaten or physically mistreated, nor did the police actively attempt to force the defendant to confess.

In Colorado v. Connelly, 479 U.S. 157 (1986) the Supreme Court further refined the definition of a voluntary statement. In that case, the defendant argued that his statement to police was not voluntary, asserting that his mental condition was such that he experienced hallucinations to such a degree that it inhibited his ability to make free and rational choices. Dismissing the approach of the Colorado Supreme Court, which solely determined voluntariness based on whether the statements were the product of rational intellect and free will, the Court held that "coercive police activity is a necessary predicate to the finding that a confession is not voluntary within the meaning of the Due Process Clause of the Fourteenth amendment." Id at 167. See also United States v. Byram, 145 F.3d 405 (1st Cir. 1998) (explaining that voluntariness is determined in part by whether police employed coercive tactics).

The defendant is in his late thirties and held the position of an elder in his village in Afghanistan, where he was in charge of village affairs and acted as a representative of the village to the Afghan government. The defendant's adequate treatment while in custody has not been contested. Moreover, while the military did not advise him of his rights, he had been educated in this respect by the DEA agents who had.

Having received similar training and following the same procedures, the accounts of the interviewers concerning the conduct of their interviews is also similar. Each interviewer received and successfully completed specialized training in conducting interrogations, to include the behavior appropriate in conducting interviews. At all times, each conducted themselves in a manner consistent with Field Manual 34-52, "Human Intelligence Collector Operations" and with the Law of Land Warfare.

The first interviewer assigned to the defendant interviewed him on ten separate occasions: November 6th, 8th, 9th, 11th, 13th, 18th, 20th, 23rd, and 29th, 2006, and December 5, 2006. As the first interviewer assigned to the defendant, she made sure to treat him with respect and dignity so as to build up a rapport with him. Each interview lasted less than 2 hours and occurred after 7:30 am. Present for each interview was the interviewer and an interpreter, who were each unarmed and dressed in civilian clothes. The interviews were conducted in a conversational tone, and at no time was the defendant verbally or physically threatened, harassed, harmed or otherwise mistreated. At no time did the defendant express a desire not to speak with the interviewer, and never complained to her concerning her treatment of him or the treatment he received from others. This interviewer had sole responsibility for questioning the defendant until such time as she rotated out of Afghanistan.

A second interviewer was subsequently assigned to the defendant, and interviewed him on at least the following four occasions: January 11, 2007, February 21 and 22, 2007, and March 3, 2007. Each interview lasted less than 2 hours and occurred after 7:30 am. Present for each interview was the interviewer and an interpreter, who were each unarmed and dressed in civilian clothes. As the second interviewer, she wanted to establish a rapport with the defendant, and found that treating detainees (including the defendant) well was the most effective means of obtaining information. As with the first interviewer, the second conducted the interviews in a conversational tone, and never verbally or physically threatened, harassed, harmed or otherwise mistreated the defendant. She frequently brought to the interviews food and a drink for the defendant, who appeared eager to talk to her. At no time did the defendant express a desire not to speak with the interviewer, and never complained to her concerning her treatment of him or the treatment he received from others, including the first interviewer.

Contrary to the expectations of some, interviews of the defendant were conducted in an environment designed to befriend him- treating him with respect rather than abuse. While the defendant's overall detention lasted approximately one year, his interview sessions were typically days if not weeks apart, and were not prolonged affairs, each lasting less than 2 hours. The interviewer and interpreter were the only ones present during these sessions, and they wore civilian clothes and were unarmed. The tone of the interviews was conversational and non-threatening. No threats or tactics designed to threaten, harm or humiliate were employed, and the defendant never complained of mistreatment.

Given the totality of the circumstances, there is a complete absence of the type of coercive activity upon which a finding of involuntariness must be predicated. As such, the statements were

voluntarily given, and should be admissible for impeachment of the defendant should he choose to testify.

III) Conclusion

For all of the foregoing reasons, the Government respectfully requests that the defendant's supplemental motion be denied.

                    Respectfully submitted

                    KENNETH A. BLANCO, Chief
                    Narcotic and Dangerous Drug Section

                    _____*/s/ Matthew Stiglitz*_____
                    Matthew Stiglitz
                    Julius Rothstein
                    Trial Attorneys
                    Narcotics and Dangerous Drug Section
                    U.S. Department of Justice
                    1400 New York Avenue, N.W., 8th Floor
                    Washington, D.C.  20530
                    (202) 305-3646
                    matthew.stiglitz@usdoj.gov

Certificate of Service

I hereby certify that a copy of the foregoing motion was electronically filed this 4th day of April 2008 via ECF, which will forward a copy to Carlos Vanegas, Esq., counsel for the defendant.

                    _____*/s/ Matthew Stiglitz*_____
                    Matthew Stiglitz