UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | |
| | ) | Crim. No. 06-357 (CKK) |
| KHAN MOHAMMED | ) | |
| | ) | |
| Defendant. | ) | |

GOVERNMENT'S MEMORANDUM IN AID OF SENTENCING

The United States, by and through undersigned counsel, respectfully submits this memorandum in aid of sentencing to the Court for its consideration.

I)   Introduction

The defendant was charged in a two count superseding indictment in the District of Columbia that was returned by the grand jury on January 23, 2008. Count one charged the defendant with distributing one kilogram or more of heroin knowing and intending that it be imported into the United States. Count two charged the defendant with engaging in a drug trafficking offense knowing and intending to provide something of pecuniary value to a person or individual who has engaged or is engaging in terrorist activity or terrorism. On May 15, 2008, a jury convicted the defendant of both counts after less than two hours of deliberation.

The evidence adduced at trial reflected that Mohammed is an associate of the Taliban, an organization of extremist Muslims currently conducting an insurgent campaign to rid Afghanistan of "infidels", overthrow the current government, and install itself in power by means of force and acts of terrorism. Further, the Taliban engage in drug trafficking in order to finance the acquisition of weapons, ammunition and equipment necessary to conduct its attacks on coalition forces, the

1

Afghan government and anyone else who stands in their way. The defendant's responsibility was to coordinate attacks in Nangarhar Province on behalf of the Taliban. The evidence showed that the defendant had engaged in acts of terrorism in the past, and was actively planning future attacks. The evidence also showed that he was an experienced drug trafficker, and that money earned from that drug trafficking was used to support himself and advance the cause of the Taliban.

For all the reasons set forth herein, the Government requests that this Court sentence the defendant to a term of **life imprisonment**. Such a sentence is within the statutory maximum provided by law for this offense and would also be consistent with the defendant's "advisory" total offense level under the Federal Sentencing Guidelines. See United States v. Booker, 543 U.S. 220 (2005).

Moreover, pursuant to 18 U.S.C. Section 3553(a), this Court is authorized to fashion a sentence which reflects, inter alia, "the nature and circumstances of the offense," as well as consideration of other listed factors. In this case, a sentence of life imprisonment is an appropriate punishment for the defendant's conduct. This trial was the first ever under the narco-terror statute, and is believed to be the first of a Taliban member in the United States. A sentence of this magnitude is necessary to deter future criminal conduct by other foreign nationals, especially Taliban members, who are engaged in international drug trafficking and narco-terrorism, by sending a clear and unequivocal message that their illegal conduct will be severely punished in U.S. courts. Further, such a sentence would ensure that the defendant will not be able to harm others in the future.

2

II)     The Evidence at Trial Overwhelmingly Established the Defendant's Involvement in Narco-Terrorism and Drug Trafficking With the Knowledge and Intent to Send Heroin to the United States.

The defendant's arrest and ultimate conviction were the product of a three month investigation conducted by the U.S. Drug Enforcement Administration (DEA) in conjunction with Afghan law enforcement authorities between August and October 2006. The investigation included the use of a confidential source who made video and audio recordings of conversations he had with the defendant,[1] and who purchased approximately 11 kilograms of opium and two kilograms of heroin from him or with his direct assistance. As elicited at trial, the essential facts of the case are as follows:

In the summer of 2006, "Jaweed", an Afghan farmer, was living with his family in Peshawar, Pakistan due to a long term drought that had driven them from their ancestral home in Garetek Village, located in Nangarhar Province, Afghanistan. One day, Jaweed was summoned to the home of Abdul Rahman, whom Jaweed knew from growing up in the same village. According to Jaweed, Rahman had been a member of the Taliban regime in Nangarhar Province, in charge of investigations, and had fled to Pakistan when the Taliban were ousted by the United States and its coalition partners. On meeting Rahman, Jaweed was instructed to return to his home in Afghanistan, where he was to obtain rockets to be used in an attack on the Jalalabad Airfield, a facility used by U.S. and NATO forces in Nangarhar Province. Not wanting to become involved with the Taliban or conduct such attacks, Jaweed explained to Rahman that he had no experience in such things and so wouldn't be of much help. Rahman responded by telling Jaweed that "I have another person who are [sic] there, you and him will work together." Tr. 5/9/08- p. 24, lines 15-16. That man was

---

[1]Eleven of these recordings were admitted at trial.

identified by Rahman as Khan Mohammed, whom both men knew from Garetek village.

Fearing for his and his family's safety should he refuse, Jaweed agreed to go back to Afghanistan, intending to report the incident to the authorities upon his return there. Prior to that opportunity, however, the defendant greeted Jaweed on his arrival in the village and indicated that he had already been apprised of the mission by Rahman. While he would help Jaweed with the attack, Mohammed told Jaweed that it would be his responsibility to obtain the rockets to build up trust with the Taliban.

Shortly thereafter, Jaweed reported what happened to Colonel Latif, the police chief for the Charprahar District, where the Garatek village was located. Colonel Latif subsequently introduced Jaweed to the DEA unit located in Jalalabad, and the investigation commenced. The DEA instructed Jaweed to tell the defendant that he had acquired the rockets, equipped Jaweed with an audio recorder, and asked him to meet with the defendant to discuss his/Rahman's plans.

This initial conversation, recorded on August 18, 2006, set the tone for the rest of the investigation.[2] In it, the defendant freely admitted to prior acts of terrorism in blowing up government vehicles and shooting rockets at the police chief's office. He also expounded on his future terror plans:[3]

> 26    KM:  . . . We will continue our action in our country. Whatever we do, here are a lot of [opportunities]. We can place and explode bombs and fire missiles toward the airport.

---

[2]While particular parts are summarized in the body of this memorandum, the defendant so thoroughly expresses his disdain for "infidels" (i.e. non-believers of the Muslim faith), members of the government and those who collaborate with them, as well as his plans for assisting in their destruction, that the transcript of his conversation with Jaweed is attached in it's entirety as Exhibit A.

[3] "KM" is Mohammed and "JW" is Jaweed.

4

27    JW:    Yes

28    KM:    And to hit them with. This will be our Jihad and this will make us the [money] for our expenses.

29    JW:    What is the target of these people? The fact that they fire missiles to the airport, do they want to shoot the foreigners [Westerners] or the local people?

30    KM:    What they do is to kill the Americans. The Americans are infidels and Jihad is allowed against them. If we have to fire [the missiles] toward the airport, we will do it and if not the airport, wherever they are stationed we will fire at their base too. I mean we have to use the mines too. God willing, we and you will keep doing our Jihad.

Tr. Ex. 1A and 2A. Further, the defendant confirmed his relationship with Taliban members Abdul Rahman and Habib Zai, (formerly the sub-governor for Chaprahar District under the Taliban regime), and corroborated Jaweed's account concerning his conversation with Abdul Rahman:

34    KM:    God willing, when this operation is done, then I will take you and make you sit with them, with Habibzai and all the others.

35    JW:    I have not exchanged two words with Habibzai yet. It was Abdul Rahman who told me to get in touch with you. If it were not for the recommendation of Abdul Rahman, I would not have seen you either. He told me that you are his man, you are fully active on their behalf and he said whatever I need or whatever problem I have to get in touch with you. I said, "OK, it is alright."

36    KM:    Yes. . .
. . .
45    JW:    You and Habibzai. You, Habibzai and Qari Abdul Rahman (all three) are together in this?

46    KM:    Abdul Rahman, Habibzai and our word are the same. We are his people and with him we make our program [terror attack].

Frequently during later conversations, additional references were made by the defendant concerning the need to obtain rockets, meetings planned with other Taliban members, and the need to eliminate infidels.[4]

During their initial interviews of Jaweed, the DEA agents were told that the defendant had previously been involved in opium and heroin trafficking. This was later confirmed by the defendant during, among other times, the following conversation with Jaweed on September 18, 2006:

> 45-   JW:    ... When the guy told me about the opium, I thought
>               of you and I said, there is no better dealer than you. Because
>               you are experienced, you know everything about good quality
>               and bad one, no one can pass fake stuff on you and if they
>               don't give you good powder, they cannot pass on the bad
>               quality on you.
>
> 46-   KM:    No, God willing, we are people of the trade.[5]

Tr. Ex. 1H and 2H. With this information, the DEA asked Jaweed to approach the defendant with a request on behalf of a "friend" to purchase opium, in exchange for a commission to be split between the two men. Over a series of conversations, the defendant agreed to act as a broker for the transaction, selecting the opium seller and negotiating on Jaweed's behalf. The issue of the commission was discussed frequently, with the defendant pleased with the prospect of earning larger

---

[4]Given the totality of the evidence, the government believes that paragraph 10 of the pre-sentence report, to which the defense objected, is an accurate reflection of the evidence that was adduced at trial – Jaweed provided evidence that Rahman was coordinating terror activities from Pakistan, and the defendant discussed having committed attacks that were sanctioned by Rahman and Zai. Further, as the defendant would tell Jaweed, "[They said] we will consult about the program [attack]. It would be according to their advice and I cannot do it unless they order me to do it. (Tr. Ex. 2A, line 54.)

[5]In other conversations, the defendant's experience in the drug trade was highlighted by his offers to obtain, at various times, "50 seyrs" (kilograms) (Tr. Ex. 2E, line 39), a "thousand seyrs" (Tr. Ex. 2D, line 208), or "[w]hatever quantity you want, we have the source, as much as you need." (Tr. Ex. 2H, line 70).

and larger commissions as their business with Jaweed's friend grew.

On September 11, 2006, the DEA provided Jaweed with $2800, and he met with the defendant at the Chaprahar Bazaar. There, the defendant negotiated with several sellers he was familiar with before settling on one.[6] The defendant then negotiated a price, and handed the seller the money for the down payment that Jaweed had given him. Three days later, the defendant led Jaweed to the seller's compound. In the video recording of that meeting, the defendant is seen inspecting various pads of opium and selecting the 11 kilograms of opium that Jaweed wanted.[7] Once the opium was weighed,[8] Jaweed handed the defendant the money, which the defendant in turn provided to the seller. The defendant then helped to carry the opium away from the seller's compound before turning it over to Jaweed.[9] The gross weight of the opium was later determined by the DEA to be 10.96 kilograms, of which 9.05 kilograms tested positive for opium.

Once the initial opium purchase had been made, the DEA then asked Jaweed to return to the defendant, telling him that the opium had been converted to heroin and sent to the west, and that his friend had future plans to send heroin to the United States. Jaweed did so in a recorded conversation on September 18, 2006. The defendant's reaction was telling:

> 21-    JW:    This opium is going abroad and all other powders
>                are going abroad.

---

[6]It later became apparent that the defendant and the seller had prior opium dealings, as the two later were recorded discussing a prior deal in which the defendant had sold the seller opium that was apparently of questionably quality. (Tr. Ex. 2G, lines 11-12)

[7] Photo attached as Exhibit B.

[8] Photo attached as Exhibit C.

[9] Photo attached as Exhibit D.

22-     KM:     Good, may God turn all the infidels to dead corpses.

Tr. Ex. 1H and 2H.

At the request of the DEA, Jaweed also placed an order for heroin for his "friend", to be sent to the United States. The defendant proved to be an eager participant in such a deal, as it served the dual purpose of making money for them and furthering the jihad against Americans. As he stated in a recorded conversation on September 20, 2006:

7-     JW:     All right, is it possible to find powder?

8-     KM:     There are a lot, as much as you need I will give it to you. Two things would be done: one, as they say, the Jihad would be performed since they send it to America.

Tr. Ex. 1I and 2I.

Eventually, Jaweed ordered two kilograms of heroin, and paid the defendant $6,000 he had been provided by the DEA. The defendant returned several days later and, in a meeting at the defendant's compound, the defendant was seen on video (Tr. Ex. 1K) inspecting and then turning over to Jaweed 2 kilograms of heroin.[10] Particularly disturbing was the presence of the defendant's 4 year old son at his side during the majority of the transaction.[11] This substance was subsequently analyzed by the DEA, which confirmed that it was heroin in the amount of 1.981 kilograms.

The defendant was arrested on October 29, 2006.

The trial on this matter was held between May 9-15, 2008. At its conclusion, the jury convicted the defendant of both counts. With respect to the narco-terror charge, the jury found that the defendant had distributed both heroin and opium for the purpose of providing something of

---

[10] Photo attached as Exhibit E.

[11] Photo attached as Exhibit F.

8

pecuniary value to an individual or organization engaged and engaging in terrorist activity or terrorism.

III)    Legal Analysis

A.    The Defendant's Advisory Federal Sentencing Guidelines Range Is Life Imprisonment

In United States v. Booker, 543 U.S. 220 (2005), the Supreme Court held that certain applications of the mandatory United States Sentencing Guidelines violated the Sixth Amendment, because they permitted the maximum allowable sentence to be enhanced based on judge-determined facts. As a remedy, the Court invalidated the statutory provision that made the federal Guidelines mandatory, 18 U.S.C. § 3553(b)(1), thus making the Guidelines "effectively advisory." Booker, 543 U.S. at 245. Nonetheless, the Supreme Court held that in the future a district court must still "consult [the] Guidelines and take them into account when sentencing." Id. at 264 (citing 18 U.S.C. §§ 3553(a)(4) & (5)). "Under this new sentencing regime, a sentencing court is required 'to consider Guidelines ranges' applicable to the defendant, but is permitted 'to tailor the sentence in light of other statutory concerns as well.'" United States v. Coumaris, 399 F.3d 343, 351 (D.C. Cir. 2005) (internal quotations omitted). The "other statutory concerns" referred to in Coumaris are expressed primarily in 18 U.S.C. § 3553(a). United States v. McCants, 2006 WL 3086883 at p.4 (D.D.C.).

The decisions which have issued since the Booker ruling have set out a procedure for the imposition of sentences with the guidelines acting only in an advisory capacity. Under these rulings, a sentencing court must first correctly determine the applicable Guidelines sentence, including any permissible departures, and then, after considering the Guidelines and all other factors in Section 3553(a), decide whether to apply the Guidelines sentence, or apply a non-Guidelines sentence. See

9

United States v. Eura, 440 F.3d 625, 632 (4th Cir. 2005); United States v. Crosby, 397 F.3d 103, 111-13 (2d Cir. 2005).[12]

As reflected in the Pre-Sentence Report (PSR), the defendant's Guideline range on count two is calculated using a combination of §2D1.14(a) for the base offense level (calculated using the drug amount for the underlying offense) and §3A1.4 for the specific offense characteristic.

In this case, the base offense level is **32**, corresponding to the drug equivalency combination of 1.98 kilograms of heroin (equal to 1,981 kilograms of marijuana) and 9.05 kilograms of opium (equal to 452.5 kilograms of marijuana).

With respect to the specific offense characteristic, §3A1.4 applies, as narco-terrorism falls within the definition of a federal crime of terrorism under 18 U.S.C. § 2332b(g)(5)(iv). As such, the base offense is increased by **12** levels.

Additionally, §3A1.4(b) dictates that the defendant's criminal history level shall be set at Category **VI**.

Based upon the government's calculations, the defendant's total offense level is **44**. As explained in the PSR report, a total offense level over 43 is treated as an offense level of 43, which when calculated with a criminal history Category VI, corresponds to life imprisonment. USSG, Chapter 5, Part A, Application Note 2.

---

[12] If a district court decides not to apply a Guidelines sentence, it must explain on the record its rationale for varying from the advisory sentence. See United States v. Mares, 402 F.3d 511, 519 (5th Cir.); Crosby, 397 F.3d at 116. The final sentence will then be subject to review by the Court of Appeals for "reasonableness." Booker, 543 U.S. at 261-262.

B.      The Factors Set Forth In 18 U.S.C. Section 3553(a) Support of A Sentence of Life
        Imprisonment.

        As the jury found that the amount of heroin the distributed by the defendant was one

kilogram or more, the defendant's conviction on count two carries with it a mandatory minimum

sentence of twenty years incarceration and a maximum sentence of life. See 21 U.S.C. Section

960a(a) (". . . shall be sentenced to a term of not less than twice the minimum punishment under

section 841(b)(1) of this title [10 years], and not more than life. . . ).  The factors set forth in 18

U.S.C. Section 3553(a) support the conclusion that a sentence of life imprisonment is appropriate

under the facts and circumstances of this case. The relevant factors include:


1.      The Serious Nature and Circumstances of This Offense

        The extreme violence and insecurity that pervades life in Afghanistan is hard to understate.

In 2006, the last year the defendant operated there, U.S. armed forces in Afghanistan lost 65 men and

women in action, along with 400 wounded.[13]  Civilian casualties as a result of insurgent activity

made 2006 "the deadliest year for civilians in Afghanistan since 2001 . . . at least 669 Afghan

civilians were killed in at least 350 separate armed attacks by anti-government forces in 2006."

Human Rights Watch, *The Human Cost: The Consequences of Insurgent Attacks in Afghanistan*,

Vol. 19, No. 6(c) (April 2007) p. 3.[14]  For specific examples of violence perpetrated by the Taliban,

_____

        [13] U.S. Department of Defense, Defense Manpower Data Center, Data, Analysis and
Programs Division, *Operation Enduring Freedom - Casualty Summary By Month*,
http://siadapp.dmdc.osd.mil/personnel/CASUALTY/oefmonth.pdf .  The total dead and wounded
as a result of hostile action from the start of Operation Enduring Freedom through August 2,
2008 were 354 and 2,305, respectively.

        [14]Available on the Web at
http://www.hrw.org/reports/2007/afghanistan0407/afghanistan0407web.pdf .

we would refer the Court to the government's Motion In Limine with regard to pseudonyms, filed under seal on February 25, 2008. Further undermining the country, and posing a global threat, is Afghanistan's unquestioned position as the single greatest producer of opium in the world, with 82% of global land under poppy cultivation[15] and 92% of overall opium produced as of 2007.[16]

Measured against this backdrop, it is clear that the defendant's illegal activities as a terrorist and a drug trafficker constituted an extremely serious form of criminal conduct, particularly when, as in this case, the two activities were combined. The evidence in this case showed that the defendant's activities displayed at trial were not an isolated event; rather, they were indicative of his dedicated involvement in perpetuating the turmoil that has prevented the people of Afghanistan from living in peaceful coexistence under a stable government. Further, his conduct directly threatened the lives of American service members, their NATO coalition partners, and the DEA agents posted at the Jalalabad Airfield.

This Court is authorized by statute to impose a sentence necessary to "reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C. Section 3553(a)(2)(A). The illegal conduct committed by the defendant clearly supports the sentence sought by the government in this case.

---

[15] UNITED NATIONS OFFICE ON DRUGS AND CRIME, *2008 World Drug Report* at 37, http://www.unodc.org/documents/wdr/WDR_2008/WDR_2008_eng_web.pdf.

[16] Id. at 40.

2.    The Need For Deterrence

The federal sentencing statute also provides that the punishment should afford "adequate deterrence" of criminal conduct. 18 U.S.C. Section 3553(a)(2)(B). Three facts are relevant in discussing deterrence. First, this is the first conviction in the nation under the narco-terror statute, and what is believed to be the first conviction in a U.S. court of a member of the Taliban, particularly relating to drug trafficking. Given this, it is expected that this case and the Court's sentence will be reported widely in the media, particularly in Afghanistan.

Second is Afghanistan's prominence in the production of opium and heroin. As evident from an examination of the transcripts introduced at trial, drug production and trafficking are so commonplace that they are discussed and conducted in barely disguised terms. Further, respect for law enforcement is such that it is seen at best as an inconvenience rather than a reason to cease criminal activity.

The third factor, as testified to by Special Agent-In-Charge Edward Follis, called as an expert at trial, is that the Taliban has taken on a central role in every stage of opium/heroin production and transportation, relying on it as a principal source of funding for its activities. More to the point, he stated that ". . . I would be able to represent that the vast majority of our cases, certainly over 50 percent, had a definitive Taliban dimension." Tr. 5/14/08- p. 20, lines 22-24. This opinion is similar to that arrived at by the United Nations, which determined that "opium cultivation in Afghanistan is now closely linked to insurgency." United Nations Office of Drugs and Crime, *Afghanistan Opium Survey 2007* (October 2007) at iii.[17] Reviewing the historical relationship between the Taliban and opium, the agency concluded that:

---

[17]Available at http://www.unodc.org/pdf/research/Afghanistan_Opium_Survey_2007.pdf.

13

> . . . the Taliban are again using opium to suit their interests. Between
> 1996 and 2000, in Taliban controlled areas 15,000 tons of opium
> were produced and exported – the regime's sole source of foreign
> exchange at that time. In July 2000, the Taliban leader, Mullah Omar,
> argued that opium was against Islam and banned its cultivation (but
> not its export). In recent months, the Taliban have reversed their
> position once again and started to extract from the drug economy
> resources for arms, logistics and militia pay.

Id. at iv.

Given all of these factors, the sentencing of this defendant presents the Court with the opportunity to send a clear message to the Taliban and other drug traffickers in Afghanistan, as well as narco-terrorists world-wide: the punishment for sending heroin to the United States from abroad, and using the proceeds from drug trafficking to finance terrorist activity, is significant.

3.    Protection of the Public from Further Crimes of the Defendant.

It is plain from the evidence introduced at trial that the defendant is intent on causing as much harm to Americans and others as possible, and that his intent was not limited to the plan to attack the Jalalabad Airfield. Throughout the trial the Court heard, from the defendant's own mouth, evidence of his hatred for all those who are non-believers in the Islamic faith (Americans in particular), those who "occupy" Afghanistan, and those who collaborate with them. In addition to the examples cited above in section II, the Court and jury heard the defendant say the following:

> . . . So we will attack if we could. If not, then we will hide ourselves
> and return home with no worry. We will have to attack them and then
> happily we will return. God willing, we will take it [the place] back
> from them, these are infidels and we have to eliminate them. Look,
> make sure that you don't let anyone know this. It is something only
> between the two of us.

Tr. Ex. 2A, line 38;

> If we don't get rid of infidels, this would be a great obstacle in our
> country. We will continue our jihad, jihad is allowed religiously

14

> against the infidels and if a Muslims [sic] is on their side and get shot, the hell with him. . .

Tr. Ex. 2A, line 80;

> Once we speak to them, then, goodness, we will set the program [attack]. You work and we will do the work. The infidels need to be killed.

Tr. Ex. 2C, line 48;

> May God eliminate them right now, and we will eliminate them too. Whether it is by opium or by shooting, this is our common goal. . .

Tr. Ex. 2H, line 36.

Of equal concern is the fact that the defendant operated surreptitiously, using his position as a village elder and a Non-Governmental Organization (NGO) employee as a cover to allay suspicion as he carried out acts on behalf of colleagues forced into exile in Pakistan. As the defendant himself explained to Jaweed,

> It is good for my credibility to be with NGO, I mean not to be suspected. Every person say that he is busy with his work and that is why I have involved myself with it.

Tr. Ex. 2B, line 66. Thus, even if the defendant were to express contrition for his conduct at this point (something he has never done previously), it would be impossible to judge the sincerity of his words.

Given the defendant's single-minded focus on eliminating perceived enemies, to permit him out of prison to return to Afghanistan would be to subject all those who support a free and democratic Afghanistan -- westerners and Afghans alike -- to substantial danger.

IV)    Conclusion

At its heart, this case vividly demonstrated the character of two men. One man, tired of his country being torn apart by years of war and strife, stood up at great risk to himself and his family to do the right thing- expose a terrorist and drug trafficker to authorities and help them bring that man to justice. The other man, out of religious fervor -- or worse, simple greed -- chose to perpetuate the violence and drug trafficking that is plaguing the country of Afghanistan and contributing to global insecurity. The Court needs to hold the defendant to account for his choice. For all of the foregoing reasons, the Government respectfully requests that the Court impose a sentence of life imprisonment.

Respectfully submitted,

WAYNE C. RAABE, Acting Chief
Narcotic and Dangerous Drug Section

Matthew Stiglitz
Julius Rothstein
Trial Attorneys
Narcotic and Dangerous Drug Section
Criminal Division
U.S. Department of Justice
1400 New York Ave., NW, 8th Floor
Washington, D.C. 20530
202-305-3646

## CERTIFICATE OF SERVICE

I hereby certify that a copy of this pleading was delivered to all parties via ECF on this 26th day of August, 2008.

Matthew Stiglitz

16

# U.S. vs. Khan Mohammad
Exhibit 2A

Date:          August 18, 2006
Length:        1:29:16
Participants:  Khan Mohammad (KM)
               Jaweed (JW)

**Line# Speaker:      Statement**

| | |
|---|---|
| **00:22**<br>1     JW:     Khan Mohammed.  How are you? | ۱- م : خان محمدھ سترى مشى<br><br>( ۲۲:۰۰ ) |
| 2     KM:     Good.  Are you well? | ۲- خ م : ښه یی ښخیر. |
| 3     JW:     How is everything?  Are you in good? | ۳- م : ښه یی قرارى ده طبعت د ښنه دى  قرارى د ه ښنګه یی. |
| 4     KM:     How are you?  Is your health good? | ۴- خ م : ښنګه یی ؟ طبعت دى ښنه ده |
| 5     JW:     Where are you, you fool? I told you several times that we will get together and talk about that subject.  I swear that we have problems getting involved with them. | ۵- م : څیرته یی وخرکوسه تا نه څوارى ما ویلى یاره ګپ لګوو ، کینو سره او دا مسله باند ى خبرى وکرو سره . دوى سره خو مونږ ه ھسى په الا نجه واﷲ چه ککر شو . |
| 6     KM:     Did you get the thing? | ۶- خ م : شى دى پیدا کرى دى |
| 7     JW:     I have got the thing also got the missiles too.  I have them ready according to the price you told me to find the missiles. What did you do about the mines? | ۷- م : شى مى ھم پیدا کرى مزایل مى ھم پیدا کرى ، تیار مانه چه ھغه کوم نرخ تا ا ر ا ګرووچه یار مزایل پیدا کره تا ما ینونه ځنګه کرل؟ |
| 8     KM:     The mines, it is a little. God willing, will find it. | ۸- خ م : ماینونه خو لږ ھغه د ى انشاﷲ پیدا به شى |
| 9     JW:     So, it is done.  It has been found, yes? | ۹- م : خو شوى دى نو پیدا شوى دى کنه |
| **00:58**<br>10     KM:     It is done.  God willing, I have the source.  We are trying for them to get more weapons and things like that for us.  I have some weapons and the fact that you got these things, it is very good | ۱۰- خ م : شوى دى انشاﷲ درک ښته دى او نور ھم ھغى پلو کو ښنښ کووم چه سلاح او دا شیونه میونه مور ته ډیر راپیدا کو . سلاح یو ښه لرم خو چه تا دا شیان پیدا کرل دا د یر ه ښنه خبر ه ده<br><br>( ۵۸:۰۰ ) |

1

| | | |
|---|---|---|
| news. | | ۱۱- م : هغه شی گوره ما پخا ی کری دی . دا شی که ته په کور کی اردی چه یی را و مه او که کورکی نشی اینودی دی بل چیرته هم اردی چه به خبری خان سری پوه کری کنه |
| 11     JW:     Look, I have placed that thing some where.  If you want to put this thing in your homes, then I will bring it. If you cannot place it in your home and want to keep it somewhere else, we both should have an understanding. | | |
| 12     KM:     You and I are friends. | | ۱۲- خ م : دا خو زما او ستا اندیوالی ده کنه |
| 13     JW:     Yes. | | ۱۳- م : هو |
| 14     KM:     And we cannot reveal our secret to others. | | ۱۴- خ م : او بل چا ته خو راز هم نه شو بنکاره کولای |
| 15     JW:     Yes | | ۱۵- م : بنه |
| 16     KM:     Then, we will do like this, we will bury this away from home.  This is a disgraceful act and there are many informers. | | ۱۶- خ م : نو داسی به وکرو چه د ا به مونږ او تا سی له کوره لیری بنخه و په دی کی نام بدی ده شیطان ډیر دی |
| 17     JW:     Yes | | ۱۷- م : بنه |
| 18     KM:     And we will put it in such a place where no one can get an  idea. | | ۱۸ خ م : او داسی خای که به یی کیردو چه دا سی دچاورته فکر  ورته نوی. |
| 19     JW:     Yes | | ۱۹- م : بنه |
| 20     KM:     Then we will place it there. So the informers will not search the house. | | ۲۰- خ م : نو هلته یی کیردو او مطلب چه شیطا نان هم پر کور تلا شی ونه کری. |
| **01:48** 21     JW:     The point is that there is enemy chasing you and an enemy after me.  In these days if you take even one step with these people, the entire world would know what these people are up to. We have to keep our secret and keep this thing in a place where no one will know. You have to think as to where you want to place this thing and what to do with it. | | ۲۱- م : خبره دا سی ده چه دبنمن  تا پسی هم دی او ما پسی هم دی نن دی خلکو سره چه یو قدم هم دا خیسته غنده دنیا درباندی پو هیری چه دی خلکو څه حرکت وکر خان به دیر مخفی وساتو او دغه شی که دا سی یو خای کی کیردی چه څوک پوه هم نشی دا باند ی او دا شی هم کیردو نو دی سوچ برابر کره چه کله شی راغی څه پری وکرو. |
| 22     KM:     Absolutely.  We trust you, and when we bring it here, we cannot tell | | ۲۲- خ م : بلکل - زمونږ خو اعتبار دی پتا باندی چه مونږ یی راورو بل چا ته ویلی هم نشو . |

| | |
|---|---|
| anyone else. | |
| 23    JW:    Yes | ۲۳- م : ښه |
| **02:16**<br>24    KM:    I will also blow up the mines there.    I have blown them up around the Dago Sar [Top of the hills] and blown them up around the Red Castle. The fact that you are my new associate, this is a secret between you and me. Then, God willing, there is money and everything in this.  These are infidels we will kill them and we will continue our Jihad with blessing. | ۲٤- خ م : ما ينو نه هم الوزه ومه ، پاس به دغه کی هم الوزو لی می د ی په دا گو سر کی می هم والوزولی دی په سره کله کی می کری دی نو ته چه زما نوی انډيوال ی دا زما او ستا راز دی او بس انشالله چه پيسی هم پکی شته هر څه پکی شته او کا فر دی وژنو به ی او جهاد به خپل له خيره کوو. |
| 25    JW:    Look!  The fact that I agreed to this operation, I swear that I did this because of you.  My friend, if you were not with me in here, I would not have done this work at all and I would have been working to earn my living. Based on the instruction of these people when they told me to work together with Khan Mohammed and I said Khan Mohammed is my long time friend.  I said if Khan Mohammed keep my secret and I keep his secret.  When two people work together they can do anything.<br>Now about the subject of Kunar as you told me before that we will go to Kunar. Now look, about the [trip] of Kunar, like a person with one wing [alone] neither you nor I can leave home and I am sick and in this condition. | ۲٥- م : گوره زما چه دا کار ته غاره اينی ده کنه ما فسم دی چه  ستا په دا د باندی م غاره اينی ده چه يار ه ته ماسره نوی پد ی خایکی ما بيخی دا کار هم نکوه . نو خپله خواری او غريبی می کوله چه د هغو خلکو به هدف چه ما ته بی وويلی چه يار ه ته خان محمد سره خان غار ه کره کنه خان محمد سره ، نو نو ما ويلی چه خان محمد خو زما پخوا نی ملگری د ی ، خان محمد چه زما راز وساتی او زه د خان محمد راز وساتمه کنه ، دوه کسان چه کار وکری هغه هر څه کولای شی ، خو پاتی شو د کنر په حساب باند ی چه تا ما ته مخکی خبره کری وه کنه چه يار ه کنر ته خو خو کنر ته په خپله وگورو چه يار ه يو وزری سری ی نه هم له کوره نشی وتلی او زه هم نشم وتلی مريض يم په دغه حال باندی يمه  . |
| 26    KM:    Yes, absolutely, no, we are not going to Kunar.  We will continue our action in our country.  Whatever we do, here are a lot of [opportunities].  We can place and explode bombs and fire missiles toward the airport. | ۲٦- خ م : بلکل و.  نه کنر ته خو نخو موز وتاسی په خپل وطن کی فعاليت کوو . او چه زمونږ ه هر څه کوو هر څه دلته دير دی کولای شو چه مونږ او تاشی بمبونه هم کيردو مزايل هم خوشی کرو دنيارو په ميدان باند ی. |
| 27    JW:    Yes | ۲۷- م : ښه |

| | |
|---|---|
| 28    KM:    And to hit them with. This will be our Jihad and this will make us the [money] for our expenses. | ۲۸ـ خ م : او پری ویولو همدغه کی زما او ستا سو جهاد دی او همدغه کی زمونږ او ستا سو خرڅی هم راوزی . |
| 29    JW:    What is the target of these people?  The fact that they fire missiles to the airport, do they want to shoot the foreigners [Westerners] or the local people? | ۲۹ـ م : ددی خلګو هدف څه شی دی ؟ کنه چه ددی خلګو هدف چه دوی په میدا ن هوای باندی میزایل خوشی کوی  انګریزانو باندی خوشی کوی که نه په داخلی کسانو باند ی |
| **03:52** 30    KM:    What they do is to kill the Americans.  The Americans are infidels and Jihad is allowed against them.  If we have to fire [the missiles] toward the airport, we will do it and if not the airport, wherever they are stationed we will fire at their base too. I mean we have to use the mines too.  God willing, we and you will keep doing our Jihad. | ۳۰ـ خ م : دا داسی کو ی چه امریکا نیان مطلب وژنی . امریکانیان کافر دی او جهاد پر ی کیدای شی او که طیارو میدا ن کی ور خوشی که هلته یی هم ورخوشی کوو ، او که طیاره میدان کی نوی او بل څای کی هم قرار ګاه ونسی ، هم ی پر ی اچو و مطلب دما ینوله لاری هم کار اخلو او انشاالله مونږ او تاسی به خپل جهاد کوو. |
| 31    JW:    Buddy!  I believe one hundred percent that these people, the Taliban, will stand up again and God willing, they will resist and these people will have to keep out of here and cannot remain here. | ۳۱ـ م : یاره زه خو سل په سلو کی تصمیم داسی لرم چه یاره دا خلک به بیرته راپور ته کیږدی دا طالبان دا بیرته راپور ته کیری او انشاالله چه دا خلګ به له دی ملک نه به وزی او پاتی کیږی به نه . |
| 32    KM:    God willing, I will take you there and make you sit there. | ۳۲ـ خ م : او انشاالله زه به تا بوزمه او بیا به دی کینومه .ورسره بنه سهی |
| 33-    JW:    Yes. | ۳۳ـ م : هه |
| 34-    KM:    God willing, when this operation is done, then I will take you and make you sit with them, with Habibzai and all the others. | ۳۴ـ خ م : بس انشاالله چه دا کار وشی بیا زه به تا بوزمه بیا دی ورسره کشینه وم د حبیب زی سره هغه سره او تولو سره به دی کینوم. |
| 35-    JW:    I have not exchanged two words with Habibzai yet.  It was Abdul Rahman who told me to get in touch with you.  If it were not for the recommendation of Abdul Rahman, I would not have seen you either. He told me that you are his man, you are fully | ۳۵ـ م : ما حبیب زی سره تراوسه پوری دوه خبری هم ن دی کری دوه خبری حبیب زی سره ما ته خو همهغه عبدرحمان وویلی چه یاره نه ده سره وګوره ، که که عبدرحمان خبره نو ی تاسره هم نه لیدل هغه ما باند ی سپارښتن وکړ چه دا زمونږ سړی دی او دا مونږته پوره فعالیت کوی هر څه کار چه وی هر مشکل چه وی ده سره پتماس کی کیره ما وپلی بنه سهی ده |

| | |
|---|---|
| active on their behalf and he said whatever I need or whatever problem I have to get in touch with you. I said, "OK, it is alright." | |
| 36-    KM:    Yes. Right now, there is no need for weapon, we have weapon. God willing, if you want it, it is ready for you. | ۳۶- خ م : هه. اوس سلاح ته هم ضرورت نسته — سلاح شته او انشالاه که ته وغواری درته حاضر دی. |
| 37    JW:    Now, if suddenly those people tell us that there is an urgency you should go there and here and start fighting in a county or something like this. I personally do not have even one bullet or machinegun, did you understand? What have you got? | ۳۷ م : او دفتاً که داسی یو کار پیش شی کنه چه یار ه دفتاً که ته خای یواری هغه خلک خیر راکی ته یاره تاسی فلانی خای ته وخی یا بسمدانی خای ته وخی ولسوالی باندی جنک وکری یوشی وکری ما سره پخپله ما سره یو کار توس هم نشته ماشین هم نشته او کارتوس هم یوه شوی تا سره چه شته ؟ |
| <u>05:17</u><br>38-    KM:    I also have bullets with me, also have the rounds of rocket with me and I can say that I also have the bullets of Pika [PKM, a type of belt-fed machine gun] with me. I have everything in the box with me. Everyone keep them in a secret place and there is no need to show the place to others. God willing, whenever you go there, I will fill up the belts that go around your back and then you will leave with blessing. So we will attack if we could. If not, then we will hide ourselves and return home with no worry. We will have to attack them and then happily we will return. God willing, we will take it [the place] back from them, these are infidels and we have to eliminate them. Look, make sure that you don't let anyone know this. It is something only between the two of us. | ۳۸- خ م : کارتوس هم راسره شته دراکټ مرمی هم شته او داشی ووایه چه دپیکا مرمی هم شته ، هر څه ماسره بکس کی شته او هغه هر چا خیل خفیه خای کی اینی دی او د هغی خای ښودنه هم چاته پکار نوی زه به انشاالله یو وخت چه ته کله تلی زه به ملابندونه ډک کرم او بیا به ځی پخیر . اوبس حمله ده پری بی کو که وس مو ورسیدی هغه دی او که نه خانونه به غلی کوو به خیل کورونه به راخو. حمله به پری کو ا. موز به بیرته خني خوشحاله خونو انشاالاه چه نیسو یی خندی کفار دی دمنخه یی بوزو. نو ګوره چه څوک درنه خبر نه شی دا روما وستا دوه په دوه خبره ده. |

| | |
|---|---|
| 39    JW:    You said something good. Is the government of Pakistan involved with these people?  They (the government) must be supporting them because without their support, it is impossible to do this kind of operation. Not without their involvement. | ۳۹- م : څه خبر دی وکړه. هسی ددی خلګو سره د پاکستان دحکومت لاس هم شته دی کنه ؟ ملاتر خو به د هغو خلګو به ورسره وی ولی چه بغیر ملاتر نه خو دا کار  هم نه کیږی چه د چا لاس ورسره نوی . |
| 40    KM:    Of course there is support but I cannot tell you who these people are. And it is our law that one should not share all the secrets with a friend. | ۴۰- م : ملاتر خو خا ما خا ورسره شته نو اوس خو مونږ تاته نفر نشو ښودلی او دا زمونږ قانون دی چه ملګری ته به تول رازونه نه وایی. |
| 41-    JW:    Buddy, you said something good. | ۴۱-م : یاره ښه خبره دی وکړ 41 |
| 42    KM:    And you will know when you go around with them, meet the groups and I take money from them for you, God willing. This. | ۴۲- خ م : او هغه وخت به درته معلوم شی چه کله وګر خیدلی دلو کی تاب شی وګرزیدی او پسی درته تری نه اخلم انشاالله چه دا. |
| 43    JW:    Hey! This is important point, by God, I am very poor guy, I swear that I am poor.  I swear that I don't have a source of two Rupees. I am sick and you know it.  It is God desire that we and you do the Jihad with these people then at least there should be something in it because without money nothing can be done. | ۴۳- م : هی مهم دا خبره ده چه زه واالله دیر غریب هم یمه دخای غریب یمه کنه او قسم دی یاره چه ددوی روپی درک هم نشته ، مریض هم یمه تا ته خو معلومه ده یعنی دا خو د خدای رضا ده چه چه دا مونږ او تاسو ی جهاد ته لیزود دی خلګو سره خو افلاچه یو څه شی خووی بی له پیسو خو یو شی هم نکیږی . |
| 44-    KM:    God willing, there is enough money in this to get you a car. When you do an attack, if successful then we will give you a lot of money.  We will not forget about you, there is money with us and you just prove your reliability. . | ۴۴- م : انشاالله چه پیسی به دومره پکی وی چه موتر به درته واخلو پکی دایو جنګ ووه دخیره راته چه کامیاب شوی پخیر تا نه به بیا دیر ی پیسی بلاس درکواو پریزدو دی  هسی نه.  پیسی مونګ کی شته خالی خان اعتباری کړه. |
| 45    JW:    You and Habibzai. You, Habibzai and Qari Abdul Rahman (all three) are together in this? | ۴۵ م : ستا هغه سره حبیب زی سره.  ستا او د حبیب زی او قاری عبدالرحمان خبره خو یوه دکنه |
| 46-    KM:    Abdul Rahman, Habibzai and our word are the same.  We are his people and with him we make our | ۴۶ خ م : عبدالرحمان د حبیب زی او زمونږ یوه خبره ده دهمغنی نفر یو او هغی سره مونږ پروګرام کوو. |

6

| | |
|---|---|
| program. | |
| 47-  JW:    Look Khan Mohammed, Khan Mohammed!  If God does one thing, to make this people disappear, those red Westerners.  If God prevail us on this, then I am telling you that no one in the world will point their finger to us. | ۴۷ م : گوره خان محمده – خان محمده  یو کار خدای وکره چه دغه خلک له مخه لارشی دا سره انگریزان کنه دغه باندی مو خدای کامیاب کری او بیا په درته ووایم چه به نری کی څوک مونږ ه ته گوته ونه نیسی چه یاره تاسی . |
| 48-  KM:    God willing, we are trying.  If we are successful, I will get you a very high position. | ۴۸ خ م : انشاالله چه مونږ هم دا کوشش کو و چه مونږ او تاسی کامیاب شو بیا به د بر ه غته وظیفه درته پکی واخلم دخیره خدای کامیاب کرلو بواری . |
| 49-  JW:    No, the subject of position is not so important.  The important thing is the Jihad, These people out of our country, right.  It is also the resolution of these people that the Westerners should get out of our country, right? | ۴۹ م : یاره د وظیفی خبره هم دومره مهمه نده مهمه جهاد دی دمونږ او تاسی د ملک نه دغه خلگ کنه هو ددی خلگو تصمیم هم همدادی چه انگریزان زمونږ ملک نه ووخی |
| 07:42 50-  KM:    The point is we have a lot of friends here, I share my car and drive around this way and that way so I can be trusted.  I do have the car with me but we don't trust anyone.  We fired rockets at the county-chief office and they paid us three hundred thousand Rupees for one night program.  God willing, if you do a program, then I will take two or three hundred thousand for you too.  Will take it from them and you will keep the money. | ۵۰ خ م : مطلب مونږ اندیوال دیر لرو کنه هغه پلو دی پلو موټر می اعتبار لپاره هغه د ی شریک کری د ی هغه بلو دی پلو گرخم پکی بنه موټر راسره دی خو دا سی دی چه په چا اعتبار نلرم که نی هغه دی د راکټو دری مووکری په  ولسوالی باندی ی او مونږ ته دری لکه روپی به یوشپه پروگرام باند ی راکوی انشاالله تا یو پروگرام وکرو دوه دری لکه تاته هم تری نه اخلم ، تسلیم به ی کرو او تا بیا به پیسی تا سره وی |
| 51-  JW:    You have been there earlier, what was the final decision of these people, to get these things and keep it to keep it with you? | ۵۱ م : ته په هغه مخکی ورخوکی تلی وی تاته اخری دی خلکو څه فیصله وکر ه چه دا شیان تاسی واخلی ا و پخای کیرده درسره؟ |
| 52-  KM:    They told us that we should get the equipment, keep it with you and when we come there, we will make the program. | ۵۲ خ م : نوی هغوی خو مونگته داسی وویلی دی چه تاسی سامان  واخلی او خان سره مونږ کیردی  چه مونږ کله در غلو |
| 53-  JW:    Then will make the program. | ۵۳ م : بیا به پروگرام جروو. |

| | |
|---|---|
| 54-    KM:    [They said] we will consult about the program and after the consultation we will set up the program. It would be according to their advice and I cannot do it unless they order me to do it. | ۵۴- خ م : پروگرام به بیا هلته مصلحت وکرو او مصلحت نه بعد به بیا پروگرام جوروودابه دهغوی دمشوری کاروی او ما ته چه هغوی امرونکری زه ی نشم کولای. |
| 55-    JW:    OK, I have got the thing, also have gotten the missiles and I have placed them ready. Have you obtained the mines? If not, get them because you promised that I have to get this thing and you will get that. | ۵۵- م : بنه ما شی اخیستی د ی مزایل می هم اخیستی دی تیار می برابر کر ی دی او تا ماینونه که پیدا کری او که نه وی کری پیدا کری ځکه خو دا باند ی دا حواله کری و ه چه ته به داشی کوی او زه به داشی کوم. |
| 56-    KM:    I do have the mines and I do have a source. | ۵۶ خ م : ماسره ماینونه شته دی درک می پیدا کری ورته. |
| **09:01**<br>57-    JW:    OK, you have found it. Now if you want to keep this thing,  keep these things at home, I will tell you clearly that I cannot keep it in my home because my house is located near the road and I cannot keep it in my home. Now, to keep this thing somewhere where only you and I know about it, it will be good. Or if you want to keep it in your home, it is good too. | ۵۷-م : بنه چه پیدا کری دی که داسی وای چه دا شیان به خپل کورکی اردو زه خو پاکه خبر درته کوم چه بخپل کورکی نشم ساتلی ځکه زما کور خو سرک په سرباندی دی زه خو پخپل کورکی نشم سا تلی . نو اوس ددی شی پخای کولو لپاره چه دا سی خای کی پخای شی چه ما او تا ته معلوم وی هم دیره بنه خبره او که وای چه ته کورکی اردمه هم بنه خبره ده |
| 58-    KM:    No, we are not placing them in home. There are many informers so I will not place them in home.  But there is a garden down there, you and I will take them there and place them there as long as no one know about them.  Will keep them there and when there is program, we will take them out of there. | ۵۸-خ م : نه کور کی نه کرد م .شیطانان دی دیر نو کور کی خوی نردم خو هلته لاندی یوه باغچه ده دی باغچه کی به یی بوسوکی کیردوما او تا چه څوک را باند ی پو نشی او هلته به ی خوندی کواو کله چه بیا پروگرام شو هم هغی خای نه به یی وباسو |
| 59-    JW:    This is also right. Yes, when they come here. | ۵۹-م : دا هم سهی خبره ده او نو چه کله هغوی کله راغلل. |
| 60-    KM:    We are not placing them in home because there are hundred informers. | ۶۰ م : کور کی نکردو کورکی سل شیطانان دی. |
| 61-    JW:    When they come here and instructed us to do so. | ۶۱- م : کله چه هغوی راغلل مونږته هدایت وکر ی چه دا سی وکرو |

| | |
|---|---|
| 62-    KM:    Yes, right. | خ م : او کنه ۶۲ |
| 63-    JW:    We will do it accordingly. It is not that we. | ۶۳م : همغه سی به بیا وکروداسی خوندی کنهَ |
| 64-    KM:    We will take it there to our guest room and will place it in our guest room. | ۶۴- خ  م :   هلته بی بوسو کوته ده زموزپه کوته کی به یی کیردو. |
| 65-    JW:    Now I have gotten these things for example: These are four missiles and cost eight thousand Rupees. Who should I get this from? | ۶۵- م : او دغه شیان ما اخیستی دی ددی پیسی فرض مثال دا خلور مزایل اته زره روپی قیمت لری دازه اوس له چا نه واخلم |
| 66-    KM:    Sir, as soon as it happens. Right away, I have the money in my possession. | ۶۶-خ م : دا خو صاحب چه خنگه دغه سو فوری پیسی ما سره شته دی. |
| 67-    JW:    Yes. | ۶۷- م :َ شه. |
| 68-    KM:    This is your money and it is with me.  We will put this thing together in a place and once those guys come here, I will get you twenty thousand instead of eight thousand from them. | ۶۸- خ م : ستا پیسی دی  ما سره دی ، دا شی به دواړه سره پخای کرو او هغه خلک راشی زه درته دا اتوزرو پخای شل زره اخلم |
| **10:25** 69-    JW:    This is good.  I, myself, am a poor man.  I swear by God that I don't even have two Rupees. I borrowed this money from someone else and bought this thing with it, right. | ۶۹- م : سهی خبره ده ، زه پخپله غریب سری یم واﷲ که راسره دوه روپی هم یی دا پیسی دبل چا په قرض کری او داشی می پری اخیستی . کنه. |
| 70-    KM:    We will do something, this man is coming here and we will [stop] conversation so that this man will not hear us. | ۷۰- خ م : او نور به داسی وکرو چه هلته سری هم روان دی نور به خبره دغه کوچه هغه سری یی و انوری |
| 71-    JW:    OK. | ۷۱ م : ښه |
| 72-    KM:    Yes, this dishonorable person is following us.  Why is he sitting there? | ۷۲-خ م : و  دا بشرف هم مونږ تعقیب کوی چه دا خنگه ناست دی ؟ |
| 73-    JW:    Very good.  We will do like this and this would be our word. Their important thing is and it is also their | ۷۳ خ م : آفرین ما او تا چه داسی وکرو چه زما او ستا همدا خبره شوه  زه مهیمه خبره او ددوی پلان داسی دی دا انگریزان – د انگریزانو ختمه ول. |

| | |
|---|---|
| plan, the Westerners.  It means to eliminate the Westerners. | |
| 74-       KM:     Yes, right. | ۷۴- خ م :هو کنه |
| 75-       JW:     To end up this government. To finish up this government and this Regime. | ۷۵- م : دغه دولت په حساب  ختم کول دی کنه چه دغه دولت ختم شی چه دغه رژیم ختم شی . |
| 76-       KM:     It is only Jihad in our hearts. | ۷۶- خ م : بس زمونږ خاص جهاد په زړه کی دی . |
| 77-       JW:     Very good. | ۷۷ م : دیر اعلی |
| 78-       KM:     To get out the infidels from our country. | ۷۸ خ م : ُ چه کافر دی دوطنه یی ورک کو. |
| 79-       JW:     Very good, you said a good thing. | م : ُ دیر اعلی. خه خبره دی وکره. ۷۹ |
| **11:12** 80-       KM:     If we don't get rid of infidels, this would be a great obstacle in our country.  We will continue our jihad, Jihad is allowed religiously against the infidels and if a Muslims is on their side and get shot, the hell with him.  That the Government. | ۸۰- خ م :  که دا کافر ورک نه کرو دا دیر لوی خند کیږی پدی وطن کی او مونږ خپل جهاد کوو او کافرباندی جهاد روادی او که مسلمان ی خواکی ولاړوی او ویوله هم بلام ورپسی هغی ته |
| 81-       JW:     If they are standing with infidels they will be hit. | ۸۱ م : چه د کافر په جمع کی والاړ وی خوبه لګیری |
| 82-       KM:     And if standing against [on the side of]  government and is hit then Jihad is allowed against them too. | ۸۲- خ م : او د حکومت پکی والاړوی او ولګیره په هغی هم زمونږ جهاد دی |
| 83-       JW:     Will be hit and the hell with him. | ۸۳ م : لیګری به او توره بلامی ورپسی |
| 84-       KM:     And God willing, we will prevail.  Habibzai, Abdulrahman and all of them will come after a few days. They called and said that they are coming.  God willing, we will discuss about it and have them meet you too. | ۸۴- خ م: او انشاالله چه کامیابیرو به ،حبیب زی دو عبدالرحمان دوی دا تول له مخی نه به راخی څو ورځی دبعد  ماته یی تیلفون کری ووچه مونږ ه راخو او انشاالله پدی باندی به په مصحلت  خبری هم وکرو او تا سره به مخ هم کرم . |
| 85-       JW:     As long as they meet me and I understand what they say. | ۸۵ م : چه ما سره مخ شی او یا دد ی په خبره پوشم |

| | | |
|---|---|---|
| 86- | KM: If I mean there. | ۸۶- خ م : او که چیرته مطلب |
| **11:55**<br>87- JW: Listen, this is an ordinary work, we will do a lot of things for them. Will do a lot of things. | | ۸۷- م : هی دا خولا عادی کار دی دیر کارونه به ورته نو – دیر کارونه ورته کو. |
| 88- KM: I mean, if they do not come here and instruct us from there then we will continue our work. They are surely coming for the program. If they do not give us a task. If they don't give us a task, we cannot attack on our own. If we do it on our own, then no one will pay us money. | | ۸۸- خ م : که مطلب مخ ته که را نه غلل کنه او همغی خای نه هدایت وکړ هم مونږ او تا سو خپل کا ر کوو . خو په تګ باند ی حتماً همغوی پروگرام ته راخی – چه همغوی وظیفه را نکړی هغه . وظیفه چه را نکړی خو هم مونږ پخپل سر تعرض نه کو – په دی کی موږ پخپل سر وکو بیا پیسی مونږ ته څوک نه را کوی . |
| 89- JW: This is right. | | ۸۹- م : همدا سهی خبر ده٠ |
| 90- KM: If they allow us then you and us will go for the money. | | ۹۰ خ م : چه هغو ی اجازه ورکړی بیا مونږ او تا سو به پیسو پسی ورشو. |
| **12:25**<br>91- JW: [Speaking with UM1] Peace be upon you. Welcome, how are you? Is everything alright? | | ۹۱- م : وعلیکم اسلام پخیر راغلی خیریت د ی ستړی مشی قرار ی ده.<br>( دتلفون جواب) |
| 92- JW: I am going to urinate. I am going to pee only. | | ۹۲- م : زه لږ تشی متیازی کومه بنه خالی رګ و همه |
| 93- KM: Come quick, because. | | ۹۳- خ م : ژر راخه چه |
| 94- JW: All right. Hold on we will go both together [Pause 12:50-14:06] | | ۹۴- م سهی شو ه یو خای خو وار . وکوه دواړه یوخای خو (وقفه) |


Case 1:06-cr-00357-CKK     Do




Case 1:06-cr-00357-CKK    Do



2006. 10. 18    08: 06: 00

