```
 1                          AFTER RECESS

 2              THE COURT:  Good afternoon, everybody.  Thank you

 3  for being timely.  One thing I'm going to have you do is -- I

 4  don't have any problem with you finding out what they do, I

 5  don't think we need quite as much detail.  This is not a

 6  jurisdictional -- sort of a general voir dire.  If you know

 7  that they work in the cafeteria at the school, we don't need

 8  to know exactly what they do or -- if they mention something

 9  that clearly potentially has something to do with our case,

10  then I don't have a problem with a lot of detail.

11  NEW JUROR STEPS UP

12              THE COURT:  Good afternoon, sir.

13              JUROR:  Sure.

14              THE COURT:  This is Juror Number 1367.  Make sure

15  that you talk into the --

16              JUROR:  Right here?

17              THE COURT:  Uh-huh.  And the numbers are 15, 25,

18  26 --

19              JUROR:  I wasn't sure about 26, that's why I want

20  to ask you first.

21              THE COURT:  No problem, we'll go through it.  28,

22  29 and 30.

23              JUROR:  Yes, ma'am.

24              THE COURT:  Let me start with 15.  Fifteen is

25  whether you or somebody close to you is in law enforcement.
```

1    Is that you or somebody else?

2              JUROR:  Somebody else.  Someone in my family.

3              THE COURT:  What's the relationship?

4              JUROR:  Cousin.

5              THE COURT:  And what -- you really don't need to

6    whisper.

7              JUROR:  Okay.

8              THE COURT:  You can talk in a normal tone.

9              JUROR:  A cousin is in law enforcement, and I have

10   two best friends that are in law enforcement.

11             THE COURT:  What law enforcement agency for your

12   cousin?

13             JUROR:  The police department.

14             THE COURT:  That is in D.C?

15             JUROR:  Yes, Metropolitan Police Department.

16             THE COURT:  How about your friends?

17             JUROR:  Same thing.

18             THE COURT:  Do you know how long your cousin and

19   your two friends have been in --

20             JUROR:  This is 2008.  Say, three years for my

21   cousin, and the buddy would be maybe eight or nine years.

22             THE COURT:  Was it one friend or two?

23             JUROR:  Two.

24             THE COURT:  And do you know where they are assigned

25   or what kind of duties they have?

 1          JUROR:  This is kind of hard on one of them, I say

 2   the Sixth District and Special Unit.

 3          THE COURT:  And is the Special Unit, do you know

 4   what they target?

 5          JUROR:  Huh-uh.

 6          THE COURT:  So, you don't know what the Special

 7   Unit does?

 8          JUROR:  I know what they do, but he don't discuss

 9   it with me.

10          THE COURT:  Oh, okay.  So, he's never talked to you

11   about it?

12          JUROR:  No.  No.

13          THE COURT:  Has your cousin or your two friends --

14   have they discussed their work with you?

15          JUROR:  No, never.

16          THE COURT:  And in terms of -- since they're in law

17   enforcement and we do have people that are going to be

18   testifying as part of our law enforcement operation, would the

19   fact that you've got a cousin and friends in law enforcement,

20   would that influence you to give the witnesses in this case

21   either greater or lesser weight just because they're in law

22   enforcement as opposed to waiting to hear what they have to

23   say?

24          JUROR:  No, I wouldn't do that at all.

25          THE COURT:  So, you'd wait and listen and make a

1   decision individually?

2           JUROR:  That's correct.

3           THE COURT:  Twenty-five is either you are or

4   somebody close to you been arrested, charged, found guilty or

5   gone to jail for drug offense or crime of violence?

6           JUROR:  Not me.  Not me.

7           THE COURT:  Somebody else?

8           JUROR:  Yes.

9           THE COURT:  What's the relationship?  Friend or a

10  relative?

11          JUROR:  Friend, relatives.

12          THE COURT:  What's the closest relative?

13          JUROR:  The closest is a brother.

14          THE COURT:  So, how many friends and how many of

15  the relatives?

16          JUROR:  It's a mixture.

17          THE COURT:  Can we -- can you break them down?

18          JUROR:  A ballpark figure, maybe -- I'd say five

19  relatives and six or seven friends.

20          THE COURT:  And --

21          JUROR:  Associates, I wouldn't say friends.

22          THE COURT:  All right.  Any of them -- are they

23  just arrested or were they actually charged?

24          JUROR:  Yes.

25          THE COURT:  And have any of them -- have all of

1 them been found guilty and gone to jail?

2     JUROR:  Yes.

3     THE COURT:  So, this is the friends and the brother

4 and relatives?

5     JUROR:  That's correct.

6     THE COURT:  And was it drug offenses or crimes of

7 violence or both?

8     JUROR:  Both.

9     THE COURT:  In terms of the -- let's do drug

10 offenses first.  Do you know what kind of drug offenses?

11     JUROR:  No, I just know he was in there.  But the

12 friends I know theirs was drugs and other various crimes, yes.

13     THE COURT:  Were you ever a witness in a case?

14     JUROR:  No.

15     THE COURT:  Did you ever go down and watch the

16 cases?

17     JUROR:  No.

18     THE COURT:  Did you ever discuss with either your

19 friends or your relatives the details of the case?

20     JUROR:  No.

21     THE COURT:  So, do you know anything more than just

22 that they were drug offenses?

23     JUROR:  No.  Say that again.

24     THE COURT:  Do you know anything more than they

25 were just drug offenses?

1          JUROR:  No.

2          THE COURT:  Do you know what the drug was that was

3   involved?

4          JUROR:  Cocaine and marijuana.  That was it.  Just

5   cocaine and marijuana, those two.

6          THE COURT:  In terms of the crimes of violence,

7   what kind of crimes of violence?

8          JUROR:  I can't answer that.

9          THE COURT:  You don't know what -- well, you

10  said -- you said either somebody close to you either been

11  arrested, charged, found guilty, gone to jail, it was either

12  drug offense or crime of violence.  So, were any of these

13  people charged with a crime of violence as you would define

14  it?

15         JUROR:  I wouldn't know that, but -- I wouldn't

16  know the violent part, but I know of the drug charges.

17         THE COURT:  So, would it be accurate to say that

18  you don't know whether any of these friends or relatives were

19  charged with crimes of violence, is that correct?

20         JUROR:  That is correct.

21         THE COURT:  So, what you know is that they've been

22  charged of --

23         JUROR:  They have been convicted of them.

24         THE COURT:  -- of drug offenses?

25         JUROR:  Right.  And the violent ones.

1             THE COURT:  When you say the violent ones, what --

2             JUROR:  Well, I mean, violence is -- violence,

3    correct, I mean, it could be assault, it could be armed, I

4    mean.

5             THE COURT:  So, that's what I was trying to get at.

6    Do you know whether they have been convicted of assaults or

7    things like that or do you know?

8             JUROR:  Yes, they have.  They had done time for it.

9             THE COURT:  So, can you tell me which crimes of

10   violence you think that they have been convicted for?

11            JUROR:  All I know is they was convicted, I don't

12   get into all the detail.

13            THE COURT:  You know it was an assault?

14            JUROR:  Yes.

15            THE COURT:  Were they robberies, do you know?  Only

16   if you know.

17            JUROR:  No.

18            THE COURT:  You know there's at least one assault?

19            JUROR:  Yes.

20            THE COURT:  And they were convicted of cocaine and

21   marijuana charges?

22            JUROR:  Uh-huh.

23            THE COURT:  Do you know this from talking to them

24   or talking to other friends or others?

25            JUROR:  Talking to them.  I don't go by second or

1  third.  Whatever they tell me, I leave it alone, that's it,

2  that's all.  Yes, ma'am.

3          THE COURT:  So, do you have enough information to

4  know whether you think they were treated fair with the system

5  or you don't know enough about the case?

6          JUROR:  I don't bother it.

7          THE COURT:  That means you don't know?

8          JUROR:  I don't know.  I wouldn't know.

9          THE COURT:  Now, since a number of them have

10  obviously been involved with law enforcement because they have

11  been convicted, is there anything about these -- the fact that

12  a number of your friends and relatives have been convicted,

13  would that affect your fairness and impartiality in this case?

14          JUROR:  No, it wouldn't at all.

15          THE COURT:  This case does have charges that

16  involve drugs, heroin and opium.  Is there anything about the

17  cases or these relatives and friends, anything you know about

18  them that you think would affect your fairness and

19  impartiality?

20          JUROR:  No.

21          THE COURT:  The 26 was -- let me just ask one more

22  question -- back up to these.  Are all of these people that

23  you've talked about, are they still in jail or are they out?

24          JUROR:  Some are out and I think a couple of them

25  are in jail, that I know of.  Two are, I think, still in jail.

1   The rest of them are out.

2           THE COURT:  Do you know anything about the cases,

3   specifically, any detail about any of these cases other than

4   just what the drugs are?

5           JUROR:  No, ma'am.

6           THE COURT:  Have you made a special effort not to

7   find out?

8           JUROR:  Yes, I have.

9           THE COURT:  And is there a reason for that?

10          JUROR:  No.  I mean, it's their business and mines

11  is mine, theirs is theirs.

12          THE COURT:  Okay.  Then 26, whether you or somebody

13  close to you had ever been a victim, witness, arrested or

14  convicted of any crime?

15          JUROR:  That's --

16          THE COURT:  Of any crime.  It doesn't have to be

17  drugs or crimes of violence.  But you think that those

18  experiences would affect your fairness and impartiality?

19          JUROR:  No, I wouldn't.

20          THE COURT:  Are there other -- would there be other

21  people that would fall into the category of other crimes that

22  you know of that you think might affect -- that you know more

23  about the crimes, so it might affect you in this?

24          JUROR:  No, it still wouldn't.  It's my duty as a

25  juror to listen and evaluate.  I just do what I have to do,

1    and that's what I was sworn to do.

2              THE COURT:  All right.  Twenty-eight is whether you

3    or somebody close to you traveled in or worked either through

4    the military or civilian in South Asia, Afghanistan or

5    Pakistan?

6              JUROR:  Yeah, my uncle.

7              THE COURT:  And is he in the military or civilian?

8              JUROR:  Military.  He was in the Army.  My cousin

9    is in the Navy.

10             THE COURT:  Any others?

11             JUROR:  That's all right now.  The rest of them

12   retired.

13             THE COURT:  So, do you have people that were in the

14   military that are now retired that are family?

15             JUROR:  Uh-huh.

16             THE COURT:  Who?

17             JUROR:  My dad, grandfather, uncles, cousins,

18   grandfather.

19             THE COURT:  Let me start with the ones that -- you

20   said the uncle had visited --

21             JUROR:  Afghanistan, yes.  He was down there.

22             THE COURT:  How long ago, do you know?

23             JUROR:  His discharge was in 2005 -- five or six,

24   don't quote that one, but between five or six he was

25   discharged.

 1          THE COURT:  And he went there as part of the Army?

 2          JUROR:  Yes.

 3          THE COURT:  Was he injured at all when he was

 4  there?

 5          JUROR:  I think he was, but I hadn't talked to him

 6  since then, so I can't answer that one.

 7          THE COURT:  And so was he called up like from the

 8  Reserves or is he career?

 9          JUROR:  No, he was career Army.

10          THE COURT:  And then he got discharged or his term

11  was up or what?

12          JUROR:  He got discharged.  I know he was injured,

13  so I don't know what that would be called.

14          THE COURT:  So, he was discharged because of his

15  injuries?

16          JUROR:  Yes.

17          THE COURT:  And your cousin was in the Navy?

18          JUROR:  He's in the Navy.

19          THE COURT:  Presently, right now?

20          JUROR:  Right now, yes.

21          THE COURT:  Do you know where he is stationed?

22          JUROR:  He was stationed in Guam, but right now

23  he's stationed in -- what part of Virginia is that?  Norfolk.

24  Norfolk, Virginia.

25          THE COURT:  You said your dad, grandfather, uncles

```
 1   and cousins, were they --

 2            JUROR:  Vietnam and World War II.

 3            THE COURT:  World War II was your grandfather and

 4   your dad was Vietnam.  Were they drafted as opposed to career

 5   military?

 6            JUROR:  They was career.

 7            THE COURT:  Both of them were career?

 8            JUROR:  All of them are career, uncles, too.

 9            THE COURT:  What combat did your uncles see?

10            JUROR:  Vietnam, and one was Korean War.  I

11   think -- I'd say granddaddy, I always say granddaddy.

12            THE COURT:  How about your cousins?

13            JUROR:  You got uncles down there for Vietnam,

14   right?

15            THE COURT:  Yeah.

16            JUROR:  Yeah.  Just Vietnam.  He was in Vietnam.

17            THE COURT:  And you say your cousins --

18            JUROR:  Desert Storm.

19            THE COURT:  Your cousins are Desert Storm?

20            JUROR:  Uh-huh.

21            THE COURT:  And so were any of these relatives,

22   your dad, grandfather, uncles or cousins, were any of them

23   injured?

24            JUROR:  My dad was.

25            THE COURT:  That would have been in Vietnam?
```

1          JUROR:  Yeah, it happened in Vietnam.

2          THE COURT:  What kind of an injury?

3          JUROR:  He had a bullet bound to the sternum.  Is

4   that the stomach area, the sternum area.  He had a bullet

5   wound right here (indicating).

6          THE COURT:  So, it sound like it's tradition to be

7   in the military?

8          JUROR:  For them, yeah.  I couldn't follow.  I

9   couldn't do it.

10         THE COURT:  Afghanistan, which is where the alleged

11  actions took place in this particular case is obviously a war

12  zone.

13         JUROR:  Uh-huh.

14         THE COURT:  To some degree the operations involved

15  are somewhat similar to like a military operation, even though

16  they involve drugs.  And there is an issue in terms of the

17  Government presenting some evidence which the jury will have

18  to consider in terms of whether or not Mr. Mohammed is

19  associated with the Taliban and whether there were some plans

20  to attack Jalalabad airfield.

21         Now, based on your family's tradition, would

22  that -- would you have any feelings based on that tradition

23  and the fact that they have served and some have been injured,

24  would that affect how fair and impartial you could be with

25  Mr. Mohammed?

1          JUROR:  No, it wouldn't.

2          THE COURT:  Do you have any views about

3   Mr. Mohammed based on what has been said about the case, the

4   nature of the charges or anything else?

5          JUROR:  What you mean?

6          THE COURT:  In terms of like -- I'm looking at it

7   in the context of the military, in terms of whether -- because

8   you come from this tradition, whether that in any way would

9   color the way that you look at the facts in this particular

10  case.  Or can you separate it out and make a decision just on

11  what's presented in the courtroom.

12         JUROR:  What's presented in the courtroom.

13         THE COURT:  And the fact that you have an uncle

14  that did go to Afghanistan, which is, of course, the place

15  that we have at issue here, and evidently was injured,

16  although you don't know what the injury is --

17         JUROR:  Huh-uh.

18         THE COURT:  Would that in any way affect or

19  influence you in looking at the evidence in this case?

20         JUROR:  No.

21         THE COURT:  So, you think that even though he went

22  to Afghanistan and was injured there, that you think you could

23  be fair and impartial in this case?

24         JUROR:  Yes.

25         THE COURT:  Now, the second -- 29 is as to whether

1   you or somebody close to you traveled or worked, as a civilian

2   or military, in a predominantly Islamic country.  Are there

3   any others besides the ones you've talked about?

4              JUROR:  No.

5              THE COURT:  So, it would be whatever countries you

6   listed here?

7              JUROR:  Islamic -- Afghanistan, is that Iraq, would

8   that be considered one?

9              THE COURT:  Yes.

10             JUROR:  Then my cousin was in Iraq, the one that is

11  in the Navy.  And as you see, my uncle was in Afghanistan, so

12  that's why I put those two down.

13             THE COURT:  And your cousin who is in the Navy and

14  was --

15             JUROR:  -- stationed in Iraq.

16             THE COURT:  How long was that?

17             JUROR:  That was -- this is '08 -- '07.

18             THE COURT:  Did he see any action or do you know?

19             JUROR:  We didn't discuss that.

20             THE COURT:  Is there anything -- in terms of them

21  being predominantly Islamic countries, at least two of them

22  went and one uncle was injured, would that give rise in you of

23  any feelings against those from Islamic countries?

24             JUROR:  No.

25             THE COURT:  And the last one is whether you or

1   somebody close to you served in -- we have Armed Forces,

2   Reserves, ROTC, anybody besides the ones that you've

3   mentioned?

4               JUROR:  No.

5               THE COURT:  All right.  I'll start with you.  Any

6   questions?

7               MR. STIGLITZ:  Yes.  Good afternoon.

8               JUROR:  Good afternoon.

9               MR. STIGLITZ:  You mentioned a pretty fair number

10  of acquaintances of yours who have been to jail.  Can I assume

11  that some of them have since gotten out of jail and are back

12  in the community?

13              JUROR:  I guess, I don't talk to them.

14              MR. STIGLITZ:  That was my follow-up question.  So,

15  you never talked to any of them about their experiences?

16              JUROR:  That's done.  What's inside was theirs.

17  What's out here is out here.

18              MR. STIGLITZ:  So, you don't have any opinion about

19  any of your friend's or relative's cases concerning about

20  whether they were treated fairly or not by the police or the

21  courts?

22              JUROR:  No.

23              MR. STIGLITZ:  Has your cousin or your uncle,

24  either of them, talked to you about anything about their

25  experience in the military in Afghanistan or Iraq?

1           JUROR:  No.

2           MR. STIGLITZ:  In any respect?

3           JUROR:  No.

4           THE COURT:  They haven't discussed their

5    experiences with you in the military?

6           JUROR:  They just say, you know, if they had to do

7    it again they wouldn't.

8           MR. STIGLITZ:  Would not?

9           JUROR:  Uh-huh.

10          MR. STIGLITZ:  Did they tell you why?

11          JUROR:  They just put it that way.  So, I say,

12   well, I ain't -- wasn't no need to ask them, they wasn't going

13   to finish it.

14          MR. STIGLITZ:  So, when they got out you didn't ask

15   them how was it or what was it like there or --

16          JUROR:  I did ask that.  They maybe talked about

17   the traveling part, but the other part, they left that there.

18   So, I said it must have been real hectic, so I left it alone.

19          MR. STIGLITZ:  What was the nature of your uncle's

20   injuries?

21          JUROR:  I don't recall because I hadn't talked to

22   him about it.  All I know is my mom said he was injured.  So,

23   I don't -- I hadn't talked to him yet anyway.

24          MR. STIGLITZ:  Okay.

25          THE COURT:  Ms. Jahn.

 1              MS. JAHN:  You hadn't spoken with your uncle since

 2    he was injured in 2005?

 3              THE COURT:  2005 or 6.

 4              JUROR:  I hadn't talked to him since '06, yes.

 5              MS. JAHN:  And was the reason you didn't talk to

 6    him about the nature of his injury and maybe he wasn't able to

 7    talk?

 8              JUROR:  No, he's able to talk.  I just -- you know,

 9    how you don't -- you lose contact, but I just hadn't talked to

10    him, that's all.  When he's home I'm not there or when I'm

11    not there he's -- so, it's more I hadn't talked to him, you

12    know, face-to-face, or -- so, I'm going this year to see him

13    anyway in June.

14              THE COURT:  So, does he live in the area?

15              JUROR:  No, he's down in West Virginia.

16              THE COURT:  Okay.  How about in terms of the other

17    relatives and your friends, are they in this area or a lot of

18    them --

19              JUROR:  Scattered around.

20              MS. JAHN:  One more.  With regard to your cousin

21    that was in Iraq, I didn't hear what you said in terms of --

22    do you know if that person was injured?

23              JUROR:   He wasn't injured at all, no.

24              MS. JAHN:  Is he still an active member?

25              JUROR:  Yes.

1              MS. JAHN:  Now, he's the one that was in Norfolk

2    that you were saying?

3              JUROR:  That's correct.

4              MS. JAHN:  That's all I have.

5              THE COURT:  Thank you, sir.

6              JUROR:  Thank you.

7    JUROR STEPS DOWN - NEW JUROR STEPS UP

8              THE COURT:  Good afternoon.  This is Juror Number

9    1495.  And it's 15, 17, 25 and 34.  Fifteen is either you or

10   somebody close to you in law enforcement.  Is that you or

11   somebody else?

12             JUROR:  Somebody else.

13             THE COURT:  What's their relationship?  Are they

14   family or friends?

15             JUROR:  Family.

16             THE COURT:  What, a cousin --

17             JUROR:  Brother.

18             THE COURT:  Brother?

19             JUROR:  Yes.

20             THE COURT:  What is the law enforcement agency?

21             JUROR:  He used to work at the U.S. Secret Service

22   at the Pentagon.

23             THE COURT:  At the what?

24             JUROR:  Pentagon.

25             THE COURT:  Pentagon.

1           JUROR:  He was a police officer.

2           THE COURT:  And how long ago did he work with the

3   Secret Service.

4           JUROR:  Couple of years now.

5           THE COURT:  Couple of years --

6           JUROR:  Couples of years.

7           THE COURT:  Couple of years ago?

8           JUROR:  Yes.

9           THE COURT:  And was he a uniformed officer or did

10  he draw protection to the President, or do you know?

11          JUROR:  First he was a uniform officer and then he

12  became an undercover officer.

13          THE COURT:  With the Secret Service.

14          JUROR:  Yeah, at first he worked with the Secret

15  Service.

16          THE COURT:  In the Secret Service he was a uniform

17  officer as opposed to on the protective detail?

18          JUROR:  Yes.

19          THE COURT:  And he also did some undercover work

20  for the Secret Service.

21          JUROR:  After he went to the Pentagon he did some

22  undercover work.

23          THE COURT:  Oh, okay.  Is he presently at the

24  Pentagon?

25          JUROR:  No.

1              THE COURT:  What period of time was he at the

2    Pentagon?

3              JUROR:  Well, he had left there and in 1996 or '97

4    because he had went AWOL and left his job.

5              THE COURT:  Oh, okay.  Did something happen with

6    that?  Did he ever get picked up or what happened?

7              JUROR:  Well, he had got arrested because he had

8    went AWOL.  He had problems in his marriage, so --

9              THE COURT:  Do you know what happened ultimately

10   with the case.  He went AWOL, he got arrested, and did he get

11   prosecuted, did he just get discharged from the police?

12             JUROR:  Discharged.

13             THE COURT:  Did he serve any time or anything in

14   jail or anything?

15             JUROR:  He had went to jail, but it was for a short

16   time.

17             THE COURT:  So, is there anything about your

18   brother's experiences -- and do you know this from talking to

19   your brother or talking to other family members?

20             JUROR:  Well, from talking to other family members.

21             THE COURT:  So, this isn't something you heard

22   directly from him?

23             JUROR:  Some things I heard directly from him, and

24   some I heard from other family members.

25             THE COURT:  In this case there's going to be, as

 1   you know from meeting the witnesses, that it's law enforcement

 2   officers that will testify and this was a law enforcement

 3   operation that took place.  The experiences that your brother

 4   had both looked like good and bad, would that in any way

 5   affect your consideration of the evidence in this case?  Is

 6   there anything that you would bring to this case because of

 7   these experiences of your brother?

 8          JUROR:  No, I wouldn't have a problem with --

 9   because I don't know the full details of my brother's

10   situation.

11          THE COURT:  So, at this point do you think you can

12   be fair and impartial both to the Government and the defense?

13          JUROR:  Yes.

14          THE COURT:  And do you have any feelings about law

15   enforcement based on your brother's experiences, that law

16   enforcement is good, bad or do you just not have any feelings

17   in general about law enforcement, you just know about your

18   brother's problems?

19          JUROR:  Just a general feeling of it -- about it.

20          THE COURT:  And your general feeling is what, about

21   law enforcement?  What we're trying to get at is to see

22   whether your brother's experiences would influence you.  In

23   other words, your brother's experiences, which seem to be

24   mixed in terms of what happened to him, as to whether those

25   experiences you would be thinking about in considering the

1   evidence in this case or whether you can put them aside,

2   listen to the evidence and make an independent objective

3   decision?

4           JUROR:  Well, I can put it aside and make a

5   decision.

6           THE COURT:  And 17 is whether you or somebody close

7   to you had been either previously or presently working at the

8   U.S. State Department, is that you or somebody else?

9           JUROR:  Me.  It was a summer job for a few months.

10          THE COURT:  So, you worked at the State Department

11  for a few months?

12          JUROR:  In 2002.

13          THE COURT:  And what did you do?

14          JUROR:  Answer -- sometimes I answered the phones.

15  Run errands.

16          THE COURT:  Were you assigned to a particular

17  section of the State Department or a particular office?

18          JUROR:  Yes, in the legal department at first.

19          THE COURT:  Anything about that experience that you

20  think would affect your thinking about and considering the

21  evidence in this case?

22          JUROR:  No.

23          THE COURT:  Twenty-five is whether you or somebody

24  close to you has ever been arrested, charged with a crime,

25  found guilty, gone to jail either because of drug offenses or

1   because of crimes of violence?

2           JUROR:  Drug offenses.  Some of my brothers.

3           THE COURT:  Can you tell us how many?

4           JUROR:  Well -- how many that had got arrested?

5           THE COURT:  Yes.

6           JUROR:  -- or went to jail?

7           THE COURT:  If you want to break it down.

8           JUROR:  It was -- two of them went to prison for

9   drug possession.  One of them also for drugs and for having a

10  gun.

11          THE COURT:  Was that --

12          JUROR:  -- a robbery.

13          THE COURT:  So, it's two brothers that are involved

14  in this that got convicted?

15          JUROR:  Well, it's separate cases, not together,

16  you know.  One of them had went to prison for about 15 or 16

17  years for drug possession.

18          THE COURT:  Were these cases in D.C. or some place

19  else?

20          JUROR:  In D.C.

21          THE COURT:  Were you a witness in any of these

22  cases?

23          JUROR:  No.

24          THE COURT:  Did you ever go down and watch the

25  cases?

1              JUROR:  No.

2              THE COURT:  Are these brothers older than you or

3     younger?

4              JUROR:  Yes, they older.

5              THE COURT:  How much older are they?

6              JUROR:  One of them is the second oldest and the

7     other one is the third oldest.

8              THE COURT:  So, what is the age gap between you and

9     the others, roughly.

10             JUROR:  About 17 or 16 years apart.

11             THE COURT:  So, between you and your older brothers

12    is about 16 or 17 years?

13             JUROR:  Yes.

14             THE COURT:  Did you talk to your brothers about

15    their experiences when they got arrested on those drug

16    offenses and the gun offenses, did you talk to them at all

17    about the their cases?

18             JUROR:  Not in detail.  They had told me about some

19    of their experiences in the -- but not about all of them.

20             THE COURT:  Based on those discussions, do you have

21    any opinions as to whether they were treated fairly by the

22    police or the Court or do you not know enough to have an

23    opinion?

24             JUROR:  Well, in some of their cases -- well, they

25    knew they had made the mistakes.  They had did what they

 1   shouldn't did.  But I don't know full details about everything

 2   they did.

 3            THE COURT:  Okay.  Is there anything -- there are

 4   drugs involved in this case as a claim, as a charge, is there

 5   anything about your brother's cases that you think would

 6   influence you in this case?  In other words, can you separate

 7   your brother's cases, and what we want you to do in this case

 8   is have an open mind in listening -- in going into the case,

 9   not deciding any issues.  Go in, listen to the evidence as

10   presented in the courtroom, weigh it fairly and impartially,

11   and not -- put aside anything from the outside and make a

12   decision based just on what's presented in the courtroom.  Do

13   you think you can do that?

14            JUROR:  Yes.

15            THE COURT:  And have you come to any conclusions

16   about Mr. Mohammed before this case starts, or at this point

17   do you presume him innocent the way you're supposed to?

18            JUROR:  No, I haven't come to any conclusions about

19   it.

20            THE COURT:  The last question is whether you're

21   familiar with the Taliban and the Taliban movement.  How are

22   you -- what is the source of your familiarity with it?

23            JUROR:  I heard about it on the news.  I don't know

24   any full details about it.

25            THE COURT:  Do you remember what you heard on the

1    news about it -- any specifics about it?

2                    JUROR:  About it being --

3                    THE COURT:  About the Taliban.

4                    JUROR:  Being involved in terrorist attacks.

5                    THE COURT:  Involved in terrorist attacks.  All

6    right.  And there be evidence that will be presented on this

7    part of the trial, and it would be up to you to weigh that

8    evidence fairly and impartially and see whether the Government

9    has proven the case beyond a reasonable doubt.  Can you

10   separate out what you've heard in the news, and again, make a

11   decision about whether or not Mr. Mohammed is associated with

12   the Taliban based on whatever is presented in the courtroom,

13   separate and apart from whatever you heard in the news.  Can

14   you do that?

15                   JUROR:  Yes.

16                   THE COURT:  Any questions?

17                   MS. JAHN:  With regard to your brothers that were

18   imprisoned, did you ever go and visit them at the facilities

19   in which they were imprisoned?

20                   JUROR:  No.

21                   MS. JAHN:  But you had conversation -- I think you

22   said your one brother was in jail -- was in jail for about 15

23   years, did you talk to him on the phone then while he was

24   imprisoned?

25                   JUROR:  Sometimes.

1           THE COURT:  And during these conversations did you

2      ever have discussions about his feelings about his lawyers or

3      the prosecutors or the police in his case?

4           JUROR:  No, he never talked to me about that.  He

5      would talk to my parents more about that.

6           MS. JAHN:  Did you learn things from your parents

7      about his opinions about the attorneys or the police involved?

8           JUROR:  No, not really.  They really didn't go into

9      details about his lawyers.

10          MS. JAHN:  Did they go into details about their

11     feelings about the police?

12          JUROR:  Well, my father had sometimes his opinions

13     about it.

14          MS. JAHN:  And did those opinions -- were they

15     relayed to you about what his thoughts were?

16          JUROR:  No, huh-uh.

17          MS. JAHN:  So, even though your dad had these

18     opinions about the police with regard to this case against

19     Mr. Mohammed, you don't think that those opinions that you

20     learned would impact your ability to be fair and impartial if

21     you hear police testify in this case?

22          JUROR:  No, I don't think it would impact my

23     decision.

24          MS. JAHN:  And then on the juror form it said that

25     you were unemployed, is that still the case?

1        JUROR:  Yes.

2        MS. JAHN:  Have you been employed in the past?

3        JUROR:  Yes.

4        MS. JAHN:  What did you do in the past?

5        JUROR:  My last job I worked in FEMA, it was a

6   temporary jog for a few months in 2004 until January 2005.

7        MS. JAHN:  And what did you do for FEMA?

8   Administrative-type work like answering the phone?

9        JUROR:  Answering the phone, registering callers

10   for different disasters.

11        MS. JAHN:  Thank you.

12        THE COURT:  Wait.  Wait.  Wait.

13        MR. STIGLITZ:  It happens to me all the time,

14   people forget me.  You mentioned to the Court -- let me ask

15   you a couple questions with your brother, the one who was at

16   the Pentagon and he was in the Secret Service, is that one and

17   the same brother that served time in prison?

18        JUROR:  No, he never served time.  He had been

19   arrested because he had went AWOL, he left his job.

20        MR. STIGLITZ:  Was he -- it's unclear to me, was

21   your brother a police officer at the Pentagon or was he in the

22   military?

23        JUROR:  A police officer at the Pentagon.

24        MR. STIGLITZ:  And so he left his job without

25   permission, that's why he was arrested?

1          JUROR:  Yes.  Some things was happening to him on

2  his job and he didn't really go into a lot of details about

3  it.

4          MR. STIGLITZ:  With respect to your -- your

5  feelings about him, the Judge asked you how you felt about

6  that, you never really did answer that question because you

7  said you had some feelings about the law enforcement in that

8  respect.  What were those feelings?

9          JUROR:  Well, I really don't know what I feel about

10 it because I don't know the full details of about what was

11 going on with him when he was at work.

12         MR. STIGLITZ:  Okay.  And with respect to your

13 brothers, you said your father did have an opinion about how

14 they were treated by the police, is that right?

15         JUROR:  Yes.

16         MR. STIGLITZ:  What was that opinion?

17         JUROR:  Something about not trusting the police

18 and -- well, it was mostly just some negative opinions about

19 it.

20         MR. STIGLITZ:  Okay.  And how -- is that something

21 that you think you might be thinking of while you're sitting

22 at a juror in this case if you were to be selected?

23         JUROR:  No.

24         MR. STIGLITZ:  If I can have one moment, Your

25 Honor?

1          THE COURT:  You haven't been a juror before, have

2     you?

3          JUROR:  No.

4          THE COURT:  It's probably a little bit different

5     than what you expected in terms of asking questions, but it's

6     to sort of give us an opportunity to find out a little bit

7     about you to see what your views are and see -- and for you to

8     think about your own views to see whether the bottom line you

9     can be fair and impartial.

10          MR. STIGLITZ:  Other than -- I know you mentioned

11     the State Department job, which was a couple years ago, and

12     the FEMA job.  What other jobs have you had?

13          JUROR:  I was a student at UCD, and worked in the

14     Work Study Program.

15          MR. STIGLITZ:  Did you have a particular business?

16          JUROR:  Just the department -- Special Student

17     Services Department.

18          MR. STIGLITZ:  What's that department?

19          JUROR:  Tutorial program, tutoring students.

20          MR. STIGLITZ:  That's all I have.

21          MS. JAHN:  Nothing further.  Thank you.

22          THE COURT:  Thank you very much.

23     JUROR STEPS DOWN - NEW JUROR STEPS UP

24          JUROR:  Good afternoon, Your Honor.

25          THE COURT:  This is Juror 0882.  And 15, 20, 22,

1   28, 29 and 34.  Fifteen is law enforcement.  Is that you or

2   somebody close to you?

3           JUROR:  I represent the police department, I'm a

4   county attorney for Prince George's.

5           THE COURT:  And you represent -- in what kinds of

6   things?  That they get sued or other kinds of things?

7           JUROR:  I'm on the civil end.  I'm the same as

8   corporation counsel or for what was -- so, I do 1983 cases or

9   Article 2446 in Maryland as well as battery, just regularly

10  tort claims, discrimination, legislative challenges.

11          THE COURT:  So, do you always represent the police

12  department itself or the officers -- or if the officers are

13  sued you represent the police department.

14          JUROR:  Well, I can only represent an officer if

15  they have an actual --

16          THE COURT:  Okay.

17          JUROR:  -- or I cannot represent the county, the

18  police department is not an entity, so I represent the county

19  or individual officers.

20          THE COURT:  How long have you been doing that?

21          JUROR:  I've been on the litigation for about two

22  years about, and on the other end for two to three,

23  transaction contract stuff for another two or three years.  So

24  I've been there a total of five.

25          THE COURT:  Now, what did you do before this?

1              JUROR:  I was a law clerk for two judges.

2              THE COURT:  In Maryland or D.C?

3              JUROR:  Both Maryland.  Trial -- state level.  In

4     between, actually, I was an editor for a news agency in

5     Singapore.

6              THE COURT:  Now, in this particular case it's --

7     this is obviously a law enforcement operation, there is law

8     enforcement obviously who will testify.  Are you going to be

9     predisposed to finding in your favor or believing them either

10    for or against based just on the kind of the job that you've

11    got.

12             JUROR:  Naturally I know the role of a jury, so I

13    come at it from the perspective of impartiality, but given my

14    representation that's kind of your opinion.

15             THE COURT:  Well, we need to know from you -- we

16    need to know from you whether you think the job is such that

17    it's colored -- or would color the lens in which you would

18    listen to the evidence.  There are some attorneys that are

19    prosecutors and become defense attorneys, so they shift

20    around.

21             On the other hand, it may be that because this is

22    your present job and you're working with it that, you know,

23    that you associate yourself with that because of the work and

24    that it would be more difficult for you to do as a lawyer

25    would be expected, which is clearly not to give you greater or

1    lesser weight to the law enforcement people that are going to

2    testify.

3              JUROR:  No, I believe I could come at it from an

4    impartiality.

5              THE COURT:  So, you think you wouldn't be inclined

6    to --

7              JUROR:  Swayed either way, no.  My bread and butter

8    is usually legislative challenges, so I do more on the

9    probable cause law enforcement side than I actually do with

10   appeals and injunctions.

11             THE COURT:  Do you do -- have you done trials?

12             JUROR:  Just bench.  No, I haven't got past the

13   motion stage on any of my excessive force cases.

14             THE COURT:  So, when you say legislative, what do

15   you mean by that?

16             JUROR:  When the county counsel implements a law

17   that, say, the adult entertainment industry doesn't like and

18   they go to -- the last one, at least, they went to District

19   Court and I represented the county on both the preliminary and

20   permanent injunction.  So, it was a bench trial.

21             THE COURT:  Let me ask in terms of what you have

22   actually handled.  Have you handled any cases where there's

23   been complaints against officers, say, in drug operations or

24   any kinds of those --

25             JUROR:  Forfeitures, but that's it.

1          THE COURT:  You haven't -- do you have any cases

2   besides forfeitures that involve drug cases in any form?

3          JUROR:  Not that I can think of.

4          THE COURT:  What about in terms of crimes of

5   violence, or have they been more -- I won't call them

6   transactions, anything of that nature?

7          JUROR:  I mean, I don't handle things that are any

8   way really criminal in nature.  I end up dealing with the

9   resultant --

10         THE COURT:  Because they are civil cases?

11         JUROR:  Yeah.  So, they want money from the county

12  with my cases.  Most are settled, if possible.  You know, like

13  an officer cutting off a handcuff, one of those plastic cuffs,

14  and ripping a tendon out of a wrist, and deciding whether or

15  not we have immunity for that action or whether or not we have

16  to pay out or should pay out and that kind of thing.

17         THE COURT:  So, back to my question in terms of --

18  if I understood you correctly, you felt that even though you

19  do represent individual officers, that in this particular case

20  that you thought -- you would not be influenced one way or the

21  other going into the case or during it by the work that you

22  do, but would make an individual decision as to each of the

23  people that would get up on the stand?

24         JUROR:  Yes.

25         THE COURT:  In terms of -- you studied law,

1   obviously.  Indicated you had a clerkship.  You were an editor

2   for a news agency in Singapore.  What was the focus of the --

3   did it have a special area that the news agency was interested

4   in?

5              JUROR:  I mean, no, not at all.  It was broad

6   based.  It was just current news of the day.  Southeast Asia.

7   I dealt with the Bali bombing, but I was only there to kind of

8   report it because I had the night shift.  So, I edited the

9   copy that came in, and so I was a broad when we went into --

10  against them.

11             THE COURT:  Where?

12             JUROR:  When we went to Iraq I was abroad, I was in

13  Singapore.

14             THE COURT:  In terms of -- since there is -- part

15  of Count 2 has terrorism connections to it.  Does the fact

16  that you're familiar with the Bali bombing or Iraq, any of

17  these going to impact on the fairness and impartiality in this

18  case?

19             JUROR:  I don't believe so.

20             THE COURT:  In terms of your jobs -- it's been this

21  position and the two clerkships in terms of legal jobs, is

22  that correct?

23             JUROR:  Yes.

24             THE COURT:  Did you do any criminal work when you

25  were in law school or anything else?

1            JUROR:  The only -- I did like a week before I was

2    picked up by the judge -- the first judge I worked for.  I

3    volunteered at the public defender's office for a week.

4            THE COURT:  Where was --

5            JUROR:  Also in Prince George's.

6            THE COURT:  You've served you indicated as a juror

7    in a criminal case, how many times?

8            JUROR:  Just once.

9            THE COURT:  This is 22.  I'm just indicating the

10   question, it's 22.

11           JUROR:  Just once, it was right after law school.

12           THE COURT:  Was that here or in Superior Court?

13           JUROR:  Correct.  Superior.

14           THE COURT:  Without telling us what the verdict

15   was, did the jury reach a verdict?

16           JUROR:  I was an alternate, unfortunately.

17           THE COURT:  Can you indicate what the nature of the

18   charges were, if you recall.

19           JUROR:  Yeah, it was a manslaughter -- or alleged

20   manslaughter.  I believe it involved a boyfriend and

21   girlfriend.  The boyfriend set a mattress on fire and tried to

22   kill his girlfriend in an apartment, the bare bones of what I

23   remember.

24           THE COURT:  How long ago was that case?

25           JUROR:  Five or six.

1           THE COURT:  Okay.  Anything about that

2   experience --

3           JUROR:  Maybe longer -- seven.

4           THE COURT:  Anything about the case itself that you

5   think would affect your consideration of the evidence in this

6   case?

7           JUROR:  No, not that it would affect it.  I enjoyed

8   the experience.

9           THE COURT:  Anything about the experience of being

10  on the trial or you didn't get to deliberate that you think

11  would affect, again, the consideration of the evidence in this

12  case?

13          JUROR:  No, Your Honor.

14          THE COURT:  Twenty-eight is whether you or somebody

15  close to you traveled, worked, civilian or military, in

16  Southeast Asia, particularly Afghanistan or Pakistan.  So,

17  besides Singapore, anything else?

18          JUROR:  I studied in Israel, both Arabic and

19  Hebrew.

20          THE COURT:  I'm sorry, with the what?

21          JUROR:  With the Hebrew University.  I went over to

22  study Arabic and ended up studying Hebrew.

23          THE COURT:  Any other -- in terms of putting down

24  28, did you -- was it your -- were these the jobs that you've

25  talked about?

1            JUROR:  What was 28?

2            THE COURT:  Either you or someone close to you

3    traveled or worked in South Asia, particularly Afghanistan or

4    Pakistan, either civilian or military?

5            JUROR:  It's just me, the closest to that question

6    I come.  And the Israel/Jordan experience as well as the

7    Singapore experience.

8            THE COURT:  So, you studied in Israel and traveled

9    to Jordan.

10            JUROR:  Yes.

11            THE COURT:  Anything about those experiences that

12    you think would affect your fairness or impartiality?

13            JUROR:  No, loved it.

14            THE COURT:  And 29 is you or somebody close to you

15    traveled, worked in a predominantly Islamic country, besides

16    Jordan, any other --

17            JUROR:  Malaysia.

18            THE COURT:  You were there for --

19            JUROR:  I passed through multiple times when I was

20    living in Singapore.  Indonesia a little bit.

21            THE COURT:  Did you develop any views about Islam

22    or Islamic countries or Islam or anything else?

23            JUROR:  Nothing in particular.  My friends kind of

24    are broad based.

25            THE COURT:  So, you don't think there's anything

1  that you developed in terms of your viewpoints that would

2  affect your fairness and impartiality in this case?

3            JUROR:  I don't think so.

4            THE COURT:  Thirty-four is you're familiar with the

5  Taliban and the Taliban movement.  What is the source of that?

6            JUROR:  Just newspapers, current events.  I'm not a

7  buff by any means, just know what other people do.

8            THE COURT:  What sticks in your mind about what you

9  read about the Taliban.

10            JUROR:  Just that it's an extremist movement in

11  Afghanistan, in Bush's mind they are partially responsible for

12  Osama bin Laden -- and Shuria law.

13            THE COURT:  You need to speak into the microphone.

14  If you talk down, it doesn't pick up.  You said something at

15  the end about law.

16            JUROR:  Just implemented Shuria law.

17            THE COURT:  S-H-U-R-I-A.  Is there anything -- in

18  this particular case there's going to be -- the Government

19  will be required to provide some evidence relating to the

20  allegation that Mr. Mohammed is associated in some way with

21  the Taliban.

22            Is there anything about your reading in the

23  newspapers that would affect your fairness and impartiality to

24  start with?  In other words, whether you've come to any

25  predispositions about Mr. Mohammed based on the charges or

1    anything else?

2              JUROR:  No.  I know what I've read, but --

3              THE COURT:  Would you be able to separate out -- we

4    want you to come in with an open mind --

5              JUROR:  Sure.

6              THE COURT:  -- listen to the evidence, weigh it,

7    and be fair and impartial and make a decision based on the

8    evidence presented in the courtroom, not on what you might

9    have read or whatever.  Can you separate the two things out?

10             JUROR:  I believe I could.

11             THE COURT:  All right.  Anything you want to ask?

12             MR. STIGLITZ:  No questions.

13             THE COURT:  Ms. Jahn?

14             MS. JAHN:  I think you said something toward the

15   end about the Taliban and Bush's view that they are

16   responsible for September 11th.  Is that a view that you

17   share?

18             JUROR:  Not necessarily.  No, I don't.

19             THE COURT:  You need to speak into the microphone.

20             JUROR:  No, not necessarily.

21             MS. JAHN:  When you say not necessarily, can you

22   expand upon what you mean by that?  Either you don't share it

23   or you do, so I'm just wondering why you're taking the middle

24   ground of not necessarily as a response.

25             JUROR:  I didn't have all the facts and basis from

1   which to make the decision that Bush made from day one.  So, I

2   guess from what I know now, you know, I think his actions were

3   a little bit off.

4           MS. JAHN:  In light of what you know now and the

5   fact that you're going to be hearing allegations that

6   Mr. Mohammed is affiliated with the Taliban, are you then

7   going to be thinking about the connection to September 11th

8   and what happened then or would you be able to focus on what's

9   going on in this case?

10          JUROR:  I think anybody is goes to associate --

11  when you say terrorism today, I think anybody associates it

12  with 911, that's not something that you'll be able to get away

13  with -- get away from, excuse me.  So, yes, I do believe

14  the -- I would make that association.  But knowing my role as

15  a juror, that's something that you have to distinguish from to

16  come at it from a view of impartiality.

17          MS. JAHN:  You think you'd be able to distinguish?

18          JUROR:  I do.  I think I'm a fair person.

19          THE COURT:  Now, with regard to your job working

20  basically representing an actual officer or the county.  Would

21  you give greater weight to a police officer or law enforcement

22  testifying, particularly in a case where you already have to

23  distinguish terrorism from the facts?  Do you think it would

24  be more difficult in light of your employment?

25          JUROR:  In light of my employment I know that

 1    everybody really comes at it and represents themselves very

 2    differently.  So, to give credibility to a person, I can only

 3    do that when I hear the individual, it's not necessarily a law

 4    enforcement grouped all together in my mind.

 5         MS. JAHN:  So, you don't necessarily have ideas or

 6    positions that you would believe a law enforcement official

 7    over someone who is not a law enforcement official?

 8         JUROR:  Not necessarily.  It's person by person.

 9    I've seen it too many times.

10         MR. STIGLITZ:  If I may.  One question.

11         THE COURT:  All right.

12         MR. STIGLITZ:  Whatever feelings you may have

13    either way concerning the administrations war on terror, and I

14    use quotations there.  Do you feel that those feelings would

15    have any impact on what you see and hear in this courtroom and

16    your ability to determine guilt or innocence based purely on

17    what you see and hear in this courtroom?

18         JUROR:  Based on the way I answered the first

19    question, I really often come down in the center.  I don't

20    hold very strong views -- I hold very strong views on one or

21    two matters in life, so, generally speaking, I like to judge

22    or adjudicate every decision I make on a case by case basis,

23    if that answers your question.

24         MR. STIGLITZ:  It sounds to me like your answer is

25    no, whatever your feelings on the administration's policies

1    wouldn't have any impact on your --

2            JUROR:  I would hope not.  This is a court of law.

3    It's not politics.  I would hope.

4            THE COURT:  All right.  Thank you.

5    JUROR STEPS DOWN - NEW JUROR STEPS UP

6            THE COURT:  Good afternoon.  This is Juror Number

7    0142, Numbers 9, 22 and 30.  Number 9 is whether you know

8    other people on the panel?

9            JUROR:  One of the ladies work in a store that I go

10   to.

11           THE COURT:  So there's someone that works in a

12   store that you go to?

13           JUROR:  Uh-huh.

14           THE COURT:  And you recognize, what, her face or --

15           JUROR:  I mean, I'm in there every day, so --

16           THE COURT:  Is she a friend or --

17           JUROR:  Huh-uh.  Just someone that I see every day.

18           THE COURT:  You can speak in a normal tone, they

19   really can't here.

20           JUROR:  Okay.

21           THE COURT:  To make sure we do get a record.  The

22   reason we ask this question is if both of you wind up on the

23   same jury, we want to make sure that you'd be willing to speak

24   out, to give consideration to what they have to say.  And if a

25   prior contact would either overly influence or lean towards

1    her views or against those views because of your contact.  In

2    other words, the prior contact would influence you in some

3    way.  Do you have any concerns of that?

4              JUROR:  No.

5              THE COURT:  Twenty-two.  You served in a criminal

6    case before, is that correct?

7              JUROR:  Yes, ma'am.

8              THE COURT:  And how many times?

9              JUROR:  Once.

10             THE COURT:  And how long ago was that?

11             JUROR:  That was in October.

12             THE COURT:  Of '07?

13             JUROR:  Yes, ma'am.

14             THE COURT:  Was that in Federal Court or Superior

15   Court?  Without telling us the verdict, was the jury able to

16   reach a verdict?

17             JUROR:  Yes.

18             THE COURT:  Do you remember what the charges were

19   or the nature of them?

20             JUROR:  I think it was kidnapping.

21             THE COURT:  Is there anything about the facts of

22   that case or the case that you think would influence you in

23   this case?

24             JUROR:  No.

25             THE COURT:  Anybody about your experience as a

1   juror participating in a trial or the deliberations that would

2   influence you in this case?

3              JUROR:  No.

4              THE COURT:  Thirty is whether you or somebody close

5   to you ever served in the Armed Forces, the Reserves, National

6   Guard, ROTC?

7              JUROR:  My uncle is in the Reserves.

8              THE COURT:  Has he been called up in any recent

9   time that you know of?

10             JUROR:  No.

11             THE COURT:  Did he ever serve in a combat zone?

12             JUROR:  Not that I know of.

13             THE COURT:  Is he in the area or some place else?

14             JUROR:  He's in the area.

15             THE COURT:  Any questions?

16             MS. JAHN:  Where do you work?

17             JUROR:  I work at mental health practice on

18   Pennsylvania Avenue.

19             MS. JAHN:  How long have you been there?

20             JUROR:  Four years.

21             MS. JAHN:  Thank you.

22             THE COURT:  Any questions?

23             MR. STIGLITZ:  No questions.

24             THE COURT:  Thank you.

25   JUROR STEPS DOWN – NEW JUROR STEPS UP

```
 1              THE COURT:  This is Juror Number 285.  And 17, 20,
 2    30 and 34.
 3              JUROR:  Which I don't remember what they are any
 4    more.
 5              THE COURT:  That's all right.  I put it on the
 6    record so we have it there.  Seventeen related to whether you
 7    or somebody close to you either works or worked at the State
 8    Department.
 9              JUROR:  Right.  My friend          works there.
10              THE COURT:  Don't give names.
11              JUROR:  Sorry.
12              THE COURT:  But you have a friend that works at the
13    State Department.
14              JUROR:  Right.
15              THE COURT:  And do you know what section or where
16    your friend works?
17              JUROR:  He goes to Iraq, that's all I know.
18              THE COURT:  And do you know in what capacity?
19              JUROR:  No, I'd like to.  I have no idea.
20              THE COURT:  And --
21              JUROR:  I don't think he works very hard.
22              THE COURT:  Does he talk about his work at all?
23              JUROR:  No.
24              THE COURT:  So, you don't have any idea what he
25    does?
```

1          JUROR:  He hangs out at the swimming pool,

2    seriously.  I have no idea what he does.

3          THE COURT:  Since he's been to Iraq, I take it he's

4    never been injured in any way on any of his trips?

5          JUROR:  No.

6          THE COURT:  He goes on a regular basis?

7          JUROR:  I don't know, I haven't seen him in like

8    six months, so I don't know how often he's going.

9          THE COURT:  Has he talked about Iraq, even though

10   he hasn't talked about what he does.

11         JUROR:  Not really.  The last -- he talked about is

12   they stayed at the Saddam Hussein Palace.  That's what I hear

13   about, I hear about the social aspects of the Americans there.

14         THE COURT:  So you haven't heard -- so is there

15   anything that he's talked about that you think would influence

16   you in this case in terms of the fairness or impartiality?

17         JUROR:  No.

18         THE COURT:  Twenty is whether you or somebody close

19   to you is a lawyer.  Is that you or somebody else?

20         JUROR:  I don't know why I put that down.

21         THE COURT:  Lawyer, studied law, received legal

22   training or paralegal?

23         JUROR:  Oh, I took media law and criminology in

24   college, which is way back.

25         THE COURT:  Have you used it at all?

1          JUROR:  No.

2          THE COURT:  Thirty is you or somebody close to you

3   served in the Armed Forces, including the Reserves, National

4   Guard or ROTC.?

5          JUROR:  My dad served in the Army and many of my

6   co-workers are former military.

7          THE COURT:  Was your father a career officer or was

8   he drafted or --

9          JUROR:  No, he was drafted when they built the

10  Berlin Wall way back in the 60s, but he never went overseas.

11         THE COURT:  So, he was there for -- drafted, spent

12  his two years or whatever and then --

13         JUROR:  He got out before they shipped his unit to

14  Vietnam.  As far as all my co-workers that have served, I

15  don't think any of them -- I don't know who has been to the

16  Middle East and who hasn't, so --

17         THE COURT:  It's not something that is part of the

18  conversation?

19         JUROR:  No, it's unrelated to what we do.  It just

20  happens to be a fair amount -- it seemed to be D.C.

21         THE COURT:  Okay.  Then 34 is whether you've heard

22  about the Taliban?

23         JUROR:  Right.  Just what's in the news, CNN,

24  morning news.

25         THE COURT:  What do you remember about from the

1  news -- what do you remember about them?  What sticks in your

2  mind.

3          JUROR:  I have to show my ignorance now.  I think

4  Osama bin Laden as part of the Taliban.  Just the hunt for the

5  weapons of mass destruction.  I'm sure if George Bush was up

6  for a third term we'd hear more about it.

7          THE COURT:  The reason we ask this question is

8  because the Government as part of the second charge will have

9  to show that Mr. Mohammed is associated with the Taliban.  And

10  we want to make sure that you can separate out whatever you

11  read in the newspapers from whatever gets presented in court

12  because you're going to be making a decision only on what is

13  presented in court.  Can you do that?

14          JUROR:  Yes.

15          THE COURT:  And have you formed any views either

16  based on the charges or in any other capacity about

17  Mr. Mohammed at this point or do you presume him innocent and

18  have a totally open mind?

19          JUROR:  Open mind.

20          THE COURT:  Any questions, Ms. Jahn?

21          MS. JAHN:  I know you've heard about the palace and

22  the social aspects of Iraq, but did you ever hear him talk

23  about the dangers that he faced when he was over there or how

24  he was transported or anything along those lines?

25          JUROR:  Yeah, they talk about -- I don't know what

1   the appropriate word would be, shelling in the distance, they

2   would hear it, they could see it.  I don't see think it comes

3   near them.

4           MS. JAHN:  Did he ever talk about being armed

5   himself or being around others?

6           JUROR:  I don't think he has that kind of job.

7           MS. JAHN:  What do you think his job is, if you had

8   to guess?

9           JUROR:  Business analysis.  Basic business

10  consulting.

11          MS. JAHN:  Okay.

12          JUROR:  I know what is he makes, so -- not that

13  that's relevant, but I really don't know.  I really only hear

14  about the social things.

15          MS. JAHN:  I think you mentioned your job, it says

16  that you do IT work?

17          JUROR:  Right.

18          MS. JAHN:  What kind of work do you do?

19          JUROR:  I am a program manager within our software

20  applications practice, so we host applications for TSA,

21  Transportation Security Administration.  So, it's just

22  software patching, building, hosting these servers.

23          MS. JAHN:  Okay.  And then I also think you made a

24  comment about the Taliban being equal to Osama bin Laden, if

25  you could just explain what you meant by the reference to

1  Osama bin Laden?

2            JUROR:  I thought he was related, that it was

3  all -- that was his regime or something.

4            MS. JAHN:  If you were --

5            JUROR:  I didn't know I was going to be tested.

6            MS. JAHN:  If you were given information that would

7  maybe be different than what you believe right now, would you

8  be able to take the new information and not have it -- take

9  the new information and have the new information in

10 determining a verdict in this case, not taking what your prior

11 opinions or knowledge is regarding Osama bin Laden and the

12 Taliban?

13           JUROR:  Yes. If the Court would present facts,

14 whereas, mine is just a jumble, a hodgepodge collection.

15           MR. STIGLITZ:  I'm going to take a stab and guess

16 from a comment that you made that you're not particularly

17 satisfied with the administration's policies concerning war on

18 terror and things of that nature?

19           JUROR:  I'm just not a Republican, that's all.

20           MR. STIGLITZ:  Regardless of what your feelings

21 are, can you set those feelings aside and consider the

22 evidence here at the trial and the witnesses that you hear at

23 the trial in deciding the case?

24           JUROR:  Yes.

25           THE COURT:  Thank you.

1            MR. STIGLITZ:  Your friend's injuries, did that

2    include sunburns, also?

3            JUROR:  Pretty much.

4            MS. JAHN:  I didn't hear the question.

5            MR. STIGLITZ:  I was asking if the friend's

6    injuries may include sunburns.  It sounds like most of his

7    time was spent at the pool.

8            THE COURT:  Thank you.  Keep this mind this is all

9    on the Internet at some point.

10   JUROR STEPS DOWN – NEW JUROR STEPS UP

11           THE COURT:  You are Juror Number 1252.  Questions

12   17, 24 and 25.  Seventeen is whether you or somebody close to

13   you is presently or previously employed by the State

14   Department?

15           JUROR:  Yes.

16           THE COURT:  Was the you or somebody else?

17           JUROR:  My Aunt Karen work in the Labor Department.

18           THE COURT:  I'm sorry.

19           JUROR:  My Aunt Karen worked for the Labor

20   Department.

21           THE COURT:  So your -- and don't mention names.

22   Your aunt worked for the State Department before she worked

23   for Labor, is that what you're saying?

24           JUROR:  No, she worked in the Labor Department.

25           THE COURT:  The question was whether she worked for

1    the United States State Department?

2              JUROR:  Sorry.

3              THE COURT:  That's all right.  So there isn't

4    anybody?

5              JUROR:  No.

6              THE COURT:  Twenty-four is whether you or somebody

7    close to you had ever been a victim, a witness to a drug

8    offense or a crime of violence?

9              JUROR:  I was a witness to a drug case here.

10             THE COURT:  So, did the case go to trial?

11             JUROR:  Yes.

12             THE COURT:  And you testified?

13             JUROR:  Yes.  It was a long time ago.  It was

14   around '90, but it was --

15             THE COURT:  It was around 1990, but it Federal

16   Court?

17             JUROR:  About '89, yeah.  Around '90.

18             THE COURT:  About 1990 in Federal Court.  And you

19   were a witness in the case.  Were you a witness for the

20   prosecution or for the defense?

21             JUROR:  For the defendant.

22             THE COURT:  And were you treated fairly by the

23   lawyers and the Court?

24             JUROR:  Yes.  Yeah.

25             THE COURT:  Did you testify on behalf of somebody

1    you knew or somebody you knew in the neighborhood or --

2              JUROR:  He lived in the neighborhood, the

3    defendant.

4              THE COURT:  Any do you know what happened in the

5    case?

6              JUROR:  He's still locked up.

7              THE COURT:  He did get convicted?

8              JUROR:  Yes.

9              THE COURT:  And do you have any views about the

10   case in terms of whether he was treated fairly overall or not?

11             JUROR:  I think he was treated fairly.  They asked

12   the questions how long I knew him.  Did I ever buy drugs from

13   him?  And I told him, yeah.  And how much did I buy?  But he

14   got convicted because I was not the only witness.

15             THE COURT:  Is there anything -- this case does

16   have some drugs in it as well, but is there anything about the

17   case that you were involved in that you think would affect

18   your considering the evidence in this case?

19             JUROR:  No.

20             THE COURT:  You indicated that they asked you were

21   whether you were buying drugs from him, did I understand you

22   correctly?

23             JUROR:  They asked me, did I ever buy drugs from

24   him back in the days, and I told them, yeah.  And they wanted

25   to know how much.  It was like a dime here and a dime there.

1              THE COURT:  What drugs were they?  What kind of --

2              JUROR:  Cocaine.

3              THE COURT:  So, at least at one point in time in

4    your life you were using drugs?

5              JUROR:  Yes.

6              THE COURT:  This case does involve criminal charges

7    involving not cocaine but opium and heroin.  Does the fact

8    that you at one point used drugs, would that affect your

9    fairness on either side?

10             JUROR:  No, because I have been clean for 11 years.

11             THE COURT:  Would you be feeling in any way

12   negative toward the Defendant because he's being charged with

13   importing drugs to the United States?

14             JUROR:  No.

15             THE COURT:  Twenty-five is whether you or anybody

16   close to you has been arrested, charged, found guilty or --

17   that was a witness.  Twenty-five is whether you or somebody

18   close to you had been ever been arrested, charged, found

19   guilty or gone to jail for a drug offense or a crime of

20   violence?

21             JUROR:  My son is locked up now, he just violated

22   his probation.  He over at the D.C. Jail.

23             THE COURT:  And was the original charge a drug

24   charge?

25             JUROR:  No.  No.  No.  Him and a police officer got

1    into it because he jumped out there for his baby mother and he

2    got locked up.

3              THE COURT:  I missed the beginning.  The police

4    officer and he --

5              JUROR:  Him and his baby mother got into it with a

6    police officer, so he jumped in the police face and they

7    looked him up.

8              THE COURT:  So, your son's baby's mother was having

9    a discussion or altercation with the police?

10             JUROR:  Yes.

11             THE COURT:  He got in the middle of it and he got

12   locked up?

13             JUROR:  Yes.

14             THE COURT:  Is he still looked up?

15             JUROR:  He was on probation but he messed up his

16   probation so they violated him.

17             THE COURT:  Did he mess it up based on this

18   incident or --

19             JUROR:  He messed it up by not going to see his PO

20   when he was supposed to go.  Not being on time.  Going to see

21   her when he wanted to go see her.  I told him it don't work

22   like that.

23             THE COURT:  And anything about your present -- you

24   know, this case, evidently it's sort of pending there.  Would

25   that affect how you looked at this evidence either from the

1    prosecutor or the defense?

2              JUROR:  No, because he'll be home on the 25th --

3    he'll be finished with all the time May 25th.

4              THE COURT:  So, you don't have any feelings one way

5    or the other either good or bad toward the prosecutor or the

6    defense at this point based on this?

7              JUROR:  No.

8              THE COURT:  So, can you come into this case with an

9    open mind, weigh the evidence fairly and impartially, make a

10   decision just on what's presented in the courtroom, not any of

11   these other aspects of what has happened or what I've asked

12   you, put those aside.  Can you do that?

13             JUROR:  Yes.

14             THE COURT:  Ms. Jahn?

15             MS. JAHN:  What was your son originally on

16   probation for?

17             JUROR:  Him and his girlfriend was out and his

18   girlfriend got into it with a police --

19             THE COURT:  This is the one with the police

20   officer.

21             MS. JAHN:  So, what was he convicted of that then

22   warranted him being placed on probation?

23             JUROR:  It was something about the police.  I don't

24   know the name.

25             MS. JAHN:  Do you know if it was assault on a

1     police officer?

2                    JUROR:  Assault on a police officer.

3                    MS. JAHN:  You work in the computer field --

4                    THE COURT:  You all need to you -- this is a long

5     day.  You need to speak up.  She's working very hard to take

6     this record.

7                    JUROR:  I work at Catholic University of America.

8                    MS. JAHN:  You work in the computer section.

9                    JUROR:  No, housekeeping.

10                   MS. JAHN:  How long have you been there?

11                   JUROR:  April 23rd it would be five years.  It's

12    five years now.

13                   MS. JAHN:  Thank you.

14                   MR. STIGLITZ:  If I may let Mr. Rothstein ask the

15    questions on this one.

16                   THE COURT:  All right.

17                   MR. ROTHSTEIN:  Ma'am, you said that you had

18    testified in a criminal trial before, is that correct?

19                   JUROR:  Yes.

20                   MR. ROTHSTEIN:  Was that the one involving Reginald

21    Baugham over at 56th and Blaine?

22                   JUROR:  Yeah.

23                   MR. ROTHSTEIN:  Is that where you used to live?

24                   JUROR:  Yeah.

25                   MR. ROTHSTEIN:  And you were a customer of Reginald

1   Baugham's on a daily basis, isn't that right?

2              JUROR:  Yes.

3              MR. ROTHSTEIN:  So, for quite sometime you said you

4   had been clean, 11 years?

5              JUROR:  Yes.

6              MR. ROTHSTEIN:  But prior to being clean you had

7   been addicted to crack cocaine, correct?

8              JUROR:  Yes.

9              MR. ROTHSTEIN:  And you said --

10             JUROR:  You say prior to being clean have I been --

11             MR. ROTHSTEIN:  No, prior to being -- you're now

12  clean?

13             JUROR:  Yes.

14             MR. ROTHSTEIN:  But before then you were addicted

15  to crack cocaine?

16             JUROR:  Yes.

17             MR. ROTHSTEIN:  What steps did you take to become

18  clean?

19             JUROR:  I went in a program up on Harvard Street,

20  Northwest, and I stayed in there for like, I'd say, like 12

21  months.  From there I started going to the Christian Center, I

22  passed my --

23             THE COURT:  You need to -- she's having trouble

24  capturing it.  Don't look at him, look at me and talk and then

25  we'll get a record.  We missed -- you went something to

1    Harvard Street.

2              JUROR:  I went to Harvard, it's a drug program, and

3    I stayed up there.  So from there I went to live with my aunt

4    and from there I have been going to church with her ever since

5    and I've just been clean.

6              MR. ROTHSTEIN:  Were any of these programs court

7    ordered?

8              JUROR:  Harvard Street, Northwest.

9              MR. ROTHSTEIN:  You have been arrested before,

10   correct?

11             JUROR:  Yes.

12             MR. ROTHSTEIN:  You've been arrested for the

13   possession of crack cocaine?

14             JUROR:  Yes.

15             MR. ROTHSTEIN:  And you have been convicted of

16   possession of crack cocaine?

17             JUROR:  Yes.

18             MR. ROTHSTEIN:  And placed on probation?

19             JUROR:  Yes.

20             MR. ROTHSTEIN:  And you recall your testimony

21   happening how long ago in the Reginald Baugham case?

22             JUROR:  I think it was like nine years.  It was

23   here, I say about nine years.

24             MR. ROTHSTEIN:  Did your addiction to crack cocaine

25   affect your memory or other types of thought processes?

1                JUROR:  No.

2                MR. ROTHSTEIN:  You don't remember that being

3   in 2003?

4                JUROR:  No, I thought it was in '89, I mean '98.

5                MR. ROTHSTEIN:  Do you remember me being one of the

6   prosecutors on that case?

7                JUROR:  No.

8                MR. ROTHSTEIN:  Mr. Carpenter?

9                JUROR:  I don't remember them, it's been awhile.  I

10  don't remember them.

11               MR. ROTHSTEIN:  All right.

12               JUROR:  I know it was here in this court.

13               MR. ROTHSTEIN:  You knew other family members of

14  Reginald Baugham, correct?

15               JUROR:  Did I know the family members?

16               MR. ROTHSTEIN:  Yes.

17               JUROR:  Yeah, we grew up together.

18               MR. ROTHSTEIN:  Edwina and the rest?

19               JUROR:  April --

20               MR. ROTHSTEIN:  Just his brothers and sisters?

21               JUROR:  Yeah.  Yes.

22               MR. ROTHSTEIN:  Did you -- have you talked to them

23  since the time that you testified?

24               JUROR:  Huh-uh.

25               THE COURT:  You have to say yes or no.

1       JUROR:  No.

2       MR. ROTHSTEIN:  And you think it was fair what

3  happened to him?

4       JUROR:  To me, I'm saying, he sold drugs and we all

5  testified on him and we told them the truth.  So, I'm saying

6  it was up to the prosecutors.  I heard he was getting off, but

7  I don't know how true it is.

8       MR. ROTHSTEIN:,So you knew that he had sold drugs,

9  correct?

10      JUROR:  Yes.

11      MR. ROTHSTEIN:  But you still don't have an opinion

12  on how -- you don't have an opinion on whether it was a

13  correct verdict or not?

14      JUROR:  I really don't know.  I really don't know.

15  He got convicted.  He sold drugs.  I know he sold drugs.  I

16  testified that I knowed him and what I bought from him.

17  That's all I could do.

18      MR. ROTHSTEIN:  You have been arrested in the last

19  10 years, haven't you?

20      JUROR:  No, I didn't -- the last arrest, I was

21  locked up in -- it was in '90.  It was '90.

22      MR. ROTHSTEIN:  '90 you're saying was your last

23  arrest?

24      JUROR:  Yes, I think it was '90.

25      MR. ROTHSTEIN:  But your Harvard Clinic was court

1    ordered?

2              JUROR:  Yes.

3              MR. ROTHSTEIN:  And that was -- you say your last

4    arrest was 18 years ago, correct?

5              JUROR:  No, it wasn't 18.  I'm going to say '94.

6    '94.

7              MR. ROTHSTEIN:  '94.  That's still 14 years ago,

8    correct?

9              JUROR:  Yes.

10             MR. ROTHSTEIN:  And you said you've been clean for

11   11 years?

12             JUROR:  Yes.

13             MR. ROTHSTEIN:  Do you remember when you were

14   finally convicted and sentenced for that?

15             JUROR:  I really don't know.

16             MR. ROTHSTEIN:  Do you remember how many times

17   you've been arrested for crack cocaine use?

18             JUROR:  About four.

19             MR. ROTHSTEIN:  You have a clear recollection of

20   that?

21             JUROR:  Yes.  Uh-huh.

22             THE COURT:  Can we ask this -- the question that we

23   had asked whether you or somebody close to you had been

24   arrested on drug charges, and you didn't say anything about it

25   until he started to talk.  Had you forgotten about it?

1              JUROR:  No.

2              THE COURT:  One of the questions was:  Have you or

3   a relative, close friend, ever been arrested, charged with a

4   crime or found guilty or gone to jail for a drug offense?  If

5   he hadn't asked the questions, you would not have -- you

6   didn't tell us that you had been arrested for drug offenses.

7   Was there a reason why you didn't indicate that?

8              JUROR:  No.

9              THE COURT:  Did you just forget it or --

10             JUROR:  No, I thought when you asked the question,

11  I just had put my son -- because -- I put myself on the other

12  paper.

13             THE COURT:  Okay.  Because Question 24 does get to

14  be a witness, and you did talk about that.  25, you only

15  talked about your son and you didn't talk about yourself.

16             JUROR:  Yes.  The reason I didn't talk about myself

17  was because I was just here Monday, and when I answered my

18  other questions I put it on my other paper.

19             THE COURT:  Okay.  You know that each of these --

20  every time you're sent to court you should -- you have to give

21  the same answers -- you may need to give the same answers over

22  and over.

23             JUROR:  Okay.

24             MR. STIGLITZ:  Am I to understand that you were in

25  court a couple days ago, you didn't mention that yourself had

1  been arrested?

2          JUROR:  Yes, I did.

3          THE COURT:  She did, but she didn't think she

4  needed to do it today.

5          MR. STIGLITZ:  I'm sorry.  Did you mention that

6  your son had been arrested?

7          JUROR:  No, I mentioned me.

8          MR. STIGLITZ:  Oh.

9          THE COURT:  Okay.  Anything else?

10          MS. JAHN:  No, I don't think so.

11  JUROR STEPS DOWN

12          MR. STIGLITZ:  We move to strike.

13          MS. JAHN:  We would oppose it, Your Honor, she

14  seemed to give unbiased, impartial --

15          THE COURT:  Let me just say she, she should have

16  indicated she's had four arrests.  If he hadn't said anything,

17  we wouldn't have known it.  And that does make a difference in

18  terms of arrests and convictions.  I mean, I think in terms of

19  the rest of it, she didn't say anything that I would say is

20  biased.  All right.  At least I don't remember anything in

21  particular.  But the fact that she's left out something fairly

22  major, four arrests and some convictions, does make a

23  difference.

24          MS. JAHN:  But it did come out, Your Honor.

25          THE COURT:  Yes, but not because of her.  If he

1   hadn't known about it, we would never have known.  I know some

2   of the judges are doing criminal checks, I didn't do it in

3   this particular case.  This is a drug case, and I think either

4   she's forgotten it or she decided not to do it, we didn't get

5   a very good explanation.  Last Monday she told them about

6   herself but not her son.  Today she tells me about the son but

7   not her, both of which are incorrect, you know, it is all

8   roughly the same questions.  She didn't bring it up.

9         I don't know whether she's lying or forgotten or

10   she needs to be prompted, but that's a key omission.  I would

11   excuse her based on that.  I don't think there's any -- I

12   don't think there's a bias particularly in terms of the rest

13   of her answers, but she didn't indicate what I think is a

14   chief point here.  It's also not clear to me when she shifted

15   around on the dates.  So, I'm not sure when she actually was

16   convicted.  Was that trial in 2003?

17         MR. ROTHSTEIN:  2003.  Judge Kennedy.

18         THE COURT:  So, I mean, there's a problem there if

19   she was at that point -- was she at that point from your

20   knowledge at the trial, was she at that point still using or

21   are you talking about past things?  If you don't know --

22         MR. ROTHSTEIN:  I don't recall, Judge.  I know she

23   was a lifelong addict.  She left me with the impression that

24   she was still an addict when she testified for the defendant

25   in that case.

1          THE COURT:  All right.  But I think the bigger

2    problem is that she didn't bring up four arrests and

3    convictions.  That's pretty difficult to forget.

4          MR. VANEGAS:  Out of curiosity, was that a

5    conviction that resulted from that trial?

6          MR. ROTHSTEIN:  In the case that she testified in?

7          MR. VANEGAS:  Yes.

8          MR. ROTHSTEIN:  Yes, it was.

9          THE COURT:  I don't know whether it was on all

10   charges or not.  Was it on all charges or not?  He had one

11   where he had to retry it.

12         MR. ROTHSTEIN:  It was not that one, no.

13         THE COURT:  All right.  I will excuse 1252.

14   NEW JUROR STEPS UP

15         THE COURT:  All right.  This is Juror Number 1391.

16   Fifteen, 17, 19, 28, 29, 32, 34 and 39.  So, let me start with

17   15.  Indicates either you or something close to you is

18   connected to law enforcement.  You need to talk in a normal

19   voice, they really can't hear you -- into the microphone.

20         JUROR:  My girlfriend works for the FBI.  I've got

21   some friends who work for the FBI.  And a friend that's a

22   police officer in Alexandria.

23         THE COURT:  You're going to -- it's been a long

24   afternoon.  You're going to need to speak up a little bit.  Do

25   you know what your girlfriend does at the FBI?

```
1              JUROR:  Vaguely.

2              THE COURT:  Does she do chemical analysis, she does

3    fingerprints or --

4              JUROR:  She's an analyst.

5              THE COURT:  Is she associated with a particular

6    office, robbery, bank robberies or --

7              JUROR:  It's not a question I ask.

8              THE COURT:  So what -- you don't -- other than that

9    she's an FBI analyst, does she talk about her cases at all?

10             JUROR:  No.

11             THE COURT:  And your friend at the FBI, what does

12   that person do?

13             JUROR:  Also an analyst.  And the same, they don't

14   really discuss their work.

15             THE COURT:  And the police officer you said was in

16   Alexandria?

17             JUROR:  Yes.

18             THE COURT:  So, is he a local Alexandria police

19   officer or something else, just assignment?

20             JUROR:  Yes.

21             THE COURT:  Do you know what he does?

22             JUROR:  Yes, just a -- I believe he's a bike cop

23   right now.

24             THE COURT:  How long have each of these people been

25   with law enforcement, like your girlfriend, how long has she
```

1    been with the FBI?

2              JUROR:  Three years.  The others two years plus.

3    And the police officer at least three and a half, four.

4              THE COURT:  We have law enforcement testifying,

5    it's going to be a law enforcement operation.  Is there

6    anything about their work that would make you more inclined to

7    believe them or not believe them when the witnesses in our

8    case gets up on the stand?

9              JUROR:  No.

10             THE COURT:  So the fact that you've got close

11   friends and a girlfriend in law enforcement isn't going to

12   influence you one way or the other in terms of this particular

13   case, is that what you're saying?

14             JUROR:  I don't believe it would, no.

15             THE COURT:  Seventeen is whether you or somebody

16   close to you is presently or previously employed by the State

17   Department.

18             JUROR:  My roommate is a Foreign Service Officer.

19             THE COURT:  Do you know where -- has he been

20   assigned overseas yet?

21             JUROR:  Yes, a couple times.

22             THE COURT:  What countries?

23             JUROR:  Central African Republic, Beirut, Ukraine.

24             THE COURT:  And has he talked about his experiences

25   in these different countries, particularly say Beirut?

1          JUROR:  A little bit.

2          THE COURT:  Do you know what he does within the

3    Embassy, what his position is?

4          JUROR:  Economics.

5          THE COURT:  And, again, anything about his

6    experiences that you would think would affect your fairness

7    and impartiality in this case?

8          JUROR:  No.

9          THE COURT:  Either you or somebody close to you

10   employed by a criminal defense lawyer or appeared as a defense

11   witness or involved in a defense of a criminal case in some

12   way?

13         JUROR:  I was a paralegal for a law firm right out

14   of college and did both defense work, and I can't think of

15   the -- prosecutor -- not prosecutor, but yes, they did some

16   legal work.

17         THE COURT:  So, they were a criminal defense firm?

18         JUROR:  Mostly in aviation stuff.  I wasn't exactly

19   sure if that's what you were looking for, so I thought I'd put

20   it down.

21         THE COURT:  That's fine.  So, they were -- were

22   they accidents that occurred?  They were representing

23   different people connected to it or --

24         JUROR:  Sometimes the airlines, sometimes parts

25   makers.

```
 1                THE COURT:  How long did you -- were you a

 2   paralegal.

 3                JUROR:  About a year and a half.

 4                THE COURT:  Did you go to court at all as part of

 5   that job?

 6                JUROR:  One case I went to court and moved papers

 7   around.

 8                THE COURT:  Do you remember what the nature of the

 9   case was?

10                JUROR:  It was a U.S. Airways crash outside of

11   Pittsburgh that happened in about '97 or '98.

12                THE COURT:  Twenty-eight is you or somebody close

13   to you traveled, worked in South Asia, particularly,

14   Afghanistan or Pakistan?

15                JUROR:  I worked for the Defense Department, so I

16   know a good number of people that have been over there.

17                THE COURT:  Anybody that's like a close friend or

18   family member?

19                JUROR:  Work colleagues, but not true close

20   friends.

21                THE COURT:  Are they part of the military or are

22   they civilians working at the DOD that have gone?

23                JUROR:  Mostly civilian.

24                THE COURT:  And they've gone to Afghanistan?

25                JUROR:  Yes.
```

```
 1              THE COURT:  And Pakistan?

 2              JUROR:  Yes.

 3              THE COURT:  And have they discussed their

 4    experiences there at all?

 5              JUROR:  No.

 6              THE COURT:  Anybody injured with their trips?

 7              JUROR:  No.

 8              THE COURT:  Based on their work, you know, their

 9    trips, et cetera, is this anything that would influence you in

10    this case?

11              JUROR:  I don't believe so, no.

12              THE COURT:  What do you do at DOD?

13              JUROR:  I'm an analyst.

14              THE COURT:  What do you analyze.

15              JUROR:  I'm in -- I'm not sure if I can say, but --

16              THE COURT:  Well, let me ask it this way.  If

17    you're not allowed to say then just say so, I'm not going to

18    press you.  Do you work with classified material?

19              JUROR:  Yes.

20              THE COURT:  Are you allowed to say where in DOD you

21    work?

22              JUROR:  NGA.

23              THE COURT:  Which, for the record, is what?

24              JUROR:  National Geospacial-Intelligence Agency.

25              THE COURT:  Is there anything about your work that
```

1   you think would influence you in this case or you would know

2   something potentially that might affect this case?

3              JUROR:  I don't think so.

4              THE COURT:  You work for DOD, and this case --

5   obviously, because Afghanistan is a war zone, the operations

6   have sort of a military aspect to them, although they are law

7   enforcement.  Anything about that aspect of it or the fact

8   that the charge includes a terrorism charge, anything about

9   that that you think would affect your fairness and

10  impartiality in this case?

11             JUROR:  I don't think so.

12             THE COURT:  And 29 is you or somebody close to you

13  traveled, worked in a predominantly Islamic country.  Is that

14  you at all or the same friends?

15             JUROR:  I grew up in Saudi Arabia.

16             THE COURT:  Were your parents in the military.

17  State Department or --

18             JUROR:  Oil.

19             THE COURT:  Oil.  I was getting to that.  How many

20  years did you spend there?

21             JUROR:  Fifteen, full time.

22             THE COURT:  From age of what to what?

23             JUROR:  Two to 16, and then I got shipped off to

24  boarding school and would visit at Christmas.

25             THE COURT:  Your parents stayed there how much

1    longer?

2                JUROR:  They're still there.

3                THE COURT:  Do you travel there frequently to visit

4    them?

5                JUROR:  I try to go at least once a year to see the

6    family.

7                THE COURT:  Anything about your growing up

8    experience in Saudi Arabia, an Islamic country, that you think

9    would affect your fairness and impartiality in this case, any

10   views you developed or anything else?

11               JUROR:  I don't think so.

12               THE COURT:  Thirty-two is whether you've had

13   friends -- you, family members, close friends, personal

14   experience with acts of terrorism?

15               JUROR:  I was in Khobar when the Khobar Tower

16   bombing occurred, about two kilometers away.

17               THE COURT:  How old were you?

18               JUROR:  Seventeen.

19               THE COURT:  How old were you?

20               JUROR:  Seventeen.

21               THE COURT:  Do you know any people that were

22   killed?

23               JUROR:  No.

24               THE COURT:  Did it -- other than the event, I mean

25   were there any effects on you living in the country at that

1    time?

2            JUROR:  The country got locked down pretty good for

3    about two weeks.  It was interesting to see different security

4    apparatus come out.

5            THE COURT:  But no other effect on your

6    perspective?

7            JUROR:  No.  No.

8            THE COURT:  Thirty-four is whether you're familiar

9    with the Taliban or the Taliban movement?

10           JUROR:  Yes.

11           THE COURT:  What would be the source of your

12   knowledge?

13           JUROR:  Both open source and classified materials.

14           THE COURT:  Now, in this particular case the

15   Government will be presenting evidence relating to the

16   Taliban.  And the charge involves whether or not Mr. Mohammed

17   is associated with the Taliban and whether he was involved in

18   any planning for a strike on Jalalabad airfield.

19           Is there anything about what you know about the

20   Taliban, classified or otherwise, that you would have

21   knowledge relating to any of that?

22           JUROR:  No.

23           THE COURT:  Is it something that you would, in

24   terms of whatever information you do have, let's say, open

25   source for the moment, that would affect how you view

1  Mr. Mohammed at the present time?

2          JUROR:  I don't believe so.

3          THE COURT:  So, do you -- can you presume

4  Mr. Mohammed innocent at this time?

5          JUROR:  Yes.

6          THE COURT:  Do you have any views about him or

7  predispositions or come to any conclusion about him at this

8  point?

9          JUROR:  No.

10          THE COURT:  Will you keep an open mind, weigh the

11  evidence fairly and impartially, and make a decision most

12  importantly on what is presented in the courtroom, not what

13  you may know outside?

14          JUROR:  Yes.

15          THE COURT:  So, if they present information, let's

16  say, less than what you know outside, can you leave that other

17  information out?

18          JUROR:  I believe so, yes.

19          THE COURT:  And if they present more than what you

20  know, again, can you leave the information out?

21          JUROR:  I believe so.

22          THE COURT:  The last question relates to the

23  hardship in terms of the length of the trial.

24          JUROR:  My only concern is I have a doctor's

25  appointment on Friday afternoon that I would like to make.

 1          THE COURT:  What time is it?

 2          JUROR:  3:30.

 3          THE COURT:  How far away is it?

 4          JUROR:  K Street.

 5          THE COURT:  We're probably going to stop at 4:00,

 6  would there be any possibility of you being able to move that

 7  back, do you know?

 8          JUROR:  I could ask.

 9          THE COURT:  Is this like a routine thing or is this

10  something that you specifically set up -- I don't want to get

11  into what --

12          JUROR:  It's specifically set up.

13          THE COURT:  Is it something that you can put off or

14  is it something that you need to attend to?

15          JUROR:  I'd prefer not to put it off.

16          THE COURT:  So, we'd have to stop at 3:00, is that

17  what you're saying, roughly 3:00 to get there?

18          JUROR:  I believe so, yes.

19          THE COURT:  But would you be willing, if you did

20  get selected, to see if you can make it a little bit later in

21  the day?

22          JUROR:  Yeah, I can do that.

23          THE COURT:  Government, any questions?

24          MR. STIGLITZ:  No.

25          THE COURT:  Ms. Jahn?

1              MS. JAHN:  When you lived in Saudi Arabia, did you

2    experience any violence during your time there in terms of

3    what you witnessed or saw?

4              JUROR:  No.

5              MS. JAHN:  When you were there when the towers were

6    bombed, how did that -- I know you said they locked it down,

7    how did that experience impact you at all?

8              JUROR:  I became more aware of different groups and

9    entities that are operating in the world.

10             MS. JAHN:  So, in terms of your knowledge of these

11   different groups, and understanding that some of it is

12   classified, and that's not asking you that.

13             THE COURT:  You need to talk into the --

14             MS. JAHN:  -- understanding that some of it is

15   classified, and I'm not asking you about that.  Based on your

16   personal experiences and your job, if you're given information

17   that may have been contrary to what you already know, would

18   you be able to use that information and --

19             THE COURT:  Which information?

20             MS. JAHN:  The information that's given in this

21   courtroom, which may be different than what your personal

22   knowledge is or your employment related knowledge is, would

23   you be able to make your own assessment independent of what

24   your prior knowledge is in this courtroom?

25             JUROR:  Restate that one more time.

1           THE COURT:  I think what she's getting at is if

2     what we present in court is different than what you know,

3     whether you will consider and make the decision based on what

4     is presented and not factor in what you know on the outside?

5           JUROR:  I should be able to, yeah.

6           THE COURT:  Is that what you're asking?

7           MS. JAHN:  In light of your personal experience and

8     your employment experience, do you have any fears in

9     particular to someone who may allege to have been a member of

10    the Taliban?

11          JUROR:  I don't think so.

12          MS. JAHN:  So, it is clear, you have no fears or

13    you're unsure if you have fears?

14          JUROR:  I don't understand the question.  Do you

15    have any fears based on your prior experiences and your work

16    as to whether or not --

17          THE COURT:  Are the fears associated with this case

18    or his work?

19          MS. JAHN:  Both, Your Honor.  I'm asking in terms

20    of his work and his personal experiences whether or not

21    anything that you've learned or experienced would impact or

22    have a fear level to you in light of what you may or may not

23    hear in this case?

24          JUROR:  No.  I think everyone's got a heightened

25    sense of awareness now, but I don't see that out of the

1   ordinary.

2           THE COURT:  Do you see anything about this case as

3   we've described it that would make you fearful in any way?

4           JUROR:  No.

5           THE COURT:  Since you have, obviously, other

6   knowledge as well?

7           JUROR:  No.

8           THE COURT:  Okay.  Thank you.

9           JUROR:  Thank you.

10  JUROR STEPS DOWN

11          THE COURT:  Why don't we take a break.  It will be

12  a 10 minute break.

13  BRIEF RECESS

14                          AFTER RECESS

15          MR. VANEGAS:  Your Honor, somebody came to my

16  attention just right now when we sat down after speaking to

17  the last gentleman.  As I was looking at the address, he

18  actually -- we live in the same building.  I just saw he's at

19                  .  I live in Apartment    and he's in    .  I

20  don't recognize him.  I mean, I get home so late that I don't

21  run into so much traffic.

22          THE COURT:  You know, he didn't recognize you

23  either, so I wouldn't worry about it.  I appreciate you

24  putting it on the record.  They're told if they run into

25  people in any -- in any other venue, you know, not to talk to

1   you, so --

2           MR. VANEGAS:  Sure.

3           THE COURT:  No.  No.  No.  I always look at the

4   addresses, too, to make sure it's not a neighbor.

5           MR. STIGLITZ:  You're not to suggest that you're

6   coming home late because you're working.

7           THE COURT:  It's going on the Internet.  It's going

8   to be on Pacer.  Eventually they get it downstairs.  They will

9   be able to get it.  In the redactions there will be personal

10  identifying information -- unless the lawyers ask for

11  redactions on other personal identifiers or sensitive material

12  in terms of the personal material or information.  That's why

13  we're trying to get people not to say their name.  But clearly

14  you need to say something to us, but I put it under seal so

15  that should solve it.

16  NEW JUROR STEPS UP

17          THE COURT:  Good afternoon.  This is Juror Number

18  0037.  Seventeen, 22, 25, 30 and 34.  Seventeen is whether you

19  or somebody close to you worked or is working at the State

20  Department.

21          JUROR:  Intern at the State Department back in

22  1996.

23          THE COURT:  If you can speak up just a little bit.

24          JUROR:  I interned at the State Department back in

25  '96.

1              THE COURT:  And were you assigned to a particular

2    desk or section?

3              JUROR:  It wasn't a country desk, it was the Office

4    of Paramilitary Affairs.

5              THE COURT:  Were you there for like a full semester

6    as part of school?

7              JUROR:  I was.

8              THE COURT:  What does Paramilitary Affairs do?

9              JUROR:  It did a lot of the logistical planning for

10   using military equipment to move supplies and to move foreign

11   aid around.

12             THE COURT:  Do you see anything about that work

13   that would have any bearing on this kind of a case?

14             JUROR:  Not really.  I mean, they were doing work

15   certainly in Afghanistan and places like that, that part of

16   the world, so I was familiar with the area and the history

17   from that experience.  I was also studying foreign affairs, so

18   I had knowledge of the area.

19             THE COURT:  Did you come to any conclusions or

20   viewpoints that you think might affect your fairness and

21   impartiality in this particular case, either from your studies

22   or from your work experience?

23             JUROR:  No.

24             THE COURT:  You've served as a criminal juror in a

25   criminal case before?

1               JUROR:  Yes, in Arlington County.

2               THE COURT:  How many times have you been a juror

3     before?

4               JUROR:  Just once.

5               THE COURT:  And without telling us the verdict, was

6     the jury able to reach a verdict?

7               JUROR:  Yes.

8               THE COURT:  Do you remember what the nature of the

9     charges were?

10              JUROR:  I believe it was assaulting an officer.

11              THE COURT:  And how long ago was it?

12              JUROR:  That was about four years ago.

13              THE COURT:  Is there anything about -- factually

14    about that case that you think would affect this one?  We're

15    going to have law enforcement testify, is there anything about

16    that case, views or conclusions you came to or anything that

17    would affect your fairness and impartiality in this case?

18              JUROR:  No.

19              THE COURT:  Anything about your experience as a

20    juror as part of participating in the trial or deliberations

21    that would affect your consideration of the evidence in this

22    case?

23              JUROR:  No.

24              THE COURT:  Twenty-five is whether you or somebody

25    close to you had ever been arrested, charged, found guilty, or

1    gone to jail either for a drug offense or a crime of violence?

2                 JUROR:  Yes.  I had a close cousin who was

3    convicted of a drug offense and went to prison for a couple of

4    months.

5                 THE COURT:  Was that in D.C. or some place else?

6                 JUROR:  That was in Pennsylvania.

7                 THE COURT:  Were you a witness in the case?

8                 JUROR:  No.

9                 THE COURT:  Did you go see it?

10                 JUROR:  No.

11                 THE COURT:  Did you discuss the case with your

12    family or your cousin?

13                 JUROR:  With my family, yes.

14                 THE COURT:  Did you -- based on that discussion,

15    did you come to any conclusions about how fairly he was

16    treated by the police, the lawyers, the Court?

17                 JUROR:  We did feel like the book was quote/unquote

18    thrown at him.

19                 THE COURT:  That's the judge.

20                 JUROR:  I'm sorry.

21                 THE COURT:  I'm trying to identify who you thought

22    was harsher than you would have expected.  You're talking

23    about the whole system, the lawyers, the police and the judge

24    or just the judge at sentencing?

25                 JUROR:  We felt like the sentencing was too harsh.

1    I guess because I was -- I was young at the time, but I guess

2    because of the amount of drugs that he was caught with was on

3    the edge of being, I guess, possession to distribute.  And it

4    sounded like the police may have made an example out of him,

5    so he got a harsher sentence.

6              THE COURT:  Was it in Federal Court or local court?

7              JUROR:  I don't know.

8              THE COURT:  Is there anything about those views

9    about what happened to your cousin, and perhaps he was treated

10   more harshly than you and your family thought that would

11   impact you in your considering the evidence in this case,

12   being fair and impartial to both the prosecutor as well as the

13   defense counsel?

14             JUROR:  I don't think so.

15             THE COURT:  How long ago would that have been?

16             JUROR:  That was in the mid 80s.

17             THE COURT:  Thirty has to do with whether you or

18   somebody close to you ever served in Arm Forces, Reserves,

19   National Guard or ROTC?

20             JUROR:  My father served in the Army and National

21   Guard.

22             THE COURT:  Did he see any combat?

23             JUROR:  No.

24             THE COURT:  I take it he's no longer employed at

25   the National Guard?

1          JUROR:  Right.  Correct.

2          THE COURT:  Did he ever discuss, in terms of the

3   Army -- where was he stationed?

4          JUROR:  He was stationed down in Alabama or

5   Mississippi -- I think it was Mississippi, actually.

6          THE COURT:  So he never went overseas?

7          JUROR:  Correct.

8          THE COURT:  And you indicated a familiarity with

9   the Taliban or the Taliban movement, what would be the source

10  of this information?

11         JUROR:  School, primarily.  Reading about the

12  Soviet Afghan War.  I was a foreign affairs major.

13         THE COURT:  So, this would have been in college?

14         JUROR:  Uh-huh.  And, of course, pop culture books

15  and movies and things.

16         THE COURT:  And have you developed any

17  particular -- based on your studies and the pop culture as you

18  identified, have you identified any particular views about the

19  Taliban?

20         JUROR:  Personal views just in --

21         THE COURT:  Personal views.  Do you have any -- you

22  have this information and have you come to any conclusions

23  about them?

24         JUROR:  I think they are dictatorial, corrupt and

25  extremists and have very, sort of, disgusting views of the way

1    they treat women and civil rights and things like that.  So, I

2    guess you could say, yeah.

3              THE COURT:  All right.  Now, in this particular

4    case they charged -- or the claim includes a claim whether

5    Mr. Mohammed was associated with the Taliban, which the

6    Government would have to prove whether he would have been

7    involved in planning to attack Jalalabad airfield.  Can you

8    separate out your views of the Taliban and come to this case

9    with an open mind, weigh the evidence fairly and impartially,

10   make a decision just on what is presented in the courtroom,

11   not on whatever other things you may have read or even your

12   own views, and separate the two things out.  Can you do that?

13             JUROR:  Yes, I believe I could.

14             THE COURT:  Have you come to any conclusions about

15   Mr. Mohammed based on the charges or based on the descriptions

16   that we've given or anything else at this point, or do you

17   presume him innocent and have no views about him one way or

18   the other?

19             JUROR:  I have no views.

20             THE COURT:  You also presume him innocent, right?

21             JUROR:  Yes.

22             THE COURT:  All right.  Ms. Jahn.

23             MS. JAHN:  You said you studied foreign affairs, do

24   you have a particularized knowledge about the country of

25   Afghanistan or Pakistan in light of that education?

1              JUROR:  No, I focused primarily on the Middle East,

2   but certainly discussion did sort of -- focus around different

3   revolutions and different wars and the Soviet Afghan War was

4   the topic in several classes.

5              MS. JAHN:  What was your primary focus on for your

6   education about foreign affairs?

7              JUROR:  We focused primarily on Israel, Egypt,

8   Syria, Lebanon.

9              MS. JAHN:  And going to the Taliban, you made some

10  reference, I think you used the word disgusting views of women

11  and civil rights.  Do you have any other views outside of

12  women or civil rights about the Taliban?

13             JUROR:  No, I think that's that -- that's pretty

14  much the extent of it.  I mean, from what I know, I see them

15  as sort of a very, I don't know, authoritative, unfriendly,

16  they keep their people under their thumb.  They don't seem to

17  allow people to flourish and grow, and that's about the extent

18  of it.

19             MS. JAHN:  But you would be able to put aside those

20  views if you were to be presented with evidence that

21  Mr. Mohammed is affiliated or a member in some way of the

22  Taliban?

23             JUROR:  Uh-huh.

24             MS. JAHN:  It also says on the jury form that you

25  do web development?

1              JUROR:  Uh-huh.

2              MS. JAHN:  Can you expand a little bit upon what

3      you do?

4              JUROR:  Sure.  I help nonprofit organizations build

5      and develop websites and web applications.

6              MS. JAHN:  For what types of companies?

7              JUROR:  Primarily nonprofits, and they are almost

8      all U.S. based, but they do have International reach.

9              MS. JAHN:  And you don't do any foreign travel with

10     regard to your job, it's all based here?

11             JUROR:  Very little,and it's usually like Canada,

12     Europe,  so --

13             MR. STIGLITZ:  Your cousin's case, what type of

14     drug did it involve?

15             JUROR:  Marijuana.

16             MR. STIGLITZ:  Am I to understand that basically --

17     what was the nature of the case, was it a car stop or was he

18     caught selling to somebody or --

19             JUROR:  I think he was caught with it.  I wasn't

20     sure if he was in a car or at his home, but he was caught with

21     a large enough amount that it was just on the side of intent

22     to distribute.

23             MR. STIGLITZ:  Is that what he was prosecuted for

24     or convicted off?

25             THE COURT:  If you can say yes or no because when

1  we look at the record it's ambiguous when we look at the

2  record.

3           JUROR:  Okay.

4           MR. STIGLITZ:  So, it fair to say that the issue of

5  his guilt or innocence wasn't an issue for your family, it was

6  just how he was treated at sentencing was an issue for your

7  family?

8           JUROR:  Yes.

9           MR. STIGLITZ:  Knowing that the sentencing is

10  purely a matter for the judge to decide, do you feel you can

11  be fair and impartial to both sides concerning your view of

12  the evidence and evaluation of the evidence in this case?

13          JUROR:  Yes.

14          MR. STIGLITZ:  Okay.  That's all I have.

15          THE COURT:  Thank you.

16  JUROR STEPS DOWN – NEW JUROR STEPS UP

17          THE COURT:  Good afternoon.  This is Juror Number

18  0872.  If you can talk into the microphone.

19          JUROR:  Sure.

20          THE COURT:  And it's 19 and 29.  Nineteen is

21  whether you or somebody close to you is currently employed or

22  previously employed by criminal defense or worked in the

23  defense of a criminal case or appeared as a defense witness?

24  So, it is you or somebody else?

25          JUROR:  No, it's my mother.

1          THE COURT:  And what is her role in this?  Is she a

2    defense attorney.

3          JUROR:  She's a lawyer, and she practiced about 20

4    years ago.  I don't know what type of cases because I was a

5    child then, but currently she's an educator.  She's current

6    with her bar but not going to court.

7          THE COURT:  She's an educator in the legal field?

8          JUROR:  Yes.

9          THE COURT:  So, does she teach in law school or

10   something else?

11         JUROR:  County college.

12         THE COURT:  So, she teaches -- does she teach

13   criminal cases?

14         JUROR:  Torts, research, things like that,

15   paralegal courses.

16         THE COURT:  When she worked 20 years ago, you don't

17   know whether or not she actually did any criminal defense

18   work?

19         JUROR:  No, I don't.

20         THE COURT:  Twenty-nine is either you or somebody

21   close to you traveled or worked either civilian or military in

22   a predominantly Islamic country?

23         JUROR:  Yes, I went to Jordan in December.

24         THE COURT:  Was this vacation, work, school?

25         JUROR:  Vacation.

1              THE COURT:  Any untoward events when you were

2    there?

3              JUROR:  We went to a friend's wedding.

4              THE COURT:  Anything that would have happened to

5    you while you were in Jordan that would influence you in this

6    case in any way?

7              JUROR:  No.

8              THE COURT:  Any questions?

9              MS. JAHN:  You said your mom -- you don't know what

10   area of law she practiced, was she with a law firm or was she

11   with an office, do you recall any of that?

12             JUROR:  I know it was a small law firm.  She had

13   mentioned trying traffic cases, things like that.  I know she

14   has extensive experience in contract law.

15             MS. JAHN:  But she never talked about criminal law

16   in terms of you growing up?

17             JUROR:  No.

18             MS. JAHN:  It said that you're a trader for your

19   job.  Can you expand on what that is?

20             JUROR:  Sure.  I trade commodities on the Internet

21   and --

22             MS. JAHN:  How long have you done that?

23             JUROR:  Two years this month.

24             MR. STIGLITZ:  Nothing.

25   JUROR STEPS DOWN - NEW JUROR STEPS UP

1            THE COURT:  Good afternoon.  This is Juror

2    Number --

3            JUROR:  737.

4            THE COURT:  737.  And it's 4, 14, 22 and 34.  Four,

5    you indicated that you thought it sounded familiar in some

6    way?

7            JUROR:  Just read an article and seen it on the TV

8    about folks taking drugs from -- or opium of that nature from

9    Afghanistan and selling it to finance terrorist activities.

10           THE COURT:  Was this like a news program?

11           JUROR:  I think from National Geographic to the

12   newspaper to seeing it on TV.

13           THE COURT:  So, what sounded familiar to you was --

14           JUROR:  The topic.

15           THE COURT:  The topic.

16           JUROR:  Yeah.

17           THE COURT:  And can you put aside what you've

18   learned in terms of the topic for this particular case because

19   what we want you to do is not to come predisposed with views

20   about Mr. Mohammed.  To come in with an open mind, weigh the

21   evidence as presented fairly and impartially, and consider

22   only the evidence presented in the courtroom, not what you may

23   know outside, but only what they tell you in the courtroom is

24   the evidence.  Do you think you could do that?

25           JUROR:  That part probably -- I probably could.

 1          THE COURT:  One of the charges involves -- the

 2   Government would be required to prove that Mr. Mohammed was

 3   associated in some way with the Taliban, and that he may have

 4   been planning or associated with a plan to bomb the Jalalabad

 5   airfield.  So, the question to you is, if -- you're going to

 6   need to listen to the evidence that the Government presents,

 7   decide whether or not they meet their burden, but not be

 8   influenced by what you read in National Geographic.

 9          In other words, we don't want you bringing that

10   information, which is not part of the evidence in the case, in

11   making this decision.  Do you think you can do that?

12          JUROR:  I don't know anything about Mr. Mohammed,

13   so I don't think I can be biased.

14          THE COURT:  So, you can leave out whatever you've

15   read about the topic as you've indicated?

16          JUROR:  Yeah, sure.

17          THE COURT:  Fourteen is the various U.S. and

18   foreign law enforcement officers are going to be called as

19   witnesses, and you met them, they were presented to you.

20   Would you be inclined to give either greater or lesser weight

21   to their testimony just based on their status, as opposed to

22   waiting until they get on the stand and making an independent

23   decision?

24          JUROR:  To answer this question, I've been on

25   juries before, I always tell them -- I do believe in an

1   official setting that if officers were to testify I would give

2   their testimony greater weight than anybody else.

3           THE COURT:  And is that your present view, not just

4   what you've said before?

5           JUROR:  It is, I mean, I'm in court.

6           THE COURT:  I'm just asking whether it was a view

7   that you've changed or whether this is a view that you have.

8   So, any of the people that come and testify in this case

9   before they open their mouths, you would be more inclined to

10  accept their testimony?

11          JUROR:  Yeah.

12          THE COURT:  Than somebody who is a civilian?

13          JUROR:  Yeah.

14          THE COURT:  Okay.  Do we need to go any further?

15          MS. JAHN:  No, Your Honor.

16          MR. STIGLITZ:  No.

17          THE COURT:  Thank you.

18  JUROR STEPS DOWN

19          MS. JAHN:  I move to strike for cause, Your Honor.

20          MR. STIGLITZ:  No objection.

21          THE COURT:  All right.  This is Juror Number 737,

22  he has been excused.

23          MR. STIGLITZ:  He seems to be rather practiced,

24  just judging from his --

25  NEW JUROR STEPS UP

1          THE COURT:  Good afternoon.  How are you?  This is

2     Juror Number 0827, and the questions are 15, 22, 25, 30 and

3     40.  So, let me go through each of these with you.

4          JUROR:  Okay.

5          THE COURT:  Fifteen is whether you or somebody

6     close to you is involved in law enforcement.

7          JUROR:  Yes, my son.

8          THE COURT:  And what is the law enforcement agency?

9          JUROR:  He worked at the Smithsonian in Southwest.

10         THE COURT:  So, he's a special police officer?

11         JUROR:  Yes.

12         THE COURT:  So, does he work for a private

13     contractor that provides the security, or does he work for the

14     Federal Government, the Smithsonian?

15         JUROR:  I think he worked for the Government.

16         THE COURT:  Do you know -- does he carry a gun?

17         JUROR:  No, not yet.

18         THE COURT:  How long has he worked as a security

19     officer?

20         JUROR:  I don't know how many years.

21         THE COURT:  Has he ever had to arrest anybody that

22     you know of?

23         JUROR:  No.

24         THE COURT:  You don't know or he hasn't had to?

25         JUROR:  No, I don't know.

1              THE COURT:  And is that the only one with law

2   enforcement?

3              JUROR:  Yes.

4              THE COURT:  Let's move to 22.  You served as a

5   juror in the past in a criminal case, is that correct?

6              JUROR:  Yes.

7              THE COURT:  How many times?

8              JUROR:  One time.

9              THE COURT:  And was that in Federal Court, Superior

10  Court or some place else?

11             JUROR:  It was in Upper Marlboro.

12             THE COURT:  In Maryland?

13             JUROR:  Yes.

14             THE COURT:  Without telling us what the verdict

15  was, did the jury reach a verdict?

16             JUROR:  Well, the case was about -- the grandfather

17  was accused of raping the six year old granddaughter, and you

18  know, they came up on the stand and talked about it.  But he

19  was released because they couldn't find him -- they didn't

20  find him guilty.  So, someone else, you know, was accused.

21             THE COURT:  So the trial you had was the second

22  person, is that what you're saying?

23             JUROR:  Second person?

24             THE COURT:  Well, you indicated that there was a

25  grandfather who was originally accused, is that --

1          JUROR:  He was locked up.

2          THE COURT:  Is that the case that you were a juror

3     on?

4          JUROR:  Uh-huh.  Yes.

5          THE COURT:  And so you gave us the verdict, the

6     verdict was not guilty?

7          JUROR:  Yeah, for the grandfather.

8          THE COURT:  Was there more than one person charged?

9          JUROR:  You mean -- charged?  Well, they found him

10    not guilty so they let him go, but they said -- they says

11    someone else was accused.

12         THE COURT:  But you were a juror in the case and

13    you actually deliberated and you returned a verdict, is that

14    correct?

15         JUROR:  Yes, I was on the jury.

16         THE COURT:  So the jury reached a verdict?

17         JUROR:  Yeah, for the grandfather.

18         THE COURT:  Anything about that experience, either

19    in court, in terms of participating in the trial, or in the

20    jury room in your deliberations, that you think would affect

21    your fairness and impartiality in this case?  Anything about

22    your experiences as a juror?

23         JUROR:  As to fairness?

24         THE COURT:  Yes.  Did that experience as a juror,

25    would that have any affect in terms of your being fair and

1   impartial for Mr. Mohammed in this case?

2           JUROR:  Oh, no, it wouldn't have no effects.

3           THE COURT:  And 25 is whether you or somebody close

4   to you had been arrested or charged or found guilty or gone to

5   jail for either a drug offense or a crime of violence or both?

6           JUROR:  Well, my son, he was just arrested for

7   having this girl -- fighting, and he got in an argument with

8   the police.

9           THE COURT:  And did he get charged with something?

10          JUROR:  Well, they locked him up.

11          THE COURT:  And did he go to trial or did they drop

12  the charges or what happened to him?

13          JUROR:  He had to pay to get out.

14          THE COURT:  So he paid a fine?

15          JUROR:  Uh-huh.

16          THE COURT:  Where did that occur, in D.C. or some

17  place else?

18          JUROR:  Upper Marlboro.

19          THE COURT:  Is that the only -- is that the only

20  case that you have an answer to this question?

21          JUROR:  Well, also he was shopping with this friend

22  of his and the friend, you know, stole something, and so they

23  got him, too.  But, you know, they let him go, they didn't

24  keep him.

25          THE COURT:  So they let your son go?

1              JUROR:  Yes.

2              THE COURT:  Anything else in terms of this

3     question?

4              JUROR:  No, that's all.

5              THE COURT:  Is there anything about what happened

6     to your son in either of these cases in terms of his dealing

7     with the police or the prosecutors or if he was -- it doesn't

8     sound like he went to trial on anything, so, did he ever have

9     a defense attorney?

10             JUROR:  No.

11             THE COURT:  Well then is there anything about the

12    way that the police treated him or the prosecutor or the Court

13    that you think was unfair.

14             JUROR:  No.

15             THE COURT:  And 30 is whether you or somebody close

16    to you have served in the Armed Forces, either the Reserves,

17    National Guard or ROTC?

18             JUROR:  Well, my son had been in the Marines.

19             THE COURT:  Is this the same son or a different --

20             JUROR:  No, this is my oldest son.

21             THE COURT:  This is a different one?

22             JUROR:  Yeah, he was in the Marines.

23             THE COURT:  How long was he in the Marines?

24             JUROR:  Let's see, I can't think how many years,

25    but he was in there for a good while.

```
 1              THE COURT:  Has he left the Marines, been

 2    discharged or --

 3              JUROR:  Yes, he's not in there now.

 4              THE COURT:  Did he ever see combat?  Did he ever go

 5    to war?

 6              JUROR:  No.

 7              THE COURT:  Forty is if you have any medical

 8    condition or medical problems or medication that you have

 9    concerns about in terms of your staying awake?

10              JUROR:  Staying awake.  Well, I wrote on that card

11    that I take -- I think it is Floxamine (phonetic) -- I call it

12    Lasix, you know, I just take them twice a day, and you know,

13    sometimes it makes me go to the bathroom a lot.

14              THE COURT:  So, if we took breaks regularly would

15    that work for you?

16              JUROR:  Uh-huh.

17              THE COURT:  So, is that a yes?

18              JUROR:  Yes.  Uh-huh.

19              MR. STIGLITZ:  Your younger son, the one who's had

20    some trouble with the law.

21              JUROR:  Uh-huh.

22              MR. STIGLITZ:  So, he was arrested once for

23    fighting with a police officer?

24              JUROR:  Well, he wasn't fighting, they were just

25    arguing, you know.
```

 1              MR. STIGLITZ:  Okay.  But you don't know what

 2    happened to that case?

 3              THE COURT:  He paid a fine.

 4              MR. STIGLITZ:  I got the impression he was just

 5    bonded out.

 6              JUROR:  He paid to get out.

 7              MR. STIGLITZ:  He paid to get out of jail.

 8              JUROR:  Uh-huh.

 9              MR. STIGLITZ:  Okay.

10              THE COURT:  Did anything else happen with that case

11    or was that the end of it?

12              JUROR:  That was the end of that.

13              MR. STIGLITZ:  The other issue was I guess the

14    shoplifting case.

15              JUROR:  Uh-huh.

16              MR. STIGLITZ:  How long ago were those two cases?

17              JUROR:  It was this year -- what was it?

18              THE COURT:  Which case?

19              JUROR:  The first one was back -- I think -- I

20    can't think, I think it was back in January.  January or

21    February, one of those months.  I know it was in '08.

22              THE COURT:  And the one with the shoplifting was

23    also or earlier?

24              JUROR:  It was in '08, too.

25              MR. STIGLITZ:  Do you know, are those cases still

1    pending, does he have to go back to court sometime?

2            JUROR:  No, they let him go because he didn't take

3    anything, he was just with his friend.

4            MR. STIGLITZ:  Okay.  Now, your -- from what you

5    know of your son's cases, do you feel he was treated fairly by

6    the police and the prosecutors in those cases?

7            JUROR:  Yes.

8            MR. STIGLITZ:  I noticed you arrived a little bit

9    late this morning, is there a reason that you arrived later

10   than everybody else?

11           JUROR:  I was downstairs, but when she called my

12   number, you know, I didn't know where to go.

13           THE COURT:  So, you weren't --

14           JUROR:  I was downstairs in the jury room.  She

15   called my number and I didn't know where she wanted me to go.

16           MR. STIGLITZ:  I see.  Okay.

17           THE COURT:  So, did you then ask somebody and they

18   told you where the go?

19           JUROR:  Yeah, I went up and asked her where I was

20   supposed to go, and she told me to wait, she went around to

21   the jury -- the front desk, and the man came around and then

22   he brought me up here.

23           MR. STIGLITZ:  That's all I have.

24           THE COURT:  Ms. Jahn?

25           MS. JAHN:  You said your son -- your oldest son was

1    in the Marines?

2            JUROR:  Uh-huh.

3            MS. JAHN:  Do you know where he was stationed?

4            JUROR:  He talked about Camp Lejeune, so I thought

5    he was probably down there sometimes, you know, maybe not all

6    the time.

7            MS. JAHN:  Did he ever go outside of America or the

8    United States?

9            JUROR:  No.  No.  He didn't talk about going out

10   outside.

11           MS. JAHN:  Right now are you currently working, are

12   you employed?

13           JUROR:  Uh-huh.

14           MS. JAHN:  Where do you work?

15           JUROR:  National Children's Center.

16           MS. JAHN:  What do you do for them?

17           JUROR:  I work in their call center.

18           MS. JAHN:  Answering the phones?

19           JUROR:  Uh-huh.  I am on the computer taking

20   donations from the customers.

21           MS. JAHN:  Thank you.

22           THE COURT:  Thank you.

23   JUROR STEPS DOWN

24           MS. JAHN:  I think I move to strike for cause, and

25   my reason why is because I think Ms. Patterson had to call

1  down to the jury office this morning and they had to track her

2  down.  So, I think we're concerned that her ability to follow

3  instructions when the whole group was sitting together and

4  they all came up here together and she didn't follow those

5  instructions, that she then had to be hunted down, in terms of

6  escorted personally up here.

7          I think some of her answers seemed to be hesitant.

8  Her age and maybe here ability to understand all of the

9  questions that were posed to her, and I move to strike for

10  cause.

11         MR. STIGLITZ:  We don't object.

12         THE COURT:  I'll go ahead and excuse her.  She's

13  827.  It's close, but I'll --

14         MR. STIGLITZ:  For the record, I think that was,

15  yeah --

16  NEW JUROR STEPS UP

17         THE COURT:  Hello.  Good afternoon.  This is Juror

18  Number 0304, and it's Questions 15, 30, 40 and 41.  Fifteen is

19  whether you or somebody close to you was involved in law

20  enforcement.  Is that you or something close to you?

21         JUROR:  Well, kind of a former job.  I worked for

22  the Office of Foreign Asset Control, I'm financial law

23  enforcement.

24         THE COURT:  You need to speak up.  You can speak in

25  a normal tone, they can't hear you.

1            JUROR:  Office of Foreign Assets Control for the

2    U.S. Treasury, and they were financial law enforcement.

3            THE COURT:  What did you do with them?

4            JUROR:  I just wrote software.

5            THE COURT:  How long did you work there?

6            JUROR:  Eighteen months.

7            THE COURT:  How long ago?

8            JUROR:  Two years ago.

9            THE COURT:  Anything about your job there or what

10   you learned there that you think would affect your fairness

11   and impartiality in this case.

12           JUROR:  No, I wasn't involved in their policy

13   making or day-to-day operations, just software.

14           THE COURT:  Thirty is whether you or somebody close

15   to you ever served in the Armed Forces, including the

16   Reserves, National Guard or ROTC?

17           JUROR:  My father was in the Army.

18           THE COURT:  Did he see any combat?

19           JUROR:  No.

20           THE COURT:  And was he drafted, did he go in --

21           JUROR:  Drafted.

22           THE COURT:  Did he ever serve overseas?

23           JUROR:  He was in Korea.

24           THE COURT:  But not during any of --

25           JUROR:  No, in the 60s.  He was a medic.

 1              THE COURT:  Did your father talk about his

 2   experience in Korea?

 3              JUROR:  Just, you know, stories, you know, camp

 4   life.  Bending the rules, exchanging favors because he was in

 5   the medical corps for food, steaks.  Retaliation on officers

 6   for messing with them because they pulled their shot card and

 7   ripping them up and making them get their shots again.

 8              THE COURT:  Okay.

 9              JUROR:  I didn't realize I was laughing so hard.

10              THE COURT:  Anything that he talked about that you

11   think would affect your fairness and impartiality in this case

12   or your consideration of the evidence?

13              JUROR:  Was this a question about serving in the

14   military or any dealings with the military?

15              THE COURT:  It really was serving, but have you

16   been dealing with the military?

17              JUROR:  Yeah, my current job and my previous job.

18   My current job is Office of Naval Intelligence.

19              THE COURT:  And are you still writing software or

20   other things?

21              JUROR:  Just software, yeah.  We track weapons, you

22   know, weapons that are threatening to ships, airplanes and

23   missiles and --

24              THE COURT:  So, are you tracking weapons going on

25   ships or weapons that are attack or what?

1          JUROR:  Yeah, anything that's not American.  Even

2    our allies, British and Australian allies.

3          THE COURT:  So, do you input the information?

4          JUROR:  No.  No.

5          THE COURT:  So, this is a software program --

6          JUROR:  Again, I give them the tools, they do with

7    it what they need to do.

8          THE COURT:  So you set up the program and then they

9    input the information?

10         JUROR:  Uh-huh.

11         THE COURT:  Do you have access to the information?

12         JUROR:  I have access, yes.

13         THE COURT:  Is the access to fix things that --

14   there are problems with the program or access to do something

15   else?

16         JUROR:  Just dealing with the program, so if it's

17   information related then I can look up the information.  If

18   it's program related, you fix it.

19         THE COURT:  The reason we ask is that obviously

20   these alleged offenses occurred in Afghanistan, which is a war

21   zone.  Although this was a law enforcement action, it has

22   certain military aspects to it, so that's what we are

23   interested in.  Is there anything that -- one other piece of

24   potential evidence that may come out is that the Government

25   may indicate in their evidence that Mr. Mohammed was involved

1    with -- associated with the Taliban, and they were working on

2    planning on doing an attack on the Jalalabad airfield.

3              Is there anything about your work that would affect

4    your consideration of that evidence, assuming the Government

5    presented it?

6              JUROR:  No.

7              THE COURT:  Because what we want you to do is to

8    make sure that you make the decision based on what is

9    presented in the courtroom, not on anything you might now

10   outside.  Can you do that?

11             JUROR:  Yes.

12             THE COURT:  Also, we want to make sure you're not

13   coming with any views such that it would influence how you

14   looked at the evidence?

15             JUROR:  I understand.

16             THE COURT:  Do you have any views that you think

17   would affect how you looked at the evidence?

18             JUROR:  No.

19             THE COURT:  You said this was current, is there

20   some other --

21             JUROR:  Yeah, there was another one.  It was called

22   Counterintelligence Field Activity.

23             THE COURT:  Who is that?

24             JUROR:  That is the military.

25             THE COURT:  DoD.

1          JUROR:  It's an organization that allows all five

2   of the branches to communicate.  So, it was like a sharing

3   because -- pre-911 this agency knew something but that

4   information wasn't shared over here, so --

5          THE COURT:  Are you still doing software?

6          JUROR:  Yeah, software.

7          THE COURT:  Anything about that you would know from

8   that job that would --

9          JUROR:  I had zero access to any of the

10  information, I just complete black box.

11         THE COURT:  Forty is whether you have any medical

12  conditions and problems?

13         JUROR:  I don't know if it became apparent but I'm

14  visually impaired.  That's why when I walked up here you guys

15  were all -- I mean, I'm legally blind, but obviously I can see

16  because I have a successful career and I consider myself

17  successful at least.

18         THE COURT:  How would this likely -- I mean, in

19  terms of -- can you -- if we placed you, say, in the first

20  chair there and the witness is there, would you be able to

21  see?

22         JUROR:  Yeah, that's fine.  Like, from the back of

23  the room I had no idea what -- I saw a person on the chair,

24  but I had no idea of your hair color or your features or

25  anything like that.  So, don't -- great distances.  If there

1   are handouts, tiny writing, if you can just put it on a copier

2   maybe zoom it up a little bit.

3              THE COURT:  But if you sat in the first seat, the

4   witness box, you would be able to look at the witness?

5              JUROR:  Yes.

6              THE COURT:  You all know the evidence better.  You

7   will have individual screens every two seats.  How big are the

8   transcripts?

9              MR. STIGLITZ:  Well, we anticipate a binder full of

10  printed transcripts and they are written in about 12-point

11  font.  So, you wouldn't have to share with somebody, each

12  juror would have their own.  But there is a decent amount of

13  transcripts.

14             JUROR:  Yeah, that is probably the lowest I'd want

15  to go is 12-point font.  I can read 12-point font.  I had to

16  complete a questionnaire the other day with 12-point font, I

17  was able to do it, but I don't want to go to 10.  That's for

18  sure.

19             MR. STIGLITZ:  Would you rather have a --

20             JUROR:  Yeah, if it's 14 or 16, that's a great

21  help, it just make things easier.  But it certainly is doable.

22             THE COURT:  Okay.  And in terms of showing things

23  on the screen, you'd be able to, I take it, see because if

24  they showed portions of you'd be able to see it, it's fairly

25  close.

1          JUROR:  Yeah.

2          THE COURT:  Is there anything that we can assist

3     you with in terms of anything that's available --

4          JUROR:  Well, it might be handy to have a

5     magnifying glass just in case I do have an issue.  I carry one

6     in my own -- if you just say, use it, I got my own, obviously.

7          MR. ROTHSTEIN:  What size screen monitor are you

8     used to?

9          JUROR:  I work on the 17.  Sometimes I work on a

10    23.  And at home I bought myself a 30.

11         MR. STIGLITZ:  I think the monitors in the jury box

12    are about the size of that screen there in the corner.

13         JUROR:  Yeah, I got kind of close to one the other

14    day because I was filling out my questionnaire in the jury box

15    and I saw it.

16         THE COURT:  Okay.  All right.  We have one last --

17         JUROR:  I think that was -- I threw that in here

18    just to make sure we covered --

19         THE COURT:  So that is really relating to the

20    vision?

21         JUROR:  Yeah.  More the vision and the jobs because

22    you didn't really ask, you know, are you a contractor to the

23    military specifically, so I wanted to make sure that --

24         THE COURT:  Okay.  Any questions.

25         MS. JAHN:  Just with regard to your vision.  You

1   said you use a magnifying glass.  I notice you're not wearing

2   any corrective lenses right now.

3           JUROR:  My vision is not correctable by contacts or

4   lenses because problem is with the retina, which is a nerve.

5   Lenses and contacts correct the lens in your eye, and I guess

6   just the lens -- is there something else in there, I can't

7   remember.

8           MS. JAHN:  In terms of watching TV at home, do you

9   do that with your magnifying glass?

10          JUROR:  No.

11          MS. JAHN:  Are you able to see whatever screen

12  size?

13          JUROR:  Yes.  I have a 60-inch TV.  I sit down

14  comfortably in a chair.  If there are subtitles or like if I'm

15  watching a ballgame and there's a score, I have to lean

16  forward to see it.

17          MS. JAHN:  So, do you think that if you're

18  presented with a notebook and you used your magnifying glass

19  that that would be sufficient for you to be able to read

20  12-point font?

21          JUROR:  Yes.

22          MS. JAHN:  And in terms of seeing videos, you

23  indicated you were able to see the screen at another occasion,

24  and you think that being that close to the screen would be all

25  right for you?

1          JUROR:  Uh-huh.

2          THE COURT:  There are videos and transcripts along

3     with the video and those audios.

4          JUROR:  Would there be subtitles on that video?

5          MR. STIGLITZ:  No.

6          JUROR:  Okay.  Because that might be a problem if

7     you put like a yellow title onto -- some clutter in the

8     background, it might be difficult to read, because contrast

9     has a lot to do with it, too.  If you don't put blue on blue

10    on anything --

11         MS. JAHN:  If there came a point in time during

12    whether or not you're reading something or you're being shown

13    a video, would you feel comfortable enough alerting to the

14    judge or to someone else that you can't see it.

15         JUROR:  I can do that.  I do that all the time now.

16    I encounter a lot of people who don't know.

17         MS. JAHN:  I just want to make sure you're

18    comfortable.  In light of your prior work experience, do you

19    have a particular specialized knowledge about weapons or

20    missiles or anything of that sort?

21         JUROR:  No, none.  This particular job -- it's been

22    very high level right now, and I just -- we're building a

23    system up where we're nowhere near production, so I really

24    haven't looked at anything.  I have no knowledge really at

25    all.

1             MS. JAHN:  Thank you.

2             THE COURT:  Thank you.

3    JUROR STEPS DOWN

4             THE COURT:  If he does get selected, can you redo

5    those for him -- only if he gets selected?

6             MR. STIGLITZ:  It may be easier to zoom it up and

7    double the size of the -- the problem is --

8             THE COURT:  I'm talking about the transcripts.

9             MR. STIGLITZ:  That's what I'm saying.  Some of the

10   formats -- or some of our earlier formats, if you at all

11   tinker with the transcript's front it just changes --

12   misaligns everything.  It was a very difficult formatting

13   issue.  What we could do is copy the top half of the page,

14   zoom it up, and the bottom half, zoomed out so that way you're

15   getting a larger half in two pages.  We can figure something

16   out.  Also, I know that there's a large screen like that over

17   on the wall that's on wheels that Mr. Kramer can --

18            THE COURT:  Yeah, we can move it closer.  Okay.

19   All right.  We're getting close to the end.  We're not

20   obviously going to get this finished, but let's try ad do a

21   couple more before stopping.

22   NEW JUROR STEPS UP

23            THE COURT:  Juror Number 0048.  Fifteen, 18, 24, 34

24   and 37.  Fifteen is whether you or somebody close to you is

25   involved with law enforcement.  Is that you or somebody else?

1            JUROR:  Not me, my entire family basically -- well,

2    my father and sisters, they all work for the Palm Beach County

3    Sheriff's office.  My dad is a major there and he as been in

4    law enforcement for about 25 years.

5            THE COURT:  Do they discuss their work -- their

6    cases with you?

7            JUROR:  They did a lot this past January.  I went

8    on a week long cruise, so we were all together the whole time

9    on the boat, and they whether talking about work a lot.  And

10   naturally, my brother-in-law is also in the sheriff's office,

11   and he even went as far as to say that he wished he could be

12   writing speeding tickets right now because he was a little

13   tired of being on the boat.

14           THE COURT:  In their discussions, did they discuss

15   drugs at all or drug cases?

16           JUROR:  Yeah, it's Palm Beach County so there's a

17   bit of that.  And growing up that definitely, I guess, came

18   up, I would say.

19           THE COURT:  Anything about -- was there a

20   particular drug that's at issue there or is it just --

21           JUROR:  I can't think of -- it's more general, I

22   would say.  I can't --

23           THE COURT:  Anything about their work or -- their

24   work.  Is there anything about their work that would affect

25   your fairness and impartiality in this case?

1     JUROR:  I would say that I could not say that it

2  wouldn't.  It would be difficult for me to say that I could

3  approach things with a clear mind, just growing up with that.

4     THE COURT:  So, in terms of the question about

5  whether you would give greater weight or lesser weight to law

6  enforcement officers, it's clearly -- from meeting the

7  witnesses they were all law enforcement.

8     JUROR:  Right.

9     THE COURT:  Would you give greater weight or lesser

10  weight to them, or is there something that you -- based on

11  their status, or can you wait until you hear them testimony

12  and come to a conclusion?

13     JUROR:  Well, I definitely would do my best to try

14  to not give greater weight to someone in the law enforcement

15  field, but I think it would be difficult.

16     THE COURT:  You indicated that you or somebody

17  close to you had an experience with law enforcement or the

18  court which would make it difficult for you to be fair and

19  impartial, what's that about?

20     JUROR:  That's about just growing up in a family in

21  law enforcement.

22     THE COURT:  So, growing up in a family in law

23  enforcement you feel would affect your fairness and

24  impartiality in this case?

25     JUROR:  Yes.

1           THE COURT:  Any further questions?

2           MS. JAHN:  No.

3           MR. STIGLITZ:  If the Judge were to instruct you

4  that every witness is to be considered on their own merits,

5  and that the Defendant is entitled to a fair and impartial

6  consideration of all the evidence presented.  Do you feel that

7  you would be able to follow the Court's instructions and

8  disregard any prior experience you have with your family?

9           JUROR:  I could attempt to.  I would try to, but I

10 just couldn't say for certain that I would be able to,

11 especially spending so much time with them this past January

12 and hearing about this -- just different things going on that

13 they deal with on a day-to-day basis.

14          MR. STIGLITZ:  No other questions.

15          THE COURT:  Thank you.  You can sit down.

16 JUROR STEPS DOWN

17          MS. JAHN:  I move to strike for cause.

18          THE COURT:  Any objection?

19          MR. STIGLITZ:  No.

20          THE COURT:  Juror 0048 is excused.

21 NEW JUROR STEPS UP

22          THE COURT:  This is Juror Number 1179.  Fifteen,

23 17, 19, 20, 23, 24, 29 and 34.  Starting with 15, which is a

24 law enforcement connection.  Is that you or somebody else.

25 You need to move up a little and talk into the microphone.

1        JUROR:  It was a long time ago.  I used to work for

2   the Orleans Parish Criminal Sheriff's office as a file clerk

3   when I was in college.

4        THE COURT:  So, the way you presented it, it sounds

5   like you don't think it would have any bearing on you at this

6   point?

7        JUROR:  No.

8        THE COURT:  How would it affect you in terms of

9   considering the evidence of law enforcement officers, giving

10  them more credit, less credit just because they are law

11  enforcement?

12       JUROR:  No.

13       THE COURT:  Is that the only law enforcement

14  connection?

15       JUROR:  Yeah.

16       THE COURT:  I just want to make sure there's

17  nothing else.  Seventeen is whether you or somebody close to

18  you has worked or is working at the U.S. State Department.

19       JUROR:  My stepdaughter used to work for Voices of

20  America.

21       THE COURT:  Did she handle a particular language

22  or --

23       JUROR:  French.  And she dealt with Francophone,

24  Africa, actually.

25       THE COURT:  And either you or -- 19, somebody close

1   to you previously employed by a criminal defense lawyer,

2   defense of a criminal case or appearing as a defense witness?

3            JUROR:  In law school I worked for a -- as a law

4   clerk for a large firm that also did white collar crime, and I

5   worked for one of the partners on several criminal defense

6   matters.

7            THE COURT:  So, I take it then they were not drug

8   cases or anything of that nature?

9            JUROR:  No.

10           THE COURT:  Was that here in the area?

11           JUROR:  No, it wasn't.  It was for Carter and Cates

12   in New Orleans.  That was, oh, God, '93, '94.

13           THE COURT:  Anything about that experience that you

14   think would affect your fairness and impartiality in this

15   case?

16           JUROR:  No.

17           THE COURT:  And 20 is whether you're a lawyer.  So,

18   have you -- besides that experience, have you done any other

19   criminal work?

20           JUROR:  No, I am the Deputy General Counsel of the

21   District of Columbia Public Service Commission, which is

22   regulatory for utility matters.

23           THE COURT:  And what other legal jobs did you have

24   before this?

25           JUROR:  Before that I was the Committee Staff

1    Director for Councilman Harold Brazil.  I was also the Deputy

2    General Counsel for the D.C. Public Service Commission.  And I

3    was an associate that primarily handled public relations for

4    Alexander and Cleaver in Maryland, public relations,

5    regulatory affairs, you know, legislative affairs.

6              THE COURT:  That's been your area of expertise?

7              JUROR:  Yes.

8              THE COURT:  Twenty-three is whether you are --

9    within the past five years have belonged to or participated in

10   crime prevention groups?

11             JUROR:  Yes, my neighborhood civic organization has

12   a crime prevention task force.

13             THE COURT:  Are you presently in it or you had been

14   in it?

15             JUROR:  Had been in it.

16             THE COURT:  And what did you do as part of that?

17             JUROR:  Well, basically we had night-outs where

18   people walked around the neighborhood to be visible.  You

19   know, we came up with strategies for visibility to reduce

20   crime in our neighborhood.

21             THE COURT:  Did you have regular meetings, you

22   personally, regular meetings with the police department?

23             JUROR:  The police department did attend the

24   meetings.

25             THE COURT:  Anything about your interaction with

1    the police that you think would -- because law enforcement is

2    going to be testifying -- that you think would affect --

3              JUROR:  No, I can't imagine anything, no.

4              THE COURT:  Twenty-four is whether you or somebody

5    close to you ever been a victim, a witness to a drug offense

6    or crime of violence?

7              JUROR:  My brother was a victim of a carjacking

8    about 15 years ago.

9              THE COURT:  Was somebody arrested?

10             JUROR:  No, they found the car and not the person.

11             THE COURT:  Anything about that incident or how it

12   was handled by the police that would affect your consideration

13   of the evidence?

14             JUROR:  I can only say that New Orleans was subject

15   to the crack wars of the 90s, so, lucky he wasn't hurt.  That

16   was the most important thing.

17             THE COURT:  Twenty-nine is whether you or anybody

18   close to you traveled in or worked, either in civilian or

19   military capacity, in a predominant Islamic country?

20             JUROR:  My stepdaughter has traveled to Beirut and

21   Lebanon and Jordan.

22             THE COURT:  In what capacity, is that --

23             JUROR:  Well, one of her best friend's father is

24   Arabic, so they travel -- she travels with them quite often.

25             THE COURT:  Have they been to like Afghanistan,

1    Pakistan?

2            JUROR:  No.

3            THE COURT:  Thirty-four is are you familiar with

4    the Taliban or the Taliban --

5            JUROR:  I don't think anybody who reads or keeps up

6    could not be familiar.  I sort of chuckled when I heard that

7    question.

8            THE COURT:  What impression do you have of that?

9    What sticks in your mind about them?

10           JUROR:  What sticks in my mind?  Only what I know

11   from, I guess that would -- only what you generally get from

12   reading the newspaper, the magazines.  What sticks in my mind?

13   Oppressive regime.

14           THE COURT:  The reason we ask is that --

15           JUROR:  That would be the first thing that would

16   come to my mind.  Oppressive.

17           THE COURT:  The second charge does involve a claim

18   that Mr. Mohammed was associated with the Taliban, and that he

19   was planning with them an attack on an airfield, obviously the

20   Government has to present the evidence in terms of whether

21   this actually comes out that way.  So, part of it is -- we

22   want to make sure that you come into the case with an open

23   mind, that you would weigh the evidence fairly and

24   impartially, that you would make a decision only on what's

25   presented in the courtroom, and that you would leave out

1    whatever you read from news reports and not have that

2    influence you or filter the lines from which you look at this

3    evidence.  Can you could that?

4              JUROR:  I mean, I think it's reasonable that I

5    could.  I don't consider myself a closed minded person, I

6    don't.  It's reasonable --

7              THE COURT:  What we want to do is not have you make

8    decisions based on what you know outside.

9              JUROR:  No, I can do definitely do.

10             THE COURT:  We want you to make a decision on what

11   evidence is actually presented by the Government.  So you

12   would be deciding his guilt or innocence based on the evidence

13   presented, not about what you read about the Taliban or

14   something else?

15             JUROR:  I mean, no, I could reasonably do that.  I

16   know the principle, obviously.

17             THE COURT:  The other question is whether -- with

18   this view about the Taliban, as to whether you have already

19   formulated some view of Mr. Mohammed at this point?

20             JUROR:  I don't even know Mr. Mohammed, so that

21   would be impossible.

22             THE COURT:  All right.  Any questions?

23             MS. JAHN:  Just one.  When your stepdaughter had

24   that travel, did she ever have any encounters with issues that

25   happened during the course of her travel?

1          JUROR:  Funny story.  She was there right -- I

2   guess they were -- some coup, and she -- actually, her friend

3   actually had to use her cousin -- first cousin who was some

4   general in the military to get her from the airport to the

5   thing, so that was a positive reaction because everything --

6   there were tire fires and everything, she was scared, but she

7   made it.

8          THE COURT:  What country was this?

9          JUROR:  This was in Beirut, Lebanon.

10         MS. JAHN:  How long ago was that?

11         JUROR:  That was about two summers ago.

12         MS. JAHN:  And learning about her being transported

13  by the military, does that impact your ability here in this

14  case if you hear actions on the part of the military or other

15  law enforcement officers?

16         JUROR:  No.  Let me clarify, it was the Lebanese

17  military, it wasn't the U.S. military.

18         MS. JAHN:  I see.  So nothing with regard to what

19  you learned about that incident would impact your ability in

20  this case to be fair and impartial to Mr. Mohammed?

21         THE COURT:  Like I said, I don't know Mr. Mohammed.

22         MS. JAHN:  Thank you.

23         MR. STIGLITZ:  No questions.

24         JUROR:  I can go?

25         THE COURT:  Go sit.

```
 1  JUROR STEPS DOWN
 2           THE COURT:  The question is -- we are now at 18, we
 3  obviously are not going to get 32 people.  Assuming -- so the
 4  question is whether we should do a few more and then let
 5  them -- I wouldn't go beyond 5:30.
 6           MR. STIGLITZ:  I'm fine if you want to press
 7  forward.
 8           MS. JAHN:  My only concern would be something about
 9  a child care issue since it was not asked before.
10           THE COURT:  I will say something to them
11  beforehand, but I wanted to make sure that the court reporter
12  was up to another 15 minutes.  If you're not, say so.
13           COURT REPORTER:  I'm okay.
14           THE COURT:  How about the interpreters, are you
15  okay?
16           INTERPRETER:  Yes.
17  SIDEBAR VOIR DIRE DISCUSSION ADJOURNED
18           THE COURT:  Members of the jury, do we have
19  everybody here other than the ones that I excused this morning
20  Do we have everybody here besides the ones I excused this
21  morning?  Let me just make sure we have everybody back.  All
22  right.  Does everybody think we have everybody back.  You
23  know, do you know who is on either side.
24           COURTROOM DEPUTY:  We're missing two people on this
25  side.
```

1          THE COURT:  This is why I tell you not to hang out

2     there.  Because if you wait out there we all wait while we go

3     and try to and scout you out and round you up.  Are they still

4     missing in action?

5          COURTROOM DEPUTY:  I'm sending the CSO.  If you

6     want to --

7          THE COURT:  We should make them come back upstairs.

8          COURTROOM DEPUTY:  I told them to come back up

9     stairs.

10          THE COURT:  Instead of making you all wait while

11     the errant two people -- while we round them up.  Let me

12     excuse some people at this point.  You need to contact the

13     this evening the jury office and they'll give you direction

14     about what to do for tomorrow, and they are Jurors 1252, so

15     you're excused at this point.  Juror Number 0737.  Juror

16     Number 0827.  And Juror Number 0048.  Whoever those jurors

17     are, you are excused at this time.

18          As I said, please call this evening since you're

19     still on your two weeks to find out what happened.  I'm not

20     sure where the other two -- are the other two the ones that

21     are missing?  What I'm going to request of the rest of you is

22     I'm going to ask you to return tomorrow.  I would keep you a

23     little bit later, but we're not going to get this done this

24     evening, so it doesn't seem fair to make you stay.  So, I'm

25     going to have you come back tomorrow.

1              What I want you to do is don't go to the jury

2    office on the Fourth Floor in the main building.  Please come

3    back at 9:00 o'clock, wait outside and we'll bring you right

4    in and we'll start promptly at 9:00 o'clock if all of you are

5    there.  Please be on time.  As you can see, if somebody is

6    late it holds things up for everybody else.  And we will get

7    through this as fast as we can.

8              Okay.  The two people who just came in, if you

9    could stay when I excuse the rest for a moment.  I'm going to

10   excuse the rest of you.  Come back at 9:00, wait outside.  If

11   you can remember who you're next to, that's fine.  Wait.

12   Wait.  Wait.  We're going to collect your cards so we will not

13   leave you trying to keep track of it.

14             So, if you've given me your card, do not worry

15   about it.  If you have not given the card, please give it to

16   Ms. Patterson.  Don't leave yet.  You need to give her the

17   card.  We're trying -- we'll try and do it in sort of an

18   order.  As I said, please come back.  I'm serious about the

19   Marshal, I will send them out, and I have done so.

20             So, come back.  Be on time.  We'll get through this

21   just as fast as we can.  I thank you very much for your

22   patience.  I know that we had quite a number of questions and

23   things to go over.  Do not tonight talk about this case.  Do

24   not talk about the material you're going to tell me at the

25   bench.  Say nothing about it.  Don't tell your friends you're

1   here for this case, so they don't go and blurt something out

2   that will create a problem for you.

3            If you see anybody connected to the case whom you

4   have been introduced to, if you see them, say Hello, walk on

5   by.  They're not going to talk to you either, other than

6   saying Hello.  So that we don't have an issue of having to

7   inquire later as to whether you did talk about the case

8   because it's important that you not talk to anybody about the

9   case or anything related to it.  Okay.

10           So, as soon as she has finished -- Ms. Patterson is

11  finished picking them up, then I'll let you go.  Have a good

12  evening.  Take good care of yourselves.  Remember, this is

13  Judge Kollar-Kotelly on the sixth floor of the annex and this

14  is Courtroom 28A.  And there will be somebody outside that

15  will be there.

16           Is that side ready or not?

17           COURTROOM DEPUTY:  We just have a situation.  I

18  just have a situation.

19           THE COURT:  Okay.

20           COURTROOM DEPUTY:  You can excuse everyone else.

21           THE COURT:  Are they all taken care of?  Then other

22  than the two people who came in a little late, if you can wait

23  for one second, everybody else can go.  Have a good evening.

24  (Prospective jurors leave courtroom at 5:25 p.m).

25           THE COURT:  Juror Number 1252, you have been

1   excused.  What you need to do is call this evening to the jury

2   office so they can give you direction about whether you need

3   to come in tomorrow, but you have been excused from this

4   particular case.  All right.  So, you can go.

5           Juror Number 0142, which is left, you need to come

6   back tomorrow at 9:00 o'clock.  If you've given the card to

7   Ms. Patterson you need to be outside lined up at 9:00 o'clock

8   so that we can proceed.  It's important that you not wonder

9   off, that you go some place else.  You need to let Ms.

10  Patterson know if you're going any other place than the rest

11  room and back.  You waste a lot of our time trying to find

12  people.

13          It's important that you pay attention, okay.  So,

14  please be back tomorrow at 9:00 o'clock and we'll be promptly

15  starting from outside.  Okay.  All right.  So you're excused

16  at this point.  If we can wait, we seem to have some

17  additional jurors still left.  All right.  If the juror who is

18  sitting in the well of the court would come over here with the

19  counsel.

20  SIDEBAR DISCUSSION ON THE RECORD WITH PROSPECTIVE JUROR

21          THE COURT:  What is your juror number?

22          JUROR:  1349.

23          THE COURT:  I understand you have indicated you're

24  not going to come back tomorrow.

25          JUROR:  I have to take my mom to the hospital

1   tomorrow.  My sister is supposed to, but she can't get off

2   work, so I'm the only one left to take here.

3          THE COURT:  Is it a doctor's appointment or what?

4          JUROR:  A doctor's appointment.

5          THE COURT:  What time?

6          JUROR:  At 9:30.

7          THE COURT:  What hospital is it?

8          JUROR:  She goes to Providence.

9          MR. STIGLITZ:  Page 3, Your Honor.

10          THE COURT:  Is this a regular appointment that she

11   goes to?

12          JUROR:  Yeah, recently my brother died and she's

13   been having some problems, so I think she's supposed to see a

14   psychiatrist tomorrow.

15          THE COURT:  And do you have some sense of how long

16   that appointment will be?

17          JUROR:  No.

18          THE COURT:  So, is this the first time she's --

19          JUROR:  First time, uh-huh.

20          THE COURT:  What I'm going to ask is that when you

21   finish with the appointment, can you come back?

22          JUROR:  Yes, I'll come back.

23          THE COURT:  Then what I'll ask is that as soon as

24   the appointment is done, if you would call the jury office.

25   Do you know the number for that?

1          JUROR:  Uh-huh.

2          THE COURT:  And tell them you are on your way back.

3    And that way we can tell you exactly where you're supposed to

4    go.  All right.

5          JUROR:  But in the meantime if I can get somebody

6    else to take it, I'll be here at 9:00 in the morning.

7          THE COURT:  Okay.  That would be great.  If you can

8    get somebody else, that would be terrific, but if you can't,

9    then simply just make sure that you come back promptly.

10         JUROR:  Okay.  I will.  Thank you.

11   SIDEBAR DISCUSSION CONCLUDED

12         THE COURT:  So, we've left it that she'll try and

13   get somebody else.  If she can't, she's supposed to come back.

14   But she'll call the jury office and let them know.  She's on

15   the last page, we'll see whether we get there.  All right.

16   Then I would ask if you would get here a little before 9:00 so

17   that you can all set up and be ready, since we've asked them

18   to be outside.

19         It will take a few minutes to give cards out and

20   get them lined up and moving on it.  I will, no matter what's

21   going on, promptly stop at 5:00.  I have a criminal matter set

22   at 5:00 that I need to do.  So, we will be not going any

23   later.  I'm hopeful that we will, by the morning, have at

24   least selected the jury, we'll see, we're a little over

25   halfway through in terms of the number of jurors that we

1   actually need.

2           I would ask that -- you obviously need to leave all

3   of the information in terms of the identifying information,

4   but you obviously have your notes.  Can I ask that you, this

5   evening, look through them and start to come to some decisions

6   about what you want to do or at least some idea, so at the

7   point that we finish the rest of the -- going through the rest

8   of the people, it will not take you as long to make your

9   decisions about the peremptory strikes.  So review your notes.

10  You can take your owns notes back because you have done those

11  by juror number, and I don't have a problem with that.

12          Okay.  Is there anything else?  I guess the other

13  question is the SAM review.

14          MR. VANEGAS:  Your Honor, before we get to the SAM

15  review, what Mr. Mohammed indicated to me earlier when we

16  first arrived was that when he was being transported from the

17  jail, and that is at the point that he was still in the jail

18  and he was taken -- about to be taken -- or the actual

19  transportation, there was a problem with a new guard who was

20  taking him.  And I think because of a misunderstanding,

21  because Mr. Mohammed cannot communicate to guards and vice

22  versa, something happened and he was maced.  And so as a

23  result of being maced, he indicated that he was taken to see

24  the doctor and they reviewed him.  And so he also showed that

25  the way he was hit with the mace, it went on his chest area.

1    So, he showed that to me, and it's clear that there's -- he

2    had like a red rash type, that's what it looked like.

3           But when he went to the infirmary, the doctor

4    actually said to him, you shouldn't leave because you need to

5    make sure that you're okay.  And when we were speaking to him,

6    it seemed that he was still blinking a lot from having been

7    maced.  So, I would ask if the Court can assist us in this

8    matter and make a call to the jail to see -- whatever happened

9    this morning, arrangements can be made so it doesn't repeat

10   itself.  In.

11          But in my experience in dealing with Mr. Mohammed

12   and I think also in dealing with this courthouse and seeing

13   him at the jail, he follows instruction.  I mean, there isn't

14   much that he can do but follow a guard or he's shown where to

15   go to.  So, this morning's incident is out of character, and I

16   think it could -- I don't want the Court -- the proceedings to

17   be delayed if he has to go to the infirmary again for another

18   incident?

19          THE COURT:  I know the Marshals were there and it

20   was something that happened at the jail, but they didn't tell

21   us what it was.  So, I will call over there.  If there's ever

22   an issue, you know, there is a nurse downstairs and we can

23   call and have him looked at.  I mean, in the course of the

24   day, if you had told me earlier, I would have had the nurse

25   come up from downstairs to see if there was anything that

1   could be done, at least during the day.

2           But I will make a phone call over to the general

3   counsel's office to tell them that there's a problem here and

4   I want to make sure it doesn't happen tomorrow.

5           MR. VANEGAS:  And a secondary request, Your Honor,

6   and that is that Mr. Mohammed would like a second portion of

7   food when he gets to the jail because what they bring for him

8   is a small sandwich, and for different reasons he doesn't eat,

9   he's also fasting.  So, when he gets to the jail in the

10  evening, he would like a second meal.  If the Court would

11  like, I can prepare a proposed order and fax it to the Court

12  or the Court may have its own order.  But that's something

13  that he asked me, which is important to him.

14          THE COURT:  You can go ahead and do it.  This one

15  I've had more trouble with because in terms of trying to get

16  who the right people are to get them to actually do it.  But

17  in making my phone call, I'll make sure I include this and

18  find out who it is that you need to tell to try and make sure

19  that it happens.  I assume that there's nothing downstairs in

20  the cell block.

21          MR. VANEGAS:  No.

22          THE COURT:  Because sometimes I know that they have

23  lunch, but I don't think they have anything else.  Do they?

24          MARSHAL:  No.  Meals are brought over in the

25  morning provided by the jail.

1          THE COURT:  I'll make a phone call and see if I can

2     figure this out, but send me the order.  If it turns out an

3     order will work, I'll do that.  But I agree.  The question

4     that I have is when do you want to -- in terms of doing the

5     SAM review, I don't know if you've had an opportunity to talk

6     to him along the way or not.

7          MR. VANEGAS:  We haven't.  We'll have to do that

8     tomorrow.

9          THE COURT:  I guess the question is, can you at

10    least give him sort of a basic understanding of it so that we

11    don't have a problem in terms of it overnight.  You can go

12    through it obviously more carefully, but sort of just the

13    general nature of the restrictions on communications?

14         MR. VANEGAS:  Yes, we did start that.  We did have

15    a --

16         THE COURT:  I just want to make sure so we don't

17    have any problems.  All right.  Then I will see you tomorrow

18    at 9:00.  Thank you all.  Hopefully we can move through.  Good

19    evening.

20    COURT ADJOURNED AT 5:35 P.M.

21

22

23

24

25

1                    C E R T I F I C A T E

2              I, Lisa M. Hand, RPR, certify that the

3     foregoing is a correct transcript from the record of

4     proceedings in the above-titled matter.

5

6

7

8                              _____

9                              Lisa M. Hand, RPR

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25