IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

      Government,               CR No. 06-357
                                  Washington, DC
    vs.                        May 9, 2008
                                  9:11 a.m.

KHAN MOHAMMED,

      Defendant.             A.M. SESSION

_____

TRANSCRIPT OF JURY TRIAL (OPENING ARGUMENTS)
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:          MATTHEW STIGLITZ, ESQUIRE
                                U.S. Department of Justice
                                Narcotics and Dangerous Drug
                                  Section
                                1400 New York Avenue, N.W.
                                Washington, DC  20530
                                (202) 305-3646

                                JULIUS ROTHSTEIN, ESQUIRE
                                U.S. Department of Justice
                                Narcotics and Dangerous Drug
                                  Section
                                1400 New York Avenue, N.W.
                                Washington, DC  20530
                                (202) 305-3646

For the Defendant:           CARLOS VANEGAS, ESQUIRE
                                Federal Public Defender's Office
                                625 Indiana Avenue, N.W.
                                Washington, DC  20004
                                (202) 208-7500

(Appearances Continued on Next Page)

(Appearances Cont'd)

For the Defendant:                DANI JAHN, ESQUIRE
                                  Federal Public Defender's Office
                                  625 Indiana Avenue, N.W.
                                  Washington, DC  20004
                                  (202) 208-7500


Court Reporter:                   Lisa M. Hand, RPR
                                  Official Court Reporter
                                  U.S. Courthouse, Room 6706
                                  333 Constitution Avenue, NW
                                  Washington, DC  20001
                                  (202) 354-3269


Interpreters:                     Naim Saidi
                                  Abdul Wahed Faqiri



Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1                       I N D E X

2                                                  PAGE

3   COURT'S OPENING REMARKS                          7

4   OPENING STATEMENT BY                            30

5   OPENING STATEMENT BY                            51

6

7

8                  P R O C E E D I N G S

9           THE COURT:  Good morning, everybody.  Let's call

10   the case.

11           COURTROOM DEPUTY:  Criminal case 06-357.  The

12   United States of America versus Khan Mohammed, Mr. Stiglitz

13   and Mr. Rothstein for the Government.  Mr. Vanegas and Ms.

14   Jahn for the Defendant.  Defendant is present in the

15   courtroom.

16           THE COURT:  All right.  If we'd swear in the

17   interpreters.  We don't need to do this in front of the jury

18   every morning.

19           (Interpreters sworn by clerk).

20           MR. SAIDI:  Naim Saidi.

21           MR. FAQIRI:  Wahed Faqiri.

22           THE COURT:  All right.  The jurors are all here, so

23   we should be ready to start.  As you can see, we have put the

24   screen there.  My feeling is that at the point that you

25   actually show something we can move that around.  The juror in

1   Seat Number 7 is the one with the vision problem.  And the

2   jury in Seat Number 12 is the one with the left ear.  So, what

3   we thought we would do is -- if we either move that in the

4   middle and everybody can see it, or we can have him switch if

5   he needs to look at the end.  In terms of switch with one, if

6   he needs to be closer to the screen.  We'll just have to see

7   how it works.  My understanding is that the Government -- did

8   you bring the earphones?

9          MR. STIGLITZ:  They are all laid down on the

10   jurors' seats.

11          THE COURT:  That will make it easier.  The only

12   thing we need to be careful of is they will hear bench

13   conferences.  So, I will make sure that we -- the other quick

14   things that I wanted to mention is, you have bean e-mailing

15   issues, which is great.  If I could ask if you could both

16   e-mail and fax things, that way if people -- we can access the

17   e-mails even if we're not at the courthouse, or at least

18   Charles can, because it will be on his e-mail.  And the faxing

19   is if other people are around, we can actually get it.

20          If you're doing it immediately after hours during

21   the week, if you call and you know we're there, there's

22   probably less of an issue of faxing it.  But I want to make

23   sure that if you're doing something in the morning that you

24   actually do a fax as well.  For the weekend, hopefully there

25   won't be any issues, we've certainly issued about six

1    opinions, but just in case there is.  What I would ask is that

2    you get any issue in by noon tomorrow and a response by 7:00

3    tomorrow so we can get it looked at on Sunday and be in a

4    position to take care of it on Monday.  There may be nothing,

5    in which case that's fine.

6              Obviously, during the week the procedures order has

7    it as 7:15 in the evening and 7:15 in the morning, in terms of

8    something -- I would expect something short.  You know, if you

9    anticipate something that's going to come up, that's an easier

10   way of doing it.  I think that's it.  We'll be stopping at

11   around 4:00, unless we're at the end of a witness or whatever

12   else.  You need to use the lapel mics.  I would use them for

13   your openings since we do have people that have issues.  That

14   way you can be in front -- don't get into their space, but you

15   can be in front.

16             And then make sure you have the handheld microphone

17   if you're not -- if you don't have the lapel mic on, which you

18   can switch back and forth.  I don't have any problem doing

19   that.  If you want to do it in terms of the examination of the

20   witnesses.  You do need to move that microphone there at the

21   podium to the side because sometimes they conflict in terms --

22   you get a noise on it.  But if you don't have the mic on and

23   you're doing objections, then please have the handheld.  Since

24   we do have people with issues of hearing and stuff, in

25   addition to the Court being able to make sure I pick up on you

1   and we get a record, so we don't waste time with that.

2              Anything from the Government at this point?

3              MR. STIGLITZ:  Very briefly, Your Honor.  Last

4   night we received a minute entry through ECF from the Court

5   with several rulings, one of which was, and I'll quote it.

6   The Government shall not introduce evidence that the Defendant

7   has a history of drug trafficking.

8              THE COURT:  Right.

9              MR. STIGLITZ:  I understood that to be in the

10  context of something elicited from the confidential source

11  concerning his knowledge --

12             THE COURT:  Right.  Yeah.  All I'm doing -- that's

13  why I said in summary form.  All I did was put in writing what

14  we had discussed orally so you didn't need to go back and look

15  at the transcript.

16             MR. STIGLITZ:  Okay.

17             THE COURT:  But it's the drug trafficking that was

18  discussed at that point.  I'm not talking about, obviously,

19  the elements of this offense.

20             MR. STIGLITZ:  Okay.  Because, I mean, there were

21  very obviously mentions in the recorded conversations that the

22  defense indicated they were not excising, so I just wanted to

23  make sure that wasn't what the Court was addressing.

24             THE COURT:  No.  This was just to put in summary

25  form what we already had.

1          MR. STIGLITZ:  All right.  Thank you.

2          THE COURT:  Anything from the defense?  If not, I

3    think we're ready to go.  I'm going to do the preliminary

4    instruction, and then we'll move right into opening

5    statements.  I would keep these short and pithy in terms of

6    the opening.

7    JURY ENTERS COURTROOM AT 9:26 A.M.

8          THE COURT:  Good morning, everyone.  And thank you

9    for being on time.  I'm sorry that breakfast wasn't on time

10   for you, evidently they were short-handed downstairs in the

11   cafeteria.  But they will leave it there until after lunch

12   time, so when we takes breaks it will be available to you.

13         All right.  I'm going to start with a preliminary

14   instruction.  I'm going to start with a few details about how

15   I run my courtroom and I'm sure that we'll work cooperatively

16   together.  For my part I'll try and make sure that you do get

17   regular breaks so you're not sitting for too long a period of

18   time.  That if we do take breaks that we come back in a timely

19   manner.  I'll give you the schedule each day, what it looks

20   like in terms of if there are other matters that I've had to

21   schedule.  I try not to, but occasionally things arise and I

22   need to fit them in either at the beginning of the day, so

23   we'll bring you back a little later or we'll stop earlier.

24   Today we will be stopping at around 4:00 p.m.

25         Certainly, we will try throughout the course of

1    this trial not to have you sit any later than 5:00, sometimes

2    if we're near the end of a witness we may go over a little

3    bit.  But you'll know the night before what the schedule looks

4    like so you'll be able to plan.

5             I generally do lunches from 1:00 to 2:00.  If

6    that's a problem for somebody, let me know or let Ms.

7    Patterson know.  I can certainly do it earlier.  We try and

8    set a particular time so we can schedule witnesses, and the

9    reason I do it later is that I think it's easier to pay

10   attention in the morning when you have a longer morning, and I

11   give you a shorter afternoon, and you also get some food in

12   the morning.

13            When we do take breaks, we'll obviously be making

14   an effort to be on time on our part.  We try and discuss

15   matters -- legal matters either at the beginning of the

16   morning, at the end of the day, during breaks, any issues that

17   come up so we're not interrupting the trial if we can do that.

18   Sometimes that doesn't totally work.  If we're going to take a

19   little extra time during a break, we'll let you know.  We'll

20   send back something to tell you there is going to be

21   additional time in the jury room.

22            It's important that you be on time.  If one of you

23   is missing, we can't go forward.  So, if it's a short break, a

24   lunch break or overnight, and you're starting with a good

25   precedent here, it's important that you come on time so we can

1   move the case along in an orderly fashion.  As I told you

2   yesterday, if you do come early, that's fine, just push the

3   buzzer, somebody is usually in chambers, and can let you in.

4   You just need to identify yourself as being a juror.

5           What I'd ask is, the buzzer -- they've set the

6   buzzer so if you look at the door we only see the back of your

7   head, so you can turn your head -- they didn't do this right,

8   but if you turn your head a little bit we can see who you are

9   and we'll know that you're one of the jurors.  We've talked to

10  you about ordering something in the morning, so that should

11  get here.  And as I said, if you want to come in early to have

12  the food, and it sort of varies with the time as to when it's

13  there, just sit there quietly, that's fine.

14          Now, if you need a recess at any time, please put

15  your hand up.  I do take regular breaks.  I figure out in

16  terms of witnesses and the court reporter, a regularly

17  break -- a full break in the morning and in the afternoon.

18  But your needs may be different, and if you need a break,

19  that's fine, I have no problem with that.  I want you to be

20  paying attention and not distracted.  Now, if you're putting

21  your hand up, I'm assuming you're not going to ask a question,

22  because you can't in my courtroom.  And you're not going to

23  make a comment about the evidence, because you can't do that

24  either.  So, your hand up should be you need a break or tell

25  me you can't hear somebody or there's something problem in

1    terms of what you're supposed to be looking at.

2            If you have trouble hearing us, please let me know.

3    We all have microphones.  I'll explain, we've given you

4    earphones for some of the evidence, but if it's useful to use

5    it during the trial for other matters, that's fine as well.

6    The only thing I'd ask is that when we have bench conferences,

7    you need to take them off because then you'll hear what we're

8    saying, which you're not supposed to, because they're legal

9    matters.

10           There is probably going to be a combination of the

11   Elmo technical equipment, and if you have screens, as you see,

12   every two jurors, if for some reason they don't work, again,

13   get our attention and we can make sure that they do.  We get

14   them checked, but they are fairly sensitive.  If you knock

15   them as you're sitting down, occasionally they go askew.  But

16   we do have other screens, and that one can be moved around so

17   that we can make it available to you.

18           Now, all exhibits that are admitted into evidence

19   will be made available to you in the jury room during your

20   deliberations.  It may be that counsel wants you to see

21   certain exhibits during the course of the trial.  There may be

22   other exhibits where they actually don't need to show it to

23   you, they will be admitted, but everything that is admitted

24   will be made available to you during your deliberations.

25           One other thing I want to mention is that you will

1    not be getting a transcript of the proceedings.  We do have a

2    court reporter, you've met Ms. Hand.  She does take everything

3    down because it's important to have a record.  So, I'll be

4    instructing people at various times to slow down, spell

5    things, all of it is to make sure that we have an accurate

6    record.  But I don't want you to count necessarily on getting

7    a record yourself.  So, you really need to pay attention, make

8    sure you either takes notes, I'll get to that in a moment, or

9    that you're listening to it very carefully, because you can't

10   count on getting a transcript of the testimony during your

11   deliberations.  So, I don't want you to think, I don't have to

12   pay attention, I'm going to get one.

13          Now, as you know, we do have interpreters in the

14   courtroom.  We've introduced you to them.  I'm not going to

15   have them sworn in in front of you every morning, but we do

16   swear them in in terms of their doing an accurate

17   interpretation.  I do want to give you some instructions,

18   though, I don't want you to attribute any prejudice to the

19   fact that the Defendant, Mr. Mohammed, requires a court

20   interpreter.  The Court seeks a fair trial of everyone

21   regardless of the language that they speak, and no bias is

22   permitted against persons simply because they don't speak

23   English.

24          Now, there may be some witnesses that will also

25   need interpreters, so you should treat the interpretation

1   rendered of the witness's testimony as if the witnesses

2   themselves had spoken in English and no court interpreter were

3   present.  Don't give any weight to the fact that the testimony

4   is given in a language other than English.  Don't allow the

5   witness's inability to speak English to affect your view of

6   the witness's credibility.

7         And I believe we asked if anybody spoke Pashto and

8   nobody put their hand up, so I'm assuming nobody understands

9   the native language.  But it should be whatever the court

10   interpreter says in English is what the actual testimony is.

11         Now, let me go over some of the legal rules that

12   will be important in this case.  I want to emphasize that

13   these remarks are not meant to be a substitute for the

14   detailed instructions, which I'm going to give you at the end

15   of the trial just before you start your deliberations.  These

16   preliminary instructions are intended to explain the

17   procedures we'll be following, the rules of law that will be

18   important in this case, and your responsibilities as jurors.

19         Now, you probably notice that there are 14 of you

20   in the jury box, only 12 will actually deliberate.  The

21   parties have randomly selected the alternate seats, so they're

22   not necessarily 13 and 14.  You will not know whether you're

23   an alternate or not until the end of the case when you start

24   to go for your deliberations.  So, I want you all to think of

25   yourselves as a regular juror, as those that will be required

1   to deliberate.  Don't assume that it's 13 or 14 or any other

2   number.

3          Now, when you took your seats, you have a notebook

4   and a pencil.  It's my practice to allow jurors to take notes

5   during the trial if they want to, and to have their notes with

6   them during the jury's deliberations.  I want to emphasize

7   that none of you are required to take notes, and you shouldn't

8   do so if you think that note taking is going to distract your

9   attention from the evidence or the testimony of the witnesses.

10          On the other hand, if you think that taking notes

11   might help you remember the testimony of the witnesses or

12   other evidence, or might make you pay more attention during

13   the trial, then you're free to do so.  You should remember

14   that your notes are only an aid to help your memory, they

15   should not replace your own memory of the evidence.  And those

16   jurors who don't take notes should rely on their own memory of

17   the evidence and should not be influenced by another juror's

18   notes.  These notes are for the person who is actually taking

19   them, they are not a record for someone else to rely on.

20          I would also suggest that you not spend your whole

21   time with your head down taking notes.  You should be looking

22   up, listening to the witnesses.  You're going to be making

23   credibility decisions about the witnesses, it's important to

24   watch them and their demeanor as they testify.

25          Now, whenever there's a recess in the trial, I'd

1  ask that you leave your notebooks and your pencils on your

2  seat.  You do have the earphones that I mentioned, if you'd

3  leave those as well.  They'll either be watched because

4  somebody is in the courtroom or they will be collected.  No

5  one, including me, is ever going to look at those notes, these

6  are yours.  If you look on the back it has a number, and

7  that's your seat number, so we know where to put them.

8          So, if you look on the back and it's not your seat

9  number, let us know.  We'll put them out each morning for

10 you -- you don't have the right one?  Well, at the end we'll

11 make sure that we get this switched around.  This was a little

12 hectic morning trying to get things together.  But that's the

13 point, before you start taking notes, we will look, because

14 that's the way we know.  We don't look inside, we look at the

15 back and figure out which seat it's supposed to be, and that's

16 where it should be.

17         Now, during the trial and during your deliberations

18 I want to make sure -- well, let me get back to the notes.

19 What is going to happen with the notes is that during your

20 deliberations you get to take your notes back there, but

21 during the rest of the time you either have them in the

22 courtroom or you leave them and we collect them.  That's the

23 only time that you'll actually have them back in the jury

24 room.  And at the end of the trial when you deliver your

25 verdict, the notes will be pulled out, they will be destroyed,

 1   and again, nobody is going to take a look at them.

 2              Now, throughout the trial and during your

 3   deliberations you're not permitted to conduct any research

 4   using the Internet, reference books, other reference material,

 5   independently or as a group, on any issue or subject matter

 6   concerning or relating to what's presented at trial.  As I

 7   mentioned to a number of you as we went through our discussion

 8   with you, the voir dire, you make the decision based on what's

 9   presented in the courtroom.  So, I don't want you to doing

10   research or doing something on the outside.  I'm bringing this

11   up because obviously somebody has done this.  And I want to

12   make sure that you understand you're not supposed to.

13              Also, I'd ask that you not e-mail your friends

14   and family to tell them what case you're on just so they

15   don't -- D.C. is a small community.  Just so that they don't

16   know the attorney or witnesses or whatever else, and then

17   e-mail you something back so you get information again that's

18   outside what's happening in the courtroom.  You will get all

19   of the evidence that will be presented to you and presented in

20   the courtroom.  You'll get the jury instructions at the end,

21   which will set out the elements of the offenses and how you're

22   to consider the evidence.  So, you shouldn't be adding to your

23   knowledge by doing anything on the outside.  And if you do get

24   into doing something like this, we don't wind up having to do

25   a mistrial, which means we start all over again.  You know how

1   long it took us to get the jury this time.

2          Now, at the beginning of the jury selection

3   process you were introduced to most of the witnesses in

4   person, but there were some that were introduced simply by

5   name.  If at any time during the trial you suddenly realize

6   you recognize or might know a witness or a lawyer, somebody

7   referred to in the testimony or the evidence or anyone else

8   connected with the case in any way, then please let me know

9   immediately.  I'd ask that you not tell other members of the

10  jury about your discovery so that information isn't passed on

11  to them.  Simply put up your hand at that point and indicate

12  that you need to approach.

13         Now, this is a criminal case which began when the

14  Grand Jury returned an indictment with the Court.  And the

15  Department of Justice is representing the Government, they are

16  the prosecutors, and they will be presenting the evidence in

17  support of the charges in the indictment.  Now, let me just

18  read you what the indictment is, there's two counts.  Count 1

19  is:  On or about October 18, 2006, in Afghanistan, the

20  Defendant, Khan Mohammed, did knowingly and intentionally

21  distribute one kilogram or more of a mixture and substance

22  containing a detectable amount of heroin, a Schedule I

23  narcotic drug controlled substance, intending and knowing that

24  such substance would be unlawfully imported into the United

25  States.  And then it sets out the violations under the

1    statute.

2              Count 2 is:  From on or about August 1, 2006, and

3    continuing thereafter, up to and including October 29th, 2006,

4    the exact dates being unknown to the Grand Jury, in

5    Afghanistan, the Defendant, Khan Mohammed, and others unknown

6    to the Grand Jury and not indicted here, did knowingly,

7    intentionally and unlawfully engage in conduct that would be

8    punishable under Title 21 and a Code and a section, if

9    committed within the jurisdiction of the United States.  That

10   is, to knowingly and intentionally manufacture, distribute and

11   possess with intent to distribute one kilogram or more of a

12   mixture and substance containing a detectable amount of

13   heroin, a Schedule I narcotic drug controlled substance, and

14   two, opium a, Schedule I, narcotic drug controlled substance,

15   knowing and intending to provide directly and indirectly

16   anything of pecuniary value to any person and organization

17   that has engaged and engages in terrorist activity and

18   terrorism.  Having acknowledge that the said person in an

19   organization has engaged and engages in terrorist activity and

20   terrorism.  All in violation of certain statutes under the

21   Code -- the U.S. Code.

22              Now, you should understand clearly that the

23   indictment that I've just read to you is not evidence in the

24   case.  The indictment is just the formal way of charging a

25   person with a crime in order to bring that person to trial.

1    So, you mustn't think of the indictment as any evidence of the

2    guilt of the Defendant or draw any conclusion about the guilt

3    of the Defendant just because he's been indicted.  At the end

4    of the trial you will have to decide whether or not the

5    evidence presented has convinced you beyond a reasonable doubt

6    that the Defendant committed the offenses with which he's been

7    charged in the indictment.

8              As I explain how the trial will proceed, there

9    will be instances when I'll refer to the Government and to the

10   Defendant.  When I mention the Government, I'm referring to

11   the prosecutor, the person who's presenting the evidence in

12   support of the charges contained in the indictment.  In this

13   case it's either Matt Stiglitz or Julius Rothstein, both of

14   whom work for the Department of Justice, and you met them.

15   When I mention the Defendant, Mohammed, I'm referring either

16   to the Defendant, or when I say the Defendant, I'm referring

17   either to Khan Mohammed or to his attorneys, Carlos Vanegas or

18   Danielle Jahn, and you met both of them.

19             Now, as the first step in this trial, the

20   Government and the Defendant will have an opportunity to make

21   opening statements.  The Defendant may make opening statements

22   immediately after the Government's opening statement, can wait

23   until the beginning of the Defendant's case, and in fact

24   doesn't have to make any opening statement at all.  The

25   opening statements are only intended to help you understand

1    the evidence, which is going to be introduced.  They are not

2    evidence.  After the opening statement or statements, the

3    Government will introduce evidence to support the charges in

4    the indictment.  After the Government presents its evidence,

5    the Defendant may present evidence, but he's not required to

6    do so.  The law does not require a Defendant to prove his

7    innocence, produce any evidence or testify.

8          Then the Government and the defense will make

9    final closing arguments.  Again, the lawyers' closing

10   arguments, just like their opening statements, are not

11   evidence in the case.  They are only intended to help you

12   understand the evidence.  At the end of all the evidence I'll

13   tell you in detail about the rules of law that you must follow

14   when you consider what your verdict shall be.  Finally, you'll

15   leave the courtroom together, you'll go to the jury room,

16   you'll elect a foreperson.  You'll review the evidence,

17   discuss it, and make your decision.  And your verdict for the

18   Defendant, when you reach it, must be unanimous.  All 12

19   jurors must agree.  Your deliberations are secret and I never

20   have to discuss or explain your verdicts to anyone.

21         I want to briefly describe my responsibilities as

22   the Judge and your responsibilities as the jury.  My

23   responsibility is to conduct the trial in an orderly, fair and

24   efficient manner.  To rule on legal questions which come up in

25   the course of the trial, and to instruct you about the law

1   which applies to this case.  It's your sworn duty as jurors to

2   accept and apply the law as I state it to you.  Your

3   responsibility as jurors is to determine the facts in the

4   case.  You and only you are the judges of the facts.  You

5   alone determine the weight, the effect, the value of the

6   evidence, as well as the credibility or believability of the

7   witnesses.

8           You must consider and weigh the testimony of all

9   the witnesses who appear before you.  You alone must decide

10  whether to believe any witness and the extent to which any

11  witness should be believed.  And remember, you must pay very

12  careful attention to the testimony of all the witnesses,

13  again, because you can't count on getting transcripts or

14  summaries of the testimony available to you during your

15  deliberations, even though, as I've indicated, we do have a

16  court reporter here.  You will have to rely entirely on your

17  memory and your notes if you choose to take them.

18          During this trial I may rule on motions and

19  objections by the lawyers, make comments to the lawyers,

20  clarifying questions of the witnesses, and I will certainly

21  instruct you on the law.  You shouldn't take any of my

22  statements or actions as any indication of my opinion about

23  how you should decide the facts.  I try not to develop any

24  opinions at all.  But if you think in some way I've indicated

25  or expressed an opinion about it, it certainly was not

1    intentional and you should disregard it.  The verdict in this

2    case is your responsibility in terms of determining the facts

3    of the case.

4              You may consider only the evidence properly

5    admitted in the case.  That evidence will undoubtedly include

6    sworn testimony of witnesses and certain exhibits.  During the

7    trial, if there is anything else, I'll let you know.  During

8    the trial if the Court or lawyer makes a statement, asks a

9    question that refers to evidence that you remember

10   differently, you should rely on your memory of the evidence

11   during your deliberations.

12             The lawyers in the case may object when the other

13   side asks a question, makes an argument or offers evidence,

14   which that lawyer believes is not properly admissible.  You

15   mustn't be prejudiced against the lawyer who has made that

16   objection or the party that they represent.  It's the lawyers'

17   responsibility to object to evidence which they believe is not

18   properly admissible.  And I may, when the lawyers object, call

19   them up here, hold a bench conference on the side with the

20   husher on.  I'm doing that because we're discussing matters,

21   legal matters, that the Court will have to decide, but that

22   the jury will not have to decide.  So, I'd ask that you not

23   attempt to listen.

24             Now, I know that these bench conferences

25   sometimes can be annoying.  We try and cut them down as much

1    as possible by discussing issues at other times when you're

2    not here, that sometimes doesn't work because something comes

3    out in the evidence that needs to be discussed.  You're

4    welcome during those times to talk quietly among yourselves,

5    even to stand up and stretch, don't talk about the case.  And,

6    please, don't have your earphones on while we're having these

7    bench conferences.

8              If a lawyer asks a question and there's an

9    objection and I sustain the objection, the witness may not

10   answer and you should forget about the question because

11   questions are not evidence in the case.  And you mustn't guess

12   or speculate as to what the answer to the question would have

13   been.  If a question is asked and answered and then I rule

14   that the answer should be stricken from the record, then you

15   must forget about both the question and the answer that was

16   stricken.  You should follow the same rule if it applies to

17   exhibits that are stricken.

18             Now, if I overrule the objection to a question,

19   then the witness will be told to answer and they'll go forward

20   with it.  I want to remind you that every defendant in a

21   criminal case is presumed to be innocent.  This presumption of

22   innocence remains with the Defendant throughout the trial,

23   unless and until he's proven guilty beyond a reasonable doubt.

24   The burden is on the Government to prove the defendant guilty

25   beyond a reasonable doubt, and that burden of proof never

shifts throughout the trial.  The law doesn't require a
defendant to prove his innocence, produce any evidence or
testify at trial.  If you find that the Government has proven
beyond a reasonable doubt every element of the offense with
which the Defendant is charged, it's your duty to find him
guilty.

On the other hand, if you find that the
Government has failed to prove any element of the offense
beyond a reasonable doubt, you must find the Defendant not
guilty.  You must also not be influenced by the nature of the
charges in arriving at your verdict.  Your responsibility is
to decide this case solely on the evidence presented in the
courtroom.  And, as I said, you must not involve yourself in
any kind of independent investigation.

Now, in addition, you should disregard any
statements made about the case by anyone outside of the
courtroom.  As I've told you before, that means you mustn't
talk about the case with the lawyers, the Defendant, the
witnesses, anyone else connected with the case, or the Court
or anybody who just happens to be in the courtroom.  If you
see someone involved in the case, other than a fellow juror
outside of the courtroom, I'd ask that you not talk to that
person about anything.  You'll get to know the people that are
in the courtroom and witnesses, and I'd ask that you not stop
and talk to them.  If you see any of the people, whether it's

1    the Defendant, witnesses, which you'll be seeing as we begin

2    the trial, or counsel, say Hello and walk on by.  They

3    understand that you're not supposed to stop and talk to them.

4              They're also not being unfriendly when they say

5    Hello and walk on, and they've also been given the same

6    instruction.  You may be talking about the weather or sports

7    or something else, but if you're seen talking to somebody

8    connected to the case, I need to do an inquiry in court to

9    make sure you're not discussing it.  So, it's important that

10   you not do it.  It's easier to say Hello and just walk on.

11             Now, if at any time during the trial anyone does

12   try to discuss the case with you or approach you in any way,

13   if your hear anyone talking about the case, refuse to

14   participate in or listen to the discussion.  Tell them you

15   can't talk about it and move away.  We try and tell witnesses

16   and everyone else to make sure that they not discuss it, every

17   once in awhile people forget.  If you you're at the elevator,

18   again, everybody has been told not to talk about the case, but

19   if it sounds like they are, disengage, move away.  Again, it's

20   important to make a decision only on what is presented in the

21   courtroom.

22             Now, if you do happen to speak with somebody

23   involved in the case outside of the courtroom while the trial

24   is going on, we may have to stop the trial, pick a new jury

25   and start all over again.  So, again, I don't want that to

1   happen.  It took us two days to select you.  This is a very

2   important point.  So, again, if anybody does try and talk to

3   you, make sure you don't talk to them, tell them that you

4   can't.  If you're in the cafeteria, some other place, near the

5   elevator, they may not know you're jurors, although I hope

6   you're going to get badges, remove yourself from anyplace that

7   you think they seem to be talking.  And everybody else has

8   been told the same thing.

9           Now, I'm also going to ask you to completely

10  disregard any press coverage.  I don't know if there's going

11  to be any, particularly, but if for some reason there is,

12  whether it's newspapers, TV, radio, anything that you made

13  read, see or hear, if you're exposed to news reports

14  inadvertently, disregard them, turn your attention elsewhere.

15  I'd ask that you use some common sense during this period of

16  time, they may not be talking about the case itself, but there

17  may be topics that in some way could relate to the subject

18  matter of this case.  So, I'd ask that -- whether it's TV

19  programs, news reports, docudramas or something like that,

20  that relate to investigation of criminal cases or drugs or

21  something else, please ignore them.

22          Also, remember that TV or radio shows aren't

23  necessarily real life, so I'd ask that you make your decision

24  on what's presented in the courtroom, not on what television

25  has decided cases should be about.  You'll know more also

1    because you're actually in the courtroom listening to the

2    evidence firsthand.

3            There's sometimes newspaper articles, something

4    that you may feel in your own mind has some relationship to

5    the subject matter here, put them aside, tape them, wait until

6    afterwards.  Again, I'm trying to make sure that you're not

7    influenced by anything from the outside.  Now, until the case

8    is submitted to you, you must also not talk about it with your

9    fellow jurors and your friends or relatives or anyone else

10   that is close to you, until it's over and you've completed

11   your deliberations.

12           Now, in the courthouse -- this is sort of like a

13   small town -- I'm likely to hear back if you're seen talking

14   to somebody connected to the case.  Obviously, when you leave

15   the courthouse and go home, I'm not going to know who you are

16   talking to and what you're talking about.  But let me explain

17   the reason for asking you not to talk about the case until

18   it's all over.  Once you start to talk about the case, you're

19   reaching a decision.  And you also may be influenced by other

20   people's thoughts who may or may not have been involved and

21   have heard all that you've heard.  You're here, you're the one

22   listening to the evidence.

23           We want you to keep an open mind, and that

24   includes your fellow jurors.  So, for instance, you've heard a

25   witness testify, you go back into the jury room on a break,

1    and you comment about whether you believe the witness or not,

2    or you make some other comment on the testimony.  All the

3    jurors may not be around, we don't want to you do that.

4    You're starting to reach decisions and starting to influence

5    each other.  And you're starting to reach a decision before

6    you've heard all of the evidence.

7              Now, I'm not suggesting that you don't process

8    the information you're getting as part of the trial,

9    obviously, you're going to do that and you're expected to.

10   But once you start engaging in discussions, you're starting to

11   be influenced by other people, you're starting to get more

12   fixed in your views and set and you're not keeping the open

13   mind that we want to you have.  So, that's the reason for

14   asking you, among other things, that you not get other

15   information other than what is presented in the courtroom, and

16   that you not start to talk about the case.

17             Now, if you've heard any statements about the

18   case, if anyone has tried to discuss the case with you, or

19   you've been exposed to press coverage for some reason, let me

20   know through the courtroom clerk, don't tell your fellow

21   jurors about it or anyone else so we don't create a problem

22   for them.  Just tell me or the clerk and we'll go ahead and

23   take care of it.

24             Now, after I submit the case to you, then of

25   course you can discuss it, when I instruct you to do so.  Only

1    in the jury room and only in the presence of all of your

2    fellow jurors.  So, you'll start talking about the case once

3    you've heard all of the evidence, the instructions and you

4    start your deliberations and when everybody is there.  It's

5    important that you keep an open mind, that you not decide any

6    issue in the case until after I submit the entire case to you

7    with my final instructions.  And the final analysis, your job,

8    is to decide this case without prejudice, without fear,

9    without sympathy, without favor, and based only a fair

10   consideration of all of the evidence presented in this

11   courtroom.

12           Now, I have a few practical things that I'm going

13   to raise with you.  I'm going to make you responsible for the

14   jurors on either side.  If you begin to see them drift off,

15   please give them a little poke.  I think that's why they put

16   these railings up, in terms of not being able to see it.  I

17   meant what I said about needing a break.  Please put your hand

18   up, get my attention.  As I said, I do take regular ones, but

19   you may want a break at a different time, that's fine.  We're

20   also going to get a lot of information that you're going to be

21   processing.  We're going to be going all day.  I want to make

22   sure you're paying attention.  So, if you reached a point

23   where you need to stop, that's fine, just let me know.

24           We do have water, both inside and there should be

25   some next to you there.  You can bring bottled water if you

1    want.  We do have water and cups near you, so we can provide

2    it there.  Now, also part of my job, among other things, is to

3    ensure as much as I can that you're actually paying attention,

4    so I have one other request.  Some people concentrate with

5    their eyes closed.  If you have your eyes closed, I frankly

6    don't know whether you've drifted off or whether you're

7    concentrating.  So, if that's your habit, please don't do it.

8              I do try and watch also to get a sense if the

9    jurors begin to fidget or you look like you're getting tired,

10   I may call a break or a stretch break, even if you don't

11   communicate it to me.  But, you know, you're somebody who sort

12   of looks down and closes their eyes, I can't tell whether

13   you're listening or not.  So, I'd ask if that's your habit,

14   and that is a habit for some people, please don't do it.

15             Now, all of my comments about staying awake are

16   not any reflection on the seriousness of the case.  It is a

17   serious case to everyone involved.  And it's not going to be

18   reflection on the attorneys either, in terms of their being

19   able to keep your interest, I'm sure that they will.  But, as

20   I said, I know that these trials take time, there is a lot of

21   information that's going to be presented to you that you need

22   to absorb, and it may just come to a point where you need to

23   take a break, and I don't have a problem with that.

24             Now, I want to thank you at this time before we

25   start the trial on behalf of the court and the parties to the

 1  case in advance for your cooperation and attention to this

 2  case.  We will move it in an orderly fashion and fairly, but

 3  certainly as expeditiously as we can.  So, at this point we'll

 4  move to opening statements.  What we have -- while he's doing

 5  this, we have tried to set up lapel mics so that they can move

 6  around a little bit more, but you should hopefully be able to

 7  hear them.  Again, if you have problems, let me know.  They

 8  will have handheld mics, if they don't have those or if

 9  there's objections.  But if you can't hear them for any reason

10  or me or anybody else, again, please let me know.

11          MR. ROTHSTEIN:  Thank you, Your Honor.  Please the

12  Court, Counsel, Mr. Mohammed.  Ladies and gentlemen of the

13  jury, my name is Julius Rothstein.  Thank you again for your

14  service in this case.  Together with my colleague, Matt

15  Stiglitz, we will be the prosecutors who are going to be

16  presenting the evidence on behalf of the United States in this

17  case.  Can we have the monitors on?  I'm getting better at

18  using all these electronics in court, but bear with me.  Thank

19  you.  Back when I first started trying cases, I didn't even

20  have my own computer, so let's see if this works.

21          I introduced myself and my colleague, but really

22  this case isn't about us, and it is never about the attorneys

23  in this case.  If there are two central figures in the story

24  of this case that you'll hear about, it is these two men.  One

25  of them being the Defendant, Khan Mohammed, the other primary

1    figure is another man.  Both men are from Afghanistan.  Pretty
2    much on the other side of the world.  A place where there is
3    an active war zone in Afghanistan and the surrounding areas.
4    And one can think in the annals of history about stories and
5    vignettes, that ordinary men and women were sometimes called
6    upon to make hard decisions that have significant
7    consequences.
8            And I believe that in this case you'll hear
9    evidence that you could apply that same type of situation to
10   the individuals involved in this case.  Both this farmer who
11   grew up in the same village as the Defendant, Geratak village
12   in the district of Chaprahar in eastern Afghanistan in the
13   province of what's called Nangarhar.  And this case pretty
14   much started with him.  This man, who you'll learn, introduced
15   himself to you as Jaweed.  Grew up and was born in
16   Afghanistan, primarily lived there all his life.  In fact,
17   it's a life that's very dissimilar than most people on this
18   side of the world are used to.  It definitely could be
19   categorized as the third world.  As you'll see in some of the
20   videos, some of the buildings and structures and just the
21   general surroundings, it takes you back to maybe some of the
22   old movies about Biblical times.  So, it really is very
23   different than what we're used to.
24           But this man, Jaweed, was living outside of his
25   home country, Afghanistan, in 2006.  He was trying to find

1    work for his family and for himself to support his family in

2    nearby Peshawar, Pakistan.  And while he was in Pakistan he

3    was confronted, asked to come see a person by the name of

4    Abdul Rahman, who was a man who held a certain amount of

5    respect in the Taliban.

6          The Taliban is, as you will hear, is a terrorist

7    organization.  They are responsible for the insurgency that is

8    the cause of many of the problems within Afghanistan.  You'll

9    hear that we are not at war with Afghanistan, but it is still

10   an active war zone.  Men like Abdul Rahman who swear by the

11   tenets of the Taliban, and what they want to do at this point

12   is to commit terrorist acts both against people who they view

13   as infidels and anyone else who stands in their way.

14         This man, Abdul Rahman, asked several times of this

15   farmer, Jaweed, whether he will commit an act of terrorism.

16   Whether he will go back to Afghanistan and rid it of the

17   infidels by killing them, by killing Americans, by killing

18   human beings.  This person, Jaweed, was presented with this

19   situation where it was a proverbial fork in the road.  He was

20   in the situation where it's going to be very hard to say, no,

21   Mr. Taliban, I'm not going to help you.  All of a sudden at

22   that point Abdul Rahman knows he's unwilling and is probably a

23   security risk to their plan.

24         What Jaweed did was said, okay, but I know nothing

25   about terrorism.  I know nothing about getting missiles and

1   firing them at the Jalalabad airfield where there are American

2   troops, where there are Afghans, where there are other

3   coalition forces.  No problem.  Go find this man, the

4   Defendant (indicating), Khan Mohammed.  In fact, Khan Mohammed

5   was from the same village as Jaweed.  So, Jaweed now had a

6   contact of the Taliban.  He went back to Afghanistan and he

7   sought the help of one of his friends, and he poured his heart

8   out to him, and said:  I can't do this.  What am I supposed to

9   do?  His friend -- good friend, gave him the recommendation:

10  Go see the police.  And that's exactly what Jaweed did.

11         He went to see the chief of police of the Chaprahar

12  district and explained the situation.  That, in fact, there

13  was a person within his police district who was identified as

14  a person who he needed to seek out to commit an act of

15  terrorism and violence against Americans and other people who

16  were stationed at Jalalabad airfield.  And what this chief of

17  police did was that -- as soon as he heard this information,

18  it was obviously something that was a threat within his

19  district, a threat within his province, a threat within his

20  country.  And he made the decision to actually report it to

21  the Americans.  It made a lot of sense for him.  He knew the

22  Americans would do the right thing by this.

23         And he also knew that the Americans who he was

24  going to give this information to were stationed at the

25  Jalalabad airfield.  So, he visits there -- visits the person

1    who he had contact with before, Special Agent Jeffrey Higgins,

2    and explains the information to him.  Right away Agent Higgins

3    together with the Afghan police, this police chief, devised a

4    plan.  They had to gain credibility with Khan Mohammed.  They

5    had to find a way in which they can arrest Khan Mohammed, and

6    they had to ensure that an attack did not occur.

7           So the plan immediately was to see if Jaweed was

8    willing to go wired up.  Now, it isn't the wires that you see

9    on me here today with a tape recorder that you might see in

10   movies about the mob and police undercover investigations.

11   What Agent Higgins did was he went out and bought a digital

12   recorder, like an Olympus-type recorder that's advertised you

13   can put a memo on.  And they instructed Jaweed, who had no

14   idea how to use this.  Okay.  Listen, if you're willing to go

15   ahead and do this, meet with Khan Mohammed, see if he's in

16   fact the person who was identified.  See if he in fact was

17   willing to commit an act of terrorism, but we need you to wear

18   this recording device.

19          Jaweed said:  Okay, I'll do it.  He goes and meets

20   with him on August 18th, 2006.  And in a recorded meeting they

21   confirm the fact that, yes, he is an associate of Abdul Rahman

22   and let's plan the attack to kill Americans.  After that

23   conversation was confirmed, they had to gain the credibility

24   of Khan Mohammed, not scare him away, and let him know that

25   Jaweed was serious about this as well.  To further the

1   investigation, the plan was that they were going to obtain

2   rockets, missiles, in fact.  And Chinese missiles were

3   obtained and the plan was that we would deliver them to his

4   house, we would get an Afghan search warrant, which was a

5   lawful court order in which they can enter the house, and we

6   would seize the weapons and then also arrest Khan Mohammed.

7            So that was done.  Credibility was gained by this

8   Mr. Jaweed with Khan Mohammed, but the plan changed because

9   they couldn't ensure that when the missiles were turned over

10  to Khan Mohammed that they would in fact have the security and

11  perimeter in place where they wouldn't -- they were afraid

12  that they would get into the wrong hands.  So, they devised a

13  scheme by explaining to Khan Mohammed, and Jaweed would do

14  this, and he in fact did this, saying:  Listen, I was worried

15  about this stuff.  I don't like this stuff.  You know that we

16  need warheads for this stuff.  You were going to get the

17  warheads.  I buried them in a place.  Someone stole them.

18           Khan Mohammed was very upset about this situation.

19  Don't you realize the Taliban are coming here?  Don't you

20  realize they're going to check on this plan?  You agreed to do

21  this.  You and I were going to do this.  They were going to

22  pay us money for doing this, and now we can't do this.

23           Calm down.  I'll try to get other missiles.  Of

24  course, at that time they thought -- was there anything else

25  that they can investigate this organization for?  Agent

1    Higgins is a member of the Drug Enforcement Administration,

2    and he asked Jaweed to ask the Defendant if he was willing to

3    help supply him with drugs.  And those are the two sides of

4    this investigation.  The terrorism investigation and the

5    narcotics investigation.

6              To summarize the two counts -- and the Judge did

7    read the actual indictment that the Grand Jury returned in

8    this case.  The first count is the knowing and intentional

9    distribution of one kilogram or more of heroin and whether

10   that was intended, knowing that it was going to come to the

11   United States.  And that is a violation of U.S. law.

12             The second count, I guess you could call it a

13   narcoterrorism count, but it is the knowing and intentional

14   distribution -- knowingly and intentionally to distribute,

15   possess with intent to distribute heroin and opium with the

16   knowledge and intent to provide monetary value to any person

17   or organization engaging in terrorism.  That also is a

18   violation of the U.S. law that Congress deemed was

19   appropriate.

20             In fact, there were two successful drugs

21   transactions in this case in which the Defendant, Khan

22   Mohammed, agreed to set up.  On the left you see a picture of

23   the 11 kilos of opium that the Defendant obtained for the

24   confidential source.  And on the right are two kilos --

25   two kilograms of heroin from Afghanistan.  As you will hear,

1   opium is the raw material to make heroin, and it's processed

2   in labs in Afghanistan and sent out the country for export.

3          Two main types of evidence that you'll see in this

4   case.  First of all, one is going to be the testimony of

5   witnesses who are going to take the witness stand in this

6   case.  You're going to hear from DEA agents, Afghan civilians,

7   such as Mr. Jaweed, Afghan police officials, such as the chief

8   of police, and also expert witnesses.  You'll also have the

9   benefit, in addition to certain physical evidence, electronic

10  recordings.

11         Now, witness testimony is oftentimes the most often

12  used, and I would submit to you based upon the jury's weighing

13  of the credibility, probably the most valuable witness and

14  types of evidence that you receive in any kind of criminal

15  case.  But in this case you have the added benefit of hearing

16  the Defendant's own recorded conversations.  Not only that,

17  you get to see videos.  Videos of certain encounters, meetings

18  and drug transactions that the Defendant, Khan Mohammed, took

19  place in.

20         In addition to the digital voice recorder, Special

21  Agent Higgins gave Mr. Jaweed, and asked him if he was willing

22  to wear a video recording device.  He said:  Yes, I'll go

23  ahead and do that.  So, that will give you some added evidence

24  and information about this investigation.  To go through a

25  brief chronology of the major events that you'll hear

1    testimony about in this case, I want to give you a brief

2    factual outline.

3              As I stated before, sometime in May 2006, Jaweed

4    was confronted by Abdul Rahman in Peshawar, Pakistan, and

5    asked him to commit an act of terrorism.  After he met with

6    the DEA and agreed to assist with the investigation, he met

7    with Khan Mohammed on August 18th, 2006.  He had a previous

8    meeting, but this was first recorded meeting.  In this

9    recorded conversation the Defendant discusses his willingness

10   and his role to commits acts of terrorism, obtaining rockets

11   and using them.

12             August 26th there was a recorded conversation where

13   the Defendant agrees and he discusses the purchase of opium

14   with Jaweed.  August 30th, 2006, is a recorded meeting between

15   Mr. Jaweed and the Defendant where they discuss the lost

16   rockets and the consequences of that and how Jaweed now has to

17   get them back, because this is serious.  You agreed to do

18   this, you brought me into this, we have to get new rockets.

19   And they also talk about the opium deal.

20             The story with the opium deal was that Jaweed had

21   a fictitious person who said that, I have a friend who is

22   sending this to America, sending it to the West.  And I have

23   this friend who is in need of opium, and later heroin, and

24   that's what he tells Khan Mohammed.  Of course, he didn't have

25   a friend, this is just the story that the agents and the chief

1   of police said is going to be a story that you can work with

2   and see if he's going to be willing to commit this crime of

3   drug trafficking.

4                September 6th is one of the first videotaped

5   meetings with the Defendant, where he actually solidifies,

6   yeah, there is a customer here, I have it, and we can both

7   make money off of this transaction.  September 10th is another

8   recorded conversation where the Defendant agrees to arrange to

9   meet the person who was going to be willing to sell them the

10  raw opium so that they can give it to their friend.  On

11  September 11th, 2006, Mr. Jaweed and the Defendant actually go

12  to the local Chaprahar bazaar, and you'll hear about what

13  happens at these open air markets, these bazaars, where

14  everything can be bought and sold and bartered and traded,

15  including drug deals.  And that's in fact the place where they

16  were going to meet this drug trafficker, where he would obtain

17  raw opium.  September 14th, 2006, you'll see and hear the

18  Defendant, Khan Mohammed, knee deep in negotiations, and

19  obtaining 11 kilos of opium for Mr. Jaweed to take to his

20  customer.

21               September 18th, 2006, you'll hear a recorded

22  conversation, again, where the Defendant discusses that he

23  knows that these drugs are going to be sent to the United

24  States.  And they also discuss the fact that they need to get

25  more rockets to continue the Jihad and the attacks against the

1    Americans.  September 20th, 2006, yet again, another recorded

2    conversation where you are going to hear the Defendant's

3    voice, at this point agree to help supply two kilograms of

4    heroin powder that was destined for the United States to this

5    customer of Mr. Jaweed's.  That, again, is discussed on a

6    meeting in October 12th, which is recorded and will be

7    submitted for you in evidence.

8            Again, a videotape meeting where -- at the

9    Defendant's own guest house in his compound, you'll see a

10   video of the Defendant inspecting two kilos of heroin that he

11   eventually turned over to Mr. Jaweed for $6,000.  And,

12   finally, on October 29th is the conclusion of this

13   investigation of Mr. Khan Mohammed where he was in fact

14   arrested for these offenses.

15           I mentioned to you before that you'll hear

16   testimony both from the witnesses in this case as well as

17   hearing the Defendant's own statements.  I remind you, they

18   are his words, and I'll highlight some of those phrases later

19   on in my opening statement.  They have been recorded and

20   preserved so that you can analyze that as the evidence in this

21   case.  And as I detailed to you before, it wasn't one meeting,

22   it wasn't one conversation, it wasn't three minutes, it wasn't

23   30 seconds, it was hours, hours of evidence where his plan was

24   discussed openly and freely.

25           And, finally, you'll have the benefit of

1    transcripts because we don't know Pashto, and these

2    conversations were transcribed and then translated from Pashto

3    into English.  And as you'll see and the Court will instruct,

4    these transcripts have been vetted and gone over, and the

5    parties will agree that they are accurate translations of what

6    was said in these conversations.

7              Now, I'm going to violate one of my major pet

8    peeves with PowerPoint presentations.  I hate when people put

9    on these PowerPoint presentations and read the whole thing,

10   and I'm going to violate that right now.  But I'm doing that

11   just because I want to be accurate and I don't want to make a

12   mistake about the quotes.

13             In this case you'll hear the Defendant's

14   statements and you'll divine from the translations that on

15   August 26th, 2006, the Defendant, Khan Mohammed, said:  God

16   willing, I will give you the opium, dear brother, that 60

17   seyrs -- a seyr is an Afghan measurement of weight.  And I

18   have a source and we'll find good stuff for him, God willing,

19   as long as he keep the secret of mine and yours in the future.

20   This is a crime in Afghanistan, it's not something that is

21   openly done.  If you traffic in narcotics, you will be

22   arrested.  And, therefore, he has a source, but you must keep

23   the secret, it's among you and me.

24             In that's same conversation, Mr. Jaweed, who is

25   at this point the confidential source, says to Mr. Khan

 1   Mohammed:  I have brought the thing and I have placed it ready

 2   somewhere -- he's talking about the missiles.  I swear by God

 3   that I am tired of it.  This thing needs to be placed

 4   somewhere, friend.  We will bury it somewhere, just get me off

 5   the hook from this shit.  You promised to just have it

 6   delivered and then you will take the responsibility.  I found

 7   this thing now, my friend, get me out of this shit.  I swear

 8   that I am so distressed that I cannot sleep a day -- at night

 9   or at daytime.  The other thing is that there is no warhead

10   with that, it takes the mortar's warhead, and you should find

11   those.  What did the Defendant respond?  Okay.  God willing, I

12   will find the warhead for it.  I also have a source for that.

13           Same conversation, the Defendant says:  Okay.

14   This would be our plan tomorrow, we will assign a place, we

15   will dig a hole and then we will bury it for the police

16   station.  He's talking about using it against the Chaprahar

17   police station.  We discussed before and I told you that the

18   DEA said, okay, listen, we're not going to deliver the

19   rockets, it's too dangerous of a plan, we can't ensure it and

20   we can't risk losing life if these rockets get out of our

21   hands.  And this is told to the Defendant, Khan Mohammed.  And

22   his response was:  Okay.  For now find some material.  He's

23   talking about replacement rockets.  The thing is, when these

24   people come here, the Taliban, they will ask me, and when they

25   come here these things should be ready for them.  We will also

1   give them the opium, and we'll get these things for them.  If

2   we don't get these things for them, then tomorrow they're

3   coming here and will ask me question.  He needs an answer.

4              Again, Defendant's own words translated for you.

5   On August 30th, 2006, Defendant, Khan Mohammed, said, quote:

6   And we'll try to get the opium.  We will find the opium and

7   you will get the missiles.  No mistake about his volunteering

8   and taking part in both of these plans.  The CS asked about

9   what did these Taliban members do?  The Defendant explains to

10  Jaweed.  What they do is to kill the Americans.  The Americans

11  are the infidels and Jihad is allowed against them.  If we

12  have to fire missiles toward the airport, we will do it, and

13  if not the airport, wherever they are stationed.  We will fire

14  at their base, too.  I mean, we have to use the mines, too,

15  God willing.  We and you will keep doing our Jihad.  This is a

16  conspiracy that's continuing.

17             We fired rockets at the county chief office and

18  they paid us 300,000 rupees for one night program.  God

19  willing, if you do a program, then I will take 200,000 or

20  300,000 for you, too.  That's the first recorded conversation

21  where they were trying to test whether or not Khan Mohammed

22  was the person identified and whether he was willing to do

23  this.  By his own words, you'll see, that he talks about doing

24  this in the past, and he explains that we are going to get

25  paid when we complete this program -- this mission.

1          If we don't get rid of the infidels, Khan

2   Mohammed said on August 18th, 2006, this would be a great

3   obstacle in our country, and we will continue our Jihad.

4   Jihad is allowed, religiously, against the infidels.  And if a

5   Muslim is on their side and gets shot, the hell with them.

6   That's the Defendant's attitude about collateral losses and

7   other Muslims who were seen as assisting the Americans.

8          On September 20th, 2006, Mr. Jaweed asks:  Once

9   available then, I will talk to him about this.  He, this is

10   his customer he's talking about, is sending it to American,

11   and he is dealing directly with America.  What do we care

12   about this?  I was a Jihad in this.  Did you understand or

13   not?  Khan Mohammed's response is:  This is the word.  As much

14   as you want, I will give it to you.  And then the CS says:

15   All right.  Is it possible to find powder?  Talking about

16   heroin.  There are a lot, as much as you need, I will give it

17   to you.  Two things will be done.  One, as they say, the Jihad

18   will be performed since they send it to America.  Sending

19   heroin as part of the Jihad.  Sending it to America.

20          In an audio recording on September 18th, 2006,

21   Mr. Jaweed explains that the guy is very happy with your

22   opium.  I called him the other day and asked him, what is

23   going on with the opium?  He told me that he is sending the

24   opium overseas with good rates.  I mean, he is sending the

25   powder, talking about the heroin, to the United States and

1    France, mostly to the America cities.  Khan Mohammed's

2    response:  God willing, as much as he needs, we will get it

3    for him.  No mistake about his willingness to participate in

4    drug trafficking.

5              Again, by his knowledge about where it's going,

6    this opium is going abroad and all powders are going abroad is

7    what Jaweed tells him.  Good.  May God turn all the infidels

8    to dead corpses.  On September 1st, 2006, the Defendant says:

9    May God eliminate them right now and we will eliminate them

10   too, whether it is by opium or by shooting, this is our common

11   goal.  These are the Defendant's own words, his own statements

12   recorded and preserved.  But I also want to talk about the

13   Defendant's actions, actions that will be corroborated through

14   the eyewitness testimony in this case.  They will be

15   corroborated through the videotape that you'll be able to see

16   of him actively participating in the drugs transactions.  And

17   it will be corroborated through the actual seized evidence.

18   It's not like this happened some time in the past where we're

19   relying on events that you can't make sure whether or not this

20   was in fact opium or heroin.  It was seized by the Americans,

21   it was sent to laboratories, and you'll hear expert testimony

22   that in fact what was sold, what was intended to be

23   distributed and trafficked, was opium and heroin.

24             I mentioned the videotape -- this is the

25   videotape outside, going into the opium dealer's compound.

1   And that's the Defendant, Khan Mohammed, in a still photograph

2   taken from that video camera that was covertly secretly placed

3   on Jaweed's clothing.  October 18th, 2006, these are the two

4   kilograms that I told you were seized from that deal.  How can

5   you confirm that Khan Mohammed was part of that deal?  At his

6   feet is a kilo of heroin.  In his hands is a kilo of heroin.

7   You also hear the discussions and how he's telling someone

8   nearby to make accountings of this.  Take down the seal, the

9   stamp of approval from this lab.

10          Two individuals in this case.  Two individuals

11  who had a choice and had the proverbial fork in the road.  One

12  would hope that when matters of consequence -- do they happen

13  to one of us, one would think they would make the right

14  choice.  In this case you have two opposite sides of the coin.

15  A person who did make the right choice for his country, for

16  others.  And a person who made the choice to be a drug

17  trafficker and to be a terrorist and was willing to kill

18  people, no matter how he would do it, by shooting or by drugs.

19          You, too, will be presented with a choice.  And

20  based upon the evidence that we anticipate that you'll

21  receive, you can come to one conclusion, that the Defendant,

22  Khan Mohammed, is a terrorist, is a drug trafficker, is guilty

23  of both charges.  Thank you.

24          THE COURT:  All right, Ms. Jahn.

25          MS. JAHN:  Your Honor, may we approach?

1   SIDEBAR DISCUSSION ON THE RECORD AS FOLLOWS:

2            MR. VANEGAS:  Your Honor, I thought that based on

3   the Court's order from last night regarding the exclusion of

4   references to missiles, and that missiles were obtained and

5   that those missiles were not ever shown, or that Mr. Mohammed

6   had no association whatsoever with those missiles.  I thought

7   that that was clear that he was not allowed to argue that.

8            THE COURT:  He can argue what's on the tapes.  He

9   can't show the photograph.  He can't discuss other stuff

10  that's not on the tapes.  As far as I know, I mean, I haven't

11  seen these tapes, but what he's talking about is what's on the

12  tapes.  And, certainly, the business that he's talked about,

13  at least some of those transcripts I have read, and he's

14  accurately presented it.  So, I didn't say they couldn't have

15  anything to do with missiles.  It's on the tapes that's going

16  to be admitted, he is argue from that.

17           What he can't do is present, the photos of the

18  missiles, and get outside of that than what is on the tapes.

19  But I didn't exclude all of the information on the missiles.

20  As far as I know, I think he argued -- unless I'm wrong -- I

21  think he argued from what statements have been made on the

22  tapes, which talked about they buried, they lost them, et

23  cetera.  Beyond that, I don't think he's gone -- you know,

24  that's why I made it clear on that, that we were talking

25  about -- where we discussed them here, and I did it in a

1   shorthand way, to sort of keep it.  But they weren't able to

2   do the photographs because he never saw those, and he never

3   saw the missiles.  And he didn't say he saw the missiles.

4            MR. VANEGAS:  And the way I listened to it and

5   understood it, it seems that he was making specific reference

6   to this CS buying the missiles and Mr. Mohammed saw them or

7   that he had association --

8            THE COURT:  I didn't -- there's nothing that I

9   heard that said, because I was listening, that said that he

10  saw them.  The whole point was that they were buried, which is

11  on the transcript that they were buried.  They then got

12  together again, and the CS said that they were stolen.  So, he

13  never saw -- the Defendant never saw the missiles.  And on the

14  tapes he never saw the missiles.  I don't think he said

15  anything about seeing the missiles.

16           MR. VANEGAS:  Well, that and also the issue with

17  respect to drug -- that is, going to the bazaar and buying

18  drugs, that that was all illegal, a local crime in

19  Afghanistan.

20           THE COURT:  Well, I assume there's going to be some

21  evidence of that.

22           MR. VANEGAS:  Well, if that is the case then it

23  should have been disclosed as 404(b) evidence that --

24           THE COURT:  No, it isn't.  There's nothing 404(b)

25  evidence about whether or not it's illegal or legal there.

We've had discussions about whether it is or is not, whether
at certain points growing poppies is or is not, this has been
an issue that's been out there.  And unless you have some
dispute that at the point, not some earlier point, but at this
point, which is why I excluded this other information, at this
point in time when he was involved in this in 2006 whether it
was illegal or not.  Unless you dispute it, I assume that they
would say something, otherwise, the jury would be left with
the impression that it could be legal there, even if it's
illegal here.  Nothing was ever raised about it.  I don't see
it as 404(b) evidence to state the law, as long as it's an
accurate statement.

I did preclude the discussion about the drug
trafficking earlier because it wasn't clear and I thought it
was going to be confusing.  Certain times it was legal,
sometimes it wasn't, and confuse the issue in terms of this.
If you had a question about it, you should have raised it.  I
expected that they would bring this out.  And there's never
been -- there was an issue about his earlier issues when he
was involved, according to the record, or the evidence that
they were proffering, that he had been involved in it.  And
you brought up the fact that it might have been legal during
that period.  I precluded that because I didn't want them
going down that route as to whether it was or was not
speculating about it, so that's out.

 1              But whether or not it's legal now, I think that is

 2     something that can come out.  I don't see that it's 404(b)

 3     evidence.  It's either the law or it isn't.

 4              MR. VANEGAS:  Very well.  With respect to the first

 5     issue that I was raising, we heard it differently, that is, me

 6     and Ms. Jahn, we looked at each other and thought that it was

 7     clearly argument that went beyond what the Court excluded.

 8              THE COURT:  I don't think.  He did not say -- as

 9     far as I know it was from the transcripts.  You know what's in

10     there, he read this material that was on there.  I didn't see

11     him saying anything about saw.  You can make the point in your

12     opening if you want that he never was shown and that is

13     correct.

14              MR. VANEGAS:  For the record, we're going to move

15     for a mistrial based on what we thought was improper argument

16     based on the Court's exclusion.  That's how we saw it.

17              THE COURT:  I will take a look at it and see if the

18     testimony -- whether what his argument is anything outside of

19     what is in the transcript.  What I precluded was the

20     photograph and the fact that he would have been shown the

21     materials, that's what I precluded.  I didn't think he argued

22     that he was shown anything.  He was talked -- they talked

23     about it and it was going to be buried and was going to be

24     provided, and then they never did.

25              MR. VANEGAS:  That's fine.

1          THE COURT:  But I don't remember anything.  If you

2     wrote down a quote that he's saying he saw it, let me know, I

3     can double check here.  You didn't order the rest of the

4     openings, but I'll look and see if there's anything there.

5     And I'll clarify it if for some reason that that's what he

6     said, but I don't think so.  You prepared this, you obviously

7     have it by memory.  Did you say that at all?

8          MR. ROTHSTEIN:  No.  In fact, I altered my opening

9     in my PowerPoint by taking out references that the Court

10    precluded.  So, I knew what my ground rules were.

11         THE COURT:  You can go back to the transcripts

12    precluded -- what's on the tapes is in.  You can argue from

13    that.  What was not is the photograph, which would act as if

14    he had seen these missiles, and he didn't.  That's what I took

15    out.

16    SIDEBAR DISCUSSION CONCLUDED

17         THE COURT:  All right.  Ms. Jahn, you need to

18    switch the --

19         MS. JAHN:  Good morning.  Mr. Mohammed did not

20    knowingly or intentionally distribute heroin, knowing or

21    intending that the heroin would be unlawfully imported into

22    the United States.  Mr. Mohammed did not distribute nor did he

23    possess with the intent to distribute the opium and/or the

24    heroin knowing either directly or indirectly that he intended

25    to provide anything of value to a person or organization that

1   engages in or has engaged in terrorism or terrorist activity.

2           Mr. Mohammed is innocent of the charges against

3   him.  At the end of this trial we will come back and we will

4   ask you to return the only just verdict in this case.

5   Verdicts of not guilty.  I have the honor of representing

6   Mr. Khan Mohammed.  Mr. Mohammed is a citizen of Afghanistan.

7   He comes from a small village, it's called Geratak village

8   within the Chaprahar district of Nangarhar province in the

9   country of Afghanistan.  A place halfway across the world from

10  here.

11          You will come to learn, Mr. Mohammed as a son, as a

12  husband, and as a father to seven children.  You will come to

13  learn that Mr. Mohammed was living with his wife, his five

14  daughters, his two sons, his mother, his brother and his two

15  sisters.  You will come to learn that Mr. Mohammed has been a

16  farmer for almost all of his life.  You will also learn about

17  another man, another man who was from the same village as

18  Mr. Mohammed.  This other man we will call Jaweed.

19          As it turns out, Jaweed was working for the DEA.

20  He was working as an informant for the DEA.  And you will

21  learn that Jaweed received over 8,000 American dollars for his

22  work with the DEA against Mr. Mohammed.  You will learn that

23  this is an extraordinary, extraordinary amount of money for a

24  person who had been a farmer in Afghanistan.  Now, you will

25  learn that this case almost exclusively revolves around the

1    actions of Jaweed.

2            As the Government told you, you're going to get to

3    hear and see a lot of different conversations that were had

4    between Mr. Mohammed and Jaweed.  You're going to get to see

5    videotaped recordings, you're going on get to hear audio taped

6    recordings of phone conversations.  Now, one thing that you're

7    going to hear in these recordings, and you were exposed to it

8    a few minutes ago, is some offensive language.  Offensive

9    language about women.  Offensive language about Americans.

10   And offensive language about death.  I ask you, don't let the

11   emotional impact these words might have on you in implementing

12   your ability to be a fair and impartial juror in this case.

13   Focus on all of the evidence that is put before you.

14           Now, on October -- sorry, August 26th, 2006, you

15   will hear that Jaweed and Mr. Mohammed had a recorded

16   conversation.  You'll hear that during this conversation

17   Jaweed needs Mr. Mohammed's help in obtaining opium.  You'll

18   hear Jaweed say, I've got a friend who needs opium.  But I

19   don't have a source, Mr. Mohammed, I don't know what to do.

20   Mr. Mohammed, will you help me?  Mr. Mohammed tells Jaweed:

21   Sure, I will agree to help you.  About a week later on

22   September 6th, 2006, you're going to hear another recorded

23   conversation between Mr. Mohammed and Jaweed.  You're going to

24   hear that during this conversation, Mr. Mohammed says:  I

25   don't have any opium.  I don't store it in my house, nor am I

1    buying it.  But I could go to the market and find out

2    information about the opium.  I will find out information

3    about pricing.  Mr. Mohammed also tells Jaweed:  I'm broke.  I

4    don't have any money, but I'll help you get the opium.

5           Then you're going to hear evidence that on

6    September 14th the opium transaction takes place.  We don't

7    dispute that.  Ladies and gentlemen, there's no dispute that

8    Mr. Mohammed helped Jaweed obtain the opium.  But you're going

9    to hear that either prior to or during the drug transaction

10   regarding the opium, there's absolutely no recorded discussion

11   about where these drugs are going.  There's no discussion

12   about where the drugs are going.  It's only four days later.

13   Four days after the transaction happens on September 18th,

14   2006, that Mr. Mohammed and Jaweed have a follow-up

15   conversation about how well the opium drug transaction had

16   happened.

17          Now, it's likely at this time when Jaweed starts

18   saying words like America, Britain, France, London, he

19   probably received those instructions from the DEA.  Now, about

20   a month later on October 12th, 2006, there is another

21   transaction.  Again, we do not dispute that the second drug

22   transaction happened.  There is no dispute that Mr. Mohammed

23   helped Jaweed obtain opium on October 2006.  But what's

24   different about October is that now we've got words like

25   America.  But what you're going to see or what you really

1   won't see, and there's no evidence to suggest this, is that

2   Mr. Mohammed wasn't seeking out Jaweed to make money for other

3   drug transactions.  Rather, it's Jaweed seeking out

4   Mr. Mohammed.  See, Jaweed is working with the DEA, and Jaweed

5   needs to make a case against Mr. Mohammed.

6            Now, ultimately the heroin transaction takes place

7   on October 18th, 2006.  One of the important and vital issues

8   in this case is whether or not Mr. Mohammed intended or

9   knowing that the heroin would be unlawfully imported into the

10  United States.  Equally important is whether or not

11  Mr. Mohammed distributed or possessed with the intent to

12  distribute the heroin and/or the opium, knowing or intending

13  to provide either directly or indirectly, anything of value to

14  a person or organization that engages in terrorist or

15  terrorist activities.  Those are the two main issues.

16           Now, you may think as a juror, once you've heard

17  the Government's opening statement, you've heard my opening

18  statement, that you should have an opinion as to the guilt or

19  innocence of Mr. Mohammed.  That you should wait, that you

20  should not have an opinion as to the guilt or innocence.

21  Rather, that you should wait until this trial is over to

22  determine whether or not you think he is guilty or innocent,

23  but that's wrong, it's a false premise.  Because right now

24  Mr. Mohammed sits here an innocent man.  And unless and until

25  the Government can prove its case beyond a reasonable doubt,

1   he is presumed innocent.  So, if you've not already done so, I

2   ask you right now to grasp in your minds and embrace the fact

3   that Mr. Mohammed sits here an innocent man.

4            It's the Government's burden to prove their case

5   beyond a reasonable doubt.  Mr. Rothstein and Mr. Stiglitz.

6   This burden of proof never shifts.  It never moves from this

7   table to that table during the course of this entire trial.

8   And you will see that when all of the evidence has been

9   presented to you, the Government will not be able to meet its

10  burden in this case.  When you took your oath as a juror, you

11  promised to be fair and you promised to be impartial.  You

12  promised to decide this case solely on what evidence gets

13  presented to you in this case.  If you can keep these two

14  promises, you will have no problem returning verdicts of not

15  guilty.

16           In conclusion, ladies and gentlemen of the jury, I

17  ask you to keep an open mind.  To listen -- to listen real

18  carefully.  Listen to what you do hear, but listen to what you

19  don't hear.  And at the end of this trial you will learn

20  everything there is to learn about Mr. Mohammed.  You will

21  also get to learn a lot about Jaweed and what his motivations

22  were in this case.

23           When all of the evidence has been submitted to you,

24  you will know that the Government is unable to meet their

25  burden of proof in this case.  And at the end we will come

1    back and we will stand here and ask you to return the only

2    just verdicts, verdict of not guilty.  Thank you.

3              THE COURT:  All right.  Members of the jury, I

4    think it's a little early for our morning break, but what I'm

5    going to do is take it because we'll move to a witness and

6    then it's easier not to break up their testimony.  So, we'll

7    switch your notebooks around, if you haven't already done so

8    during this period of time.  But we'll take about a 10 minute

9    break, they'll set up, and then we'll come back -- let me make

10   it 15 because it's going to be our mid-morning break, and then

11   we'll come back and pick up with the evidence.

12             Okay.  Don't talk about the case now.  You've heard

13   the arguments, remember, that's not evidence.  Leave

14   everything there, other than obviously your water.

15   JURY EXITS COURTROOM AT 10:47 A.M.

16   BRIEF RECESS

17                          AFTER RECESS

18             THE COURT:  We should be ready to proceed.  Let me

19   just suggest that there's two cases that you might take a look

20   at that relate to bringing out background about family.  U.S.

21   v. Harris, 491 F.3d 440.  491 F.3d 440.  It's a June 22nd,

22   2007 case.  That's the D.C. Circuit.  There is a bunch of

23   other circuit cases, but that's the one that is the -- there's

24   another one, United States v. Washington, 106 F.3d 983 at 999.

25   I bring this up, it's sort of counterintuitive to what most

1    people do with it.  So, you look at it -- so we don't have --

2    there's a different way of bringing it out or a different

3    purpose in bringing it out, then we can discuss it during

4    breaks and not during testimony.  It relates to bringing out

5    the Defendant's -- the family members.

6    JURY ENTERS COURTROOM AT 11:08 A.M.

7            THE COURT:  Good morning, again.  We're ready to

8    proceed with the evidence.  If the Government would call its

9    first witness.

10           (Whereupon, proceedings were held and were

11   transcribed as a separate transcript).

12

13

14               C E R T I F I C A T E

15           I, Lisa M. Hand, RPR, certify that the

16   foregoing is a correct transcript from the record of

17   proceedings in the above-titled matter.

18

19

20

21                    _____

22                    Lisa M. Hand, RPR

23

24

25