IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,

       Government,                 CR No. 06-357
                                   Washington, DC
     vs.                        May 15, 2008

KHAN MOHAMMED,

       Defendant.

_____


TRANSCRIPT OF CLOSING ARGUMENTS
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE

APPEARANCES:


For the Government:        MATTHEW STIGLITZ, ESQUIRE
                         U.S. Department of Justice
                         Narcotics and Dangerous Drug
                           Section
                         1400 New York Avenue, N.W.
                         Washington, DC  20530
                         (202) 305-3646

                         JULIUS ROTHSTEIN, ESQUIRE
                         U.S. Department of Justice
                         Narcotics and Dangerous Drug
                           Section
                         1400 New York Avenue, N.W.
                         Washington, DC  20530
                         (202) 305-3646

For the Defendant:         CARLOS VANEGAS, ESQUIRE
                         Federal Public Defender's Office
                         625 Indiana Avenue, N.W.
                         Washington, DC  20004
                         (202) 208-7500


(Appearances Continued on Next Page)

(Appearances Cont'd)


For the Defendant:              DANI JAHN, ESQUIRE
                                Federal Public Defender's Office
                                625 Indiana Avenue, N.W.
                                Washington, DC  20004
                                (202) 208-7500


Court Reporter:                 Lisa M. Hand, RPR
                                Official Court Reporter
                                U.S. Courthouse, Room 6706
                                333 Constitution Avenue, NW
                                Washington, DC  20001
                                (202) 354-3269


Interpreters:                   Naim Saidi
                                Abdul Wahed Faqiri


Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1                          I N D E X

2                                              PAGE

3     CLOSING ARGUMENT BY MR. STIGLITZ              16

4     CLOSING ARGUMENT BY VANEGAS                   54

5     CLOSING ARGUMENT BY ROTHSTEIN                 77

6     JURY CHARGE                                   90

7     VERDICT                                      125

8

9

10              P R O C E E D I N G S

11          THE COURT:  Good morning, everybody.  Call the

12    case.

13          COURTROOM DEPUTY:  Criminal case 06-357.  The

14    United States of America versus Khan Mohammed.  Mr. Stiglitz

15    and Mr. Rothstein for the Government.  Mr. Vanegas and Ms.

16    Jahn for the Defendant.  Defendant is present in the

17    courtroom.

18          THE COURT:  All right.  There were a couple of

19    things we need to talk about.  I'm assuming that counsel have

20    the last version that I sent relating to the jury instructions

21    that did not include a decision about reasonable doubt,

22    informer, the entrapment or the theory of the -- the

23    Defendant's theory of the case.  So, you should presumably

24    have printed those out.  I'm giving the others and I'll make

25    my rulings now.  I'm giving both of the interpreters and the

1   two court reporters copies of it, along with the verdict form.

2   So, let me go through this.

3           In terms of the reasonable doubt instruction, I'm

4   going to leave the one that I have, it is based on the Taylor

5   case.  The notes in the Red Book specifically approved this

6   note that the FJC, which is the instruction I'm giving, which

7   is set out in the Taylor case is there.  I looked at what

8   Chief Judge Lamberth had done, which seems to be a combination

9   of some of the language in the present Red Book instruction

10  and the FJC.

11          What concerns me is that the Taylor case, and we

12  don't have anything later than that, we have Taylor and then

13  we have -- there's another unreported case that actually

14  approves of the prior Red Book instruction, which the D.C.

15  Court of Appeals decided they didn't like.  But the Taylor

16  decision is critical of the, quote, hesitate language.  So, I

17  think with all due respect to Chief Judge Lamberth, I'm not

18  going to change and use a combination of the two.

19          I did additional research, there's no more recent

20  cases from this circuit.  So, we basically have Taylor, which

21  likes the FJC one, and we have an opinion where the old Red

22  Book instruction was approved.  No opinion about the newer

23  one.  And there's this language that is critical of the

24  hesitation language, which is what is the key part that was

25  picked up by Chief Judge Lamberth.  So, I'm just going to

1    leave it the way it is.  You've taken your positions and

2    that's on the record.  I think the instruction I'm giving is

3    still good law.

4              Moving to the informant instruction, which is

5    2.24.  Most of these cases are from around -- either 1964 is

6    the Hardy case, or there are cases in the 1970s, and we don't

7    really have anything since then.  Looking at Hardy, which is

8    the case that defense counsel pointed out.  The informant in

9    that case had a criminal record and wasn't an addict.  And

10   there was a police informant was corroborated by an eyewitness

11   who was a police officer.  And there they found that it wasn't

12   reversible error.  Most of the cases the courts have been

13   concerned regarding the credibility of the testimony viewed

14   with caution because, in most of the cases, they have been

15   addict informers, and there's been no corroboration on a

16   material point.  That's the Kinnard case, which was 465 F.2d.

17   566.

18             The lead case, which is 506 F.2d 111, discusses

19   how the rule evolved, where the only testimony connecting the

20   defendant with the unlawful sale of narcotics was that of a

21   paid informant who was also a drug addict.  So, most of the

22   cases seem to be in that order.  Here, I mean, that is not the

23   issue we've got.  It's not a matter of testimony.  We've got

24   corroboration on tape recordings and video of conversations

25   with the Defendant.  So, substantially all of the

1   incriminating evidence is tape recorded, and in some instances

2   video of the Defendant.  So, the corroboration is the best

3   kind.  It's the Defendant's own words and actions as heard and

4   seen on these recordings.

5           So, I don't think you have the same issue where

6   you've got testimony from people who are paid informants but

7   also happen to be addicts, or where you've got someone with an

8   interest in the case corroborating it.  Here the corroboration

9   is actually the Defendant's own words and actions.  So, I

10  don't think it's appropriate to give it.  And the instruction

11  talks about, you know, viewing it with caution.  And my

12  concern, frankly, is I don't know that they should view with

13  caution the Defendant's own statements, which is the way you

14  could potentially interpret giving the instruction.  So, I

15  don't think it's appropriate.  But you've put things on the

16  record.

17          The entrapment, I have done a written order

18  setting it out in terms of -- the biggest problem, I think, is

19  not having a lot of facts developed from the defense for me to

20  figure out, other than just the one statement.  So, I put

21  everything that I can think of that potentially could be

22  argued in this written order.  So, I'm not giving it.

23          Moving to the Defendant's theory of the case.

24  There are several versions that have floated around on this,

25  so I will go through them.  The version that initially

1   concerned me was, since the Court reads it, is that it used

2   the word states or denies, which gives the impression that

3   somewhere on the record the Defendant who, of course, didn't

4   testify and didn't have to, but that somewhere in the record

5   the Defendant actually stated these things.  And we do have

6   Defendant's statements through these recordings.  And that's

7   not true, there's no statement on any of the recordings or any

8   of the other evidence that actually has the statements that

9   are ascribed to it with any denial.  So, that's why I put it

10  in the context of a contention.  And it seems to me the

11  argument that you're actually making is that there's

12  insufficient evidence to show the various things that would

13  need to be proved.

14          There were e-mails back and forth, and the next

15  issue was —— which I noted was that included was the

16  distribution with the drugs intended to go to the United

17  States in two parts.  And the one part that seemed to be

18  talking about it, it didn't specify Count 2, but in context

19  would appear to be that, had the importing to the United

20  States, and that's not an element of that actual offense.  It

21  is on Count 1, but it isn't required in Count 2.  So, either

22  it was redundant or it wasn't accurate, so I took that out.

23          I then put in the two counts as you seem to have

24  set it out, which is the last version that I sent out.  The

25  Government came back with what I think is not an inappropriate

1   argument, and that is, that they don't have to conclude on the

2   terrorist activity prong element that he has to have been

3   associated with the Taliban.  They can come to that

4   conclusion, but they can decide he was a terrorist, period,

5   without concluding that he necessarily was doing this on

6   behalf of the Taliban.  There's evidence in the record that he

7   did participate in some attacks that he has in there, but he

8   doesn't say he does it on behalf of the Taliban.  He talks

9   about it sort of in a Jihad way.

10           So, the way it's presented, it makes it sounds

11   like you have to make a finding that he's associated with the

12   Taliban.  You could, I mean, they'll have to consider whether

13   there's evidence that proves that, but you could also conclude

14   that even if he's not connected to the Taliban that he still

15   engaged in terrorist activity.  And the way it's written, it

16   makes it too narrow.  It lists it strictly in the Taliban.  By

17   the time we got this, frankly, I had run out of ideas and

18   energy.  So, I'm not sure how it can be fixed.  I don't know

19   how you want to do this.  I'll leave it to the defense.

20   You've been receiving, hopefully, all of these e-mails back

21   and forth.  I don't know how else to set this out or how we

22   could fix this to make it clear that it's not just the

23   Taliban, that it could be some other activities.  But I didn't

24   hear back from the defense on any of this, so I don't know

25   where you are.  So, I can hear from you at this point.  I

9

1   mean, Count 1 is not a problem, it's really the Count 2

2   business about limiting it to the Taliban.

3            MR. VANEGAS:  Your Honor, in that case, since it

4   focuses specifically on the Taliban, and I understand the

5   Government and the concern also -- the Court's response, and

6   it can be just to any person or to any terrorist organization.

7            THE COURT:  So that he's a member, affiliate or

8   associated with any terrorist organization in the time period?

9            MR. VANEGAS:  Yeah.

10            THE COURT:  Okay.  Government.  Terrorist

11   organization and -- so we would change it in two places to say

12   terrorist organization where the Taliban is?

13            MR. STIGLITZ:  Well, that addresses one of the

14   points but not both.

15            THE COURT:  What's the other one?

16            MR. STIGLITZ:  The Court mentioned that they don't

17   even have to find that he was a member of an organization.

18   Just the mere fact that he himself was engaging in terrorism

19   is sufficient for the jury to find that the Defendant is

20   guilty.  So, again, I mean, this is perhaps a little more

21   generic in terms of organization, but there still needs to be

22   some distinction or some suggestion that, you know, that isn't

23   the end all be all of their examination.

24            THE COURT:  Well, do you have any suggestions?

25            MR. STIGLITZ:  Yes.

1          THE COURT:  Why don't you show it to Mr. Vanegas.

2          MR. STIGLITZ:  I haven't written anything, I'm just

3    reading it.

4          THE COURT:  I'm sorry.

5          MR. STIGLITZ:  I haven't written anything, we're

6    just using your last version as sort of a basis.  How about if

7    he contends that he was not -- he was not a terrorist -- he

8    was not engaged in terrorist activity either individually or

9    as a member of, and then address the organization, et cetera.

10         THE COURT:  Okay.  How does that sound?  I'm

11   assuming he's making a blanket thing, so --

12         MR. VANEGAS:  Your Honor, I would assume that when

13   it says, to any person, that he's covered by that.

14         THE COURT:  They have changed it up at the top.

15   Look at -- it would say specifically, as to Count 2,

16   Mr. Mohammed contends that there is insufficient evidence to

17   show that he was not engaged in terrorist activity

18   individually or a member, affiliated or associated with any

19   terrorist organization in the time period charged in the

20   indictment.  Now, I'm not sure what you'd put.  So, that would

21   be the fix for the first sentence.  In the second one, would

22   you change anything there, Mr. Stiglitz, or can we leave it

23   the way it is?

24         MR. STIGLITZ:  I would make it that there's

25   insufficient evidence to show that he knowingly or

1   intentionally provided directly or indirectly anything of

2   pecuniary value to any individual or any organization engaged

3   in terrorist activity.

4           THE COURT:  How about -- what's wrong with any

5   person?

6           MR. STIGLITZ:  Well, because the instruction

7   says --

8           THE COURT:  I think it says person, doesn't it?

9           MR. STIGLITZ:  It says person or organization.

10          THE COURT:  Okay.  So, why can't it be value to any

11  person or to any terrorist organization?

12          MR. STIGLITZ:  I thought that's what I just said.

13          THE COURT:  You said changing person to individual.

14          MR. STIGLITZ:  I'm sorry, the version I have in

15  front of me doesn't have person, that's why.  I'm sorry.

16          THE COURT:  All right.

17          MR. STIGLITZ:  There were four versions floating

18  around last night.

19          THE COURT:  I know.  So, what we would do is, the

20  second -- in the paragraph about Count 2, we would add to show

21  that he was not engaged in terrorist activities individually,

22  or was a member, affiliated or associated with any terrorist

23  organization in the time period charged in the indictment.

24  And then the second sentence would remain the same, except

25  instead of the Taliban, it would be to any terrorist

1    organization.  And Count 1 will remain the same.

2              MR. STIGLITZ:  That's fine.

3              THE COURT:  Does that work?

4              MR. VANEGAS:  Yes.

5              THE COURT:  Okay.  I'll need to get that typed up.

6    Okay.

7              MR. STIGLITZ:  As long as I'm up here --

8              THE COURT:  Let me finish my -- unless it's related

9    to this?

10             MR. STIGLITZ:  Not this point, no.

11             THE COURT:  In terms of the verdict form, I

12   actually think the Government's version works better.  My

13   concern in trying to set this up was to try and do it such

14   that they would appreciate the fact that they could do one --

15   either one of these or to do both, and I think this makes it

16   clear -- which is correct in terms of the instruction -- makes

17   it clear that the choice is -- either they find one of these

18   or if it's both, it's actually set out and that's what they

19   should fill in.

20             What I was trying to get at was to set it up so

21   there wouldn't be some confusion about and not have a lot of

22   instructions about that they had to do one or both or whatever

23   in the way they would setting it out.  But is there a

24   particular concern that the defense has in terms of the way

25   that it's done at this point.  It was really to get at the

1    issue that they could decide both or they could decide just

2    one.

3              MR. VANEGAS:  It's fine, Your Honor.

4              THE COURT:  Okay.

5              MR. STIGLITZ:  Your Honor --

6              THE COURT:  Yes.

7              MR. STIGLITZ:  This was the point I wanted to

8    address.  On Page 2, on each version there's sort of a large

9    blank in the 2A, and we were wondering if there was a

10   particular reason for that blank?

11             THE COURT:  What is the blank?

12             MR. STIGLITZ:  Our version says:  The Government

13   has -- and then there is a tab.

14             THE COURT:  I'm sorry, are we on Page 1 or 2?

15             MR. STIGLITZ:  Page 2, 2A instruction.  The

16   Government has, and then there's a rather large gap.

17             THE COURT:  The version I have has moved stuff

18   closer, so --

19             MR. STIGLITZ:  Oh, okay.  This was the version we

20   just --

21             THE COURT:  Is that the one I just handed out?

22             MR. STIGLITZ:  Yes.

23             THE COURT:  Let me look.  The one I have doesn't

24   have that.  Let me just look.  Oh, yes.  I'm not sure why that

25   happened, it must have been in the print-out.  The one I have

1    doesn't.  I will make sure the jury gets one that doesn't have

2    the gap.  Not a problem.  Okay.  And the last thing, from my

3    perspective, is the Marshal Service has come to talk to me

4    about the fact that for the -- who brings the drugs to the

5    jury when they do it?  I wasn't totally off the wall yesterday

6    when I thought that the Marshal Service does it.  It turns out

7    that watching the jury they now use CSOs, but the Marshal

8    Service is prepared to be the one to take the drugs into the

9    jury for them to look at, which has always been the practice

10   that I was familiar with, and so they're willing to do that.

11           The police still have to bring the drugs to the

12   courtroom for the Marshal to take it back.  But our Deputy

13   Marshal very nicely contacted his supervisors to find out

14   whether that was the appropriate procedure, having had this

15   discussion.  So, I'm much more comfortable doing it that way.

16   So, that's the way we'll do it unless we have some problem.

17   And that's the end of my laundry list.  Is there anything else

18   that needs to be brought up by Counsel?  Anybody have any

19   issue?

20           MR. STIGLITZ:  No.

21           MR. VANEGAS:  No.

22           THE COURT:  Let me mention in terms of the closing

23   arguments.  I don't have a procedure that you have to wait

24   until the end to object.  I leave it to you to decide whether

25   you should object at that point because it's sufficiently

 1    prejudicial, that it needs to be fixed then and not at the

 2    end.  Or that it's something that can be brought up at the

 3    end.  I don't have any rules about this, I leave it to you to

 4    make this decision to bring it to my attention.  Hopefully, we

 5    won't have a problem, and hopefully, everybody will be very

 6    accurate since you have transcripts and can look -- every

 7    argument or factual statement that you make, you should be

 8    able to point out -- if there's some objection to it, to point

 9    out in the record where you got it, so we don't have a problem

10    of statements being made that are not supported by the record

11    itself.

12          But I would just make that statement that if

13    something leaps out, I will intervene, but counsel still has a

14    responsibility to do the same thing.  And you need to make up

15    your mind whether it's something that needs to be addressed

16    right then or whether it's something that can wait and do

17    something at the end.  Hopefully, this won't be something that

18    I don't actually have to engage in.  And let me do one other

19    thing.  Let me take the two things we need fixed while you're

20    doing closing arguments back and just have them fixed while

21    we're gone.  Let me just do that explanation and I'll be right

22    out.  Is everybody ready to go?

23          MR. STIGLITZ:  Yes.

24          MR. VANEGAS:  Yes.

25          THE COURT:  All right.  I'll be right back.

1   OFF THE RECORD

2           THE COURT:  Will I need the earphone things or

3   you're not going to need that?

4           MR. STIGLITZ:  I don't anticipate playing any

5   audio.

6           THE COURT:  Fine.  Okay.  We're all set.

7   JURY ENTERS COURTROOM AT 9:46 A.M.

8           THE COURT:  Good morning, members of the jury.  All

9   right.  We're ready to proceed at this point.  We'll be

10  starting with the Government's closing argument.

11          MR. STIGLITZ:  Thank you, Your Honor.  May it

12  please the Court, Counsel.  Ladies and gentlemen, good

13  morning.  I don't think it would be an overstatement to

14  describe Jaweed as an unsophisticated individual.  He's a

15  farmer with no education other than what he learned from an

16  experience of life in Garatek village.  And that life was the

17  only life that Jaweed knew, with two exceptions.

18          The first instance in which he moved to another

19  place was at a time when the Soviets invaded and things

20  weren't good in the country.  So, he picked up his family and

21  he moved to nearby Peshawar, Pakistan, which as you'll recall

22  from the map that you saw, and you'll get again, is not that

23  far away from the Nangarhar province, Afghanistan.  But things

24  got well enough that he and his family returned back to

25  Garatek village where they continued to live until a second

1   calamity arose, and this one was more of a natural calamity,

2   and that was a drought.  A drought that hit Afghanistan.  And

3   being a farmer, the drought caused him to be unable to support

4   his family with the crops.

5           So, once again, he picked up and he took his family

6   with him to Peshawar, Pakistan, when he obtained a job as an

7   assistant in a vegetable market.  Now, as Jaweed told us, he

8   wasn't the only Afghan in a situation -- finding himself in

9   Peshawar, many Afghans, thousands, hundreds of thousands.

10  When things would get bad for various reasons, they would pick

11  up their things and they would move to Pakistan.  Sometimes it

12  was for things like drought.  Sometimes it was for things of a

13  more sinister reason.

14          For example, we learned that Abdul Rahman had also

15  moved to Peshawar, Pakistan, from Nangarhar province,

16  Afghanistan.  Abdul Rahman had been an official with the

17  Taliban in charge of investigations in Nangarhar province.

18  And when the Americans came and when the coalition forces came

19  and ejected the Taliban from power, Abdul Rahman, having a

20  problem of his own, he too left, and he went to Peshawar,

21  Pakistan.

22          Abdul Rahman, he's a man of power.  He's the type

23  of guy that when he needs to talk to you, he sends for you.

24  And Jaweed received just such a summons, and he reported to

25  Abdul Rahman's house to hear what he had to say.  What did

1    Abdul Rahman tell him?  Abdul Rahman told him:  I need you to

2    go back to Afghanistan, obtain rockets, and those rockets will

3    be used against the Jalalabad airfield.

4          Now, Jaweed tried to put him off.  He said:  I have

5    no experience in rockets.  I don't know what they're about.

6    Abdul Rahman had a ready answer.  Go back to Afghanistan, I

7    have someone there for you, you and he will be partners in

8    this, and he will help you do this thing that you need to do.

9    And Jaweed said:  Well, who is this person?  And Abdul Rahman

10   identified him.  That person was Khan Mohammed, the man

11   sitting in this courtroom.  The man that Jaweed had known from

12   his hometown village all his life.

13         Well, Jaweed returned to Afghanistan.  There was

14   never a choice about that.  He told you that he knew that if

15   he didn't at least appear to follow Abdul Rahman's

16   instructions, great harm could come to either himself or his

17   family.  So, he picked up and he moved back to Afghanistan.

18   And there he had a choice to make, as you learned in the

19   opening statements.  That choice would have been to either

20   actually do what it was that Abdul Rahman wanted him to do, or

21   to report what he had learned to the authorities.  A difficult

22   choice, but one that he made.  He decided, this is not

23   something that I want to do.  I'm tired of my country being

24   torn apart.  I want to do the right thing.  So, what did he

25   do?

1          He sought out an authority figure in the Afghan

2     Government, and was introduced ultimately to Colonel Latif,

3     the police chief at the time in the Chaprahar district in the

4     Nangarhar province.  And he came to Colonel Latif with this

5     information, and Colonel Latif, he understood the significance

6     of this information, and he realized pretty quickly that this

7     information, that this plan that was being devised, was --

8     let's face it, it was over the heads of -- the Afghan police

9     were over their head on this one.

10          So, Colonel Latif went to people that he knew he

11     could trust.  People that he knew would do the right thing.

12     Those people were the Americans.  So, he took Jaweed and he

13     brought him to the Americans, and Jaweed reported what had

14     happened to him.  Had reported what had happened to him in

15     Peshawar, Pakistan.  And the rest, as they say, ladies and

16     gentlemen, is history.  In this case, dutifully recorded for

17     you on DVD in a number of audio and video recordings.

18          Now, ladies and gentlemen, standing here making a

19     closing statement -- a closing argument, the purpose of the

20     closing arguments is for each side, myself right now and then

21     in a little while counsel for the defense, to highlight facts

22     in the case.  Facts which, hopefully, in a sensible form that

23     will help you when you go back and you deliberate on the case.

24     As you might imagine, there are any number of ways in which to

25     present this information to you.  What we've decided to do,

1   however, is to use the instructions -- use the elements of the

2   offense as the structure for this closing argument.  Because

3   when you look at the various elements of the offenses and how

4   the facts fit with those elements, we believe that it will

5   make it very clear and very easily understood when you go back

6   there and you deliberate.

7        When you look at the elements, if you condense

8   every element in this case down to its essence, all the

9   elements of the case of each of the charges can be answered or

10  addressed if you can answer for yourselves three questions.

11  Those three questions are:  What did the defendant do in this

12  case?  Why did he do it or with what knowledge?  And who did

13  he do it for?  And I submit to you that if at the end of the

14  case when you go back there deliberating, if you can answer

15  these three questions you'll have arrived at a verdict.

16       So, let's talk about these three issues.  First:

17  What did the Defendant do?  Well, as you heard from the Court,

18  the indictment alleges two counts.  The what in this case is

19  essentially identical as it pertains to these two counts.  Did

20  knowingly and intentionally distribute one kilogram or more of

21  a mixture and substance containing a detectable amount of

22  heroin.  The only difference in Count 2 is that we also

23  include the element of opium.  So, what did the defendant do?

24       Well, as we're asked to, as the indictment would

25  suggest, look at -- the Defendant distributed a controlled

1    substance.  In this case there's no -- you'll be instructed

2    that under the law heroin and opium are controlled substances.

3    That the distribution was knowing and intentional, and with

4    respect to the Count 1, that it had to have occurred outside

5    the United States.  And, three, if you find it was heroin, did

6    it weigh more than a kilogram?

7            So, let's look at the first element, and this is an

8    element that is shared in each of the offenses.  You're going

9    to get, after the parties finish their closing arguments,

10   you're going to get instructions from the Court on the law.

11   The first instruction you're going to get concerns

12   distribution.  What does it mean to distribute?  Well, it

13   doesn't have to be anything as formal as having a contract or

14   even receiving payment or even expecting to receive payment.

15   Distribution means simply to transfer or attempt to transfer

16   something to another person.

17           So, if you can hold my keys, please.  Thank you.  I

18   just committed a distribution.  I just handed my keys to

19   somebody else.  I don't have to get paid for it, I don't have

20   to expect to get paid for it.  The mere transfer of something

21   to another person is a distribution.  And, again, as you'll be

22   instructed, opium and heroin are controlled substances.

23           Now, ladies and gentlemen, there are a lot of

24   questions, especially of Agent Higgins in this case.  Why did

25   you go to -- why did you even approach him for drugs?  This

1    was a terrorist case.  Why did you approach Khan Mohammed for

2    drugs?  I would submit to you, ladies and gentlemen, there was

3    nothing accidental or random about the DEA asking Jaweed to go

4    to Khan Mohammed and ask him for drugs.  In her

5    cross-examination on the very first day, Ms. Jahn, counsel for

6    the defense, asked Agent Higgins:  Was there a reason why you

7    chose opium as the first drug rather than heroin as the first

8    drug?  Agent Higgins responded:  The reason was information

9    that I had received from Jaweed about previous knowledge he

10   had about Khan Mohammed.

11         Well, what was that previous knowledge or what can

12   you infer from that?  Well, I submit to you, ladies and

13   gentlemen, that the evidence in this case is quite clear that

14   the Defendant was an experienced drug trafficker.  How do we

15   know that he was an experienced drug trafficker?  Well, let's

16   start from his own words when he talked to Jaweed on

17   recordings and told Jaweed all about his prior drug

18   trafficking, or at least acknowledged it.  For example, and

19   this is on Exhibit 2H, Line 45, when Jaweed says:  When the

20   guy told me about the opium, I thought of you, and I said,

21   because there's no better dealer than you because you're

22   experienced.  Experienced.  You know everything about good

23   quality and bad one.  No one can pass fake stuff on you, and

24   if they don't give you good powder, they cannot pass on bad

25   quality to you.  What was Khan Mohammed's response?  Did he

1    deny it?  Did he say:  What are you talking about?  Of course

2    not.  He said:  No, God willing, we are people of the trade.

3    What trade is that?  Drug trafficking.

4            Further, we learned that Jaweed isn't his only

5    customer.  Khan Mohammed says in Exhibit 2J on Line 27.  He

6    tells him:  I'm getting it for others and others, too, it is

7    not only your work.  And we asked Jaweed:  What did that mean?

8    He was talking about getting heroin for other people, not just

9    me.  But it's not just the Defendant's own words, ladies and

10   gentlemen, you can look to the words of the opium dealers that

11   the Defendant was dealing with.  They, too, pointed out the

12   Defendant's experience.  I should say the Defendant pointed it

13   out.

14           Remember when he went to the opium sale and he was

15   sitting there and he was talking to the opium sellers.  As

16   he's inspecting the opium, what does he say?  He tries to pass

17   himself off -- he basically is trying to compare the quality

18   of the opium he's looking at then with the quality that he had

19   previously provided these sellers.  He says:  What great opium

20   I gave you.  What did the sellers say?  Oh, oh, I swear to

21   God, the one you gave us, we had a lot of trouble with it.

22   You did not give us opium like this.

23           So, it's not just the Defendant's own words that

24   I'm an experienced drug trafficker, you have the words of the

25   other drug traffickers pointing out that the Defendant is an

1    experienced drug trafficker.  Well, what kind of experience is

2    this?  How do you gauge the true experience of somebody about

3    their ability to come up with large quantities of drugs.

4    Fifty seyr.  We learned yesterday from Agent Follis that a

5    seyr is the same as a kilogram.  Sure.  No problem.  Khan

6    Mohammed, Exhibit 2E.  Even if you need 20 seyr, it is

7    available.  30 seyr, also available.  You need 50 seyr, also

8    available.  Fifty seyr, that sounds like a lot.  How about

9    1,000 seyr?  Yes.  Sure.  Don't worry, I will find him 1,000

10   seyr of opium.

11           This is not some small time drug trafficker, ladies

12   and gentlemen, this is somebody with substantial experience.

13   How about unlimited amounts?  Yes.  And we're not talking

14   about opium here, we're talking about heroin.  2H and 2I.

15   Whatever quantity you want, I have the source, as much as you

16   want.  And 2I, Jaweed says: God willing, you can give us good

17   powder?  Absolutely.  Absolutely.  I will supply you for as

18   much as you need.

19           Now, we heard in the opening statements from the

20   defense that they did not dispute that their client was

21   involved in an opium and heroin transaction.  But as you

22   heard, ladies and gentlemen, opening statements are not

23   evidence.  So, some of you may have been wondering, why did

24   the Government go through all this time showing that these

25   distributions actually took place and that the Defendant was

1   involved in the distribution.  Because even though it was

2   conceded, that was not evidence.  We had to put on evidence

3   that the Defendant was in fact involved in these two drug

4   transactions.  And we did.

5          We have the Defendant's role, and this is the opium

6   deal.  Exhibit 2E.  You'll recall, this is the conversation

7   the day before the meeting at the market on September 10th.

8   They got together and Jaweed said:  Look, I finally got the

9   money for the opium, when shall we do it?  And Khan Mohammed

10  says on Line 19A:  God willing, 10:00 o'clock, you just come

11  there and I will have the stuff ready.  We'll take the money

12  from him and I will give him the money and you give you the

13  thing.

14         So, the fact of the matter is, ladies and

15  gentlemen, this drug transaction, this opium deal, would never

16  have happened but for the Defendant's involvement.  Why is

17  that?  Well, as we learned yesterday from talking with Agent

18  Follis and from Jaweed earlier, opium trafficking is illegal.

19  The opium traffickers don't even bring their opium to the

20  bazaars, they just handle their negotiations there.  And it's

21  not like you have a booth Opium Dealer Open for Business,

22  prices negotiable.  No.  It's done on the street.  You see an

23  opium dealer that you know, you walk up to that opium dealer,

24  and he knows you because, remember, these guys they only deal

25  with the people they know and they trust.  Jaweed didn't know

1    these opium dealers, the Defendant did.  The Defendant is the

2    one who put this opium deal together.

3            What happened?  Between September 11th and

4    September the 14th, the Defendant was the linchpin in this

5    entire opium transaction.  On the 11th, after Jaweed got the

6    money, he meets Khan Mohammed sharp at 10:00 o'clock.  What do

7    they do?  Khan Mohammed starts taking him around the bazaar

8    and they go to various different opium sellers.  I'm looking

9    for good quality opium, do you have it?  No, I don't have good

10   quality opium.  Well, I'm looking for good quality.  I don't

11   have enough good quality.

12           They get to the fourth opium seller, that man that

13   Khan Mohammed decides that we're go to go with.  The man that

14   he trusts, the man he has experience in dealing with.  The

15   same man he would later say:  Remember the opium I gave you?

16   And the man will say:  Yours wasn't that great, we had a lot

17   of trouble with it.  This is the same dealer.  And they

18   haggled.  Khan Mohammed and the dealer, they haggled over

19   price, over amounts, and ultimately Khan Mohammed said, this

20   guy is good, I trust him.  Let's work with this guy.  Jaweed

21   says, okay.  He hands his money to Khan Mohammed.  Khan

22   Mohammed gives the money to the opium seller, the opium seller

23   says, I'll see you in a day or two.

24           Now, Jaweed doesn't even know where this opium

25   seller lives.  Khan Mohammed has to take him there.  And so

1   Khan Mohammed comes and picks up Jaweed, they walk an hour or

2   so to the opium seller's house.  The first day didn't work out

3   because the road blocks, but they went there on the second

4   day.  What did the Defendant do during that videotaped

5   transaction?  Well, the Defendant, he was it.  Jaweed was

6   basically -- he was the wallet at this deal.  Let's call it

7   like it is.

8          Khan Mohammed is the one who was making this

9   negotiation work.  Khan Mohammed, we see him sitting there

10  inspecting each pad, having a conversation with the dealers.

11  This is dry.  This is good.  You know, hey break open a piece.

12  He breaks open a piece.  And as he's sitting there and he's

13  cleaning off each paddy, he's handing it to the drug seller's

14  son, and he is basically -- as they weigh it, they put it into

15  the plastic bags.

16         And let's not get hung up on names.  We were

17  referring to these men at this compound as the opium sellers,

18  but for all intents and purposes, the Defendant was an opium

19  seller at this transaction.  He may have not brought the opium

20  to the table, but that table wouldn't have even been set but

21  for Khan Mohammed's involvement in this case.  And you'll be

22  instructed on that.  If somebody participates in something

23  with the intention of making it succeed, they are guilty of

24  the offense of the distribution.

25         But we don't even have to get that cute about it

1  because the Defendant himself transferred opium to Jaweed.  I

2  mean, you look at this photograph taken from Exhibit 6D.  This

3  is 6D, taken from Exhibit 1G.  He's like Santa Claus, except

4  instead of a bag full of toys, it's a bag full of opium.

5  Remember, he walks away -- Jaweed pays Khan Mohammed because

6  his deal is with Khan Mohammed.  Khan Mohammed pays the

7  sellers, gets the opium.  Khan Mohammed carries two of the

8  three bags out.  They walk a little ways, and then finally

9  Jaweed takes the bag that he was carrying and puts it in this

10  bag here, and then he continues on his own way until he gets

11  the opium to Colonel Latif.

12         So, right here, ladies and gentlemen, is definitive

13  proof on videotape that the Defendant distributed opium to

14  Jaweed.  And this opium, as we know from the chemist's report,

15  which is in evidence and you'll see.  For an old scale, it was

16  pretty accurate.  I mean, the scale -- they asked for 11 seyr

17  and they got just about 11 seyr, it was 10.96 kilograms.  And

18  when the chemist actually tested that, apparently Khan

19  Mohammed's credit wasn't that good because he got stiffed on a

20  couple of the pads.  And you saw that really only 9.05

21  kilograms tested positive for opium.

22         That brings us to the second transaction, the

23  heroin transaction.  After this first transaction was

24  completed, Jaweed went back and told Khan Mohammed:  Look, my

25  customer was very satisfied with this opium, it was of very

1    good quality, but now we're looking for -- he's looking for

2    some heroin -- and we'll get to where he's sending it in a

3    little bit.

4               THE COURT:  You need to slow down.

5               MR. STIGLITZ:  Sure.  And Khan Mohammed didn't even

6    hesitate.  Of course, I can help you out.  And he did.

7    Several weeks later after the DEA had finally been able to

8    come up with the money to pay for it, Jaweed approached Khan

9    Mohammed, and said, my customer is ready, can I get that

10   heroin now?  Absolutely.  How much do you need?

11   Two kilograms.  Pays him the money.  Khan Mohammed takes a

12   couple days to walk to the place where he had to go get the

13   heroin.  And he comes back and it's time for the transaction.

14              He tells Jaweed:  Hey, I got your heroin for you.

15   Come on over.  And he does.  He sits down here, face to face,

16   again, on video, and the Defendant, as conceded by the defense

17   in their opening, but proven now, sat down, and after showing

18   Majboor the stamp so Majboor could write down a receipt, Khan

19   Mohammed turns over the heroin to Jaweed.

20              And that, ladies and gentlemen, gets us to the

21   distribution part.  But there's a second element.  Was this

22   distribution intentional or was it an accident?  And simply

23   stated, when it was knowingly and intentionally distributed,

24   that simply means, was it consciously, voluntarily and on

25   purpose, as opposed to mistakenly, accidentally or

1    inadvertently.  There's no accident here, ladies and

2    gentlemen.  Opium was ordered, opium was delivered.  Heroin

3    was ordered, heroin was delivered.  It's not like I give

4    somebody my coat and forget the keys are in the pocket, and it

5    was an accident that I gave the person the keys.  There was no

6    accident here.

7            And I believe, and I put a question mark, because I

8    don't want to speak for the defense, but I don't believe it's

9    disputed that it was intentional.  I mean, it was conceded in

10   the opening that he did it.  I don't believe there's any

11   evidence that you can find that it was -- that by accident or

12   mistake, but we don't know yet.  And then there's a third

13   element, and this really only applies to Count 1.  That the

14   distribution occurred outside the U.S.  And it really makes

15   sense.  For it to be distributed for the purposes of importing

16   into the U.S., the distribution necessarily had to have

17   occurred outside the U.S.   And that is undisputed.  The

18   evidence is clear, prior to this trial Jaweed never even left

19   Afghanistan.

20           That brings us to the additional question.  And

21   this is the last question on the what.  Remember the three

22   questions that I mentioned at the beginning of this argument.

23   What did the Defendant do?  The last question really concerns

24   the weight.  And, again, this is essentially undisputed.  We

25   have the chemist report here as Exhibit 12C, and when we look

1   to the weight, you'll see the heroin is 51 percent pure here.

2   But that doesn't mean that you just take 51 percent of the

3   weight and that's the way you look at it.  The instructions

4   will tell you that the weight applies to the substance or

5   mixture that contains the heroin.

6          So, in here in this instance the weight -- the

7   total weight is 1.981 kilograms, just shy of two kilograms.

8   That is the weight we're concerned with.  That weight is one

9   kilogram or greater.  That's the what.  So, that's one of the

10  three questions that has to be answered.  And we believe that

11  we've answered it.

12         Let's get to the why.  And this point, ladies and

13  gentlemen, is where sort of the counts diverge.  The what is

14  the same, essentially, for the two counts.  But now we get to

15  the why, and this is where we start going our separate ways.

16  With Count 1, it's intending and knowing that such substance

17  would be unlawfully imported into the United States.  Count 2

18  is knowing and intending to provide directly or indirectly

19  anything of pecuniary value.

20         THE COURT:  You need to slow down, Mr. Stiglitz, so

21  that we can have a record here.

22         MR. STIGLITZ:  Sure.  We'll get to Count 2 in a

23  minute.  Let's focus on the why as it pertains to Count 1.

24  The Defendant either intended or knew that the heroin would be

25  unlawfully imported into the United States.  Notice it's

1    either or, the Government need only prove one of those, but I

2    submit to you, the Government in this case proved both.  That

3    he intended and he knew.  Let's get to the knowledge part

4    first.  How does one prove knowledge?  Well, you'll receive an

5    instruction that says:  Someone's intent or knowledge or both

6    directly -- ordinarily cannot be proved directly because there

7    is no way of looking directly into the workings of the human

8    mind.  But you may infer the Defendant's intent or knowledge

9    from the surrounding circumstances.

10          So, what does that mean?  Well, we're not mind

11   readers.  We can't read Khan Mohammed's mind.  But we can look

12   at the surrounding evidence and get a pretty good idea what it

13   is that Khan Mohammed knew.  What kind of evidence might alert

14   us that Khan Mohammed knew what was going on with this heroin?

15   Well, how about being told what was going on with this heroin,

16   that would be pretty good evidence.  How many times would you

17   have to be told that these drugs were going to America?  One

18   time?  Two times?  How about 10 times?  Because that's at

19   least the number of times that Jaweed mentioned the word

20   America when talking about where drugs were going.

21          And here are just a couple of samples.  The first

22   suggestion of America and the United States came up after the

23   first opium transaction was completed.  Jaweed returned to

24   Khan Mohammed, and what did he say?  He tells Khan Mohammed:

25   He told me that he is sending the opium overseas with good

 1   rates.  I mean, he is sending the powder to the United States

 2   and France, mostly to the American cities.  Okay, you might

 3   say, that's some evidence that he knew where these drugs were

 4   going, but maybe he didn't hear him.  Okay.  How about another

 5   reference then.  Further, this is now -- we're not talking

 6   about the opium anymore, we're talking about the heroin, the

 7   future heroin that I'm in the process of trying to buy from

 8   you.  He says:  The best thing is it is going directly to

 9   America.  From Exhibit 2I.  And the Defendant replies:  Yes,

10   this is.

11            Well, you might say, well, maybe he didn't hear

12   that one.  Well, here he acknowledges that the drugs are going

13   to America on 2J, Line 11, Jaweed says:  He got someone and is

14   sending it to America.  I have already told you about America.

15   Now, the man is sending this thing to America.  Khan Mohammed:

16   Yes, you did mention it.  So, if there was any doubt as to

17   whether he heard what Jaweed said, this eliminates that doubt.

18   He now knows, yes, this heroin is going to America.  And just

19   to make sure, there's a reminder.  At the time the heroin is

20   sold, remember, he takes delivery of the heroin, Khan Mohammed

21   and the Jaweed walk outside the house and they stand outside

22   talking for a couple minutes, what happens?  Jaweed says:

23   This thing is going to America, do you understand what I said?

24   Khan Mohammed replies:  Okay.

25            So, there should be no doubt in anybody's mind that

1   Khan Mohammed knew exactly where this heroin was going.  But a

2   minute ago I said the evidence showed that he both knew and

3   intended that it go there.  Well, ladies and gentlemen, why

4   did the Defendant intent to send it to the United States?  He

5   may not have come up with the idea, but he certainly jumped on

6   the bandwagon really quick.  Why?  Because the motive for

7   sending drugs to the United States is the same motive for

8   committing the terrorist acts that he was committing in

9   Afghanistan.  It's all part of the Jihad against the

10  Americans, against the infidels.  And you don't have to take

11  my word for it, take the Defendant's word for it.

12          Exhibit 2H, Jaweed says:  All the other powder is

13  going abroad.  Good, says Khan Mohammed.  May God turn all the

14  infidels to dead corpses.  Exhibit 2I.  All right.  Is it

15  possible to find powder?  Khan Mohammed:  As much as you need

16  I will give it to you.  Two things would be done.  One, as

17  they say, Jihad would be performed since they send it to

18  America.  The other thing, as we learned, was -- and we'll

19  make a buck while we're doing it.

20          In short, ladies and gentlemen, heroin is simply

21  another weapon in Khan Mohammed's arsenal when it comes to

22  pursuing the Jihad, to kill the infidels, to kill Americans,

23  to kill foreigners.  As he says:  May God eliminate them right

24  now and we will eliminate them, too, whether it is by opium or

25  by shooting, this is our common goal.  So, ladies and

1    gentlemen, there really is no issue concerning whether the

2    Defendant knew the drugs were going to the United States.  And

3    there's really no issue that he thought it was a great idea

4    and intended to send it to the United States.

5           So, that brings us really to the conclusion of our

6    examination of Count 1.  Did the Defendant distribute heroin?

7    Yes, he did.  Did the heroin weigh one kilogram or more?  Yes,

8    it did.  It weighed 1.98 kilograms.  Was it knowing and

9    intentional?  Yes.  It wasn't accidental.  Was it distributed

10   outside the United States.  Yes.  It was distributed outside

11   of Garatek village.  Did he intend or know that it would be

12   imported into the United States?  Yes.  He both knew and

13   intended that it would be imported to the United States.  And

14   once you have addressed each of those issues, three of which

15   aren't even disputed, the only verdict you can find on Count 1

16   is that the Defendant is guilty of distributing that heroin,

17   intending and knowing that it would be going to the United

18   States.  And that ends our examination of Count 1.

19          Now, I told you a little bit ago that the why

20   diverged.  Once we get to the why, the whys are different for

21   Counts 1 and 2.  Now, let's focus on Count 2.  We already know

22   the what, we just described.  The what's are identical.  Did

23   he distribute a controlled substance.  The only difference in

24   this case is it's opium as well as heroin.  Yes.  Was the

25   heroin more than a kilogram?  Yes.  Was it knowing and

1  intentional?  Yes.  Count 2 has no requirement that the heroin

2  be going to the United States.  So, going to the United States

3  only concerns Count 1.  Now that we're on Count 2, we can

4  disregard that part.

5          So, that takes us to the why.  Why did the

6  Defendant do this?  Well, there are several parts, it's a

7  pretty long why, but let's focus on the first part.  The

8  Defendant either knew or intended to provide something of

9  pecuniary value, either directly or indirectly.  So, what is

10 pecuniary value in this case?  Well, as you'll learn,

11 pecuniary value means anything in the form of money, and the

12 instruction goes on to describe other things, drugs is a form

13 of pecuniary value.

14         But in this case, really, what are we talking

15 about?  We're talking about cash.  Cash in the form of

16 commissions that would be made from these drug sales.  You

17 heard from Special Agent Follis, I mean, cash is the number

18 one reason that the Taliban even gets involved in drug

19 trafficking at every level because it's the primary means of

20 funding everything that is done in the insurgency in

21 Afghanistan.  And there really is no issue that the Defendant

22 knew and intended to receive commissions in this case.  From

23 the very first conversation that Jaweed had with Khan Mohammed

24 when he was asking him about the opium, he knew that there was

25 a commission at the end of the line.

1             Exhibit 2B.  This is the very first reference to

2    drugs at all in the recordings.  Line 5.  The news is, I will

3    tell you something, there is a friend of mine, he wants to buy

4    50 or 60 seyr.  There will be a commission in it for me and

5    you.  I asked him:  What does that mean, commission?  It means

6    money.  I mean, this may be a half a world away, but

7    motivations aren't necessarily any different than dealers here

8    in the States might have, it's about the money.

9             And the Defendant knew —— acknowledged that he

10   would be receiving these commissions.  Again, you might say,

11   well, he didn't hear that one line about commissions.  Well,

12   he acknowledges it.  In Exhibit 2D.  If in 10 or 15 seyr ——

13   this is Jaweed speaking —— if in 10 or 15 seyr there is 3,000

14   or 4,000 for me and you, this will be very good.  Khan

15   Mohammed replies:  Even if there is 2,000, this will be

16   enough.  And here we're talking about money.  That's certainly

17   not the only reference.  2D later on, in the same

18   conversation:  Yes, get the commission openly from your

19   customer.

20            2E.  A completely different conversation, Khan

21   Mohammed says:  I thought if we get some money, we will buy a

22   car for business.  Once we have money, then the money will

23   keep coming.  Now, ladies and gentlemen, I just want to take a

24   point and ask you to remember business, I'll come back to it

25   in a little while.  But this particular conversation is one of

1   many conversations certainly, but this particular conversation

2   will have relevance later on when he talks about getting a car

3   for business with the money that they're going to make from

4   drug trafficking.

5          And the money did come, you heard from Jaweed.

6   After the first transaction, when he went back to the

7   Americans with extra cash, on the second time the Americans

8   said, you know what, whatever extra cash there is, give it to

9   Khan Mohammed.  And that's what he did.  He gave Khan Mohammed

10  his commission for assisting in that heroin transaction.  So,

11  it wasn't just speculation that Khan Mohammed would be getting

12  money, he did get money.  And not only that, he expected more

13  money in the future.  And Exhibit 2H, Jaweed says:  Once he

14  works a few trips and his business improves -- this is talking

15  about his customer -- then God will also make us well off.

16  Khan Mohammed replies:  As long as you also tip us in this.  I

17  asked Jaweed what that meant.  That meant paying him his

18  commission.

19         Jaweed responds:  No, I will give you your share

20  to you.  And Khan Mohammed replies:  Whatever is in the

21  balance, you want to split that with us in half or whatever

22  you want to do, it's up to you.  Why was Khan Mohammed

23  engaging -- why was it important for Khan Mohammed to get good

24  quality opium?  Why was it important for him to be getting

25  this heroin?  Because he knew -- and the conversations are

1    throughout the recordings, this is all about building up trust

2    with the customer.  Because the more he trusts us, the better

3    the quality of stuff we get him, the more he is going to keep

4    back coming back to us, the more future commissions are in it

5    for us.

6              So, the what is pretty much -- or the why, excuse

7    me, is pretty much answered here.  He knew or intended to

8    provide something of pecuniary value.  A pecuniary value is

9    cash commissions.  He knows or intends to provide them

10   directly to both himself -- this is Khan Mohammed speaking --

11   he's going to enrich himself, but also indirectly.  Who else

12   is he enriching?  An organization.  So, that brings us to the

13   next question.  We've discussed the what, we've discussed the

14   why, and now we're at the who.  This is the third question

15   that you need to consider when you're back in the jury room

16   deliberating.

17             Who is the Defendant and who is he allied with?

18   And that brings us back to the indictment.  To any person or

19   organization that has engaged in and engages in terrorist

20   activity and terrorism.  So, there's a lot of or's and

21   either's, let's break it down a little bit more and take this

22   step by step.  Who.  To any person or organization, B, that

23   has either engaged in or is engaging in, C, terrorist activity

24   or terrorism.  Let's take A first.

25             Now, ladies and gentlemen, out of that, lawyers

1  have a reputation for using words that really don't mean what

2  the words -- what we all know what the words to mean, this is

3  not one of them.  A person is a person.  It's as simple as

4  that.  Which person are we talking about here?  We're talking

5  about this man, the Defendant.

6          How about an organization?  An organization is

7  simply two or more people, whether organized or not, which

8  engages in terrorist activity.  Now, there's one

9  particular organization -- notice there's no name brand

10  attached to this.  It doesn't have to be a particular named

11  group.  It doesn't have to be organized.  The three of us get

12  together, we decide to go out and do some terrorist activity,

13  that's an organization.  But there is an organization here,

14  ladies and gentlemen.  And that organization is the Taliban.

15  And the one of two times where what the attorneys say is

16  evidence is right here in the form of a stipulation.  The

17  Court told you that you can take this stipulation that the

18  Taliban is a terrorist organization as undisputed fact.  So

19  that's A.

20          B is:  That has either engaged in or is engaging

21  in.  What does that mean?  There's a legal definition for

22  everything, ladies and gentlemen, and this is one of them.

23  And there are several different ways, and they're all

24  independent, you can find any one of these as a definition for

25  engaging in, previously or will engage in in the future.

1  Number 1.  To commit or incite to commit a terrorist activity.

2  Number 2.  Prepare or plan a terrorist activity.  Number 3.

3  To solicit any individual to engage in a terrorist activity.

4  Or Number 4:  To commit an act that affords material support,

5  including -- and this can be any number of things, I've just

6  selected a few of them for this slide, transportation, funds,

7  weapons, explosives.  For what purpose?  You have to provide

8  that support for the commission of a terrorist activity to any

9  individual who the person knows to be committing the activity

10  or to a terrorist organization.

11            So, what are some examples of terrorist activity?

12  Let's talk about the definition first.  This is C.  What is

13  terrorist activity?  It's any activity which involves the use

14  of any explosive, firearm or other weapon or dangerous device

15  other than for mere personal monetary gain with the intent to

16  endanger directly or indirectly the safety of one or more

17  individuals.  Let me just take a moment and talk to you about

18  this.

19            It doesn't happen much anymore, but we've all

20  heard of the story of a guy walking into a bank with hot dogs

21  or even dynamite strapped to him, and he goes up to the teller

22  and says:  Give me all your money or I'm going to blow up this

23  bank.  Is that terrorism?  No, it's a bank robbery.  And

24  that's what this term is meant to distinguish between.  If

25  you're simply just doing it for money, that's not terrorism.

1   It's to distinguish the every day acts that involve firearms,

2   involve explosives, from the more sinister acts that are more

3   than just about the money.

4            What are some examples of this type of terrorist

5   activity?  Well, we can think of a few.  How about firing

6   rockets or missiles at an airport?  How about firing rockets

7   or missiles at a military base?  How about laying or blowing

8   up mines to kill people in cars?  How about firing mortars at

9   people —— at targets?  These are all various things using

10  weapons, using explosives, with the intent to harm people.

11  And the fact is, the Defendant has committed or is planning to

12  commit each of these things, each of these examples of

13  terrorist activity.

14           First we know from the Defendant's own mouth that

15  he has previously committed —— engaged in terrorist activity

16  using rockets.  In the first recorded conversation, 2A, Line

17  50, he tells Jaweed —— and this is unsolicited, he just

18  volunteers this.  We fired rockets at the County Chief's

19  office.  The County Chief's office, as we learned, is the main

20  office in Chaprahar.  That is sort of like your municipal

21  center where the sub-governor works, the police station is

22  there, other instrumentalities of the Afghan government.  This

23  Afghan government that is so abhorred by the Defendant and the

24  people he has allied himself with.  And that was done with the

25  object of killing Afghan government people.

1      But we also know that he's also engaged in other

2 types of terrorist activities in the past, he's committed

3 these acts by himself by his own admission.  I will also blow

4 up the mines there.  I have blown them up around the Dago Sar

5 and blown them up around the Red Castle.  We asked Jaweed:

6 What did he mean when he was telling you this?  He told you

7 that he was referring to using mines to blow up government

8 cars.  These are infidels, we will kill them and we will

9 continue our Jihad blessing.

10      This isn't just about money for Khan Mohammed,

11 ladies and gentlemen.  Sure, that is a nice side benefit, but

12 this is about killing people.  About getting rid of people he

13 finds personally or morally reprehensible to himself.  Well,

14 those are two admissions of the Defendant of past acts that he

15 has committed, but I think the evidence is also sufficient --

16 also overwhelming that he is in the process of planning

17 activities.  The whole reason Jaweed got involved with Khan

18 Mohammed to begin with is of a plan to commit a terrorist

19 activity.  And Khan Mohammed admits as much.  We will continue

20 our action in our country.  Whatever we do, here are a lot of

21 opportunities, we can place and explode bombs and fire

22 missiles toward the airport.  From Exhibit 2A.

23      But that is not all, ladies and gentlemen.  He's

24 also planning on firing missiles, not just at the airport, but

25 wherever the target of opportunity presents itself, including

1   military bases.  Exhibit 2A, Line 30.  The Americans are

2   infidels and Jihad is allowed against them.  If we have to

3   fire the missiles toward the airport, we will do it.  And if

4   not the airport, wherever they are stationed, we will fire at

5   their base, too.  I mean, we have to use the mines to, God

6   willing, we and you will keep doing our Jihad.

7           What is another example of the Defendant planning

8   terrorist attacks?  He doesn't like the Government, that's

9   clear.  He doesn't like infidels, that's clear.  He doesn't

10  even like Afghans, so long as they are helping the infidels.

11  And we have a perfect example of that here, Exhibit 2A, Line

12  80.  Khan Mohammed:  If we don't get rid of the infidels, this

13  would be a great obstacle in our country.  We will continue

14  our Jihad.  Jihad is allowed religiously against the infidels,

15  and if a Muslim is on their side and gets shot, the hell with

16  them, that and the Government.  Jaweed responds:  If they are

17  standing with the infidels, they will be hit.  Khan Mohammed

18  replies:  If standing against -- or on the side of the

19  government and is hit, then Jihad is allowed against them,

20  too.

21          Well, yes, we have evidence of him committing

22  acts in the past.  We have evidence of him planning to commit

23  acts in the future.  But there's also evidence that the

24  Defendant either had or is in the process of providing

25  something of material support for terrorist activity.  And you

1  saw from that instruction that material support can take many

2  forms, certainly weapons, and Lord knows there's enough

3  evidence of that.  In every conversation the Defendant is

4  telling Jaweed about how he has all these weapons hidden,

5  mortars, mines, bullets, whatnot.  What about transportation?

6  I mean, it's a pretty innocuous thing, right?  Transportation.

7  Remember that conversation I asked you to remember a little

8  while ago about the business, remember, we were talking about

9  commissions.  If we get money, then the money will keep coming

10 and maybe we can buy a car so we can continue with our

11 business.  What's the business here, ladies and gentlemen?

12          You remember Jaweed told Khan Mohammed:  The

13 rockets I got, you're not going to believe it, they were

14 stolen.  Khan Mohammed wasn't happy with this.  He said:  You

15 need to go out and get some more rockets.  What am I going to

16 tell them?  We'll get to that in a little bit.  But what did

17 Khan Mohammed say ultimately?  Exhibit 2C.  Yes, we will

18 tightly and firmly load it in our car and bring it.  They

19 don't search around noontime.  This was not a conversation

20 about drugs, ladies and gentlemen.  This was a conversation

21 about how they're going to get the new rockets from wherever

22 it is they're getting them to the hiding place.  And remember

23 there was a conversation -- why is it about noontime that is

24 good?  Well, the police are having lunch, and they don't

25 search as well during lunch time.

 1            So, ladies and gentlemen, this isn't just about

 2    weapons, although certainly there's a lot of evidence of that.

 3    This also is things as simple as using the drug money to get a

 4    car to transport the weapons, that is material support.

 5    Without all of these other little things, the Taliban or any

 6    organization or any terrorist can't get done what it is that

 7    they want to get done.

 8            Now, you saw in the indictment, providing something

 9    of pecuniary value to somebody who has engaged in or is

10    engaging in terrorist activity or terrorism.  Even though

11    common sense would say they mean the same, they are slightly

12    different.  Terrorism means premeditated, politically

13    motivated violence, perpetrated against noncombatant

14    targets --

15            THE COURT:  You're going way too quickly.

16            MR. STIGLITZ:  -- noncombatant targets by

17    subnational groups or clandestine agents.  What's an example

18    of a subnational group?  The Taliban.  And that brings us to

19    the second question of who.  Yeah, the Defendant in his own

20    right was a terrorist.  And, yes, the Defendant was the

21    recipient of this.  But who was the Defendant allied with?

22    And the evidence is clear that he is allied with the Taliban.

23            So, who are the Taliban players in this little part

24    of the Afghan universe that has been the subject of this court

25    trial.  We have Abdul Rahman.  Abdul Rahman, we learned, was

1  in charge of investigations when he was in power in Nangarhar.

2  We heard about Habib Zai.  This name, by the way, was first

3  mentioned by the Defendant, not Jaweed.  Habib Zai,

4  interestingly enough, all of these folks are from the same

5  village or nearby.  Habib Zai was a sub-governor for the

6  Taliban during the regime in Nangarhar province.  And then we

7  have the Defendant, what's the Defendant's role?  Well, it

8  certainly wasn't anything as glamorous as being the head of

9  investigations or the sub-governor, but it was critical

10 because he's the one -- guys like Khan Mohammed who can remain

11 behind, they don't have to flee to Peshawar, Pakistan.

12        And his association here -- we don't have to rely

13 on Jaweed's word, we can rely on the Defendant's word.  When

14 you do an attack, and this is from Line 2A:  When you do an

15 attack, if successful, then we will give you a lot of money.

16 We will not forget about you.  There is money and us -- with

17 us, you just prove your reliability.  And then Jaweed asked

18 him:  You and Habib Zai, you and Habib Zai and Qari Abdul

19 Rahman, all three are together in this?  Khan Mohammed

20 replies:  Abdul Rahman, Habib Zai and our word are the same.

21 We are as people and with him we make our program.  Program,

22 as we learned, is a euphemism for attack.

23        So, from the Defendant's own mouth we have an

24 admission that he is in the thick of it with Abdul Rahman and

25 Habib Zai.  He is their man left behind in Garatek village in

1   Chaprahar district.  So, what's the plot, as we learned from

2   Jaweed.  Abdul Rahman says:  You go back to Afghanistan and

3   you get these rockets.  Abdul Rahman says:  You contact Khan

4   Mohammed.  And the Defendant from that point on acts as the

5   go-between between Khan Mohammed -- between the Taliban and

6   Jaweed.  But, again, you don't have to just believe Jaweed's

7   version of this because it's confirmed by the Defendant.

8           THE COURT:  Mr. Stiglitz, we need to take a break,

9   so let me just stop at this point.

10          MR. STIGLITZ:  Sure.

11          THE COURT:  Let me go ahead -- and if people need

12  to take a break, go ahead.  Why don't we do like a five minute

13  break or something like that.  Whenever you're ready back

14  there we'll come and get you.

15  JURY EXITS COURTROOM AT 10:40 a.m.

16          THE COURT:  We're on a short break.

17  BRIEF RECESS

18                          AFTER RECESS

19          THE COURT:  Dorothy will have a redone second page

20  of the verdict form, it doesn't have the space.  So, whenever

21  we take a break, just come up and get one and substitute it.

22  JURY ENTERS COURTROOM AT 10:51 A.M.

23          THE COURT:  All right.  Members of the jury, don't

24  be hesitant about putting your hand up.  Don't leave me

25  guessing whether you need a break, okay?  I don't have any

1   problem, either do counsel, we'd rather you took the break

2   instead of sitting there uncomfortably.  So, don't be

3   hesitant.  All right.  Mr. Stiglitz, you can pick up where you

4   stopped in your closing argument.

5         MR. STIGLITZ:  Thank you, Your Honor.  For those of

6   who you may have been distracted for other reasons, we were

7   just talking about the -- really the plot, the genesis of what

8   brought Jaweed and what brought Khan Mohammed together in this

9   case.  And this plot, as I indicated at the beginning of my

10  statement, was originally disclosed by Jaweed.  But it wasn't

11  just his word that you have to rely on, it was confirmed by

12  the Defendant.  And this was one of the more -- well, there

13  are a lot of important portions of the transcript, but this is

14  a particularly important one.

15        Exhibit 2A, Line 34.  Khan Mohammed:  God willing,

16  when this operation is done then I will take you and make you

17  sit with them with Habib Zai and all the others.  Jaweed:

18  I've not exchanged two words with Habib Zai yet.  It was Abdul

19  Rahman who told me to get in touch with you.  If it were not

20  for the recommendation of Abdul Rahman, I would not have seen

21  you either.  He told me that you are his man.  You are fully

22  active on their behalf.  And he said that whatever I need or

23  whatever problem I have to get in touch with you.

24        The earlier -- similar to the account that he gave

25  to Colonel Latif and the DEA.  Does the Defendant deny it?

1   Does he say:  What are you talking about?  No.  His response

2   is:  Yes.  Confirming everything.  I am your man here.  If you

3   have a problem, you come and see me.  I am with Habib Zai and

4   Abdul Rahman.  And the Defendant tells us that he takes his

5   orders from the Taliban.

6          Again 2A.  Line 54.  They said we will consult

7   about the program.  They being Habib Zai and Abdul Rahman,

8   who, as we learned from the transcripts, Khan Mohammed is in

9   regular contact with.  We will consult about the program

10  attack, and after the consultation we will set up the program.

11  It would be according to their advice, and I cannot do it

12  unless they order me to do it.

13         So, we learn that -- and the evidence shows, rather

14  clearly, that the Defendant has engaged in and is presently

15  engaging in terrorist activity on his own part.  He's sent

16  rockets to -- he's shot rockets at the County Chief's office.

17  He's laid mines and has blown up cars.  But he's also acting

18  as a conduit of the Taliban committing acts of terrorism as

19  part of a sub-national group that commits violent acts against

20  noncombatants.  And, ladies and gentlemen, we learned that the

21  Taliban and drug trafficking go hand in hand in Afghanistan.

22         Special Agent Follis told you yesterday that the

23  great majority of his cases, when he was Country Attache in

24  charge of the DEA office, in charge of American drug

25  investigations in Afghanistan, the great majority of his cases

1    involved the Taliban at some level or another.  The bottom

2    line is, the Taliban is neck deep in drug trafficking at every

3    level in Afghanistan.  Why?  Because that is where they get

4    their money to fund their activities.  To go after the

5    Government.  To kill infidels.  To try to chase Americans and

6    other foreigners outside of their country, a country that they

7    expect one day that they will retake and get power of again.

8         That brings us to the last who question.  And this

9    is the last element of Count 2.  He had to have done all this

10   having knowledge that the said person and organization has

11   engaged and engages in terrorist activity and terrorism.  You

12   remember that the third element was providing the pecuniary

13   value to a person or organization that has engaged in or is

14   engaging in terrorist activity or terrorism.  That's the third

15   element.

16        The fourth element is that he did this having

17   knowledge that the people he was helping had engaged in this

18   terrorism and terrorist activity.  And I ask you this, who

19   better to have knowledge of what the Defendant was doing and

20   who the Defendant was helping than the Defendant.  We don't

21   have to speculate in this case whether he knew that he was --

22   that the terrorist individual was committing terrorist

23   activity.  He knew it because he was the guy.  We don't have

24   to speculate as to whether the organization that he was

25   indirectly aiding was a terrorist organization, he was part of

1   the organization.  So, who better to know who the Defendant

2   was helping than the Defendant himself.

3            So, ladies and gentlemen, that brings us to a

4   summary of Count 2.  We already have seen the what, and that

5   was essentially undisputed.  He distributed a controlled

6   substance.  In this case it could be he either opium and/or

7   heroin.  You could find either one or you could find both.  We

8   submit to you that both have been distributed in this case.

9   With respect to the heroin, was it more than a kilogram?  Yes.

10  Was it done knowingly and intentionally?  Yes.  This isn't

11  new.  This is just the same -- getting back to the very

12  beginning -- because this is the same elements that you have

13  in Count 1.

14           Then we get to the why.  Did he know or intend to

15  provide something of pecuniary value to a person or

16  organization that has engaged in or is engaging in terrorist

17  activity or terrorism?  And the answer is:  Yes.  Now, I say

18  here yes to both, but really it should say yes, all.  Did he

19  know or intend to provide something of pecuniary value?  Yes.

20  He knew it and he intended it.  He knew it -- that he was

21  doing this drug stuff to get money.  He intended to get future

22  money as well by building up trust with Jaweed's customer.

23           Did he intend to do this or provide this to a

24  person engaging in terrorism?  Of course.  Himself.  How about

25  an organization that is engaged in terrorism?  Yes, the

1    Taliban.  It was both terrorist activity and terrorism.  So,

2    really, the answer should be yes, all.  And then the last

3    question, the fourth element of this offense.  Did he know

4    that the recipient engaged in or is engaging in terrorist

5    activity or terrorism?  Of course he did, he was the guy.  Who

6    better to know than the Defendant.  So, the answer to that

7    question is yes.  And if you find that you can answer each of

8    these questions yes, then you have to find the Defendant

9    guilty of Count 2.

10            Now, ladies and gentlemen, when you go back in the

11   jury room and you carefully consider all the evidence and you

12   apply that to the instructions that you're given by the Court,

13   many people have a sense that because they are in a courtroom

14   now we have to throw out our common sense.  In fact, we're

15   relying on your common sense.  Just because you're in a jury

16   room doesn't mean you pitch it out the window.  When you

17   examine the totality of the circumstances in this case and you

18   apply your common sense to the facts that have been thoroughly

19   laid out at the trial, and when you examine it further back in

20   your deliberations, there's really only one conclusion in this

21   case, and that is for you to make a decision.  Jaweed had to

22   make one, now it's your turn.  And the only decision that is

23   justified by the facts in this case is a decision of guilty on

24   Count 1 and Count 2.  Thank you for your time.

25            THE COURT:  All right.  Mr. Vanegas.

1              MR. VANEGAS:  Good morning, ladies and gentlemen.

2              THE JURY:  Good morning.

3              MR. VANEGAS:  When this first -- when this case

4    first started, what you learned about this case was that it

5    was a case about terrorism from the get-go.  That is, that you

6    heard from the witness, Jaweed, that somewhere in Pakistan or

7    Peshawar, Pakistan, he came upon this individual named Abdul

8    Rahman, and Abdul Rahman gave him a task.  And he also gave

9    him the information of who the person that he was supposed to

10   see in Chaprahar, and that was Khan Mohammed.

11             And in listening to that first audio, all you kept

12   hearing was missile, mines, attacks, and actually just

13   terrorist activity.  And as the case progressed, as you

14   listened to more recordings and as you listened to more

15   videos, what you saw was that at the very end you didn't have

16   a single photograph, a single tangible evidence, anything that

17   related to weapons, to mines, to bullets.  You didn't have any

18   diagrams, any plan of attack, you had nothing about terrorism

19   at the end of the day.

20             And this was during the course of two months, two

21   months during which Mr. Khan Mohammed is secretly audio taped,

22   secretly video taped, but there's absolutely no evidence of

23   terrorism.  But what you do get is these drugs.  But who

24   wanted these drugs?  These drugs -- the person who put in an

25   order for these drugs was the DEA.  They're the ones who

1   wanted to task Jaweed to go and find some drugs.  So, the case

2   first starts out as terrorism, but then it changes, it morphs

3   into something else, because early on they have absolutely no

4   case, they have no evidence.  Because this man is saying

5   offensive things, he's saying things about attacking Americans

6   and infidels, but there's absolutely no corroborating evidence

7   that any of that stuff took place.

8          Now, throughout these audios Mr. Khan Mohammed

9   again and again said offensive, disgusting things, things that

10  can be renounced and denounced, but ultimately none of that

11  came to any fruition as to what he was saying he would do.

12  Now, when you were first asked to participate in this trial,

13  we went through an extensive questioning about whether you can

14  look at Mr. Khan Mohammed, who looks different, who has a

15  different appearance, who has his beard, who has his hat, and

16  look at him and judge him fairly and impartially.  And all of

17  you indicated that you could.  Well, now we are here at this

18  moment.

19          Before I proceed with breaking down the evidence,

20  what I would like to remind you of is three principles of law

21  that are critical, that are important, that are essential to

22  our system of justice.  What are those principles?  The

23  principles are presumption of innocence, burden of proof and

24  beyond a reasonable doubt.  Presumption of innocence means

25  that when a person is arrested -- back when he was arrested in

1  Afghanistan in August, excuse me, on October 29th, 2006, he

2  was presumed innocent.

3          When he was charged by a Grand Jury and charged

4  with these two counts in the indictment, he's still presumed

5  innocent.  The indictment is just a charging document, it's no

6  evidence of any kind.  And so as you see Mr. Mohammed, he is

7  presumed innocent.  The presumption of innocence means that

8  you have a cloak of protection that the Constitution of the

9  United States gives that to all criminal defendants who are

10  charged.

11          The second principal, burden of proof.  The burden

12  of proof -- it's the Government's duty to present evidence.

13  The Government's duty and responsibility and obligation to

14  come to you and provide sufficient evidence that this man has

15  committed a wrongful and illegal act.  But in order to take

16  that protection, that presumption of innocence away from

17  Mr. Mohammed, the Government's burden has to be proved beyond

18  a reasonable doubt.  Now, the burden of proof never shifts, it

19  always stays on this table where you have this collection of

20  the drugs that the drug enforcement agent -- that they tasked

21  for, that they paid for.

22          The burden of proof always stays there.  And so

23  later on if you may have a question as to, well, if this case

24  first started about missiles, rockets and attacks and mines

25  and there is no evidence of such things, then you look here.

1   If there are doubts, you always look here.  If there are

2   things that you wanted to hear, things that you wanted to

3   listen or something that is missing about the case, you always

4   look here.

5           Reasonable doubt.  How do you explain that?  How do

6   you define that?  It's a doubt for which you have a reason.

7   And in this case there are many reasons to doubt as to

8   Mr. Mohammed's guilt.  When Ms. Jahn first came up before you

9   last Friday morning, she indicated that Mr. Mohammed is --

10          THE COURT:  Your mic is off or something happened.

11  Does it need a battery?

12          MR. VANEGAS:  I think I can try to do this --

13          THE COURT:  It's okay, we have batteries.

14          MR. VANEGAS:  So, beyond a reasonable doubt.  And

15  there are many doubts in this case.  Let's begin with the

16  actual case, the charge that relates to terrorism.  How do you

17  plan an attack of terrorism without any weapons?  Without any

18  bullets?  Yes, Mr. Mohammed was running his mouth off

19  regarding mines, explosives, missiles and rockets, but during

20  the course of two months, as he's been audio taped eight

21  times, video taped three times, and there's also this

22  surveillance, because you heard that at some point Haji

23  Latif's -- one of his officers is conducting surveillance to

24  make sure that Mr. Mohammed and actually Jaweed is safe.  So

25  they know that here is Khan Mohammed the suspect -- the person

1    who is --

2            THE COURT:  It seems to be -- just put some

3    batteries in.

4            MR. VANEGAS:  Yes.  I apologize, we'll try again.

5    So, throughout the course of these two months while he's under

6    active investigation, do you ever see any evidence of a plan

7    of attack?  Did you ever see any evidence of a diagram or some

8    type of plan that says that they're going to attack Jalalabad

9    airport?  Early on, how many times did we hear about attacks?

10   And when Jaweed was on the stand, he would be asked questions

11   regarding, well, what did you understand this to mean.  And

12   always you had responses about attacks, about missiles and

13   mines, and at the end of the day you don't have any of that.

14           There is something Mr. Stiglitz pointed out to a

15   reference in the audio in which Mr. Mohammed says, yeah, that

16   he attacked the county office.  But who works in the county

17   office?  None other than the then Chief, Haji Latif.  And

18   while he was on the witness stand, he never stated or said

19   anything about his office or the building that he works in was

20   under attack.  There was never any report about any type of

21   incident or violent attack.  Never.  So I asked him --

22           MR. STIGLITZ:  Objection.  Can we approach?

23   SIDEBAR DISCUSSION ON THE RECORD AS FOLLOWS:

24           THE COURT:  We kept evidence out of any attacks and

25   stuff, the Government raised it as an issue.  And, you know,

 1  my feeling was that if they weren't going to be able to show

 2  specifically that he did it, I didn't know the tapes -- I'd be

 3  careful about this because they did want to bring it in.

 4  There was objections about bringing it in, and so it didn't

 5  come in.  So it's not as though it didn't happen.  There was

 6  some concern about how prejudicial it would be and whether you

 7  specifically could lay it at the door of the Defendant.

 8          Now, I don't know when this attack occurred and

 9  whether that has anything to do with the attacks that you were

10  talking about, Mr. Stiglitz.  Because I don't know whether it

11  was a later attack, an earlier attack or what, but I'd be a

12  little careful about this area.

13          MR. STIGLITZ:  That's just what we wanted to point

14  out.  I don't recall just right now exactly when that attack

15  was, but I do recall that we were prepared to get into

16  specific examples of activity and --

17          MR. ROTHSTEIN:  It was within 2006 when Haji Latif

18  was the police chief, so it would have been the exact same

19  timeframe.

20          MR. STIGLITZ:  We were specifically precluded from

21  raising that, and we think it's unfair that the defense is

22  making it seem like nothing really happened.

23          MR. VANEGAS:  Well, was there evidence of attacks

24  in Jalalabad airport?

25          THE COURT:  No, you can -- that I think you can do.

1    But I think the Latif thing did come up and there was

2    objections about it, and I found that it was too prejudicial.

3    But I think -- I would be a little careful about getting into

4    that.

5                MR. ROTHSTEIN:  In the suppression hearing, Agent

6    Higgins testified that they had to provide security and

7    Jalalabad was attacked, and we kept that out because of the

8    stipulation, and also the -- in the suppression hearing, Agent

9    Higgins testified that he was part of the security force there

10   at the Jalalabad airfield while he was stationed there and the

11   Nangarhar province was the subject of terrorist attacks.

12   Those are instances that we would have brought up, but for the

13   Court's ruling.

14               MR. VANEGAS:  With respect to the police chief --

15   that's fine.  I understood that the attack took place after

16   this man, Mohammed, was arrested and also that he was demoted

17   all after his arrest.  With respect to the Jalalabad airport,

18   I didn't understand it to be that somehow Mr. Mohammed was

19   directly engaged in terrorism.

20               THE COURT:  No.  I kept it out in part because you

21   objected because it was prejudicial, and the question was

22   whether they could tie it to Mr. Mohammed.  I don't think that

23   Jalalabad airport you can tie to -- there was testimony about

24   attacks, but there's nothing to show that Mr. Mohammed had

25   something to do with it.  I think you have to be careful how

1    you word it in terms of it being any evidence that

2    Mr. Mohammed was involved in actually attacking it, as opposed

3    to just making a general statement that Jalalabad airport was

4    never attacked, because I don't think that's accurate.  But I

5    think you can certainly say that Mr. Mohammed -- there's no

6    evidence that Mr. Mohammed was involved -- I mean, actually

7    attacked Jalalabad airport.

8            In terms of the police chief, it seems to me that

9    one is a little trickier, because we got into some discussion

10   and ultimately decided not to get into it.  Nobody -- at least

11   nobody raised the issue of there being some statement in his

12   material that indicated that he had been involved in attacking

13   it, so we never got into that much detail, but I certainly

14   precluded it, so we never went down that path.  You objected

15   and it seemed prejudicial.

16           So, as I said, I think you can talk about

17   Mr. Mohammed not being involved -- there's no evidence that

18   Mr. Mohammed was involved in an attack on Jalalabad airport.

19   There was talk about it, but it never happened.

20           MR. ROTHSTEIN:  Other than the audio tapes.

21           THE COURT:  I'm sorry, in terms of -- what I'm

22   talking about is plans.  What he's arguing is that they never

23   occurred, right?

24           MR. VANEGAS:  Yeah.

25           THE COURT:  So, all I'm saying to you is that we

1   don't have any evidence that it occurred because Mr. Mohammed

2   was involved in doing it.  In other words, I wouldn't -- you

3   can't say that Jalalabad airport never got attacked, because

4   we know it's not true.  But you can say that Mr. Mohammed

5   didn't attack Jalalabad -- there's no evidence that he

6   attacked the airport, so that's not a problem.

7           MR. VANEGAS:  That's fine, I'll stay away from the

8   police --

9   SIDEBAR DISCUSSION CONCLUDED

10          MR. VANEGAS:  So, with Jalalabad airport, there's

11  no evidence that Mr. Mohammed at any time had diagrams, had a

12  plan of attack, that somehow that he was -- that he was

13  investigated, or during the time that he was investigated that

14  show that he actively had a plan for attacking Jalalabad

15  airport.  Now, in the videos and the audios you kept hearing

16  that -- and from Mr. Mohammed, that Habib Zai and Abdul Rahman

17  were going to show up, and that when they show up they were

18  going to have this program.  Well, one thing that never

19  happened is that Habib Zai nor Abdul Rahman, they never showed

20  up.  Is there any evidence that you've been presented that

21  these two individuals came from Pakistan and actually met with

22  Mr. Mohammed?  But overall, what you kept hearing, especially

23  from Jaweed on the witness stand, was like, well, they were

24  going to come up and it was going to be in three days.  And so

25  if you start from August 18th and then you end on

1    October 18th, you go from Exhibits A through K.  Where is the

2    evidence that these individuals are going to show up?  They

3    made absolutely no appearance, they're missing in action.  And

4    so, what do you do with that evidence?  That evidence should

5    give you pause to doubt as to -- you know, is this man right

6    here associating himself or is he just talking?

7            Right.  At the end of the day, if he has absolutely

8    no access from the evidence that you have been presented, and

9    he's not connected with any rockets, missiles and mines, and

10   you kept hearing that over and over again, that's like

11   someone -- like an arsonist who is going on about -- I want to

12   burn that building.  Okay.  But he doesn't have the flammable

13   liquids, he doesn't have the lighter, he doesn't have the rag,

14   he has none of the implements to set anything on fire.  And at

15   the end of the day, Khan Mohammed absolutely did nothing as

16   far as coordinating, participating or encouraging an attack.

17   You don't see that.  Not in the evidence that you've been

18   presented.

19           So, given the absence of that evidence, right, then

20   the drug enforcement agency, basically on the other side of

21   the planet -- think about that.  The drug enforcement agency

22   on the other side of the planet decides to engage in another

23   activity, right.  Here they're investigating this man for

24   terrorism, and before I get into the narcotics, what does the

25   Drug Enforcement Agency do with respect to the terrorist

1   aspect of this case?

2           Well, they give Haji Latif, the police chief, lots

3   of money, who gives his money to -- who gives that money to

4   one of his subordinates to go out and buy rockets.  So now

5   United States currency from the Drug Enforcement Agency is

6   given to an unknown Afghan official who goes to an unknown

7   part in that part of the world to meet an unknown arms dealer,

8   an arms merchant.  For what?  To buy rockets to then bring

9   back.  For what purpose?

10          Well, with the idea, the theory being that once we

11  have these rockets then we give it to Jaweed, who then meets

12  up with Khan Mohammed and there you have it.  Think about that

13  plan, it's preposterous.  But the DEA then decides to go at

14  another plan, a very sustained program with a lot of detail,

15  and they are basically say to this farmer, okay, you did a

16  good job.  He started making all this noise about Abdul Rahman

17  and Habib Zai, good, but now we have a different plan for you.

18  Go to this man and start saying that you want drugs, that you

19  want opium.

20          And during the first meeting, ladies and gentlemen,

21  just remember that Jaweed doesn't say that this stuff is going

22  to America, but what you learn through cross-examination when

23  Ms. Danielle Jahn asked Agent Higgins:  Were you getting a

24  little frustrated with Jaweed not bringing up America?  Agent

25  Higgins said:  I wasn't getting frustrated because he was

1   doing an admirable job.  Notwithstanding his admirable job, he

2   knew that he was forgetting to put out the words America.

3   Right?  Because that is part of one of the elements, the

4   crucial element, that is, because if you're going to be all

5   the way on the other part of the world and the DEA is

6   basically funneling money to a confidential source so they can

7   get these narcotics.  Well, these narcotics can only come

8   here -- here in District Court in a criminal trial if the

9   magic words America are said.  Okay.  So now the plan is in

10  place, they plant this in Jaweed's head, you have to say

11  America because if you don't say America it's not going to

12  work.  So, sure enough he starts --

13              MR. STIGLITZ:  Objection.

14              THE COURT:  I'm sorry.

15              MR. STIGLITZ:  Objection.

16              THE COURT:  I don't know what the nature of the

17  objection is.  Come to the side then.

18  SIDEBAR DISCUSSION ON THE RECORD AS FOLLOWS:

19              THE COURT:  What is the objection?

20              MR. STIGLITZ:  That misstates the law.  The drugs

21  have to have -- don't have to have any connection to the U.S.

22  and they can still convict him of an offense in this case.

23  So, for counsel to be just saying blanketly that if there's no

24  America there's no case.  That is a misstatement of the law.

25              THE COURT:  I don't understand what you're saying?

1          MR. STIGLITZ:  Counsel said --

2          THE COURT:  I know what he said.  What he was

3   saying is that -- doesn't it have to be imported for this

4   charge?

5          MR. STIGLITZ:  Yeah, but it wasn't made clear that

6   this was -- this charge that he was talking about.  He was

7   talking generally that if this case doesn't work --

8          THE COURT:  That's true, that's what he said.  So,

9   what is the other charge they would bring against him sitting

10  out in Afghanistan?

11         MR. STIGLITZ:  Count 2.

12         THE COURT:  Oh, I see what you mean.  So, the

13  argument you're making is, if I understood the argument

14  correctly, is an argument that they could only charge him if

15  they had the importing.  They are correct, you can charge him

16  with only Count 2, you wouldn't need the importing.  So that

17  is not an argument that is accurately --

18         MR. VANEGAS:  As to Count 1 it's accurate.

19         THE COURT:  Yeah, but you didn't make it clear.  I

20  would agree with that.

21         MR. VANEGAS:  I believe I had moved on to the other

22  part of --

23         THE COURT:  Yeah, but I think you need to correct

24  that when you're talking about it.  You're talking about in

25  order to charge him with Count 1 they need the America.

1   Because it is correct that for Count 2 you don't.  You're

2   going to leave them with a misimpression, they are correct

3   about that.

4   SIDEBAR DISCUSSION CONCLUDED

5           MR. VANEGAS:  Ladies and gentlemen, just so that

6   we're clear, I'm talking about Count 1.  All right.

7   Distribution to import drugs to America.  And the DEA plants

8   this idea of America on Jaweed's head, and little by little he

9   starts talking about it, right.  This farmer on the other side

10  of the planet starts saying, yeah, it's going to go to

11  America.  I have this friend, the friend is this agent right

12  here.  All right.  So he is starts funneling money, and

13  saying, you just keep saying America, you're doing a good job.

14  Khan Mohammed says:  Okay.  And then he starts making more

15  offensive statements.  Right.  But this is a sustained program

16  with a lot of determination by the DEA through how many

17  meetings, right.  Every time that Jaweed has to meet with Haji

18  Latif they drive to Jalalabad airport to talk about the case,

19  to see how he's doing, to make sure that he keeps bringing up

20  America.

21          And as Haji Latif said, all the instructions were

22  given by the DEA, by the Americans.  There's no question about

23  that.  There's no doubt about that:  Jaweed -- Jaweed doesn't

24  even know that Iran borders his country.  He had not or

25  vaguely heard about Tajikistan or Uzbekistan.  So when you

1    start talking about the idea of America, what does America

2    mean to Jaweed?  That's very important, right?  So, what the

3    Government wants you to do as far as intent -- you're going to

4    have an instruction regarding knowing and intending.  How do

5    you take knowing and intending when it comes from the DEA

6    agent to Jaweed -- you say America.  Okay.  I say America.  To

7    the farmer.  The farmer then says America, but he has no

8    conception of where America is.  Right?  And so he has no

9    conception really of different parts of his own country.  But

10   he's told to say the code word, America, and that's sufficient

11   apparently to the Government.

12          So, where is the intent in knowing -- America means

13   something beyond just the word America.  And let's get down

14   to, how was it going to be imported?  Did you ever hear any

15   evidence -- okay, this is the plan.  These drugs, the heroin,

16   is going to leave Afghanistan by this manner.  It's going to

17   be taken by these people.  These drugs are then going to come

18   to United States, America, beyond just a word through the

19   Pacific Ocean, through the Atlantic Ocean, through Canada,

20   through Mexico.  That is America, right?  If you're going to

21   bring something to America, you have to have an entry.  Did

22   you ever hear any discussion about how this was going to take

23   place?  No.  You just heard America.

24          America means a lot more than that just the word.

25   There has to be some thought, there has to be some analysis,

 1  there has to be some exchange of how this stuff -- these

 2  bags -- the heroin is going to get to the United States.

 3  Jaweed tries his best.  American cities.  He says France.

 4  Have you ever been to France?  No, but I've heard of it.

 5  Well, that's what they put him up to.  So now what they are

 6  doing is transferring his knowledge of what America is, but he

 7  doesn't really explain it to him, right?  Because Jaweed can't

 8  go beyond just saying America.  So, Jaweed doesn't have the

 9  intent or the knowledge of what America is, and so they're

10  saying by Jaweed saying it to him and he adopts it, now he

11  knows about America.  And just because he kept saying America,

12  like he has an understanding of what America is or how these

13  drugs are going to get there.

14          The case -- the Government's case at that point

15  completely falls.  It falls like a house of cards because

16  they've given you no evidence, no analysis from the witnesses

17  as to how this was going to take place.  Let's talk about

18  these drugs.  The Drug Enforcement Agency around the corner or

19  on the other side of our planet, giving money to an informant

20  to go speak to this man.  The man who is running off his mouth

21  and saying lots of different things, but he does not bring up

22  drugs.  But then he says, yeah, I'll go find you drugs.  And

23  then where does he find drugs -- the first time, right?  He

24  goes to the opium sellers.  There are four stalls.  And these

25  four stalls are where?  Well, they are 60 meters from the

1  county building.  And who works at the county building, lo and
2  behold, Police Chief Haji Latif, right?

3           So, apparently it's okay to be out there
4  negotiating, that part is quasi-legal, maybe not illegal.
5  That's okay.  But the actual distribution, that is illegal.
6  But think about it.  In that video where these paddies are
7  exchanged -- and you should pay close attention to that video
8  where the paddies are exchanged because you'll see Jaweed and
9  he'll say, no, I want this amount, and are you sure you'll
10 take care of my account.  He's engaged, because as you know,
11 back in Pakistan he was also a market seller, so he knew how
12 to bargain.  But he wants you to believe that at the time that
13 they went to the four stalls that he just sat there silent for
14 an hour, hour and a half.

15          So, when I asked him, you were there, right, at the
16 stalls?  You've been there before?  Yes.  Were you
17 negotiating?  No.  Well, how long were you there?  For an
18 hour, hour and a half.  What did you say?  Nothing.  Imagine
19 that, just sitting there for an hour and a half.  And so you
20 have the video now of where this transaction is taking place
21 at the opium sellers, and there you have an actual trafficker,
22 right?  The trafficker who is bringing out all the paddies.
23 It is not Khan Mohammed.  Yes, he took him there.  Yes, he's
24 brokering a deal, but as all those men are kind of squatting
25 down and they are just dealing and wheeling, the other

1    person -- the other two people are saying, you know, we've

2    been weighing opium all night.  Look at that.  Read it.

3    Because if these people had been weighing opium all night,

4    well, those are the traffickers.  But it seems like those

5    traffickers don't matter to the DEA.  What matters is this man

6    right here.

7            And even though he does not keep opium that is seen

8    in the guest house, because apparently drug dealers never keep

9    opium in their guest house.  I guess Khan Mohammed -- he has

10   to actually go to where the traffickers are, right?  The

11   people who are selling and dealing, but the Government doesn't

12   seem to care about those people.  The local police chief

13   doesn't seem to care about those because you see them.

14           MR. STIGLITZ:  Objection.

15           THE COURT:  I'll sustain any further discussion on

16   that line.

17           MR. VANEGAS:  Now we'll go to the heroin deal.

18   Yes, Mr. Mohammed says:  I'll go get you the heroin because

19   Jaweed's friend wants it.  Jaweed's friend being, again, the

20   DEA.  They keep insisting that they want drugs, and again, the

21   code word has to be America.  Well, America is more than just

22   this word.  And you have no evidence that Mr. Khan Mohammed

23   knew where America was, knew how these drugs were going to get

24   to America, knew who was going to take these drugs to America.

25   All you heard was a friend.  If Jaweed doesn't know, how is he

1    going to know.  And he did not say anything beyond saying yes,

2    okay.  It's offensive that he said yes -- may they turn them

3    to -- but if you go back to your principles of law.  If you

4    truly believe and embrace the idea of presumption of

5    innocence, and the Government has not proven beyond a

6    reasonable doubt as to Count 1 that he was importing this

7    stuff to the United States.  Let's get to Count 2.

8           If this man is never seen anywhere near these guns,

9    this ammunition, not even a single bullet, the terrorists --

10   the local terrorist is not even seen photographed, there's no

11   exhibit of a single bullet.  He's just talking.  Doing lots of

12   talking.  And, yeah, sure, he gets a commission.  And do you

13   see that with the proceeds of that commission he goes and buys

14   something?  Does he buy a single bullet?  Does he buy these

15   mines or missiles?  No, the DEA bought the missiles.  So, the

16   idea that because he's brokering these things and he gets a

17   little commission, and somehow I give the commission to

18   myself, and therefore, because I'm a terrorist, I'm guilty of

19   Count 2, that's absurd, ladies and gentlemen, there is no

20   evidence that he engaged in any terrorist activity.

21          And this Habib Zai and Abdul Rahman -- Elvis was

22   going to show up in Chaprahar district before those two

23   characters showed up, because two months later they were still

24   not in sight.  Agent Follis was on the witness stand and he

25   talked a lot.  He gave us a lot of information.  But within

1  that information that he provided, he didn't give you any

2  indication about how -- somehow these drugs were going to be

3  transported into the United States, right?  You didn't hear

4  that.  He told you about, yes, one kilogram of heroin, you

5  break it down 17 times so it goes from $120,000 to over a

6  million.  Yeah, these big words, right?  Wow.  Scary.  But did

7  this man have any knowledge, any intent, that somehow these

8  drugs were going to be brought to the United States and broken

9  down 17 times and then sold and magnified.

10         THE COURT:  You need to slow down, Mr. Vanegas,

11  we're not going to get a record.

12         MR. VANEGAS:  Sorry.  So, for however interesting

13  the witness was, it was a nice interesting discussion, it

14  added nothing to case.  Yes, the chemist came in and did a

15  very nice job of explaining this process of just -- like

16  giving the examples of cooking.  Fine.  All good.  Right?  We

17  know it's heroin, that was conceded up front from the very

18  beginning.  Ladies and gentlemen, I'm about to sit down soon,

19  and the Government is going to come back and they get a second

20  chance because it's their burden of proof, and just remember

21  that as they're arguing to, or as Mr. Stiglitz is arguing to

22  you, think about, what would Mr. Vanegas have to say about

23  that.  You know, think critically as to what he's saying.

24         And as you go back into the jury room to

25  deliberate, share your doubts.  I mean, one juror may be --

1    well, that whole intent business, that doesn't make sense to

2    me.  Another juror may say, well, what about all those

3    missiles and mines, you know, we didn't even see any of that.

4    And how about when Jaweed is asked:  Well, what did Mohammed

5    Khan mean when he had quit doing this stuff, when he had quit

6    selling?  Well, actually, what Jaweed says -- what he really

7    meant to say was that he had stopped doing this because the

8    Government would shut him down.  Think about how many times

9    that happened.  You had the transcript, right?  And then Mr.

10   Stiglitz asked him:  Well, what do you intend -- what did you

11   understand Khan Mohammed to say?  A completely different

12   answer, right?  How do you get that?  This is the villager who

13   is selling vegetables in Pakistan, a very nice man, but how is

14   it that the interpretation of what Khan Mohammed said just

15   changed so dramatically.  And your evidence -- your memory

16   controls.

17            Look at your notes or your own memory and go back

18   to the references that Mr. Stiglitz pointed out.  So, another

19   juror may think about, well, yeah, he met with them in Kabul

20   seven times.  He was going back and forth to talk about the

21   case.  And they told him, of course, tell the truth.  And what

22   else did they say to you?  Well, tell the truth.  How long

23   does it say:  Hey, you tell the truth.  They just kept telling

24   me, tell the true, that was it.  I submit there was a lot more

25   said.  Certainly, what was said -- go back to the meetings

1   that Jaweed and Haji Latif had in Jalalabad airport, they were

2   receiving direct instruction.  And according to the agent, he

3   may have met with Jaweed maybe over 20 times.  And every time

4   that Jaweed went, so did Haji Latif.

5           Haji Latif in the course of his work for the DEA

6   makes over $30,000.  Right?  The police chief right around the

7   corner from the opium stalls.  And Jaweed, he makes $8,000.

8   Maybe for here in the United States or for America it may be a

9   lot of money, but for the farmer from Peshawar or from

10   Afghanistan, it was a lot of money.  And it's admirable that

11   he didn't want it, but ultimately he accepted it.  So, now

12   what you have is the DEA paying one confidential source over

13   $30,000, another confidential source over $8,000, putting out

14   money for the heroin, putting out money for the opium, putting

15   out money for missiles.  The DEA, halfway around the world, so

16   far away from here -- America.  And putting together a plan to

17   give the confidential source, Jaweed, money so that he can go

18   and task this man to say, hey, this stuff is going to America.

19           Ladies and gentlemen, the Government's evidence

20   does not add up.  It falls far short.  They have presented you

21   with insufficient, inadequate evidence, that Khan Mohammed is

22   guilty.  That he is guilty beyond all reasonable doubts.

23   There are many doubts.  And always keep in mind that things

24   that I have not raised, you can raise, because you are the

25   finder of fact.  You have listened to all this evidence.  So,

1    ultimately it's your decision to make.  And it's a profound

2    decision to make because you cannot come maybe a week later,

3    and say, you know what, now that I think about it, what Mr.

4    Vanegas said about that whole intent business, that makes

5    sense.  You got to share your doubts.  You got to exchange

6    them.  You got to look at those transcripts and see what was

7    said, and then you got to look at those videos.

8           For example, the video where Jaweed goes to this

9    man's guest house.  Mr. Khan Mohammed is lying on his back,

10   they're having a long conversation, it's a long video.  You

11   have it, it's in evidence.  Mr. Stiglitz only pointed you to

12   the bad parts, but leading up to this -- there's a whole

13   discussion about how these two went to a wedding and they

14   can't figure out which -- was it the wedding for Mulla Gore

15   (phonetic) or Hiad (phonetic) and they are going back and

16   forth.  And it seems at the very end -- towards the end when

17   he decides that he wants to put that into evidence is because

18   Jaweed says, oh, yeah, the opium, that's right, I forgot,

19   because I'm on a mission here, I'm on a plan, and I have to

20   say opium, I have to say heroin, and I have to say America.

21   Ladies and gentlemen, reject that.  The only reasonable

22   correct just verdict in this case is a verdict of not guilty.

23   Khan Mohammed is an innocent man.  Thank you.

24          THE COURT:  All right.  Members of the jury, we're

25   now going to do a rebuttal, which is shorter, but does anybody

1    need a break at this point?  If you don't, we'll go forward.

2    Okay.

3             MR. ROTHSTEIN:  It's my opportunity to say good

4    morning to you.  Yes, Mr. Vanegas is correct in one respect,

5    that we do have the last word because we do have the burden.

6    And it is our system of justice that the Government, the

7    prosecution, has the burden to prove each and every crime.

8    Not only each and every crime, each and every element that

9    must prove that crime beyond a reasonable doubt.  And we

10   submit to you that we've proven that, we've proven those

11   elements, we've proven those crimes beyond any doubt,

12   reasonable or otherwise.

13            Mr. Vanegas preluded that you would be receiving

14   certain instructions, and one of those instructions is that

15   the Defendant is presumed innocent, that is correct, it's one

16   of the tenets of our law.  That's why, even within opening

17   statements, when there is a concession on certain elements or

18   certain crimes, it doesn't matter, it's still our burden, we

19   have to prove it.  However that cloak of innocence, that cloak

20   of protection that the law provides in this case is whipped

21   off as soon as you find that the evidence in this case has

22   proven the defendant guilty.  And we would submit to you that

23   the evidence has exactly done that.

24            We told you what to expect.  We presented it for

25   you.  And we would submit to you that it has come in

1    corroborated, backed up, unimpeached and ready for you to go

2    back into that jury room to deliberate and find the Defendant

3    guilty of each and every charge.  The Defendant makes argument

4    that you can't find the Defendant guilty because there was no

5    evidence of a completed terrorist attack.  But you will be

6    instructed that the mere planning of terrorist attacks is

7    sufficient proof, and that is the law, for terrorist activity.

8    And imagine the absurdity of such an argument, that these

9    American agents are sent to a war zone for the first time,

10   they're not military, they're law enforcement, they usually

11   work in the States, sent there for the first time.  And they

12   receive information from a brave individual who is a citizen,

13   who is not working off charges, he's not asking for money for

14   any kind of payment for this, but he's doing this because he

15   is sick and tired of what is happening in his country.

16           And they do their job.  They take the information,

17   they established Jaweed's credibility.  He has to show them

18   that he's interested, otherwise, what's going to happen?  Just

19   like Jaweed said, I could not turn down that offer of Abdul

20   Rahman's when I am in Pakistan.  What would happen is that my

21   family would be in jeopardy.  They would know that I know that

22   they want to do an attack and I turned them down.  I'm not of

23   the same mindset as them.  The same thing has to be proven to

24   Khan Mohammed.  And you see the chain of command here, right?

25           Khan Mohammed is someone who is flying under the

1    radar.  He's their man in Garatek.  He's their man in

2    Nangarhar.  And he is doing a good job.  By his own words and

3    admission on those video tapes, he's bragging about what he

4    has done.  And the force of those words should not be

5    diminished by the fact that these agents did their job, and

6    those rockets that were obtained to show the credibility of

7    Jaweed were never delivered for a legitimate purpose.  And

8    that armed dealer who had those rockets out for sale, they

9    were never used for a terrorist attack.  They were put into

10   evidence and safeguarded.

11        It is an absurd argument that the law does not

12   contemplate when Congress enacted this statute, that they said

13   you have to prove a terrorist act was completed.  Do we need

14   one?  No.  Is there evidence of completed terrorist attacks?

15   Absolutely.  Done by this man.  Killing people.  Blowing up

16   cars with mines.  Also, it's an absurd conclusion to find that

17   their intent to commit these acts and to engage in the

18   insurgency was not serious because the commanders didn't

19   decide when it was going to happen.  There is obviously, in

20   this case, evidence -- and you'll see it in the transcripts,

21   you heard it testified, that Abdul Rahman, and above him,

22   Habib Zai, are the ones who are calling the shots.

23        He's willing to do it, not only because he believes

24   in the plan, but he's going to get paid.  I would submit to

25   you, that's probably one of the worst motivations that -- he

1    understands that there is a certain benefit to him in doing

2    this, he explains that when he said that he did these attacks.

3    He got hundreds of thousands of rupees when he did this in the

4    past.  And he promises:  When you do this, Jaweed, you will

5    share in this, and do this -- and you'll gain the benefit of

6    working for the Taliban, also.

7            The fact that the Taliban didn't show up, there are

8    reasonable reasons.  Again, you have to examine whether or not

9    any of these doubts and these arguments are reasonable.

10   Jaweed testified that it was getting to be winter, these two

11   men talk about it.  Yes, it's getting to be winter now, it's

12   getting colder out here now, and it's good to delay because

13   you know what, we don't have the rockets yet, but we will find

14   the rockets.  He knows that he's going to have to produce the

15   rockets when he's ordered to do an attack.  And he agrees that

16   it's a good idea -- that the winter is coming, because they

17   don't do offenses in the winter, it bogs down.  You saw the

18   maps between Jalalabad and Kabul, it's not that far away.

19   You'll have the maps in evidence.  From Nangarhar province to

20   Kabul, Jaweed testified it took him five or six hours to

21   travel by car.  This is the Third World as we described.  This

22   is the Third World, as you saw in those videos, mud houses.

23   And it's not like these weapons are kept in their house.  You

24   don't grab grandpa's shotgun above the mantel.  I don't even

25   know if people even do that anymore.

1          But as you heard from Special Agent Follis, these

2    criminal elements in Afghanistan, the drug traffickers, the

3    Taliban, they secret them because you not only have the full

4    force of the Afghan government, the police, the military,

5    thankfully you have the additional force of the DEA and other

6    criminal investigative agencies out there in Afghanistan who

7    are trying to take these weapons off.  The only reason why the

8    DEA carried belt-fed machine guns and assault rifles is

9    because it is in direct relationship with a threat that's

10   posed to them.  It's a dangerous area.

11         A dangerous area because of individuals like Khan

12   Mohammed.  He's testified that -- no problem.  Jaweed says, I

13   got the rockets.  It needs a warhead, you know, like the fuse.

14   No problem.  I have a source for that.  Bullets, we can get

15   that.  Mines, I've used them.  What better evidence do you

16   want in this case than the words of the Defendant, and his

17   past experiences should be the first indication about what his

18   intent was in committing these crimes.  No attack on Jalalabad

19   airfield.  Thank God.

20         You hear evidence of even the Defendant, his fear

21   of being suspected and found to be a member of a drug

22   trafficking organization or terrorist organization.  I direct

23   you to Exhibit 2A from 1A, it's the first audio recording.

24   Line 14 on August 18, 2006.  Khan Mohammed says:  And we

25   cannot reveal our secrets to others.  They operate in secret.

1   This is a clandestine operation.  They use clandestine labs to

2   make the heroin.  But as Special Agent Follis testified to you

3   the other day, they have to operate in secret.  Why do you

4   think they are in Pakistan?  The subject of the investigation,

5   trying to overthrow the Afghan government, and they will do

6   that with anyone who assists the Afghan government.  Whether

7   it be the military, whether it be Muslims standing by.  Jaweed

8   asked this, well, if they're nearby these targets they're

9   going to get hit.  Who cares.  The hell with them.  The hell

10  with them as long as we commit our plan, our program.  And

11  that's –– that is an express direct expression of his intent

12  on what he was planning to do in these offenses.

13          It is of no consequence and should not come into

14  your deliberations that the actual plan of how the drugs were

15  going to get to America were discussed.  Special Agent Follis,

16  and you saw from your own eyes –– now understand, that in drug

17  trafficking organizations in Afghanistan everyone plays a

18  role.  From soup to nuts, from the farmer who is indentured

19  who gets money to make their subsistence, and they are

20  basically forced to grow poppy, to the person who takes the

21  poppy resin, to the opium wholesalers, to the opium

22  wholesalers who sell the opium, and that takes place.  And

23  that's given to a larger conglomerate that takes this opium to

24  heroin labs, and then you have the exporter.  The exporter.

25          Khan Mohammed knew that these drugs were going to

1   go to the United States, but was it his job?  Did he have

2   anything to do with it?  He was happy to get his commission to

3   broker the raw product sale, which he knew was going to be

4   turned into powder, as well as the heroin powder sale.  He was

5   going to get his commission.  That was his role in the chain

6   of drug trafficking.  After he completed that, he was done

7   with it.  The fact that it was mentioned numerous times and

8   the fact that these drugs who -- you know now, at a certain

9   concentration have a certain lethality of them, was known by

10  the Defendant.  May all the infidels be dead corpses.  If we

11  send the heroin to America, it is part of our Jihad.

12          What better way to show that he knew that these

13  drugs were going to America and to the United States.  Because

14  those same people who are going to ingest this heroin, who

15  could possibly die and overdose from the heroin, are the same

16  targets of the U.S. military, the U.S. law enforcement, the

17  same targets that he intends to irradicate and wants to

18  irradicate with the Taliban in his country.  You've been given

19  various stipulations, one is that the Taliban is an

20  organization comprised of two or more individuals that engages

21  in or has engaged in terrorist activity or terrorism.  That is

22  a fact.  We would submit to you based upon the overwhelming

23  evidence in this case and the Defendant's concessions, when

24  you talk about Habib Zai and Abdul Rahman, we speak with one

25  voice.  We speak with one voice.  It's absurd to think that

1    he's not a willing member of the Taliban.

2              Let's say, for instance, that you want to think a

3    little bit further about that.  Well, is he a member of a

4    group, be it organized or unorganized, that engages in

5    terrorist activity?  Two or three people, remember.  Habib Zai

6    and Abdul Rahman, the Defendant, you have it right there.  You

7    don't even have to go that far, because as Mr. Stiglitz

8    pointed out in his closing argument, as long as the Defendant

9    is supporting himself and there's no element that proves that

10   we have to show that these commissions went directly to buy a

11   bullet or a gun, as long as he supports himself.  Remember,

12   supporting a person who has engaged, past tense, or is

13   engaging in terrorist activity.  That's what the law is.

14   That's what the law is going to be provided to you by Her

15   Honor when she reads the instructions in this case.  And we

16   submit to you that each of those elements have been proven

17   beyond any doubt, reasonable or otherwise.

18             I'd like to talk to you a little bit about

19   Counsel's comments about the role of some of these Afghan

20   witnesses in this case.  I would hope that you would think

21   that we didn't waste any of your time in the presentation of

22   evidence in this case.  You now know that even with the

23   concession in opening statement, the Government still needs to

24   prove its case with evidence.  You have each and every

25   conversation, all the transcripts.  And the fact that we

1   didn't play a portion of it because we didn't think it was

2   relevant to tell you and to have you sit through an hour of

3   Pashto, reading transcripts about a wedding.  But that's up to

4   you.  If you want to do that, you have the transcripts.  And

5   we didn't edit, cut or anything out of that.  We played

6   certain segments that we thought were relevant.

7           Furthermore, the fact that Counsel mentions

8   Mr. Jaweed was debriefed not only by Agent Higgins, but

9   interviewed by government prosecutors when he visited us in

10  Afghanistan.  And he says, incredulously, well, what did you

11  talk about?  Well, we talked about the case.  What did they

12  tell you?  They told me to tell the truth.  Which I submit to

13  you that there is -- that he has been unimpeached with his

14  recollection.  It's been corroborated by the transcripts.  And

15  you saw -- and you sat here, it took almost a day and a half

16  to go through several audio tapes.  And those are just

17  segments of some of those audio tapes.

18          The fact that he sat down with government

19  witnesses, we would submit to you -- and the Court is going to

20  instruct you that there's nothing wrong with lawyers preparing

21  and sitting down with their witnesses in anticipation of their

22  testimony in court.  Furthermore, he is unsophisticated.  I

23  would submit to you that based upon his demeanor answering

24  questions and how he conducted himself in this case, I'm not

25  going to say that he's not a smart man.  He might not be

1   educated, but nonetheless, they are certain things that are

2   outside of his familiarity.

3           And it should be of no surprise to you that a law

4   enforcement agent wants to find out what you discovered, and

5   you know what, you're not law enforcement, you're a farmer.

6   I'm going to tell you what we need in this investigation.  And

7   at any time during this investigation -- at any time during

8   any of these discussions that have been recorded, preserved,

9   and again, we would take the good and bad of any conversations

10  that came up.  We didn't know the answers that Khan Mohammed

11  was going to give us.  Did he ever say:  America?  No way.

12  Heroin?  Huh-uh, ain't going to do it.  Opium?  Too much of a

13  problem.  Obviously, I've sold some bad opium in the past, you

14  know, not going to get involved in that.  He willingly jumped

15  in.  Willingly without hesitation.  Without hesitation or

16  inducement other than the fact that it was going to get him

17  money and it was going to provide another basis to commit the

18  Jihad.

19          There's a little bit of a correction that I'd like

20  to make in response to Mr. Vanegas' statement regarding some

21  of the monies paid in this case.  Colonel Haji Latif received

22  in excess of $34,000 to $35,000 for all the investigations.

23  On this operation, as you now know, Agent Follis testified

24  that within a single operation there might be various

25  different investigations underneath it.  In this operation

 1   Agent Higgins said, we provided about $18,000.  For what?  Was

 2   it something in his salary?  Was it so he can go on vacation?

 3   What did Colonel Ahkbar (sic) tell you he used that for?  For

 4   other police investigations.  He bought heroin, he bought

 5   opium, he managed other sources that he was using.  He wasn't

 6   only working one investigation, just like Agent Higgins and

 7   the rest of the seven full time DEA agents in the entirety of

 8   the country of Afghanistan, were not working one

 9   investigation.  It was to further what they were doing.  Crime

10   fighting.

11            They didn't have any discretionary funds.  Agent

12   Higgins testified, sometimes these police officers don't even

13   get paid on time.  I asked Agent Higgins yesterday:  Why did

14   you have to wait three weeks for DEA money?  Couldn't you go

15   to the police station in their discretionary investigative

16   funds and borrow the $6,000 there?  I don't know if you were

17   able to observe him.  Agent Higgins kind of smiled, and

18   said -- that's when he said, sometimes these police officers

19   don't get paid their salaries, we couldn't go to them, it

20   doesn't exist.

21            I'd like to show you, if I could have the computer

22   monitor up.  I believe this is Government's Exhibit Number 4.

23   If we can enlarge this.  This is Nangarhar.  Government's

24   Exhibit 4, map of Afghanistan.  Part of the map is blown up,

25   it includes the entirety of the Nangarhar province.  You see

1    the airport, you see Jalalabad.  Across the border, City of

2    Peshawar, Pakistan.  This is the world of Jaweed as he knows

3    it.  It's true, he's heard of France.  I'm not -- there's no

4    question after that, I'm not too sure how much he does know of

5    France other than he's heard the name.  He knows America.

6    Again, it's not important what he knows about America, it's

7    important about what this man, the Defendant, knows about

8    America.  It equates to the U.S. forces there, to the infidel,

9    and to the customer who is going to be receiving these kilos

10   of heroin.  The users on the American streets who he wants to

11   put in jeopardy.  Same thing.  It doesn't matter if these are

12   Americans in his country or in the States.  But this is

13   Jaweed's world.

14          Other than the fact that he's come to the United

15   States to testify in trial, he's been living his life in

16   Chaprahar district, a small village called Garatek in a mud

17   compound with walls with his extended family.  He's gone on

18   two occasions to Peshawar when times got really, really bad in

19   Afghanistan.  That's the world that he knows.  He didn't ask

20   for money.  But he testified to you that he can no longer go

21   back to that world, he's not going back.  His family is not

22   going back.  This is a person who, yes, might be

23   unsophisticated, might be uneducated, but he understands the

24   realities of life.

25          Is $8,000 worth throwing your entire life away?  He

1   and his family cannot go back to what he knows as his life.

2   He was faced with a tough decision.  A decision that really

3   hinged upon life and death.  People who could die at Jalalabad

4   airfield.  People who we later learned have been victims of

5   this man.  He saw those two forks in the road, I would submit

6   to you, he chose the right one.  Now it's your choice.  The

7   case has been proven and we ask that you find him guilty of

8   each count.

9           THE COURT:  All right.  I just want to make sure

10  that once we do jury instructions you then don't go off to

11  have lunch on your own.  We've ordered it, but I want to make

12  sure that there's no problem here.  The instructions will

13  probably take us at least until 1:00 o'clock, so I want to

14  make sure that we don't have any problem.  Let me suggest

15  this.  I'll ask you to take like a 10 minute break.

16  Meanwhile, we'll figure out whether I should do instructions

17  now or after lunch.  So, let me give you a 10 minute break and

18  then we'll do that.

19  JURY EXITS COURTROOM AT 12:03 P.M.

20          THE COURT:  We ordered their lunch.  I wanted to

21  make sure we can bring it down or they can go upstairs after

22  the instructions.  We'll take a break and I'll do the

23  instructions, and then the food will be ready and they can go

24  eat.  So, we're on a 10 minute break.

25  JURY ENTERS COURTROOM AT 12:15 P.M.

1        THE COURT:  All right.  We're going to go ahead.

2   Lunch awaits you.  So, we have been able to make an

3   arrangement, so there shouldn't be an issue.  Now, the time

4   has now come when all of the evidence is in, you've heard the

5   closing arguments of the lawyers.  It's now up to me to

6   instruct you on the law that should control your deliberations

7   in this case.  I'm going to divide my instructions roughly

8   into three parts.

9        First, I'll discuss with you the general principles

10  of law, some of which you will have heard before, but it's

11  important to have them repeated.  Second, I'll discuss with

12  you the instructions that apply to the elements of the

13  offenses charged in this case and the defense.  And, finally,

14  I'll have some closing remarks about your deliberations in

15  this matter.  I will tell you up front that you will get a

16  copy of my instructions.  So, you do not need to sit there

17  writing everything down, worrying that you're not going to

18  remember it.  You obviously can take notes, if you want.  I

19  would ask, however, that you listen, even though you're going

20  to get this back there, to make sure that you hear what the

21  instructions are.  So you will have both heard them, you'll

22  have an opportunity to review them in the back, but you'll at

23  least know what the instructions are.

24        So, let me start with some of the general

25  principles.  First, I'm sure you understand by now that the

1   jury and the Court, that's you and I, have quite different

2   responsibilities in a trial.  My function is to conduct the

3   trial in an orderly, fair and efficient manner; to rule on

4   questions of law; and to instruct you on the law which applies

5   in this case.  It is your duty to accept the law as I state it

6   to you.  You should consider all the instructions as a whole.

7   You may not ignore any instruction or question the wisdom of

8   any rule of law.

9          Your function, as the jury, is to determine what

10  the facts are in this case.  You are the sole judges of the

11  facts.  You alone decide what weight to give to the evidence

12  presented during the trial.  You decide the value of the

13  evidence and the believability of the witnesses.  You should

14  determine the facts without prejudice, fear, sympathy or

15  favoritism.  You should not be improperly influenced by

16  anyone's race, ethnic origin, gender, appearance or religion.

17  Decide the case solely from a fair consideration of the

18  evidence.

19         You should not assume from any of my actions during

20  the trial that I have any opinion about the facts in this

21  case.  My rulings on objections, my comments to the lawyers,

22  my instructions to you, and my questions or comments to

23  witnesses all were concerned with legal matters or with

24  clarifying a question or answer, and are not to be taken by

25  you as indicating my view about how you should decide the

1   facts.  As I told you, I try not to develop any opinions at

2   all.  If you believe I've expressed or indicated any opinion

3   as to the facts, you should ignore it.  It is your sole and

4   exclusive duty to decide the verdict in this case.

5            If there's been any reference by the Court or the

6   attorneys to the evidence that does not coincide with your own

7   recollection of the evidence, it's your recollection which

8   should control during your deliberation.  Now, the evidence in

9   this case.  During your deliberations, you may consider only

10  the evidence properly admitted in this trial.  The evidence in

11  this case was the sworn testimony of the witnesses, the

12  exhibits which were admitted into evidence, the one fact of

13  which I took judicial notice, and the facts and testimony

14  stipulated to by the parties.

15           The Court may take judicial notice of public facts

16  and events which the Court regards as matters of common

17  knowledge.  In this case, I took judicial notice that

18  September 11, 2006, was a Monday.  Now, during the trial, you

19  were also told that the parties had stipulated, that is,

20  agreed to certain facts.  Any stipulation of fact is

21  undisputed evidence, and you may consider it as undisputed

22  evidence.  There are two stipulations in this case,

23  Stipulation Numbers 2 and 3, there isn't a Number 1, so you're

24  not missing it.

25           When you consider the evidence, you are permitted

 1   to draw from the facts which you find have been proven, such

 2   reasonable inferences as you feel are justified in the light

 3   of your experience.  Reasonable inferences are things you

 4   figure out from the facts, using your reason, common sense and

 5   life experience, without guessing or speculating.  Now, you

 6   are also instructed that it's permissible for the attorneys

 7   for the United States to be present at interviews conducted

 8   with witnesses in a criminal case during the investigation of

 9   the case and prior to trial.  Attorneys in a case have the

10   responsibility also to meet with the witnesses and review the

11   expected testimony with them.

12          Now, the statements and the arguments of the

13   lawyers are important because they are intended to help you

14   understand the evidence and the contentions of each of the

15   parties.  However, the statements and arguments are not

16   evidence.  Now, occasionally during argument a lawyer for one

17   side or the other may appear to state his belief or opinion

18   concerning the facts in the case or the credibility of

19   testimony.  A lawyer is not permitted to state their belief or

20   opinion during argument.  The attorneys are permitted only to

21   argue to you based on what the evidence in the case shows.

22   So, if you think a lawyer has expressed his personal belief or

23   opinion during argument, you must disregard any such

24   expression and judge the case only on the evidence.

25          Now, sometimes a lawyer's question suggests that

1   something is a fact.  Whether or not something is a fact

2   depends on the witness's answer, not the lawyer's question.  A

3   lawyer's question is not evidence in the case.  The lawyers in

4   this case sometimes objected when the other side asked a

5   question, made an argument, or offered evidence, which the

6   objecting lawyer believed was not proper.  You must not be

7   prejudiced against the lawyer who made the objections.

8           It's the lawyer's responsibility to object to

9   evidence which they believe is not admissible.  If, during the

10  course of the trial, I sustained an objection to a lawyer's

11  question, you should disregard the question and you must not

12  speculate as to what the answer would have been.  If, after a

13  witness answered a lawyer's question, I ruled that the answer

14  should be stricken, you should disregard both the question and

15  the answer in your deliberations.

16          Now, it's very important to remember that every

17  defendant in a criminal case is presumed to be innocent.  This

18  presumption of innocence remains with the defendant throughout

19  the trial, unless and until the defendant is proven guilty

20  beyond a reasonable doubt.  The burden is on the Government to

21  prove the defendant guilty beyond a reasonable doubt.  This

22  burden of proof never shifts throughout the trial.  The law

23  does not require a defendant to prove his innocence or to

24  produce any evidence.

25          If you find that the Government has proven beyond a

1    reasonable doubt every element of the offense with which the

2    defendant is charged, it's your duty to find the defendant

3    guilty.  On the other hand, if you find that the Government

4    has failed to prove any element of the offense beyond a

5    reasonable doubt, you must find the defendant not guilty.

6          Reasonable doubt.  As I've just said, and I've said

7    on several occasions during the instructions in this case, the

8    Government has the burden of proving the defendant guilty

9    beyond a reasonable doubt.  Now, some of you may have served

10   as jurors in civil cases, where you were told that it is only

11   necessary to prove that a fact is more likely true than not

12   true.  In criminal cases, the Government's proof must be more

13   powerful than that.  It must be beyond a reasonable doubt.

14         Proof beyond a reasonable doubt is proof that

15   leaves you firmly convinced of the defendant's guilt.  There

16   are very few things in this world that we know with absolute

17   certainty, and in criminal cases, the law does not require

18   proof that overcomes every possible doubt.  If, based on your

19   consideration of the evidence, you are firmly convinced that

20   the defendant is guilty of the crime charged, you must find

21   him guilty.  If, on the other hand, you think there's a real

22   possibility that he is not guilty, you must give him the

23   benefit of the doubt and find him not guilty.

24         Now, evidence.  Direct or indirect, which is

25   circumstantial evidence.  There are, generally speaking, two

1    types of evidence from which a jury may properly find the

2    truth as to the facts of a case.  One is direct evidence, such

3    as testimony of an eyewitness.  The other is indirect or

4    circumstantial evidence.  The proof of a chain of

5    circumstances pointing to the existence or nonexistence of

6    certain facts.  As a general rule, the law makes no

7    distinction between direct or circumstantial evidence, but

8    simply requires that the jury find the facts in accordance

9    with proof beyond a reasonable doubt of all of the evidence in

10   the case, both direct and circumstantial.

11         Now, let me give you an example of the difference.

12   For example, direct evidence of whether an animal was running

13   in the snow might be the testimony of a person who actually

14   saw the animal in the snow.  Circumstantial evidence might be

15   the testimony of a person who saw the tracks of the animal in

16   the snow, rather than the animal itself.

17         Consensual tape recording.  During the course of

18   this trial, you may have heard the phrase consensual tape

19   recording.  This term should not be confused with the phrase

20   wire interception or wire tap.  A wire interception or wire

21   tap is a court-ordered interception of communications which

22   does not require the consent of the parties to the

23   conversation.  A consensual tape recording, which is what

24   we've had in this case, on the other hand, is a recording

25   where one party to the conversation consents to the

1   conversation being tape recorded.  It is lawful to conduct

2   consensual tape recordings, and the other parties to the

3   conversation do not have to consent to the taping.  Consensual

4   tape recorded conversations may occur face to face.

5        Now, the transcripts.  The transcripts have been

6   certified by a federally certified interpreter.  While in a

7   case involving English conversations which have been recorded,

8   the jury is routinely instructed that they are not bound by

9   the transcript, that is because every juror is just as capable

10  as the person preparing the transcript to tell what is being

11  said on the recording.  That is not so with the recorded

12  Pashto conversations that have been introduced in this case.

13  Accordingly, I am now instructing you that the transcripts are

14  guides prepared for you so that you can understand the Pashto

15  language recordings.  You're not free to reject the accuracy

16  of the interpretation of the tape recordings differently than

17  the interpretation given by the certified court interpreter in

18  the transcripts.

19       In this record, Stipulation Number 2 states that

20  Government Exhibits 2A through K are fair and accurate

21  depictions of the contents of the audio and video exhibits

22  which correspond to Government Exhibits 1A to K, and Exhibits

23  2A to K are the transcripts.  Exhibits 1A through K are the

24  actual recordings.

25       Now, expert testimony.  Ordinarily, the rules of

1    evidence do not permit witnesses to testify as to opinions or

2    conclusions.  There is an exception to this rule for expert

3    witnesses.  Experts are allowed to give opinions or

4    conclusions because they become expert in some art, science,

5    profession or calling.  They may give their opinions or

6    conclusions and reasons for their opinions.  In this case, the

7    Court has permitted the following expert testimony.  One,

8    Heidi Wajno, W-A-J-N-O, I probably have butchered her name,

9    but to testify as an expert concerning forensic chemistry and

10   analysis of controlled substances, particularly heroin and

11   opium.

12          And, two, Special Agent Edward Follis, to testify

13   as an expert concerning the manner and distribution and

14   exportation of opium, morphine base and heroin in Afghanistan;

15   composition of typical narcotics organizations in Afghanistan;

16   processing, packaging, use of bazaars and price; terminology,

17   including codes, weights and special vocabulary; methodology

18   of narcotics investigations in Afghanistan; role of the

19   Taliban in relation to narcotics trafficking in Afghanistan;

20   and procedures for handling and safeguarding narcotics

21   evidence, including chain of custody.

22          You're not bound by an expert's opinion.  If you

23   find that the opinion is not based on sufficient education or

24   experience, that the reasons supporting the opinion are not

25   sound, or that the opinion is outweighed by other evidence,

1   you may completely or partially disregard the opinion.  In

2   other words, give the opinion the weight you think it deserves

3   after you consider it along with all of the other evidence.

4           Now, a law enforcement officer's testimony should

5   be considered by you just as any other evidence in the case.

6   In evaluating the law enforcement officer's credibility, you

7   should use the same guidelines which you apply to the

8   testimony of any witness.  In no event should you give either

9   greater or lesser weight to the testimony of any witness

10  merely because he is a law enforcement officer.

11          Now, Mr. Mohammed has chosen not to testify in this

12  case, and every defendant in a criminal case has an absolute

13  right not to testify.  Mr. Mohammed has chosen to exercise his

14  right to remain silent.  You must not hold this decision

15  against him, and it would be improper for you to speculate as

16  to the reason or reasons for his decision, and I, therefore,

17  instruct you not to do so.  Most importantly, you must not

18  draw any inference of guilt from the defendant's decision not

19  to testify.

20          Now, let me discuss credibility or believability.

21  In determining whether the Government has established the

22  charges against the defendant beyond a reasonable doubt, you

23  must consider and weigh the testimony of all the witnesses who

24  have appeared before you.  You are the sole judge of the

25  credibility of the witnesses.  In other words, you alone are

1    to determine whether to believe any witness and the extent to

2    which any witness should be believed.

3           In reaching a conclusion as to the credibility of

4    any witness, you may consider any matter that may have a

5    bearing on the subject.  You may consider the demeanor and the

6    behavior of the witness on the witness stand.  The witness's

7    manner of testifying.  Whether the witness impresses you as a

8    truthful person.  Whether the witness impresses you as having

9    an accurate memory and recollection.  Whether the witness has

10   any motive for not telling the truth.  Whether the witness had

11   a full opportunity to observe the matters about which he

12   testified.  Whether the witness -- matters about which he or

13   she has testified.  Whether the witness has any interest in

14   the outcome of this case, or friendship or hostility toward

15   other people concerned with the case.

16          Inconsistencies or discrepancies in the testimony

17   of a witness or between the testimony of different witnesses

18   may or may not cause you to discredit such testimony.  Two or

19   more persons witnessing an incident or transaction may see or

20   hear it differently.  An innocent misrecollection, like a

21   failure of recollection, is not an uncommon experience.  In

22   weighing the effect of the inconsistency or discrepancy,

23   always consider whether it pertains to a matter of important

24   or unimportant detail.  And whether the inconsistency or

25   discrepancy results from innocent error or intentional

1  falsehood.

2        You may consider the reasonableness or

3  unreasonableness, the probability or improbability of the

4  testimony of a witness in determining whether to accept it as

5  true and accurate.  You may consider whether the witness has

6  been contradicted or corroborated by other credibility

7  evidence.  If you believe that any witness has shown him or

8  herself to be biased or prejudiced, for or against either side

9  in this trial, you may consider and determine whether such

10  bias or prejudice has colored the testimony of the witness so

11  as to affect the desire and capability of that witness to tell

12  the truth.  You should give the testimony of each witness such

13  weight as in your judgment it's fairly entitled to receive.

14        Now, the indictment is merely the formal way of

15  accusing a person of a crime in order to bring him to trial.

16  So, you must not consider the indictment as evidence of any

17  kind.  You may not consider it as any evidence of the

18  defendant's guilt or draw any inference of guilt from it.

19  Also, you must not allow the nature of the charge itself to

20  affect your verdict.  You must consider only the evidence

21  that's been presented in this case in rendering a fair and

22  impartial verdict.

23        Let me move to Part 2, which relates to the

24  offenses and the defense.  The Defendant, Khan Mohammed, is

25  charged by indictment with Count 1, distribution of one

1    kilogram or more of heroin, intending and knowing that the

2    heroin will be unlawfully imported into the United States, and

3    then acting in an aiding and abetting capacity.  Count 2.

4    Distributing a controlled substance, knowing and intending, to

5    provide anything of pecuniary value to a person or

6    organization engaged in terrorism or terrorism activity,

7    again, in an aiding and abetting capacity.  So, let me start

8    with the instruction that applies to Count 1.

9            Distribution of one kilogram or more of a

10   controlled substance, intending or knowing, that it will be

11   unlawfully imported into the United States.  The essential

12   elements of the offense of distribution of one kilogram or

13   more of a controlled substance, in this case, heroin,

14   intending or knowing that it would be unlawfully imported into

15   the United States, each of which the Government must prove

16   beyond a reasonable doubt are as follows:

17           One, the defendant distributed one kilogram or more

18   of a controlled substance, heroin.  Distribute means to

19   transfer or attempt to transfer to another person.  The

20   Government need not prove that the defendant received or

21   expected to receive anything of value in return.

22           Two, the defendant distributed the controlled

23   substance, heroin, knowingly and intentionally.  This means

24   consciously, voluntarily and on purpose, not mistakenly,

25   accidentally or inadvertently.  Three, the defendant

1   distributed the controlled substance outside the United

2   States.  And, again, the controlled substance is heroin.

3   Four, the defendant either intended or knew that the

4   controlled substance would be unlawfully imported into the

5   United States.  And, again, we're talking about heroin.

6          The law makes heroin a controlled substance.  You

7   must decide whether the material was heroin.  In doing so, you

8   may consider all evidence that may help you, including

9   exhibits, expert and nonexpert testimony.  To establish the

10  first element of the offense, the Government must prove beyond

11  a reasonable doubt that the defendant distributed a substance

12  containing a detectable amount of heroin.  If you find beyond

13  a reasonable doubt that the defendant distributed heroin, you

14  should go on to determine beyond a reasonable doubt whether

15  the distribution involved one kilogram or more of a substance

16  or mixture that contained the heroin.

17         The Government is not required to prove that the

18  defendant knew the precise type of controlled substance that

19  was distributed.  The Government must prove beyond a

20  reasonable doubt, however, that the defendant knew that he

21  distributed some type of a controlled substance.

22         Now, this instruction applies to Count 2.

23  Distribution of a controlled substance, knowing or intending

24  to provide anything of pecuniary value to a person or

25  organization that is engaged in or engages in terrorism or

1    terrorist activity.  The essential elements of the offense of

2    distribution of a controlled substance, knowing or intending

3    to provide anything of pecuniary value to a person or

4    organization that engages in terrorism or terrorist activity,

5    each of which the Government must prove beyond a reasonable

6    doubt are as follows:

7         One, the defendant distributed a controlled

8    substance.  Distribute means to transfer or attempt to

9    transfer to another person.  The Government need not prove

10   that the defendant receives or expected to receive anything of

11   value in return.  Two, the defendant distributed the

12   controlled substance knowingly and intentionally.  This means

13   consciously, voluntarily and on purpose, not mistakenly,

14   accidentally or inadvertently.

15        Three, the defendant either knew or intended to

16   provide something of pecuniary value, either directly or

17   indirectly, to any person or organization that is either

18   engaged in or is engaging in terrorist activity or terrorism.

19   Four, the defendant knew that the intended recipient person or

20   organization has either engaged in or engages in terrorist

21   activity or terrorism.

22        The law makes heroin and opium controlled

23   substances.  You must decide whether the material was heroin

24   or opium or both.  In doing so, you may consider all evidence

25   that may help you, including exhibits, expert and nonexpert

1    testimony.  To establish the first element of the offense, the

2    Government must prove beyond a reasonable doubt that the

3    defendant distributed a substance containing a detectable

4    amount of heroin or a substance containing a detectable amount

5    of opium or both.

6         If you find beyond a reasonable doubt that the

7    defendant distributed heroin, you should go on to determine

8    beyond a reasonable doubt whether the distribution involved

9    one kilogram or more of a substance or mixture that contained

10   the heroin.  The Government is not required to prove that the

11   defendant knew the precise type of controlled substance that

12   was distributed.  The Government must prove beyond a

13   reasonable doubt, however, that the defendant knew that he

14   distributed some type of controlled substance.

15        Now, a couple definitions.  The term, quote,

16   anything of pecuniary value, unquote, means anything of value

17   in the form of money, a negotiable instrument, a commercial

18   interest, or anything else, the primary significance of which

19   is economic advantage.  The term is interpreted broadly and

20   may include anything of economic value, examples of which

21   include cash or drugs.

22        The term terrorist activity means any activity or a

23   threat, attempt or conspiracy to commit an activity which

24   would be unlawful had it occurred in the United States, and

25   which involves any one of the following:  One, the highjacking

1  or sabotage of any conveyance, including an aircraft, vessel

2  or vehicle.  Two, an assassination.  Three, a violent attack

3  upon an internationally protected person, meaning a Chief of

4  State or any representative, officer, employee or agent of the

5  U.S. Government, a foreign government, or an international

6  organization, who at the time and place concerned is entitled

7  pursuant to international law to special protection against

8  attack upon his person, freedom or dignity, and any member of

9  his family then forming part of his household, or the liberty

10  of such person.  Or, four, the use of any explosive, firearm

11  or other weapon or dangerous device, other than for mere

12  personal monetary gain, with intent to endanger, directly or

13  indirectly, the safety of one or more individuals, or to cause

14  substantial damage to property.

15           Now, the phrase, quote, engaging in terrorist

16  activity, unquote, means any one of the following:  One, to

17  commit or to incite to commit under circumstances indicating

18  an intention to cause death or serious bodily injury, a

19  terrorist activity.  Two, to prepare or plan a terrorist

20  activity.  Three, to gather information on potential targets

21  for terrorist activity.  Four, to solicit any individual to

22  engage in conduct otherwise described in this subsection.  Or,

23  five, to commit an act that the actor knows or reasonably

24  should know, affords material support, including a safe house,

25  transportation, communications, funds, transfer of funds, or

1    other material financial benefit, false documentation or

2    identification, weapons explosives or training.  A, for the

3    commission of a terrorist activity.  B, to any individual who

4    the actor knows, or reasonably should know, has committed or

5    plans to commit a terrorist activity.  Or, C, to a terrorist

6    organization or to any member of such an organization, unless

7    the actor can demonstrate by clear and convincing evidence

8    that the actor did not know and should not reasonably have

9    known that the organization was a terrorist organization.

10        The term terrorist organization is a group of two

11   or more individuals, whether organized or not, which engages

12   in or has a subgroup which engages in terrorist activity.  In

13   this regard, consider Stipulation of Fact Number 3, that the

14   Taliban is a terrorist organization, in that it is comprised

15   of a group of two or more individuals which engages in or has

16   a subgroup which engages in terrorist activity.  And the term

17   terrorism means premeditated, politically motivated violence,

18   perpetrated against noncombatant targets by subnational groups

19   or clandestine agents.

20        Now, intent.  Someone's intent or knowledge or

21   both.  Someone's intent or knowledge or both ordinarily cannot

22   be proved directly because there's no way of directly looking

23   into the workings of the human mind.  But you may infer the

24   defendant's intent or knowledge from the surrounding

25   circumstances.  You may consider any statement made or acts

1    done or omitted by the defendant, and all other facts and

2    circumstances received in evidence which indicate the

3    defendant's intent or knowledge.

4            You may infer, but are not required to infer, that

5    a person intends the natural and probable consequences of acts

6    knowingly done or knowingly omitted.  It is entirely up to

7    you, however, to decide what facts to find from the evidence

8    received during this trial.  You should consider all the

9    circumstances in evidence that you think are relevant in

10   determining whether the Government has proved beyond a

11   reasonable doubt that the defendant acted with the necessary

12   state of mind.

13           Let me give you an instruction on aiding and

14   abetting, which can be applied to both Count 1 and Count 2.

15   You may find the defendant guilty of the crime charged in the

16   indictment without finding that he personally committed each

17   of the acts that make up the crime, or that he was present

18   while the crime was being committed.  Any person who in some

19   way intentionally participates in the commission of a crime

20   can be found guilty either as an aider and abettor, or as a

21   principal offender.  It makes no difference which label you

22   attach.  The person is as guilty of the crime as he would be

23   if he had personally committed each of the acts that make up

24   the crime.

25           To find that a defendant aided and abetted in

committing a crime, you must find that the defendant knowingly

associated himself with the commission of the crime, that he

participated in the crime as something that he wished to bring

about, and that he intended by his actions to make it succeed.

Some affirmative conduct by the defendant in planning or

carrying out the crime is necessary.  Mere physical presence

by the defendant at the place and time the crime is committed

is not by itself sufficient to establish his guilt.  However,

mere physical presence is enough if it's intended to help in

the commission of the crime.

The Government is not required to prove that anyone

discussed or agreed upon a specific time or method of

committing the crime.  The Government is not required to prove

that the crime was committed in the particular way planned or

agreed upon.  Nor need the Government prove that the principal

offender and the person alleged to be the aider and abettor

directly communicated with each other.

Now, the defendant's theory of the case.  Khan

Mohammed's theory of his defense is that there is insufficient

evidence to convict him of violating Counts 1 and 2.

Specifically, as to Count 2, Mr. Mohammed contends that there

is insufficient evidence to show that he engaged in terrorist

acts individually, or as a member affiliated or associated

with any terrorist organization in the time period charged in

the indictment.  Mr. Mohammed further contends that there is

1    insufficient evidence to show that he knowingly or

2    intentionally provided directly or indirectly anything of

3    pecuniary value to any person engaged in terrorist acts or to

4    any terrorist organization.  Specifically, as to Count 1,

5    Mr. Mohammed contends that there's insufficient evidence to

6    show that he knowingly or intentionally distributed narcotics,

7    knowing that the narcotics would be imported to the United

8    States.

9            Now, let me move to Part 3.  The question of

10   possible punishment of the defendant in the event of

11   conviction is of no concern of yours and should not enter into

12   or influence your deliberations in any way.  The duty of

13   imposing sentence in the event of conviction rests exclusively

14   with me, the judge.  You should weigh the evidence in the case

15   and determine the guilt or innocence of the defendant solely

16   on the basis of such evidence, without any consideration of

17   the matter of punishment.

18           Now, when you return to the jury room, you should

19   select a foreperson to preside over your deliberations and to

20   be your spokesperson here in court.  There are no specific

21   rules regarding how you should select a foreperson.  That's up

22   to you.  However, as you go about the task be mindful of your

23   mission to reach a fair and just verdict based on the

24   evidence.  Consider whether you wish to select a foreperson

25   who will be able to facilitate your discussions, who can help

1   you organize the evidence, who will encourage civility and

2   mutual respect among all of you, who will invite each juror to

3   speak up regarding his or her views about the evidence, and

4   who will promote a full and fair consideration of that

5   evidence.

6          In your deliberations you should be willing to

7   speak out and share your views with your fellow jurors, and

8   you should take the time to listen to and consider any point

9   made by your fellow jurors in reaching your verdict.  The

10  verdicts must represent the considered judgment of each juror.

11  In order to return a verdict, each juror must agree to the

12  verdict and your verdicts must be unanimous.

13         Now, we have multiple counts, Count 1 and 2, and a

14  separate offense is charged in each of the counts of the

15  indictment that you're to consider.  Each offense and the

16  evidence which applies to it should be considered separately

17  and you should return separate verdicts as to each.  The fact

18  that you may find the defendant guilty or not guilty on any

19  one count of the indictment should not control or influence

20  your verdict with respect to any other count of the

21  indictment.

22         Now, if it becomes necessary during your

23  deliberations to communicate with me, you may send a note by

24  the clerk or the Marshal.  You will have somebody sitting

25  outside of your jury room.  The note should be signed by your

1   foreperson or by one or more members of the jury.  No member

2   of the jury should try to communicate with me by any means

3   other than a signed note.  And I will never communicate with

4   any member of the jury on any matter touching the merits of

5   this case except in writing or orally here in open court.

6   Bear in mind, also, that you're never under any circumstances,

7   and this is very important, to reveal to any person, not the

8   clerk, the Marshal, or me or anybody else, how the jury stands

9   on the question of the defendant's guilt or innocence until

10  after you have reached a unanimous verdict.

11          This means, for example, that you should never

12  state to the Court in a note or otherwise that the jury is

13  divided, and then go on to tell me what the division is or

14  anybody else.  Whether you're divided, six to six, seven to

15  five, eleven to one, or any other fashion, whether for

16  conviction or acquittal.  So, you should never indicate any

17  kind of split to anyone.

18          Now, I'm going to provide you, as I've indicated, a

19  copy of the instructions.  During your deliberations you may,

20  if you want, refer to these instructions.  While you may refer

21  to any particular portion of the instructions, you're to

22  consider the instructions as a whole, and you may not follow

23  some and ignore others.  The fact that you have been provided

24  a copy of my instructions should not discourage you from

25  making an inquiry regarding the meanings of these

1   instructions, if necessary.  And then, please, at the end

2   return the instructions to me when your verdict is rendered.

3           Now, during the trial I've permitted those jurors

4   who want to do so to take notes.  You may take your notes with

5   you to the jury room and use them during your deliberations,

6   if you wish.  As I told you at the beginning of the trial,

7   your notes are only to be an aid to your memory and they

8   should not replace your memory.  Those jurors who have not

9   taken notes should rely on their own memory of the evidence

10  and should not be influenced by another juror's notes, if the

11  notes don't coincide with their memory.  The notes are

12  intended to be for the note taker's own personal use.

13          At the end of your deliberations, tear your notes

14  out of the notebooks, give them to your foreperson.  The clerk

15  will collect your notebooks, pencils, and when you return to

16  the courtroom we'll give the notes to the clerk once your

17  verdict is announced, and they will be destroyed immediately

18  after the trial.  Nobody is going to take a look at them.

19          Now, you'll be receiving the jury instructions, as

20  I've indicated.  You will also be receiving what we call a

21  verdict form.  And this is simply to assist you in the

22  determination of your verdict.  The verdict form sets out

23  Count 1, and indicates Count 1 as to the offense of

24  distribution of one kilogram or more of heroin, intending or

25  knowing that it will be unlawfully imported into the United

1   States.  We, the jury, find the defendant, Khan Mohammed,

2   guilty, not guilty.  You indicate your verdict -- your

3   unanimous verdict.  We have a separate question, which says:

4   Has the Government proved beyond a reasonable doubt that the

5   heroin involved one kilogram or more.  And if you'd indicate

6   yes or no on that.

7           Then Count 2 states:  As to the offense of

8   distributing a controlled substance, knowing or intending to

9   provide anything of pecuniary value to a person or

10  organization that is engaged in or engages in terrorism or

11  terrorist activity.  We, the jury, find the defendant, Khan

12  Mohammed, guilty, not guilty.  You indicate your unanimous

13  verdict.

14          Now, if you find Mr. Mohammed guilty of Count 2, we

15  then ask you to go on to answer Questions 2A and 2B below.  2A

16  says:  The Government has proved beyond a reasonable doubt

17  that the controlled substance involved in Count 2 was -- and

18  then you check the appropriate line.  There's a line for

19  heroin, a line for opium, and a line for heroin and opium.

20  So, we've set out the three choices that you would have as to

21  whether the Government has proved this beyond a reasonable

22  doubt.

23          2B says:  If the jury found that the drug involved

24  is either heroin or heroin and opium, has the Government

25  proved beyond a reasonable doubt that the heroin involved is

1    one kilogram or more.  And it's yes or no, and you indicate

2    that.  Now, I'm going to send back two copies.  I'd ask that

3    the foreperson -- they are exactly the same.  I'd ask that the

4    foreperson, once you've reached a unanimous verdict, that you

5    fill this out, you sign it and date it, and do two copies.

6    You then will be sending a note out saying:  We, the jury,

7    have reached a unanimous verdict.  And you keep one verdict

8    form and you fold the other one up and send it out with the

9    note.  Okay.  And that comes to me.

10          And what we'll do is, once you reached unanimous

11   verdicts, we will bring you into the courtroom, I will call on

12   the foreperson, whoever you are.  You stand up, you

13   indicate -- you identify yourself either by your seat number

14   or by your juror number, whichever is easier for you.  I will

15   then ask you whether or not the jury has reached a unanimous

16   verdict.  Although we have you fill out these forms, this is

17   to make it clear that there's no misunderstanding.  What the

18   verdict is is what you actually state in open court.

19          So, I will then -- we'll each have a copy of the

20   verdict form, and I will go through the verdict and ask the

21   questions, and the foreperson will indicate what the unanimous

22   verdict is of the jury.

23          Now, I don't want you to be surprised, if once that

24   is announced, one or both of parties request that the jury be

25   polled.  They're entitled to know that this is truly a

1    unanimous verdict and that each of the jurors has agreed to

2    it.  So, if that is requested, what I will do is I will say:

3    Juror in seat -- I'll go through each seat, but we'll start --

4    Juror in Seat Number 1, you've heard the verdict as stated by

5    your foreperson, do you agree with it or not?  And you

6    indicate whether or not you agree with it.  And I'll simply go

7    down the line by seat number, one, two, three, et cetera, all

8    the way through in terms of the appropriate 12 jurors that

9    have actually been deliberating.  So, I want you to just be

10   aware of that.

11          Now, in terms of what you'll receive -- so, you'll

12   get the jury instructions, the two jury verdict forms.  You

13   will receive the evidence.  All of the evidence will go back

14   for you to review, except for two things, and they are the

15   drugs.  And don't be hesitant, all you need to do is send a

16   note indicating that you would like to see the drugs, in which

17   case the drugs will be taken back, you'll have an opportunity

18   to review them.  I'd ask when you're looking at them that you

19   not deliberate at that point in front of the person -- it will

20   be Ms. Patterson and somebody, usually a Marshal, who will

21   show you the drugs so that you can review them.

22          I'd ask that you not mention, discuss, deliberate

23   in front of that person.  And that person can't answer any

24   questions for you.  You can ask them to turn things around or

25   whatever so you can see things, that's not a problem.

1       Now, it's not that we don't trust your good

2  judgment in terms of sending drugs back, but I'm responsible

3  for you, and so we just don't send them back.  We make sure

4  that somebody is there with them so that you can review them.

5  Okay.

6       The other one is -- we will send the transcripts

7  back.  The recordings, we've discussed it with counsel, and

8  rather than having you try to figure out the laptop, what

9  we're going to do is to ask you to just send a note that you

10  want to listen to the recordings or the video, either all of

11  them or specific ones.  We will bring you back into the

12  courtroom and they will be played for you so that you can --

13  and you can have your transcripts or not, so that you can

14  actually hear and see them.

15      Don't be hesitant about sending these notes,

16  there's not a problem.  It's just, again, it's easier to do it

17  here than to try and leave you with the responsibility of

18  doing it back there.  And, also, you will be able to see it a

19  little more clearly here with your screens.

20      And, again, if you're brought out here, Ms.

21  Patterson will be present and there will be somebody who will

22  do the laptop electronically.  Again, don't deliberate, they

23  can't answer questions for you.  You should not be discussing

24  it.  Just look at it.  If you want something shown to you

25  again or something of that nature, that's not a problem, but

1    you can't actually discuss the evidence.

2            Now, in terms of your deliberations, you should

3    only deliberate when all of you are in the jury room and all

4    of you are together.  Now, there may be times that -- we've

5    given you breaks during the course of the trial for personal

6    needs, and you may want to do that while you're deliberating

7    as well, and that is not a problem, which may mean that

8    somebody is in the bathroom while everybody is out or

9    whatever.  I don't have a problem with that, but what I'd ask

10   is that you simply send us a note that you're actually doing

11   this for 10 or 15 minutes, whatever it is, unless you begin to

12   take too many breaks, this is not a problem.

13           What I would ask is, one, you not deliberate during

14   this time because then people aren't focused on it, people may

15   be out of the room at that point.  It doesn't mean you can

16   wander off and go out.  You need to stay.  You can stand and

17   stretch, et cetera, but you need to stay in the jury room.

18   Somebody will be out there, one of the security people, or one

19   of the Marshals will be outside there.  But during that period

20   you can relax a little bit or, as I said, do whatever you do.

21   We keep, generally, some track of how long you've been in

22   there deliberating, not that there's any magic number of

23   times, but we do want to know if you have taken breaks.

24           Now, while you're deliberating, I'd ask that you

25   not be on your cell phones or anything else.  We want you

1   paying attention to going over the evidence and discussing it.

2   And, as I said, in terms of taking a break, if you need to use

3   the restrooms out here, that's not a problem, out in the hall,

4   because this is strictly jury rooms and judges' chambers.  I

5   would ask that you not go out because you may run into

6   somebody else, and I don't want that to happen.

7           We have made arrangements for you to have lunch,

8   and we should be able to -- I think probably just take you up

9   to the dining room.  When you're up there eating your lunch,

10  again, don't deliberate, you can talk about other things, but

11  not about that.

12          All right.  If counsel would approach on the side

13  for a second.

14  SIDEBAR DISCUSSION ON THE RECORD AS FOLLOWS:

15          THE COURT:  Anything else before I let them go or

16  any changes or something else, this is the time to bring it

17  up?

18          MR. STIGLITZ:  You may want to give them the option

19  if they do want to listen to or play a video or listen to a

20  recording, I don't know if you want to tell them they can, in

21  addition to letting us know which recording.  That if there's

22  just a portion of the recording that they want to listen to,

23  that that's fine, too.  I just don't want them worried that if

24  we play this recording that we're going to have to listen to

25  an hour and a half of --

1              THE COURT:  I don't have a problem with that.

2    Anything from --

3              MR. VANEGAS:  No.

4              THE COURT:  Okay.

5    SIDEBAR DISCUSSION CONCLUDED

6              THE COURT:  All right.  At this point, I'll be

7    excusing the two alternates jurors.  As we told you at the

8    beginning, the parties selected just a seat number randomly,

9    and that those two individuals will be now excused.  I do want

10   to thank you for your patience.  All of you have been

11   wonderful jurors.  You've come on time.  When you've taken

12   breaks, you've come on time.  You have been attentive to the

13   evidence in the case, and I very much appreciate it.  All of

14   us understand that we take you away from other

15   responsibilities, other activities in your life, when you

16   participate as a juror.  So, I do want to thank you.

17             I think, for those who are excused, you should stop

18   by the jury office to get further directions because I believe

19   until Monday you may still be having to call in.  So, let me

20   excuse jurors in Seat Numbers 3 and 7.  So, if three and

21   seven -- if the rest of you could wait a second.  What I'd ask

22   is if you've left things inside, you can go back and get them,

23   and if you would -- and Ms. Patterson will go with you.  If

24   you have notes, please pull them out and give them to her so

25   we can destroy them.  We can just pull them out.  You can

1   leave the rest -- the earphones and the transcripts here, but

2   if you have things in the jury room, please go ahead and get

3   them.  We'll wait just a moment here.  And, again, thank you.

4        When you send the note there will be somebody from

5   security out there, they will pass it on to the Court, and

6   somebody will be in the courtroom awaiting these.  What we'll

7   probably do, take your things with you at this point, and

8   after lunch we'll bring you the evidence in.  And one other

9   aspect of it, in terms of the recordings or the video, if

10  you -- again, if you want to see all of it, fine.  If you want

11  specific dates or if you want a particular portion, since you

12  can look at it in the transcript and you don't want to listen

13  to all of one session, but you want to listen to particular

14  parts, simply indicate that in the note.  And when we bring

15  you out we'll either show you or have you here, whatever it is

16  that you want.  So, if you'd give us some direction, that will

17  be helpful to us.

18        Okay.  All right.  If I could just ask you to go

19  back.  And what's going to happen is somebody is going to come

20  and take you up to were -- there is a dining room specifically

21  for jurors, and they will come get you.  So, if you'll just

22  wait there.  Bring your things in with you, don't leave things

23  because you're going to need them.  Bring all your things.

24  Bring the transcripts and your notes.  And you can leave them

25  in the jury room, but you will not be coming back out here.

1    They will pick you up, take you to the jurors' dining room and

2    bring you back down again.  If somebody has left things, we'll

3    grab them.

4    JURY EXITS COURTROOM AT 1:08 P.M.

5            THE COURT:  Okay.  There's only one little change I

6    need to make, and I'll substitute it.  I notice it had count

7    or counts, and there's only two, so I want to make sure that

8    that's corrected on the multiple counts, one defendant.  The

9    rest I think is all right.  I'll wait until Ms. Patterson

10   comes back.  You do need to -- I require you to look through

11   all of the evidence.  Each side look at each other's evidence,

12   and make sure that you agree there's nothing going back that

13   shouldn't go back.  And then what I would ask is that I have

14   you sign a sheet so that we make sure that it's clear that

15   you've actually looked at it.  The other question is

16   availability.  They will be gone for about an hour and I don't

17   have a problem with that.

18           When she comes back in I'll ask you where you're

19   going to be.  At the end of the day, I do ask you to come

20   back.  What happens is every once in awhile they come back

21   with a verdict just as we're go back to get them out, and if

22   you're gone I may have trouble getting you back in again.  So,

23   what I'd ask is near the end of the day, which today since I

24   have a 5:00 o'clock matter, if you'd come a little bit before

25   5:00, five minutes of or something, and we'll be excusing the

1   jury at that point.

2           I don't require you to come in the morning, you

3   don't have to come in.  I don't bring the jury out.  I only do

4   it at the end and excuse them and give them directions about

5   coming back the next morning.  So, you don't need to do that.

6   I will find out from you each day where you're going to be,

7   and to make sure that we can get in touch with you.  I only

8   call one, so we need to designate somebody at either end.

9   We're not going to make all the phone calls, it takes too

10  long.

11          Let me mention a couple of other things.  There are

12  occasions when the jury sends a note back that they are asking

13  a question that can't be answered.  They're asking us to

14  summarize the evidence or confirm some fact or whatever.  What

15  I may do is write out a juror note back to them, which says:

16  Dear Juror, you know, in response to your question this is it.

17  And we'll call you and read it to you, and if it's okay and

18  there's not a problem, and both sides have to agree to this,

19  then we'll just send the note back.  I'll only do it for

20  things that are not -- that are sort of common things that we

21  know what the answer is going to be.

22          If, at any time, it's more complicated, I'll bring

23  you back, obviously, or if you're uncomfortable with the note

24  that's being proposed, that's fine, we'll have you come back.

25  That's not an issue.  I think that's it.  Anybody have any

1   questions other than -- as I say, when Ms. Patterson comes

2   back, I'll need to find out where you're going to be.  I don't

3   necessarily need to keep you in the courthouse.  I think both

4   of you are close enough that we can probably bring you in, but

5   we make one phone call.  If we can't find you, you know, we

6   get answering or something else, you can give us whatever you

7   want, cell phones or whatever, that's it, then you stay in the

8   courthouse.  So, we have to be able to actually get you.

9           As I said, it will be about an hour.  If we receive

10   notes that say:  We're taking 15 minutes of a rest or

11   something, I will read that into the record at the end of the

12   day so you'll know roughly how long they have actually been

13   deliberating.

14          Does anybody -- does anybody else have other

15   matters in court today?

16          MR. STIGLITZ:  No.

17          THE COURT:  Do you, Mr. Vanegas?

18          MR. VANEGAS:  Yes, at 1:45 in magistrate court.

19          THE COURT:  Okay.  Are you going to be stuck with

20   it the whole afternoon?  Is it just one matter or --

21          MR. VANEGAS:  I'll be there -- if not there then

22   I'll be in my office.

23          THE COURT:  Okay.  Can I ask that before you go

24   back to your office if you'd stick your head in just to make

25   sure you don't leave and then find out there's a note and we

1   need to bring you back.  If somebody -- Ms. Patterson is going

2   to be sitting here, if for some reason she's not, just call

3   into chambers and let us know.  And do you want to have it be

4   that both of you are always here for notes or anything else?

5   I'm only going to make one phone call, but --

6              MR. VANEGAS:  Yes.

7              THE COURT:  You can probably start looking at the

8   evidence while we wait for a second to see.

9              MR. STIGLITZ:  That's it.  To our knowledge, the

10  only item, aside from the drugs which are over here, that are

11  not in this stack, is the master disk that was created, and

12  that's Exhibit Number 1.  Since --

13             THE COURT:  I don't think we need to send that back

14  because they're not going to have a computer to be able to use

15  it.

16             MR. STIGLITZ:  That's what we thought, too, since

17  we're going to be playing them off the laptop.

18             THE COURT:  But why don't you take a look at make

19  sure that these are fine while we're waiting around.  Why

20  don't you do this and let me get the changes -- and let me see

21  if we're missing the security person or whatever.  I'll be

22  right back.

23  COURT ADJOURNED WHILE JURY DELIBERATES

24                        AFTER RECESS

25             THE COURT:  We've received a note from the jury

```
 1    indicating that they have reached a verdict.  Did we get any

 2    other notes in between?

 3                COURTROOM DEPUTY:  No.

 4                THE COURT:  No.  Okay.

 5    JURY ENTERS COURTROOM AT 4:12 P.M.

 6                THE COURT:  Good afternoon, members of the jury.

 7                THE JURY:  Good afternoon.

 8                THE COURT:  I received a note from your foreperson

 9    indicating that you've reached a unanimous verdict.  So, I

10    would ask if the foreperson could rise, and you're in Seat 13.

11    Has the jury reached a unanimous verdict as to both counts?

12                THE FOREPERSON:  Yes.

13                THE COURT:  Let me go through this.  I'll read it

14    and when I look up, if you'd then indicate what the unanimous

15    verdict is.  Count 1.  As to the offense of distributing one

16    kilogram or more of heroin, intending or knowing that it will

17    be unlawfully imported into the United States, we, the jury,

18    find the Defendant, Khan Mohammed, guilty, not guilty.

19                THE FOREPERSON:  Guilty.

20                THE COURT:  1A says:  Has the Government proved

21    beyond a reasonable doubt that the heroin involved one

22    kilogram or more?  Yes.  No.

23                THE FOREPERSON:  Yes.

24                THE COURT:  Count 2.  As to the offense of

25    distributing a controlled substance, knowing or intending to
```

1    provide anything of pecuniary value to a person or

2    organization that is engaged in or engages in terrorism or

3    terrorist activity, we, the jury, find the Defendant, Khan

4    Mohammed, guilty, not guilty.

5              THE FOREPERSON:  Guilty.

6              THE COURT:  Question 2A:  The Government has proved

7    beyond a reasonable doubt that the controlled substance

8    involved in Count 2 was -- and you check a line that applies.

9    The lines would be either heroin, opium, heroin and opium.

10   Which line was checked?

11             THE FOREPERSON:  Heroin and opium.

12             THE COURT:  So, it's the one with both drugs, is

13   that correct?

14             THE FOREPERSON:  Yes.

15             THE COURT:  2B:  If the jury found that the drug

16   involved is either heroin or heroin and opium, has the

17   Government proved beyond a reasonable doubt that the heroin

18   involved is one kilogram or more?  Yes.  No.

19             THE FOREPERSON:  Yes.

20             THE COURT:  Thank you, sir.  You can sit down.

21   Anything further from counsel?

22             MR. VANEGAS:  Your Honor, we request polling.

23             THE COURT:  You requested a polling?

24             MR. VANEGAS:  Yes.

25             THE COURT:  Okay.  I explained to you what a poll

1    is in terms of ensuring that this is a unanimous verdict.  So,

2    juror in Seat Number 1, you've heard the verdict as stated by

3    your foreperson, do you agree with it or not?

4              JUROR:  I agree.

5              THE COURT:  Juror in Seat Number 2, you've heard

6    the verdict as stated by your foreperson, do you agree with it

7    or not?

8              JUROR:  I agree.

9              THE COURT:  Juror in Seat Number 4, you've heard

10   the verdict as stated by your foreperson, do you agreed with

11   it or not?

12             JUROR:  I agree.

13             THE COURT:  Juror in Seat Number 5, you've heard

14   the verdict as stated by your foreperson, do you agree with it

15   or not?

16             JUROR:  I agree.

17             THE COURT:  Juror in Seat Number 6, you've heard

18   the verdict as stated by your foreperson, do you agree with it

19   or not?

20             JUROR:  I agree.

21             THE COURT:  Juror in Seat Number 8, you've heard

22   the verdict as stated by your foreperson, do you agree with it

23   or not?

24             JUROR:  Yes, I agree.

25             THE COURT:  Juror in Seat Number 8, you've heard

1    the verdict as stated by your foreperson, do you agree with it

2    or not -- I'm sorry, 9?

3                 JUROR:  Yes, I agree.

4                 THE COURT:  So, Juror in Seat Number 9, you

5    indicated you agree?

6                 JUROR:  I agree.

7                 THE COURT:  Sorry.  Juror in Seat Number 10, you've

8    heard the verdict as stated by your foreperson, do you agree

9    with it or not?

10                JUROR:  Yes, I agree.

11                THE COURT:  Juror in Seat Number 11, you've heard

12   the verdict as stated by your foreperson, do you agree with it

13   or not?

14                JUROR:  I agree.

15                THE COURT:  Juror in Seat Number 12, you've heard

16   the verdict as stated by your foreperson, do you agree with it

17   or not?

18                JUROR:  I agree.

19                THE COURT:  Juror in Seat Number 13, do you agree

20   with the verdict you stated?

21                JUROR:  I agree.

22                THE COURT:  Juror in Seat Number 14, you've heard

23   the verdict as stated by your foreperson, do you agree with it

24   or not?

25                JUROR:  I agree.

1           THE COURT:  All right.  Anything further from

2    either counsel?

3           MR. ROTHSTEIN:  No, Your Honor.

4           MR. VANEGAS:  No, Your Honor.

5           THE COURT:  All right.  Members of the jury, I do

6    want to thank you for your service, for you attentive

7    attention to the case, your willingness to spend time in terms

8    of considering the case, thinking it over, listening to the

9    evidence.  I know it takes you away from other

10   responsibilities, and we very much appreciate your willingness

11   to participate as part of the community as being a juror.  So,

12   let me excuse you at this time with the thanks of the Court.

13          And at this point what I would ask is that you just

14   contact this evening the jury office and just see if they have

15   any further directions for you.  Thank you very much and take

16   care of yourselves.  When you go back we'll pull out the

17   notes, et cetera.

18   JURY EXITS COURTROOM AT 4:18 P.M.

19          THE COURT:  All right.  At this point then we'll

20   set some other dates in the case.  July 24th is the date of

21   the presentence report.  Based on the fact that this is —— to

22   some degree defense counsel is going to have to deal through

23   interpreters.  Do you want additional time, I can build in

24   some additional time for you?

25          MR. VANEGAS:  Yes, Your Honor.

1          THE COURT:  How much extra time do you want?  Do

2    you want to just look at your calendar and just tell me.

3    You're going to need to get it out, talk to him, go over

4    objections, come back.  This would be the date I would get it,

5    so you would need to build in time for yourself to review it,

6    talk to your client, et cetera.

7          MR. VANEGAS:  Your Honor, can we have some time

8    during the week of August 18th?

9          THE COURT:  All right.  I'll give you until

10   August 22nd.  It's easier than pushing the dates back.  That

11   should give you plenty of extra time.  And, obviously,

12   arrangements will need to be made to work with the interpreter

13   around discussing whatever is in the actual presentence

14   report, both in terms of information as well as any

15   conclusions in there if he wants any objections.

16          In terms of Memorandum in Aid of Sentencing,

17   what -- how much extra time do you need beyond that to be able

18   to file it?  It seems to me you both should be able to file it

19   at the same time.  Is there a particular issue that would

20   require one before the other?  I mean, there are some

21   mandatory minimums that are involved.

22          MR. STIGLITZ:  No.

23          THE COURT:  What date do you -- do both of you

24   think you can be prepared?

25          MR. STIGLITZ:  Is August 22nd the sentencing date?

1          THE COURT:  No.  August 22nd is the presentence

2    report comes to me.  So, you will have -- they will have done

3    the presentence report.  They need about 70 days.  I'll give

4    them additional time.  You will have reviewed it before that.

5    If you have objections, you'll look at them.  They need to

6    talk to their client about any objections, plus they will need

7    information in filling it out.  And I will get it August 22nd,

8    after both sides have had an opportunity to review it.

9          You should make sure that if you -- if you have no

10   objections that -- if the other side, whichever other side it

11   is, has objections, that you find out how they get resolved,

12   so that when I get the report, if there are objections to each

13   other's resolutions of things, I get a response from the

14   probation office before I actually get it in your Memorandum

15   in Aid of Sentencing.  So, that is the reason for taking that

16   long.  So, how much extra time beyond the 22nd do you want to

17   file something?

18          MR. STIGLITZ:  Two weeks should be fine.

19          THE COURT:  Does that work for you?

20          MR. VANEGAS:  I would ask for the week of 15th.

21          THE COURT:  All right.  I'll do it September 19th,

22   that should give you enough time to do it.  I will build in an

23   extra week in here in case there is something you want to

24   respond to to the others.  You don't have to use it, but I'll

25   put it in.  It's a week later, which would be the 26th, and

1   then we would be looking at the sentencing in October.  How

2   about Friday, October 10th?  That's two weeks later.  If

3   something comes in, I can resolve it.  Does that work?

4          MR. VANEGAS:  That's fine.

5          MR. STIGLITZ:  That's fine.

6          THE COURT:  October 10th.  And I'll set it at --

7   since we need the interpreter, does that work for you?

8          INTERPRETER:  Yeah.

9          THE COURT:  Would you come in the night before or

10  would you be coming in --

11         INTERPRETER:  It makes no difference.  If it is

12  after 9:00 o'clock, I can come the same day.  If it is 9:00 or

13  earlier --

14         THE COURT:  Then why don't we set it, say, at 9:15

15  because I don't know what my trial schedule is.  But I'll try

16  and make sure I don't move this since we do have

17  interpreters's schedules that we need to be careful of.

18         Okay.  So, it will be a presentence report on the

19  22nd.  Memorandum in Aid of Sentencing, September 19th.  Any

20  response that you want to each others will be September 26th.

21  And the sentencing date will be October 10th at 9:15, with the

22  use of the interpreters.  And I think that's it.  The only

23  other thing is, you do need to take your exhibits back.

24         MR. STIGLITZ:  Let me just ask if Ms. Patterson or

25  some other member of the court staff can remove the

 1   transcripts from the binders and we'll just take the binders

 2   with us.

 3           THE COURT:  Sure, we can do that.  All right.  If

 4   there's nothing else then let me excuse you.  I can give

 5   you -- my next matter is at 5:00, so I can give you a little

 6   bit of time to talk in the back if you wish.

 7   END OF PROCEEDINGS AT 4:26 P.M.

 8

 9

10

11               C E R T I F I C A T E

12           I, Lisa M. Hand, RPR, certify that the

13   foregoing is a correct transcript from the record of

14   proceedings in the above-titled matter.

15

16

17

18                           _____

19                           Lisa M. Hand, RPR

20

21

22

23

24

25