IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,

       Government,                CR No. 06-357
                                   Washington, DC
     vs.                       December 22, 2008
                                   2:45 P.M.
KHAN MOHAMMED,

       Defendant.

_____


TRANSCRIPT OF SENTENCING
BEFORE THE HONORABLE COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE

APPEARANCES:


For the Government:         MATTHEW STIGLITZ, ESQUIRE
                            U.S. Department of Justice
                            Narcotics and Dangerous Drug
                              Section
                            1400 New York Avenue, N.W.
                            Washington, DC  20530
                            (202) 305-3646

                            JULIUS ROTHSTEIN, ESQUIRE
                            U.S. Department of Justice
                            Narcotics and Dangerous Drug
                            Section
                            1400 New York Avenue, N.W.
                            Washington, DC  20530
                            (202) 305-3646

For the Defendant:          CARLOS VANEGAS, ESQUIRE
                            Federal Public Defender's Office
                            625 Indiana Avenue, N.W.
                            Washington, DC  20004
                            (202) 208-7500


(Appearances Continued on Next Page)

(Appearances Cont'd)


For the Defendant:              DANI JAHN, ESQUIRE
                                Federal Public Defender's Office
                                625 Indiana Avenue, N.W.
                                Washington, DC  20004
                                (202) 208-7500


Court Reporter:                 Lisa M. Hand, RPR
                                Official Court Reporter
                                U.S. Courthouse, Room 6706
                                333 Constitution Avenue, NW
                                Washington, DC  20001
                                (202) 354-3269


Interpreters:                   Naim Saidi

Proceedings recorded by mechanical stenography; transcript
produced by computer-aided transcription

1                    P R O C E E D I N G S

2              THE COURT:  Good afternoon, everyone.

3              MR. VANEGAS:  Your Honor, can I just ask for the

4    Court's indulgence for two more minutes to communicate a

5    response to --

6              THE COURT:  Sure.  Go ahead.

7              MR. VANEGAS:  Thank you.

8    OFF THE RECORD

9              THE COURT:  Good afternoon, Mr. Mohammed.  All

10   right.  Let's call the case and proceed with the sentencing.

11             COURTROOM DEPUTY:  Criminal case 06-357.  The

12   United States of America versus Khan Mohammed.  Mr. Stiglitz

13   and Mr. Rothstein for the Government.  Mr. Vanegas and Ms.

14   Jahn for the Defendant.  Defendant is present in the

15   courtroom.

16             THE COURT:  Will the interpreter please rise and

17   raise your right hand.

18             (Interpreter sworn by Clerk).

19             COURTROOM DEPUTY:  State your name for the record,

20   please.

21             INTERPRETER:  Naim Saidi.

22             THE COURT:  All right.  Good afternoon, everyone.

23   Mr. Mohammed, if at any time you have trouble hearing the

24   interpreter, there's a problem with the battery or anything,

25   please get our attention so we can make sure that you can

1  follow the proceedings.  All right?

2           THE DEFENDANT:  Okay.

3           THE COURT:  We're here for a sentencing of

4  Mr. Mohammed.  I would like to ask defense counsel, for the

5  record, as to whether they see any issue regarding

6  Mr. Mohammed's mental competency to be sentenced today?

7           MR. VANEGAS:  No, Your Honor.

8           THE COURT:  All right.  This was a jury trial,

9  Mr. Mohammed was found guilty on two counts.  The first count

10  is distribution of one kilogram or more of heroin, knowing

11  that the substance would be unlawfully imported into the

12  United States.  The maximum statutory sentence is a 10-year

13  mandatory minimum to life, and a maximum $4 million fine.

14           Count 2 is to distribute a controlled substance,

15  heroin and opium, of one kilogram or more, knowing and

16  intending to provide anything of pecuniary value to a person

17  or organization that has engaged in or engages in terrorism or

18  terrorist activity.  Statutory maximum, 20 years, mandatory

19  minimum and -- to life.  The maximum fine is $250,000.  I have

20  a presentence report.

21           There was one revision of December 15th, which I

22  believe related strictly to the additional objections that

23  were in the memoranda and their response.  The rest of the

24  presentence report remain the same.  I have a Government's

25  memorandum in aid of sentencing.  A sentencing memorandum on

1   behalf of Mr. Mohammed.  The Government's response to the

2   Defendant's sentencing memorandum.  The Defendant's response

3   to the Government's second sentencing memorandum.  A reply by

4   the Government.

5           And then today I received documents from the

6   International Red Cross that were sent by the family of

7   Mr. Mohammed through the International Red Cross, which have

8   made their way to defense counsel, who have shared them with

9   the -- had them translated and shared them with the Government

10  and the Court.

11          In general terms, it contains a complaint by one

12  individual in Afghanistan against one of the government

13  witnesses.  The complaint seems to have been filed in

14  Afghanistan in 2004.  The papers don't reflect any resolution.

15  Nothing seems to have happened with the complaint.  I do know

16  that a Lewis check had been done prior to trial that confirmed

17  that there were no arrests or conviction of the particular

18  witness.

19          Since they have been provided, presumably, they

20  would be filed on the docket.  Is there any concern relating

21  to the names in the complaint, since we used pseudonyms for

22  the witnesses, as to whether the names should be redacted or

23  something?

24          MR. STIGLITZ:  Well, I suggested with Ms. Jahn at

25  the break that it be filed under seal, or if the Court wishes

1   to redact the name, then proceed by that fashion, but either

2   one would be acceptable by the Court.

3           THE COURT:  Whatever way you wish to do it.  I

4   think all the names should be redacted or you can file it

5   under seal, whatever you want.  Besides that, there was a

6   letter from the tribal leaders of Nangarhar province, the

7   County of Chaprahar.  It had 30 signatures.  The gist of the

8   document is that because no documents were found in the search

9   of the Defendant's home, therefore, the Defendant is innocent.

10  It also indicated his position as the President of the NGO,

11  which the Court was aware of, and had been selected by the

12  village.

13          Obviously, they didn't hear the Defendant's

14  recorded statements.  But, at any rate, the Court will

15  consider this material with everything else.  Certainly the

16  letters from the elders who clearly hold him in respect.

17          Now, let me move to the objections.  I'll do the

18  objections first.  The downward departures I'll discuss at a

19  later point, but because the objections relate to the

20  calculations, I'll go over those first.  One of the early

21  objections was to Paragraph 10 in the presentence report

22  regarding a statement that said that there were attacks on

23  Afghanistan coordinated by Rahman and Habib Zai from Pakistan,

24  which in the evidence in the case, those were two individuals

25  associated with the Taliban, Taliban leaders.

1        The Defendant objected.  In summary form, I would

2   say that Mr. Jaweed, who was one of the Government witnesses,

3   was not in Afghanistan at the time, therefore, there was no

4   evidence of actual attacks.

5        The Court will leave the statement in.  Jaweed was

6   called to a meeting with Rahman in Pakistan to coordinate

7   attacks in Afghanistan.  Mr. Mohammed discussed having engaged

8   in attacks and having done so on advice and orders of the

9   Taliban, specifically, Rahman and Habib Zai.  The next

10  objection relates to what is called the terrorism enhancement,

11  3A1.4 from the advisory sentencing guidelines.  The effect of

12  that enhancement is to add 12 levels to the offense level, and

13  it automatically places the criminal history category at a

14  level six.

15       The definition of the enhancement is an offense --

16  it is a felony that involved or was intended to promote a

17  federal crime of terrorism.  That's how the advisory

18  sentencing guideline sets it out.  There are two elements

19  related to this enhancement.  The first one -- requirement is

20  that there be a federal crime of terrorism.  The Defendant

21  concedes that Count 2, the colloquial called narco-terrorism

22  would fit the description of a federal crime of terrorism.

23       The second, which is the contested issue, requires

24  a specific intent requirement, namely, that the underlying

25  felony, which would be the felony in Count 2, was calculated

1    to influence or affect the conduct of government by

2    intimidation or coercion or to retaliate against government

3    conduct.  And based on the legislative history, the term

4    government doesn't have to be United States Government, it can

5    be other governments and can also be a specific civilian

6    population.

7            I'll do a very brief summary of a couple of the

8    cases that relate to this enhancement that counsel have

9    provided to the Court.  U.S. v. Chandia, C-H-A-N-D-I-A.  That

10   basically set out what the requirements are to find that the

11   enhancement applies.  In terms of the ruling, the Court made

12   insufficient -- set out insufficient grounds to apply the

13   enhancement.  The next case is Hammond.  The Defendant was

14   convicted of providing material support to a designated

15   foreign terrorist organization, Hezbollah.  The evidence that

16   the Court found was that the Defendant had close connections

17   with Hezbollah officials, including its spiritual leader and

18   senior military commander.

19           The Defendant's own testimony shows he was aware of

20   terrorist activities and goals, and he supported that aspect

21   of Hezbollah.  The Defendant provided material support to

22   Hezbollah to influence or coerce the government conduct in

23   Lebanon.  And the Court of Appeals found that the enhancement

24   applied.

25           The Awan case, A-W-A-N, the Defendant knowingly

1    served as a conduit for funds being transferred from the

2    United States to Pakistan in support of a separatist movement

3    seeking to establish an independent seek state in Punjab,

4    India.  The defendant was aware of the movement's use of

5    violence and attempted to recruit one individual to join the

6    movement.

7              The Court described the evidence as the defendant

8    providing funds.  He knew how the funds would be used by the

9    separatist movement, but found that it was speculative

10   regarding the defendant's motivation.  That he wanted to

11   influence Indian -- the Indian government, or retaliate,

12   rather than private purposes.  The judge described it that the

13   defendant liked associating with terrorists and said so.  In

14   that case the enhancement didn't apply.

15             The Graham case, the defendant was a member of a

16   militia group in the United States, convicted of conspiracy to

17   commit offenses against the United States, and also was

18   convicted of several weapons offenses.  The Court described

19   the evidence as the defendant and co-conspirators intended to

20   influence and intimidate federal officials in performance of

21   their duties.  Conspired to possess machine guns and other

22   weapons and planned to attack the federal officials with their

23   weapons.  In that case the enhancement was found to apply.

24             So, obviously, just by giving you a cursory review,

25   this enhancement is factually driven.  There are very nuance

1   differences in the facts where the enhancement has been

2   applied versus its non-application.  I'm going to set out in

3   summary form the arguments of both sides and give you my

4   conclusions.

5          The defendant's arguments, in summary form, against

6   application of the enhancement.  The Defendant argues that

7   there's no evidence on the record of the Defendant's

8   motivation, quote, to affect government conduct by

9   intimidation or coercion, or to retaliate against government

10  conduct through the Defendant's drug trafficking as opposed to

11  securing missiles.  The Defendant also argues there's no proof

12  that the proceeds, the Defendant's commission from the drug

13  trafficking, were directed to support the Taliban.  That they

14  may have been used by the Defendant, a terrorist, but no proof

15  he necessarily spent it on terrorist activities as opposed to

16  his personal needs.

17         The Defendant also argues that the Government

18  statements are too sweeping, focusing on the Defendant as a

19  terrorist engaged in terrorist activities, and then separately

20  as the Defendant is a drug trafficker.  But no evidence that

21  links the Defendant's drug trafficking actions as affecting

22  government conduct or civilian populations by intimidation or

23  retaliation.

24         The Government's arguments in favor of the

25  enhancement, in summary form.  The Government sets out the

1    Defendant's alliance and connections to Taliban leaders.  The

2    Defendant's continuing contacts with Taliban leaders.  The

3    Defendant's possession of weapons, including bullets, mortars,

4    mines, access to warheads.  His past use of mines to blow up

5    government cars.  His attack on the County Chief's office.

6    His role in trying to procure missiles to attack the Jalalabad

7    airport and base and the police station.

8              The Government describes the motivation for this

9    violent activity as reflected in the Defendant's statements

10   about carrying out violent jihad against the United States and

11   Britain and other foreign forces in Afghanistan, as well as

12   Afghanis who support the new government, which came in after

13   the Taliban and is opposed to the Taliban.  And the

14   Defendant's statements of his hatred of Americans.  And,

15   finally, his goal to expel them from Afghanistan.

16             Although there's evidence to support these factual

17   conclusions, this argument doesn't address the drug

18   trafficking and the motivational nexus related to the

19   Defendant supporting the Taliban or affecting government

20   conduct or civilian populations related to those governments

21   that the Defendant hates or governments that are opposed to

22   the Taliban.

23             The Government also argues that the jury verdict

24   reflects that the jury found beyond a reasonable doubt that

25   the Defendant engaged in or was engaging in terrorist

1    activity, and then I'm quoting their argument, that there was

2    a guilty verdict -- necessarily meant that he was distributing

3    drugs to provide pecuniary value to a person, himself.  He

4    knew, had previously engaged in, and was presently engaging in

5    terrorist activities, quote.  And that statement is correct.

6         But what was not an element of the offense, and the

7    jury did not have to find, and Mr. Stiglitz said this at a

8    status conference, and I quote:  The Defendant makes money

9    through drug trafficking.  He uses cash to go out and buy

10   weapons to use against people.  That was not an element of the

11   offense that the jury had to find.  So, the jury verdict

12   supports the Defendant as a terrorist who engages in terrorist

13   activities.  And the Defendant is involved in drug trafficking

14   with the goal to have drugs come to the United States.  He

15   gets a commission as part of the drug trafficking.

16        The missing piece in the verdict is that the

17   Defendant's specific motivation for engaging in this drug

18   trafficking was to influence or affect conduct of government

19   by intimidation or coercion or to retaliate against government

20   conduct or civilian populations.  So, in sum, the jury verdict

21   doesn't necessarily provide support for the required finding

22   of specific intent or motivation that links the drug

23   trafficking and how that activity affects government conduct

24   in some way.

25        The Government continues that in fact it would be

1    speculative to conclude on this record that the Defendant

2    shared his -- well -- well, let me -- in fact, my conclusion

3    would be that it would be speculative to conclude on this

4    record that the Defendant shared his drug commissions with the

5    Taliban, which was an argument that the Government made.

6          In a few places in the transcript of his recorded

7    statement he does use the plural us, as a commission for us.

8    But I think it's insufficient to conclude that the Defendant

9    shared his commission with the Taliban.  And, in fact, the

10   statements that were recorded -- Mr. Mohammed specifically

11   states that he only wanted to engage in attacks authorized by

12   the Taliban so that he could be paid by the Taliban, if

13   nothing else, for his expenses associated with the terrorist

14   activity.

15         Having said all of that, however, there are two

16   concrete factual predicates.  This is from recorded statements

17   of the Defendant where the Defendant indicates specifically

18   his intent to motivation for engaging in the drug trafficking

19   offense which underlies Count 2.  And in my findings I'm going

20   to credit Jaweed's testimony and his recorded statements and

21   the Defendant's statements, which would be only the recorded

22   statements.

23         First, as it relates to the opium, which is Exhibit

24   E, Line 44, the recorded statement of the Defendant.  The

25   Defendant states:  If they get the commission from the opium

1   sale, then the Defendant and Jaweed will buy a car for, quote,

2   business, i.e., to be used in attacks.  And the word business

3   in context means terrorist activity, and that's how it was

4   described.

5           Exhibit C, Line 78.  The car will be used to

6   transport the missiles from the Wasir area in Pakistan at a

7   time when the car will not be searched by the Afghani

8   government or armed forces.  And the car can be tightly and

9   firmly loaded with missiles.  That's his second statement.  At

10   this point in time the Defendant, with the Taliban, was

11   planning to either attack the Jalalabad airport or the attack

12   involved only the Defendant and Jaweed, then the attack would

13   be against the Afghani government police station.  And that

14   would be Exhibit B, Line 76.

15           So, the Defendant specifically intended to use

16   the commission from the drug sale of opium to buy a car, to

17   transport missiles in the car, to be used to attack probably

18   most likely the Afghani police station, which would affect the

19   conduct of the Afghani government by intimidation or to

20   retaliate the police for arresting those involved as

21   terrorists for the Taliban or Taliban sympathizers.  And the

22   police force is comprised both of law enforcement officers as

23   well as the military.

24           If the attack was on the Jalalabad airport, then

25   it would affect conduct of the U.S. Government as well as

1    since the -- it involved both U.S. soldiers and foreign

2    military forces that were stationed at that base, as well as

3    to retaliate for their presence in Afghanistan or for fighting

4    against the Taliban.  And you'd put all of this into context,

5    as the Defendant has made numerous comments about -- this is

6    all on his recorded statements, hating the Americans, the

7    infidels, foreign forces in Afghanistan.  He wants them to

8    leave.  Attacked Afghani government which has supported the

9    presence of foreign forces, and views the Taliban as its

10   enemy.

11          The second factual predicate as it relates to the

12   heroin and opium -- as to the factual predicate in regard to

13   selling heroin with a known destination abroad, specifically

14   to the United States, France, but mostly U.S. cities.  When

15   the Defendant makes his statements, of course, which are

16   recorded, he doesn't know that the heroin is never going to

17   reach the United States.

18          Exhibit H, Page 3, Line 22.  The Defendant

19   acknowledges that the heroin is headed abroad.  The Defendant

20   says, quote:  Good.  May God turn all the infidels to dead

21   corpses.  End quote.  Meaning, that the use of heroin will

22   kill the foreign drug users, the infidels, represented by the

23   foreign forces, which include U.S. soldiers in Afghanistan

24   fighting against the Taliban.

25          Exhibit I, Page 1, Line 8.  Jaweed and the

1   Defendant are discussing heroin sold abroad.  In response to
2   whether the Defendant can find more heroin, the Defendant
3   makes a recorded statement.  Quote:  There are a lot, as much
4   as you need, I will give it to you.  Two things would be done,
5   one, as they say, the jihad would be performed since they send
6   it to America.  The jihad was described as a fight against
7   foreigners who are fighting in Afghanistan against the
8   Taliban.

9           In terms of the opium, Exhibit H, Page 5.  In
10  response to Jaweed's comments about the opium deal they had
11  already finished, the Defendant referring to the infidels
12  states, quote:  May God eliminate them now, and we will
13  eliminate them, whether it is by opium or by shooting, this is
14  our common goal.  The Defendant goes on to discuss the
15  expected arrival of Taliban leaders to engage in plans for
16  attacking.

17          The Defendant's comments concerning the foreign
18  destination of opium and heroin he describes as a means to
19  destroy or carry out jihad against American citizens or
20  foreigners that he hates because American and foreign forces
21  are fighting in his country against the Taliban.  His
22  motivation, his specific intent is to retaliate against
23  government conducts, specifically U.S. Government conduct.  In
24  his mind he equates selling heroin destined for American
25  cities with shooting/attacking Americans who have armed forces

1   in Afghanistan.

2         My conclusion, the specific factual predicate,

3   based on the Defendant's own statements regarding his

4   motivation and/or specific intent to engage in drug

5   trafficking to affect the conduct of government by

6   intimidation or coercion or to retaliate against government

7   conduct, including its affect on civilian populations, is that

8   he specifically intends to use the commission from the drug

9   sales to purchase a car to facilitate attacks against U.S. and

10  foreign forces in Afghanistan and the Afghani government and

11  its official.  And the sale itself of the drugs going abroad

12  to U.S. cities he specifically intends and is motivated by the

13  drugs' destructive powers on U.S. civilian populations as a

14  means of violent jihad against Americans who have fighting

15  forces in Afghanistan against the Taliban.

16        So, the Court concludes there's a factual

17  predicate for the terrorism enhancement.  There are a series

18  of additional arguments relating to this enhancement which

19  I'll address.  There's an argument defense counsel makes

20  variously that the standard of proof for this enhancement

21  should be either beyond a reasonable doubt or at least clear

22  and convincing evidence.  There is a D.C. Circuit case, U.S.

23  v. Long cited by the Government.  The standard of proof for

24  application of enhancements, even in extraordinary

25  circumstances, with a substantial increase in the offense

1  level is preponderance of the evidence.  Therefore, the Court

2  will apply that standard of proof.

3          In the alternative, the Court finds that the

4  factual findings are sufficient to meet the standard of clear

5  and convincing evidence.  Second, the Defendant argues that

6  this enhancement violates the Sixth Amendment and that the

7  Defendant has a right to a jury trial on this issue.  There is

8  no Sixth Amendment violation with judicial fact finding of

9  sentencing factors as long as the fact finding doesn't

10  increase the maximum lawful sentence.  In this case the

11  statutory maximum is a life sentence.  Also, the guidelines

12  are advisory.

13          The Defendant third argues that because the

14  enhancement affects both the offense level and the criminal

15  history category, it is a double application and it,

16  therefore, is unconstitutional.  The Court in regard to this

17  enhancement -- the Court agrees with the Court's reasoning in

18  the Awan case, and Meskini M-E-S-K-I-N-I, 319 F.3d 88 at 91.

19  The Congress and the Sentencing Commission had a rational

20  basis for concluding that acts of terrorism represent a

21  particularly grave threat because of the dangerousness of the

22  crime, terrorists are unique criminals regarding recidivism

23  and will likely engage in some conduct again.

24          Terrorists represent a unique difficulty in

25  rehabilitation.  And there is a need to incapacitate the

1    terrorists in regard to future terrorist activity.  Also, as

2    to the increase in offense level based on this enhancement, I

3    would just note that whether in criminal history category one

4    or six the advisory guideline sentence is life imprisonment,

5    there would still be the enhancement for the offense level.

6           Fourth, the Defendant also makes a more cursory

7    argument about the enhancement violating the Constitutional

8    rights against cruel and unusual punishment, violates equal

9    protection.  Again, the Congressional Sentencing Commission

10   reasoning as to this unique category offender, the terrorist,

11   applies to this claim as well.  Also, the Defendant ignores in

12   making comparisons to other alleged Afghani drug traffickers

13   or other drug traffickers of note that the Defendant was

14   convicted of narco-terrorism, not just drug trafficking.

15          Accordingly, the Court finds the 3A1.4 enhancement

16   to be constitutional, that there exists in the record of this

17   case the factual predicate for the enhancement by a

18   preponderance of the evidence, and alternatively, by clear and

19   convincing evidence.  And in the Court's discretion, I will

20   apply this enhancement to the advisory sentencing guideline

21   calculation.

22          There are other objections, one is 3B1.2(b).  The

23   Defendant requests a reduction in his offense level, claiming

24   he was a minor participant.  He only handled the drugs and

25   money in a limited and tangential manner.  This provision

1   doesn't apply to the Defendant for two reasons.  First, in

2   order to apply the Defendant must be, quote, less culpable

3   than most other participates, unquote.  The only participates

4   are the Defendant and Jaweed, a confidential informant who

5   can't be held criminally responsible.

6           The Defendant played a critical role in that he had

7   past experience in drug trafficking and opium.  He interviewed

8   four possible sellers and chose one to buy from.  He

9   negotiated the price and quantity, inspected the opium, and

10  gave his approval prior to the sale.  Jaweed gave the money to

11  the Defendant.  The Defendant consummated the drug deal by

12  paying the seller.  Moreover, the Defendant was eager to

13  consummate other drug deals involving both opium and heroin

14  and was even interested in being involved in converting the

15  opium to heroin.  So, I'm going to conclude that this

16  provision does not apply.

17          Having dealt with what would affect the advisory

18  sentencing guidelines, irrespective of departures, which we

19  can discuss at a later point.  The offense level -- base

20  offense is 32, the group -- the counts are grouped.  If you

21  apply the 3A1.4, it adds 12 points, which is 44, but it is

22  treated as offense level 43.  Based on the 3A1.4, it places

23  him in a criminal history category six, although, it would

24  have made no difference because category one would have placed

25  him in the same position.

1            The advisory sentencing guideline range, offense

2     level 43, category six, is life on both counts.  He is not

3     eligible for probation.  The supervised release is five years

4     as to each count.  The fine range is $25,000 to $4 million.

5     Restitution is not applicable.  The special assessment is

6     $200.

7            Count 1 is a mandatory minimum of 10 years, 120

8     months.  Count 2 has a mandatory minimum of 20 years, 240

9     months.  I will adopt the presentence report as written.  So,

10    let me hear from the Government, the defense counsel, and the

11    Defendant, if Mr. Mohammed wishes to address the Court.  And I

12    can hear anything you wish to about downward departures.

13            MR. STIGLITZ:  Good afternoon, Your Honor.  From a

14    personal perspective, I think it's fair to say this is the

15    most thoroughly briefed sentencing I've ever participated in.

16    That said, there's not that much left to be said.  In our

17    first sentencing memorandum we set out at length the various

18    bases upon which we felt that the Defendant merited a life

19    sentence, not the least of which were for the dangerous nature

20    of his offense.  The risk that he posed to the public upon

21    rerelease, if he were ever to be rereleased.  The deterrent

22    value of a strong sentence on others who may be inclined to

23    engage in the same acts.

24            And for all of these reasons we felt that a life

25    sentence is justly deserved, given the facts and circumstances

1  of this case.  The Defendant, it's clear from the various

2  recordings, despises Americans, as being I guess just the face

3  he puts on any person or group of people who doesn't believe

4  as he believes.  He suggests that he's being treated unfairly

5  by the government, but I would submit that this government has

6  treated him more fairly than he would ever treat somebody were

7  the roles reversed.

8           Upon his arrival here he was provided surgical

9  treatment for a thyroid tumor.  If not saving his life, then

10  certainly dramatically increasing the span of his life.  This

11  is treatment that he wouldn't have received were he still

12  living in Garatek village.  But more importantly, he was given

13  a full public trial with all the rights that any American

14  citizen would receive.  There's no military tribunal in this

15  case.  This was a trial with public evidence gathered by

16  civilian law enforcement, and he was given a speedy trial.

17  There was no indefinite detention without charge.

18           And the Government submits that no doubt this is

19  far fairer treatment than any American could expect to receive

20  were it to find itself in a Taliban court.  Now, the defense

21  spends a lot of time in its motions discussing or trying to

22  compare this case to other cases.  And as we set out in our

23  briefs, it's really an apples and oranges discussion at this

24  point, because every case that is discussed by the defense

25  involves a drug trafficker, and just that, a drug trafficker.

1    Some may be very bad drug traffickers with a lot of drugs on

2    their hand, but they still remain drug traffickers.

3            And the Defendant is in the unique position of

4    being the first person who was convicted of narco-terrorism,

5    which as the Court knows from its ruling just now, Congress

6    and the Sentencing Commission treat as a very different animal

7    from a normal drug trafficking statute for various legitimate

8    reasons.

9            I think the Congress acknowledged that the

10   confluence of the drug trafficking world and the terror world

11   pose as an extraordinary risk to the safety of people

12   everywhere and to the national security of this country.

13   Because it is through that drug trafficking, and Afghanistan

14   is ground zero for opium and heroin production in the world,

15   that provides an almost limitless source of funds for those

16   who wish to engage in terrorist activity.  And I think the

17   Congress realized that when they passed this statute.

18           And it seems only right to take the Defendant and

19   consider him, not as an ordinary drug trafficker but as a

20   narco-terrorist.  Is Khan Mohammed the Osama bin Laden of the

21   terror world?  No.  Is he the Pablo Escobar of the drug world?

22   No.  Though certainly the evidence, we suggest, is there that

23   shows that he is a larger player in the drug world than the

24   13 kilograms, we suggest, that were introduced at this trial.

25   The Defendant's significance ultimately rests with his

1    position at the symbiotic confluence of these two worlds, the

2    drug world and the terror world.

3           Khan Mohammed is where the proverbial rubber meets

4    the road.  Without him and men like him there is no effective

5    insurgency in Afghanistan and places like that because it

6    takes people like the Defendant to convert the hatred that is

7    in the hearts of fanatics, in this case hiding out in

8    Pakistan.  And it takes a man like the Defendant to convert

9    that hatred into action on the ground in Afghanistan.

10          And without people like the Defendant, you're just

11   left with a lot of disgruntled terrorists hiding out in

12   Pakistan.  And the Defendant played a vital role in the

13   insurgency effort.  So, to say that he's not the top terrorist

14   in the world or the top drug trafficker in the world doesn't

15   diminish his role in both worlds, and his importance,

16   certainly, to the people who are posted at the Jalalabad

17   airfield.

18          Agent Higgins, the case agent in the case, is here

19   today.  I think if you asked him:  Well, was this guy

20   important to you, having been posted at the Jalalabad

21   airfield?  I submit to you he would say, yes, he was as much a

22   risk to me personally as any of the Osama bin Ladens or Pablo

23   Escobars of the world because the Defendant was perfectly

24   situated under the radar to facilitate the Taliban insurgency.

25   And Jaweed knew it.

1          As we said in the opening and as we said in the

2     closing, and as I'll repeat today.  Jaweed risked his life and

3     the life of his family by making the choice not to engage in

4     that kind of behavior.  He was a man who was sick and tired of

5     living in a culture that was being torn apart by violence and

6     by drug trafficking, and he wasn't going to get coerced into

7     that life.

8          When his feet were put to the fire when he was

9     given that order, go back to Afghanistan, purchase rockets,

10    and begin attacking places like the Jalalabad airfield, he

11    made that fateful decision to do the right thing and report

12    that to the authorities and stop it rather than facilitate it.

13    And that's a decision to this date that the Defendant can't

14    seem to appreciate.  To this day the Defendant refuses to

15    acknowledge -- I'll be interested to know whether he even

16    acknowledges that it's his voice on the tapes, because we all

17    know up until the trial he refused to even admit that.  Even

18    when confronted with his image, his lips moving and the audio,

19    he wouldn't even acknowledge that that was him speaking.

20         So, the Defendant has yet to bring himself to

21    acknowledge his role.  That lack of contrition we believe only

22    supports our argument that really there is no rehabilitation

23    here, because if you can't even acknowledge your own

24    involvement, how can you expect to see the error in that

25    involvement and seek to do something to correct it.

1        So, Your Honor, given all the circumstances of this

2   case, given the guidelines, given the extremely thorough

3   evidence that was presented to the Court from the Defendant's

4   own mouth, we believe that the Court really only has one

5   sentence to impose here to really send a message to the

6   Defendant and to those he supports and that support him,

7   really to only render that one sentence, which is a life

8   sentence, which certainly is recommended by the guidelines and

9   is permitted under statute.  So, we would ask the Court to

10  impose that sentence.  Thank you.

11        THE COURT:  All right.  Mr. Vanegas.

12        MR. VANEGAS:  It is clear that Khan Mohammed is not

13  Osama bin Laden or Pablo Escobar.  At the time that

14  Mr. Mohammed was met by the confidential informant, by Jaweed,

15  what he was talking about was engaging in the acts of

16  terrorism.  He did continue to give hateful speech.  He said

17  terrible things about people in his own government and about

18  Americans, about the soldiers, about the infidels.  There's no

19  question that he said those things.

20        And at some point the whole nature of the

21  investigation shifted.  It was not Mr. Mohammed who brought up

22  the issue of drugs, it was someone else who brought it up, and

23  he went along with that.  But if someone is so involved in the

24  narco trade and uses it to such an extent to fund weapons,

25  there are many questions that will never be answered, and that

1    is:  Why would Mr. Mohammed end up at the opium stalls if he

2    had his own sources?  Clearly, we know from the evidence and

3    from the search warrant that he did not have poppy fields,

4    that he did not harvest poppies, that he was not in the

5    production of opium, and certainly he had no association,

6    there was no lab that he was associated with.

7            And so when Mr. Mohammed went to buy it and broker

8    this opium that was essentially going to go back to the DEA,

9    was to opium stalls right around the corner from the police

10   chief in the general market.  And in looking at the history

11   and circumstance -- the nature and circumstance of the

12   offense, we have to start out with, one, the drug component,

13   and also looking at the terrorism component.

14           And what you have then is Mr. Mohammed basically

15   going out and searching for narcotics.  If Mr. Mohammed could

16   go to the market right around the corner from the police

17   chief, which was out in the public, so could anyone for that

18   matter, go out and purchase opium and negotiate.  Clearly,

19   those four vendors were not -- their livelihood was not just

20   dependent on Mr. Mohammed showing up out of the blue and

21   making a purchase of the opium.  Those opium sellers were

22   there doing business for whoever wanted to purchase opium.

23           Somehow those opium sellers were allowed to exist.

24   They were allowed to apply their trade.  And for some reasons

25   those opium sellers did not come into the radar of either the

1   American forces or of the Afghani government.

2          Once the focus of the investigation changes

3   Mr. Mohammed, what we see is that he has no access to these

4   weapons.  I mean, during the course of this investigation that

5   takes place for over two and a half months has he ever been

6   seen with a single weapon?  He talks quite a bit, but he

7   doesn't come into possession of any weapons.  Who does come

8   into possession of weapons is the police chief, and he's able

9   to do that because he was provided a substantial amount of

10  money by the DEA.  And the police chief sends an underling

11  somewhere far out in Afghanistan in order to purchase rockets

12  that they are going to give to Jaweed.  But, in any event,

13  Mr. Mohammed never had access to weapons, he never possessed

14  them, but he did talk a lot.

15         So, what we have in looking at the nature and

16  circumstance of the offense is we have Mr. Mohammed espousing

17  a lot of hateful language, going publicly to buy drugs, and

18  not having access to any weapons.  And there was never any

19  evidence that in fact he had planned an attack, that he was

20  actually going to engage in an attack, that he had done

21  reconnaissance or even the fact that there were associates.

22         We never heard evidence of who were the associates

23  that Mr. Mohammed was working in the Garatek village or in the

24  larger Nangarhar province and that he was part of this cell.

25  Clearly, he talked about himself, but then we never found out

1    who he was working with locally.

2            So, in looking at the nature and circumstances of

3    the offense, the summary is -- in a period of two and a half

4    months, is that he purchases drugs at the behest of Jaweed,

5    who was doing it for the DEA.  And Mr. Mohammed does not have

6    any weapons.  But you put these things together and you have

7    these recordings in which Mr. Mohammed goes on about how he

8    hates Americans or infidels, and that these drugs are going to

9    go to the United States.  He doesn't even know where the

10   United States is.

11           All we know of Mr. Mohammed from the history of his

12   person is at most he traveled to the border area of Pakistan

13   and maybe inside of Pakistan and the other side of

14   Afghanistan.  That being the case, when you look as we're

15   required to under the statute 3553(a), to look at the crime of

16   what Mr. Mohammed has done, and to impose that or to reference

17   that into a sentence of life.  That his acts are reduced to

18   buying drugs on two occasions, talking about weapons that he

19   doesn't have, and saying that these drugs can go to America

20   and they should -- and Americans can be killed.

21           Hateful speech can be found anywhere.  Every

22   November during the anniversary of the hostage takeover in

23   Tehran, Iran, there's always a demonstration.  Effigies are

24   burned.  People say:  Down with America.  Death to America.

25   In Pakistan -- in rural Pakistan, every time there is one of

1    these drone missile attacks on suspected al-Qaeda or Taliban,

2    people come together, they start chanting:  Death to America.

3    They burn effigies.  They did that in Syria when there was an

4    attack over the summer.

5           So, what Mr. Mohammed has done is no different than

6    what we see throughout the Arab world or the Muslim world on

7    certain occasions.  Clearly, it doesn't predominant those few

8    instances, so what he's done is not all that remarkable or

9    unique.  But there he was in Garatek village and damning

10   America.  And being so far removed, over 7,400 miles away from

11   the United States in this remote village in Afghanistan, for

12   him to say:  May this heroin turn them into corpses.  Where he

13   doesn't even know where America is.  It's not realistic -- not

14   realistic because he has no sense of where it's going to go.

15   Because he's not saying, well, let's sell these drugs, this

16   heroin, to the soldiers because that would seem realistic

17   because the soldiers are there.

18          But these drugs going to America, where he doesn't

19   even know where America is.  And he's basically parroting what

20   Jaweed is saying as to whether it will go to France, London or

21   America, and he goes along with that.  Sure, he has knowledge,

22   but what is that knowledge, truly.

23          And then the history of the person.  What do we

24   know about Mr. Mohammed?  The history of the person within the

25   two and a half month span that he was being investigated.

1  Well, we know that, yes, he was running around and he was

2  talking about attacks, but there's a whole other history to

3  Mr. Mohammed.  And that is that Mr. Mohammed is married, that

4  he has six daughters, that he has two sons, that he has three

5  sisters and a mother, and that he supports all of them.

6       And every time I go to see Mr. Mohammed, from the

7  first time I've seen him, he talked about his family.  How he

8  misses his family.  How he was the man of the house.  And how

9  women in his village in his family are dependent upon the man

10 in the house.  That they are not going to be beggars, paupers,

11 and that who is going to look out for them is a total mystery.

12 And, clearly, that could be said -- it's your responsibility,

13 you brought this upon yourself.

14      But that history shows that there's a human side to

15 Mr. Mohammed, that he's not Pablo Escobar, that he's not Osama

16 bin Laden.  And that in those two and a half months we cannot

17 look at Mr. Mohammed, and say:  Well, you killed some people,

18 you are responsible for an actual attack.  There's no such

19 evidence.  So here we are in Washington, D.C., in the capital

20 of the United States about to impose a life sentence on

21 someone who didn't kill anyone.

22      Just last week the United Nations imposed a life

23 sentence on one Theoneste Bagosora.  He got a life sentence

24 for orchestrating genocide.  For being a main player in which

25 800,000 people were killed.  Here we have Khan Mohammed, two

 1   drug sales and talking a lot of filth, and about to receive a
 2   life sentence.
 3          Another case that can shed some light to the case,
 4   Mr. Hamdan, the former driver of Osama bin Laden, who was sent
 5   to Guantanamo Bay because he is of the worst, the worst of the
 6   worst, because supposedly that's where they go.  And instead
 7   of receiving a 30-year sentence or the life sentence that was
 8   being requested, the judge, Judge Keith Allred, said to
 9   Mr. Hamdan:  Mr. Hamdan, I hope the day comes when you return
10   to your wife and daughters and country and you are able to be
11   a husband and father in the best of all those terms.
12          I'm asking for a sentence of 20 years.  And the
13   reason I'm asking for a sentence of 20 years is because by the
14   time Mr. Mohammed would return, if he were in fact sentenced
15   to 20 years, he'd be close to 60 years old.  His country would
16   be dramatically different.  We don't know who would be in
17   power.  But a sentence of 20 years would allow him to go back
18   so that when he returns to Afghanistan, he'll for the first
19   time hear his language being spoken and not be stuck in
20   another country where all he hears for 24 hours a day, and for
21   years, he'll just hear noise.
22          And I worry and it's my concern for Mr. Mohammed's
23   competency.  We talked about competency, whether he's
24   competent to be sentenced, and he is competent to be
25   sentenced.  I worry about his competency.  About his mental

1   well-being as he sits in an American prison for years and

2   years without any possibility of talking to anyone who speaks

3   his native language.  A sentence of 20 years would allow

4   Mr. Mohammed to go back and see his daughters, his sons and

5   his wife.

6           Twenty years will incapacitate Mr. Mohammed.  It

7   will send him a message.  It will send him a message,

8   certainly, because when Mr. Mohammed first came into Federal

9   District Court he was requesting that a speedy trial -- he did

10  not want to waive or exclude time, and I had to beg with

11  Mr. Mohammed that it would be reckless and foolish to proceed

12  to trial within 70 days.  In fact, he said, this can be

13  resolved in two weeks.  I don't understand where he got that

14  type of thinking or analysis, but finally I prevailed upon

15  him.

16          Now, he knows that clearly this is not a matter

17  where it was going to be resolved in two weeks or a month,

18  that he was going to be able to go back home, that this was a

19  misunderstanding.  No, he knows that this is real, that in

20  fact there was a trial and that people came from his own

21  country and testified against him.  And what Mr. Stiglitz said

22  is correct, that he did have a fair and public trial.

23          But in sentencing Mr. Mohammed to life for the

24  crimes that he committed doesn't commensurate.  It doesn't

25  commensurate because it would try to impart on Mr. Mohammed

1  that what he did was completely wrong.  Twenty years is

2  sufficient.

3          He is going to be deterred.  A 60-year old man

4  returning to Afghanistan is not going to be able to go around

5  looking for weapons, planning things.  He's going to go to a

6  society that he won't recognize.  The sentence talks about --

7  the sentencing statute mentions vocational training and

8  rehabilitation, fine.  He doesn't deserve vocational training,

9  he's not going to get rehabilitation, but the sentence should

10  not be one so that it becomes harsh, burdensome and basically

11  dehumanizing.

12          There are cases regarding different levels or

13  severity of punishment in the case of Smith.  If there is a

14  case for a type of incarceration that is unique, and which

15  very few have to suffer, well, here is the case of

16  Mr. Mohammed.  Since Mr. Mohammed first came to the District

17  of Columbia he's been in isolation.  He's been locked down 24

18  hours, seven days a week.  Every legal visit he comes up

19  chained from the waist and on his legs.  Any time that he

20  needs something, what has to happen is that a counselor has to

21  get on a language line, and if there is an available

22  interpreter, they'll speak to the interpreter and then they'll

23  contact me.

24          In my last visit with Mr. Mohammed, he asked me:

25  Will you be able to see me?  And I said:  Mr. Mohammed, I

1   don't think that's going to happen because where you're going
2   to go is going to be very far away.  And even if I wanted and
3   I would like to see you, I can't see you because I won't be
4   able to speak to you.  I will not be able to afford the
5   services of an interpreter.

6           And so what I see is Mr. Mohammed basically
7   deteriorating where he won't be able to talk to anyone.  Where
8   everything that is remotely -- where everything that he knows
9   that is part of his life of his culture will no longer be
10  present.  Early on when Mr. Mohammed first came to the D.C.
11  Jail I asked if he could be transferred in a unit where there
12  were other Muslims so that at least he could at least have
13  religious services.  That was denied.  Mr. Mohammed is not
14  allowed to go to religious services.

15          On one occasion he said to me, I've heard the
16  prayer -- the call to prayer, the muezzin.  He said, I heard
17  it, and is it possible for me to participate in those
18  circumstances?  He cannot participate in those services.  So,
19  something that is fundamental to him, almost like a basic
20  human right, the right to worship -- to worship with others,
21  he can't do.  That has been denied of him.  And as he sits in
22  the American prison for the remainder of life, there's no
23  reason why that should be taken away from him.  There's no
24  reason why he should not be able to participate in the call to
25  prayer.

1          What Mr. Mohammed has done is wrong, there's no

2   denying that.  All we're asking for is for the Court to impose

3   a sentence that commensurates with his acts.  It would be a

4   totally different situation, and I would not be making this

5   request if there was evidence that Mr. Mohammed was a habitual

6   drug dealer.  That in fact he was responsible for attacks that

7   were verified and that people were either killed or injured,

8   and that those injuries and attacks were his responsibility or

9   that he was responsible for, and that he instigated those

10  attacks.  Well, here we are without such evidence.

11         Because the statute contemplates rehabilitation and

12  vocational training and also deterrence, a sentence of 20

13  years -- or maximum 25 years would be sufficient to satisfy

14  those requirements.

15         THE COURT:  All right.  Mr. Mohammed.  Does he wish

16  to address the Court?  He can if he wishes.

17         THE DEFENDANT:  Yes.

18         THE COURT:  Why don't you come up.  Whatever is the

19  easiest way for you, Mr. Saidi.  What I would ask,

20  Mr. Mohammed, is that you do them in shorter sentences so Mr.

21  Saidi can actually translate it for me, okay?

22         INTERPRETER:  Your Honor, should I translate

23  simultaneously?

24         THE COURT:  Whatever works for you.  I just want to

25  make sure that we get everything that he actually says.  Mr.

1    Saidi, if you're going to speak, you need to have the mic

2    because that's what's going to be recorded is what's in

3    English.

4              INTERPRETER:  Thank you.

5              THE DEFENDANT:  I respectfully request from Your

6    Honor to find -- to give me information about my family -- to

7    give you information about my family.  I have five daughters.

8    Four of them are attending school and one is really young.

9    And I have two sons, one is attending school and one is too

10   young to attend.  I have three sisters, one of them have

11   mental ability.  I have one mother who is really old.  And I

12   have one wife.  And then there are seven other family members,

13   most of them really young kids.  Their whole life depends on

14   me.  I'm extremely worried about their livelihood.

15             In here I am situated in a place where in one month

16   time I cannot communicate with people that I want to

17   communicate.  I'm unhappy from my respectable attorney.  Had

18   he traveled to Afghanistan before the trial and brought all

19   the detail and information about my life, it was possible that

20   the result of the trial would have been not the same.  And I

21   also said respectfully to the government attorney, the

22   prosecutor, that they are forcing someone.  Is it like they

23   are framing someone to do something illegal.  In Afghanistan

24   in our area there is no house without opium.

25             This is what people do for their living.  They are

1    not doing it because they are against America or any other

2    country, they do it because this is the way of making their

3    living.  If Your Honor go to the opium market in our area

4    there will be more than 10 people who would ask you if you

5    want to buy or sell opium.  I really do not understand, why do

6    I have to be sentenced for so long.

7            When I think of my family members, my children, I

8    have no power to describe to you what kind of problem I have.

9    I am in -- my family is located in a place where women are not

10   allowed to go out of their house.  There is no head of

11   household in my family.  I requested many times if the

12   Government can help my family, but no one hear my request.  I

13   apologize that I cannot express my feeling openly because when

14   I think about the women, I just cannot continue speaking

15   anymore.

16           I know in Afghanistan many people commit terrorist

17   acts, and I did not do anything that I should be -- deserve to

18   serve that much time.  I respectfully request Your Honor and

19   the prosecutors to reduce my time and also eventually to give

20   me time so I can speak with the prosecutors, too.  If I tell

21   you the truth, I cannot tolerate to serve even one year.

22           THE COURT:  I didn't catch what -- what did you

23   say, you cannot --

24           INTERPRETER:  Even one year.

25           THE COURT:  Oh, okay.

1              THE DEFENDANT:  Even though the Americans are

2      treating me nicely here.  They feed me well.  They take care

3      of my medical problem.  And I had surgery, they did for

4      nothing.  I'm really happy with the Americans.  I heard in

5      America if someone lie, this is perjury, and there is a two

6      year sentence for that.

7              I'm happy that the Americans allow me in my jail to

8      pray, read the Koran and pray five times a day.  But when I

9      think about my family member, about my children, and how I was

10     brought to America, set up or framed, then I just cannot

11     understand that.  When I first came to the United States, I

12     was thinking that America will keep me here only for a month,

13     not more than that.

14             Now, if I even stay here more than a year my family

15     members, who are 10, and they all depend -- used to depend on

16     me, plus eight members of my brother family, who is deceased,

17     I take care of them.  I was responsible for their livelihood.

18     And I can swear to that, that except the time that I'm serving

19     in jail here I've never been out of my house or away from my

20     family, not even for two days.  But for the last two years or

21     more that I am incarcerated, I really do not worry about

22     myself but I'm very much concerned about my family members and

23     the women in my family.

24             Because of my extensive family, I used to work as a

25     peasant.  I used to work on my own farm.  And I also used to

1  work with other agencies to get enough money to feed my family

2  members.  I'm sorry that I cannot continue to speak anymore.

3  But my final request from Your Honor, from the prosecutors and

4  all the other people in the court is for God's sake, just

5  reduce my time, and I beg you to do that.  What I did -- for

6  the sake of my little children, please help me.  Because of my

7  woman, please help me.  For the young kids of my deceased

8  brother, please help me.

9         Even if I am incarcerated for two more years, I

10  know that I would have heart attack.  I'm sorry, I cannot

11  speak anymore, but I kindly request from Your Honor to reduce

12  my time.

13         THE COURT:  All right.  Why don't we take a -- I

14  think we've been going since 2:30, let me take a 10 minute

15  break and give him an opportunity to compose himself.  It's

16  4:00, we'll be back at 10 after.

17  BRIEF RECESS

18                          AFTER RECESS

19         THE COURT:  All right.  In addition to the advisory

20  sentencing guidelines, the Court considers the pleadings,

21  arguments and record in this case, in addition to the

22  following information in determining a fair, appropriate and

23  reasonable sentence in conformance with the factors set out in

24  18 U.S.C. 3553.

25         The Defendant states that he believes he is 38

1  years old.  There is no criminal history.  In terms of

2  education, he's had two months of schooling and is

3  self-described as illiterate.  In terms of a job, he's a

4  vegetable farmer.  Also receives a small stipend for a

5  position as the Chief Elder in his Garatek village.  Evidently

6  had been involved with an NGO, it wasn't clear to me whether

7  he received any remuneration for that.

8          In terms of finances, the Defendant inherited, with

9  siblings, a home and land in Afghanistan from his father.  The

10  Defendant was detained in Afghanistan at the Bagram Air Base

11  from October 29th, '06 to November of '07.  I'll find that he

12  has no financial ability to pay a fine.  There are no

13  substance abuse issues.

14          In terms of physical condition he has, since being

15  in the United States, been treated for tuberculosis.  A

16  thyroid mass was removed from his neck.  He's been treated for

17  a stomach ulcer.  He did go on a hunger strike from June 12th

18  of '08 to June 20th, which has had some lingering effects on

19  his physical conditions, which is described as poor.  In terms

20  of mental health/emotional, the D.C. Jail records indicate

21  that he was diagnosed with a major depressive disorder.  He's

22  been on some medication, he was diagnosed in July.

23          On a personal basis, the Defendant was born into an

24  intact family in the Garatek village in Chaprahar district in

25  Nangarhar province in Afghanistan.  The Defendant is one of 14

1   children born to his father who is deceased.  His father was a

2   landowner and chief of the village.  The Defendant's mother

3   lives in the Defendant's compound.  One brother was killed by

4   an explosive in the war with Russia.  He has a half brother

5   who is a principal at a local high school.  He also has eight

6   sisters and two half sisters.  One sister is deceased.  Three

7   sisters live in his compound.  The Defendant was married when

8   he was approximately 22 years old and his wife was 14 years

9   old.  They have seven children, two sons and five daughters,

10  ranging in age from 14 to age 3.

11          The Defendant, as he has expressed today, is

12  concerned about his family, what is happening to them,

13  particularly as to the women in his family.  As he's

14  indicated, they don't work outside the home or go out of the

15  home.

16          In terms of the offense conduct, a witness from

17  Afghanistan using the pseudonym Jaweed, who knew the Defendant

18  from their village, they grew up together.  The Defendant is a

19  little older than Jaweed.  Both Jaweed and the Defendant were

20  farmers.  The Defendant, as I indicated, was also involved

21  with an NGO.  Jaweed had moved with his family to Pakistan

22  because of the drought.  Jaweed was summoned to obtain a

23  meeting with Abdul Rahman, who was living in Pakistan, was a

24  former Taliban leader, the director of investigations.  He

25  also was from the Garatek village.

1          At this first meeting Jaweed was told that Rahman

2     was considering a role for him back in Afghanistan.  He was

3     called back to meet him at a later point.  Rahman told Jaweed

4     to return to Afghanistan to obtain missiles and attack

5     Jalalabad airport.

6          When Jaweed indicated that he didn't know how to do

7     that, Rahman told him to contact the Defendant, Khan Mohammed,

8     that they would be partners in getting the missiles and

9     attacking the airport, a facility used by U.S. and NATO

10    forces.  When Jaweed returned to Afghanistan he was afraid not

11    to follow the orders of the Taliban.  He met up with the

12    Defendant, who sought him out, who had already been contacted,

13    the Defendant, by Rahman.

14         The Defendant told Jaweed, that he, Jaweed, would

15    need to get the missiles, the rockets.  They have been

16    described as missiles or rockets, in order to build up trust

17    with the Taliban.  Jaweed did not want to carry out this

18    mission assigned to him by the Taliban.  He asked the advice

19    of a friend who was a body guard for a government official,

20    and Jaweed was put in contact with Colonel Latif, the police

21    chief at the time of the Chaprahar district, another witness

22    at the trial, who upon learning of the Taliban plan contacted

23    agents of the DEA with whom he had been involved in joint

24    investigations.

25         The DEA agents gave Jaweed an audio recorder and

1   later a video recorder, and therefore, there is a record of

2   the incriminating conversations between the Defendant and

3   Jaweed.  And there would be no reason for the Defendant not to

4   be frank with Jaweed, as he had been sent by Rahman to carry

5   out these attacks regarding the planned terrorist activities.

6   The missiles and later sales of the 11 kilograms of opium,

7   sales of two kilograms of heroin, which are all also on the

8   video.

9        The Defendant stipulated that the Taliban was a

10  terrorist organization.  Evidence proved that the Defendant

11  was a member of the Taliban in contact with two Taliban

12  leaders, which I've described, living in exile in Pakistan,

13  but still involved in terrorist activities in Pakistan.

14  Rahman, I have described as the director of investigations in

15  the Taliban government, and Habib Zai, also a leader in the

16  former Taliban government, a sub-governor of a county other

17  than Chaprahar county.

18       The Defendant had been contacted about Jaweed and

19  the plan to procure missiles, and was expected to collaborate

20  in the attack on the airport.  The Defendant admitted on these

21  tapes being in continuing contact with the Taliban in

22  Pakistan, indicating that he both visited them in Pakistan and

23  went with them in Afghanistan when they came to plan -- when

24  they, Rahman and Habib Zai and others, came to Afghanistan to

25  plan terrorist attacks on U.S. and NATO forces and the Afghani

1    government and those sympathetic to them.

2            The Defendant also stated in these recorded

3    statements that he only engaged in those terrorist attacks if

4    the Taliban approved them, so he would be paid and reimbursed

5    for his expenses.  The Taliban would have paid for the missile

6    attack.  And he said that he and Rahman and Habib Zai spoke,

7    as he put it, with one voice.  He also indicated that he

8    admitted attacking with rockets the Afghani Chief's County

9    office with Taliban approval and setting mines to blow up

10   government cars.  And that he was paid by the Taliban for

11   doing this.  He planned on attacking the Jalalabad airport and

12   the police station with Jaweed.

13           The Defendant on these conversations was very

14   conscious that he needed to act in a clandestine manner and

15   keep the discussions with Jaweed secret, because he understood

16   he was working against the government and was concerned about

17   informers and having the weapons found in his home.  So, there

18   is a number of discussions about being careful about what they

19   said.  Who was around when they had these discussions.  The

20   fact that nothing should be kept in their house or the

21   compound.  Should be hidden or buried elsewhere.

22           And the Defendant was planning on meeting with the

23   Taliban before carrying out the last of the offenses, and so

24   it's not -- it's unclear whether there were others involved

25   and whether he would have told Jaweed if others were involved,

1   since he was very careful to be -- to discuss only as much as

2   he needed to.

3        The Defendant talked of having mines, mortars,

4   warheads, bullets and others weapons which he kept hidden away

5   from his compound, all to be used to engage in terrorist

6   activities.  The Defendant also expressed a support for

7   violent jihad against infidels, killing Americans, eliminate

8   the American infidels, attacking wherever American and foreign

9   forces were stationed.  He said, quote:  It is the Taliban

10   plan to eliminate the westerners.  To get infidels out of the

11   country.  Need to get rid of infidels.  Jihad is allowed

12   religiously against infidels.  And if a Muslim is on their

13   side and gets shot, that is allowed also.  Infidels need to be

14   killed.  Unquote.

15        The Defendant describes selling opium and heroin to

16   be sold abroad, particularly in the United States, as another

17   way of carrying out jihad.  Drugs is another weapon in his

18   arsenal to kill Americans.  The DEA became concerned about

19   allowing the Defendant actual access to any missiles or

20   rockets, so Jaweed at their direction told the Defendant that

21   the missiles that had been buried had been stolen.  The

22   Defendant was very upset and angry with Jaweed, and you can

23   hear this in the recorded conversations.

24        They then moved on to having Jaweed buy the opium

25   and the heroin, allegedly, of course on behalf of somebody

1  else with the help of the Defendant, who had been involved in

2  drug trafficking before and knew the trade.  I won't go over

3  and repeat that evidence.  But, as I've indicated, the idea of

4  selling the drugs was also to get the car and various other

5  things related to the terrorists.

6          I would also indicate that in terms of -- there was

7  testimony that the sellers at the market don't have the drugs

8  with them, they only negotiate with those that they know.  So,

9  I'm not sure who would have gone in that they necessarily

10  would have -- the sellers would have sold to people they

11  didn't know.  At the same time Jaweed indicated, as these drug

12  sales were discussed and going on between Jaweed and the

13  Defendant, that he had found more missiles.  And the Defendant

14  indicated that he had a source for the warheads for these

15  missiles.

16          The Defendant was waiting for the Taliban leaders

17  to meet with them to plan the attack.  He indicated in the

18  recorded conversations that he, the Defendant, that their

19  arrival had been delayed because they had needed to keep on

20  the move, that is the Taliban leaders.  When the Defendant was

21  arrested, the Defendant had brokered the sale of the opium and

22  heroin and was planning to attack with his missiles on the

23  airport, not knowing that Jaweed was a confidential informant,

24  but thinking that they now had some new missiles that they

25  could use.

1             And if they weren't able to come up with more

2    people to be involved in the attack on the airport, since he

3    seemed to recognize that if only he and Jaweed were involved

4    that they then would go ahead and attack the police station.

5             Although we only have the Defendant's statements

6    about attacking government cars with mines and having other

7    weapons, there's no reason to tell Jaweed this unless this was

8    correct.  I would also note that Rahman, the Taliban leader,

9    told Jaweed that the Defendant was the person to help him plan

10   the attacks.  So, the Taliban sent him directly to the

11   Defendant.  This isn't Jaweed enticing the Defendant into

12   getting involved with this.

13            There was an additional departure, 2D1.1, Note 14,

14   a sentencing entrapment, which is a basis for a downward

15   departure.  The entrapment departure is described as a

16   sentencing entrapment or sentencing factor.  Manipulation

17   occurs when a defendant, although predisposed to commit a

18   minor lessor offense, is entrapped into committing a greater

19   offense subject to greater punishment.  And the Defendant

20   argued that this started with missiles.  Jaweed introduced the

21   discussion of the drugs, opium and heroin, and Jaweed

22   introduced America as the final destination.

23            When you look at the Application Note 14, which

24   explains when this is used, it's considered a reverse sting,

25   really, an operation in which a government agent sells or

1   negotiates to sell a controlled substance to a defendant.  And

2   the government agent sells at a price substantially below the

3   market value so the buyer and the defendant -- the

4   buyer/defendant purchases significantly more drugs than the

5   defendant, who is the buyer, would have ordinarily been able

6   to purchase, increasing the exposure.  And at sentencing a

7   downward departure may be warranted.

8          In this particular case the Defendant set the

9   price, was willing to sell whatever amounts Jaweed wanted,

10  inspected the drugs.  I will rely on a couple things.  One, on

11  my written memorandum, opinion and order dated May 15 of '08,

12  denying the request for jury instruction based on entrapment,

13  and the discussion that is contained in there.  And I'll

14  incorporate it as part of this sentencing.  And facts, as we

15  have in this case, do not meet the elements of entrapment or

16  reverse sting.  So, the Court in its discretion will not

17  depart downward on this basis.

18         There were various other requests for departures, I

19  would title them in general as the onerous conditions of

20  confinement.  The Defendant has indicated he's under severe

21  administrative segregation, far more onerous conditions than

22  other prisoners convicted of importing heroin.  And part, I

23  think, is because of the terrorist activity and because of the

24  concern initially about his potential contacts back to

25  Afghanistan.  While there were two government witnesses that

1   were still there coming here to testify, and presumably were

2   returning, and we used pseudonyms for both of them as part of

3   this.  I don't know whether that will continue into his

4   confinement or would need to continue into his confinement for

5   any length of time.

6            The Government has indicated, and I think to some

7   degree it's speculative as to where he's going to be placed.

8   I would say, again, that this is not just drug trafficking, it

9   has the terrorist aspect of it, which makes it unique among

10  criminals, even though he does not have a prior criminal

11  record.  There's a high likelihood of recidivism.  It is

12  difficult to rehabilitate in the usual sense, and obviously,

13  the need to incapacitate is certainly something of concern.

14           In terms of the issue of the religious services,

15  the Bureau of Prisons I think has a different approach to

16  that, based on other cases that I've had.  I won't speak at

17  this point to it because I don't know what they will actually

18  do.  But they do make different arrangements in terms of

19  giving access to the religious individuals that can come to

20  the Bureau of Prisons.

21           I would also note that Agent Follis testified

22  that two kilograms of heroin, in terms of the street value in

23  the United States, would be $1.36 to $3.06 million.  If you

24  want to compare him to other drug dealers, he's not small

25  time, even if he wouldn't have received the profits from the

1    sales in the United States.  So, based on these additional

2    conditions of request for departures, the Court will not in

3    its discretion formally depart, I'll consider it as one of the

4    factors.

5              I would say that sentencing is very difficult and

6    probably the most difficult thing that a judge does, and

7    requires very serious consideration.  In my interactions with

8    you, Mr. Mohammed, I found you to be intelligent and you're

9    articulate.  Such as your statements and your actions, I

10   think, are deliberate.  The audio and video reveals your

11   thoughts and your beliefs.  I think it's clear that you're a

12   member of the Taliban.  I think it's clear that you're a

13   terrorist.  You're also somewhat of an opportunist, but I

14   think the terrorist aspect of it overcomes it.

15             Your statements reflect not only your Taliban

16   ideology, your hostile feelings toward the present Afghani

17   government, it's officials, and those who side with it.  But

18   also reflect your undiluted hatred of Americans, particularly.

19   I mean, if Jaweed had not gone to Colonel Latif, you might

20   very well have been the one to attack the Jalalabad airport

21   and police station.  You, of course, didn't know that Jaweed

22   was not a Taliban sympathizer.

23             As for the opium and the heroin, you gleefully

24   celebrated the prospective deaths of Americans plagued with

25   drug abuse problems.  And as Agent Follis testified, in 2006

1  Kabul, Afghanistan, was the single source of 92 percent of the

2  world's heroin consumption.

3          Although you wouldn't have profited from the street

4  sales of the drugs you sold Jaweed in the same sense that the

5  sales here in the United States would, certainly over

6  $1 million to $3 million in street values, that's not an

7  insubstantial profit.  And I'm assuming that it would have

8  been somewhat commensurate  at your end.

9          Without individuals like you willing to sell opium

10  and heroin, I'm not talking about in your own country, but

11  expecting a profit in Afghanistan, if not in the United

12  States, the heroin addict would be more easily treated and new

13  users would not be so plentiful.  Drug trafficking takes a

14  toll on communities, which you are well-aware of from your

15  statements.

16          Your motivation to wage war against the United

17  States and its citizens through selling of opium and heroin to

18  destroy lives, communities, and most especially through what

19  you view as violent jihad, or attacks with mines, missiles,

20  mortars, bullets, against U.S. and foreign forces and Afghani

21  government, is to accomplish by both means, through coercion,

22  intimidation, retaliation, death, injury and destruction.  The

23  fact that no one died is only because you didn't get the

24  missiles, although you certainly tried hard enough.

25          You've admitted setting mines to blowing up

1    government cars.  We don't know if people actually died or

2    not.  Those types of attacks are fairly common in a war zone.

3    This is a very serious offense, as I've laid out on the

4    record, so I'm not going to belabor that.  You have stated,

5    understandably, that you do not want to spend any more time in

6    prison.  There are also severe consequences to your actions,

7    one of which is facing prison.  And those inevitably affect

8    your family.  And, frankly, that's true of most defendants.

9         If defendants consider their families before they

10   engaged in criminal conduct, maybe they wouldn't have engaged

11   in the conduct.  Worrying about the consequences later doesn't

12   change the seriousness of the offense that you committed.

13   Other people are affected, and that's obviously -- they were

14   not involved in the crimes, you were, but you gave no

15   consideration to it at the time that you were doing it.

16        You are entitled to put the Government to the test

17   and require them to prove the charges.  So, you're not going

18   to be sentenced by me to a higher sentence because you went to

19   trial, you're entitled to have a trial.  But in your statement

20   today I heard concern for yourself, I heard concern for your

21   family, I heard an excuse for being involved with opium,

22   everybody does it, but no acceptance of responsibility for

23   your actions.

24        Now, in terms of what you will receive, the Court

25   is to consider various aspects, comparing what you'd get

1   outside versus inside.  You will receive medical care as it

2   has already been provided to you, and you obviously will need

3   some additional care.  It's going to be up to you whether you

4   engage in any constructive programs while you're incarcerated.

5        I agree with the Congress and the Sentencing

6   Commission that acts of terrorism and terrorists pose a

7   particularly grave threat because of the dangerousness of the

8   crime.  And terrorists stand unique as criminals and therefore

9   make it difficult in terms of sentencing because there's

10  minimal likelihood of rehabilitation.  I didn't hear it in

11  your statement.  The maximum likelihood of recidivism.

12  There's also a great need to incapacitate.

13       I will also say, listening to the evidence, that

14  the case is a product of extraordinary efforts by the DEA

15  agents in a war zone.  I think all of the factors, and all of

16  them are important, but probably the most important is

17  deterrence in this particular case, I think it's paramount.

18       And I have to say that two Afghanis from different

19  walks of life, the farmer, Mr. Jaweed, and a law enforcement

20  officer, Colonel Latif, I don't know what their real names

21  are, showed great courage in bringing you to justice and in

22  placing themselves and their families, because they had

23  families at issue as well, and they made a choice, and they

24  obviously thought about it.  And we had testimony relating to

25  some of that.  They placed not only themselves but their

1   families in jeopardy, particularly Jaweed.  The police chief

2   as well, but he is at least within law enforcement.  And,

3   also, they came to this country to testify, they used

4   pseudonyms, but it's still an act of courage to come and put

5   them out in a more public trial.  They participated in our

6   criminal justice system.

7          You've been afforded all of the rights a U.S.

8   citizen would have been afforded.  And you've been convicted

9   in large measure, if not 99 percent of it, with your own

10  words.  Words that you have spoken.  This isn't someone who

11  came and said you said this.  These are words that you

12  yourself spoke.  I, therefore, find that the advisory

13  sentencing guideline sentence in this case is the fair and

14  appropriate sentence, and I see no grounds that rise to the

15  level of supporting a departure or variance from that

16  sentence, and I've given careful consideration to that, since

17  the Court needs to explain when you do a departure and

18  variance.

19         Also, to be clear, I could impose the same

20  sentence, even if the terrorism enhancement did not apply.  I

21  don't impose the sentence without due consideration that this

22  is a severe sentence, but one that I think under the

23  circumstances is fair, appropriate and reasonable.

24         It is the judgment of the Court that you, Khan

25  Mohammed, are hereby committed to the custody of the Bureau of

1    Prisons for concurrent terms of life on each counts, Counts 1

2    and 2.  You are further sentenced to serve a 60 months term of

3    supervised release on each count.  Pay a $200 special

4    assessment.  The special assessment is immediately payable to

5    the Clerk of the Court for the U.S. District Court.

6         Within 30 days of any change of address you'll

7    notify the Clerk of the Court of the change until the

8    financial obligation is paid in full.  You shall make payments

9    on the special assessment through your participation in the

10   Bureau of Prisons Inmate Financial Responsibility Program.

11   Should you be released, within 72 hours of release you'll

12   report in person to the probation office in the district to

13   which you are released.

14        While on supervision you shall not possess a

15   firearm or other dangerous weapon, not use or possess an

16   illegal controlled substance, not commit another federal,

17   state or local crime.  Also abide by the general conditions of

18   supervision adopted by the U.S. Probation Office, as well as

19   the following special conditions.  The statute requires that

20   for all felony offenses you submit to the collection and use

21   of DNA identification while incarcerated in the Bureau of

22   Prisons or the direction of the U.S. Probation Office.

23        The Court evidently is required to put in a

24   deportation compliance provision.  You shall comply with the

25   Bureau of Immigration and Customs Enforcement Immigration

1    process.  If deported, shall not re-enter the United States

2    without legal authorization during the period of supervision.

3    Should you receive permission to return to the United States,

4    you shall report to the U.S. Probation office in the area

5    where you intend to reside within 72 hours of your return.

6    The probation office shall release the presentence

7    investigation report to all appropriate agencies in order to

8    execute the sentence of the Court.

9            This is an important right.  You have a right to

10   appeal the sentence imposed by the Court and all that is

11   involved with the trial.  If you choose to appeal, you must do

12   so within 10 days after the Court has entered judgment in this

13   case.  You must talk to your lawyer about this.  What happens

14   is that if you wish to do so, cannot afford to appeal the

15   sentence or any matters related to your trial or what's been

16   involved in this case, you can file this without cost to you.

17           Your lawyer needs to simply file the notice.

18   Briefs, et cetera, can be done at a later point, but it is

19   important that you do this and that you talk to your lawyer

20   about that if you wish to do so.  If you're unable to afford

21   the cost of an appeal, you can request permission from the

22   Court to file an appeal at the expense of the government.

23           Mr. Vanegas, if there is a particular place, after

24   consideration, that you want the Court to recommend, I don't

25   guarantee that they will follow it, they haven't been

1   recently, but if you want to recommend a particular place, let

2   me know, and I'll consider the recommendation.

3           MR. VANEGAS:  Yes, Your Honor.

4           THE COURT:  All right.  Good luck, Mr. Mohammed.

5   Parties are excused.

6   END OF PROCEEDINGS AT 4:55 P.M.

7

8

9                  C E R T I F I C A T E

10          I, Lisa M. Hand, RPR, certify that the

11  foregoing is a correct transcript from the record of

12  proceedings in the above-titled matter.

13

14

15

16                          _____

17                          Lisa M. Hand, RPR

18

19

20

21

22

23

24

25