## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,

v.

KHAN MOHAMMED,

    Defendant.

**Criminal No. 06-357 (CKK)**

## MEMORANDUM OPINION
(July 22, 2016)

On May 15, 2008, Khan Mohammed ("Mohammed") was convicted by a jury in this Court of one count of distributing one kilogram or more of heroin intending or knowing that it will be unlawfully imported into the United States (Count I) and one count of distributing a controlled substance knowing or intending to provide anything of pecuniary value to a person or organization that has engaged in terrorism or terrorist activity (Count II). This matter is before the Court on remand from the United States Court of Appeals for the District of Columbia Circuit to hold an evidentiary hearing on Mohammed's ineffective assistance of counsel claim that was raised on direct appeal. *See United States v. Mohammed*, 693 F.3d 192, 202-05 (D.C. Cir. 2012).

After the issue was remanded to this Court, Mohammed filed his [118] Motion to Vacate His Conviction, or in the Alternative for Resentencing, Based on Ineffective Assistance of Counsel, and his [137] Motion for Hearing on Pending Motion to Vacate Conviction or in the Alternative for Resentencing. The government filed a [161] Motion to Re-Characterize Defendant's March 1, 2013 filing As a Motion Pursuant to 28 U.S.C. § 2255. All of the pending motions are fully briefed. Pursuant to the Court's Orders, the government filed affidavits from Mohammed's trial counsel, Carlos J. Vanegas and Danielle C. Jahn, and the Court held an

evidentiary hearing on December 3, 2015, regarding Mohammed's ineffective assistance of counsel claim.

Upon consideration of the parties' submissions,[1] the evidence provided during the evidentiary hearing, the relevant authorities, and the record as a whole, the Court finds no grounds for setting aside Mohammed's conviction and sentence at this time. For the reasons described herein, the Court shall DENY Mohammed's [118] Motion to Vacate His Conviction, or in the Alternative for Resentencing, Based on Ineffective Assistance of Counsel, DENY AS MOOT Mohammed's [137] Motion for Hearing on Pending Motion to Vacate Conviction or in the Alternative for Resentencing, and DENY the Government's [161] Motion to Re-Characterize Defendant's March 1, 2013 filing As a Motion Pursuant to 28 U.S.C. § 2255.

## I. BACKGROUND

---

[1] While the Court renders its decision today on the record as a whole, its consideration has focused on the following documents, listed in chronological order of their filing: Def.'s Mot. to Vacate His Conviction, or in the Alt. for Resentencing ("Def.'s Mot. to Vacate"), ECF No. [118]; Govt.'s Sld. Opp'n to Def.'s Mot. to Vacate ("Govt.'s Sld. Opp'n"), ECF No. [123]; Def.'s Sld. Reply to Govt.'s Opp'n to Def.'s Mot. to Vacate ("Def.'s Sld. Reply"), ECF No. [128]; Def.'s Mot. for Hrg. On Pending Mot. to Vacate Conviction or in the Alternative for Resentencing ("Def.'s Mot. for Hrg."), ECF No. [137]; Govt.'s Resp. to Def.'s Mot. for Hrg. ("Govt.'s Resp. to Def.'s Mot. for Hrg."), ECF No. [138]; Def.'s Reply to Govt.'s Resp. to his Mot. for Hrg. ("Def.'s Reply to Mot. for Hrg."), ECF No. [139]; Def.'s Notice in Resp. to the Ct.'s Order of May 8, 2015 ("Def.'s Notice"), ECF No. [142]; Govt.'s Notice In Resp. to Ct.'s Order of May 8, 2015 ("Govt.'s Notice"), ECF No. [149]; Def.'s Resp. to Govt.'s Notice of July 23, 2015, & the Accomp. Decls. of Carlos Vanegas & Danielle Jahn ("Def.'s Resp. to Govt.'s Notice"), ECF No. [152]; Govt.'s Resp. to Def.'s Sept. 2, 2015 Filing ("Govt.'s Resp. to Def.'s Resp."), ECF No, [153]; Govt.'s Mot. to Re-Characterize Def.'s Mar. 1, 2013 Filings as Mot. Pursuant to 18 U.S.C. § 2255 ("Govt.'s Mot. to Re-Characterize Def.'s Mot. as § 2255"), ECF No. [161]; Def.'s Opp'n to Govt.'s Mot. to Re-Characterize Mar. 1, 2013, Filing as a Mot. Pursuant to 18 U.S.C. § 2255 ("Def.'s Opp'n to Govt.'s Mot. to Re-Characterize Def.'s Mot. as § 2255"), ECF No. [162]; Govt.'s Reply to Def.'s Dec. 21, 2015 Opp'n ("Govt.'s Reply to Mot. to Re-Characterize Def.'s Mot. as § 2255"), ECF No. [163]; evidence presented at trial and at the evidentiary hearing held on December 3, 2015, as well as transcripts of status and evidentiary hearings and trial.

This matter comes before the Court on remand from the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit"), which summarized the factual scenario leading to the indictment in the instant action:

> While living in Pakistan in 2006, a man named Jaweed, who hailed from the village of Geratak in Afghanistan's Nangarhar province, fell in with Abdul Rahman, a former Taliban official for the Jalalabad province of Afghanistan also living in Pakistan. Rahman was plotting an attack on the Jalalabad airfield, a strategic NATO airbase in eastern Afghanistan, and instructed Jaweed to return to Geratak and contact a fellow villager, Khan Mohammed, who was also involved in the plot and needed help. Jaweed did as he was told and visited Mohammed, who brought him into the planning of the attack, directing him to obtain the missiles that would be used in the strike.

> But Jaweed soon turned against Rahman and Mohammed and disclosed the plot to Afghan authorities. The Afghan police persuaded Jaweed to continue his role in the plot, but to become their informant. When primary responsibility for the investigation was turned over to agents of the U.S. Drug Enforcement Administration (DEA) deployed in Nangarhar, Jaweed worked with them as well. The DEA agents wired Jaweed and recorded several of his conversations with Mohammed in August and September 2006.

> In the first of those conversations, Mohammed discussed with Jaweed details of the attack on the airfield and claimed that he had not only the same purpose as Rahman, but the same authority. Hearing his plans and his boast, the DEA decided to arrest Mohammed soon after Jaweed had given him the missiles. Concern about losing control of the missiles once they were in Mohammed's hands, however, led to a different strategy. The DEA would arrest Mohammed for narcotics trafficking. Following this plan, Jaweed told Mohammed he had a friend looking for opium. Mohammed replied that he knew a source who could supply as much as Jaweed's friend needed. Jaweed and Mohammed met three more times to iron out details, such as the price for the opium and Mohammed's commission. These discussions also included plans for the attack on the airfield. For example, during one of the meetings Mohammed said they needed a car to secure the missiles. *See* Government Trial Ex. 2C (Mohammed, stating that they would "tightly and firmly load [the missiles] in our car"). Eleven days later, Mohammed announced at another meeting that he would use the profits from the drug sale to buy a car, which could help carry out more drug deals.

> The opium deal went off without a hitch. Jaweed accompanied Mohammed to a local bazaar where Mohammed negotiated the sale with his source. The next day,

> Jaweed accompanied Mohammed to the seller's home and secretly videotaped Mohammed inspecting, paying for, and taking away the opium he then sold to Jaweed. Pleased with the results, the DEA agents told Jaweed to orchestrate another sale, this time for heroin. When Jaweed raised the idea, Mohammed readily agreed and acquired almost two kilograms of heroin, which he then sold to Jaweed. Mohammed was enthused by the prospect of how much money their newly formed drug business could make. When Jaweed told Mohammed that his friend would send the opium and heroin to the United States, Mohammed declared, "Good, may God turn all the infidels to dead-corpses." Government Trial Ex. 2H. Their "common goal," Mohammed told Jaweed, was to eliminate the "infidels" either "by opium or by shooting." *Id.*

*United States v. Mohammed*, 693 F.3d 192, 195-96 (D.C. Cir. 2012). On December 13, 2006, a federal grand jury indicted Defendant Khan Mohammed for distributing one kilogram or more of heroin intending or knowing that it will be unlawfully imported into the United States in violation of 21 U.S.C. §§ 959(a)(1)-(2), 960(b)(1)(A) and 18 U.S.C. § 2 ("Count I"). Indictment (Dec. 13, 2006), ECF No. [1]. Mohammed was arrested and extradited to the United States on November 5, 2007. On January 23, 2008, the government filed a Superseding Indictment adding a second count of distributing a controlled substance knowing or intending to provide anything of pecuniary value to a person and organization that has engaged or engages in terrorism or terrorist activity in violation of 21 U.S.C. § 841(a) ("narcoterrorism charge"). Superseding Indictment (Jan. 23, 2008), ECF No. [18].

The matter proceeded to trial in this Court, and on May 15, 2008, a jury convicted Mohammed on both counts of the indictment. *See* Verdict Form, ECF No. [62]. On December 22, 2008, this Court sentenced Mohammed to a term of life imprisonment on Counts I and II to run concurrently. Judgment in a Crim. Case at 3, ECF No. [84]. Mohammed currently is serving his sentence.

Mohammed filed a timely appeal and, on September 4, 2012, the D.C. Circuit upheld Mohammed's conviction in a published opinion. *See generally Mohammed*, 693 F.3d 192. However, the D.C. Circuit also remanded the matter to this Court to hold an evidentiary hearing on the claim of ineffective assistance of counsel raised by Mohammed on appeal. *Id.* at 195.

On direct appeal, Mohammed argued that his trial counsel was ineffective for failing to adequately investigate certain evidence that Mohammed asserts would have strengthened his defense. Specifically, Mohammed argued that despite identifying potential defense witnesses to his trial counsel, his counsel failed to contact these potential witnesses from Mohammed's village in Afghanistan whom Mohammed claimed could bolster his character and impugn Jaweed's character. *See id.* at 202. Ultimately, the D.C. Circuit found that Mohammed raised a colorable claim for ineffective assistance of counsel and the trial record did not conclusively show whether Mohammed was entitled to relief. *Id.* at 204. As such, the D.C. Circuit remanded the ineffective assistance of counsel claim to this Court to hold an evidentiary hearing and "test [Mohammed's] allegations further." *Id.*

After the matter was remanded to this Court, Mohammed filed his Motion to Vacate his Conviction, or in the Alternative for Resentencing which currently is pending before the Court. Mohammed's motion is premised on ineffective assistance of counsel claims related to his trial counsel, Carlos J. Vanegas and Danielle C. Jahn. Specifically, Mohammed claims that his trial counsel rendered him ineffective assistance by: (1) failing to conduct a proper pre-trial investigation; (2) failing to challenge a government witness's "interpretations" of taped evidence that was introduced at trial; and (3) failing to raise a duress argument at the time of sentencing.

## II.  LEGAL STANDARD

A defendant claiming ineffective assistance of counsel must show (1) "that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms," and (2) "that this error caused [him] prejudice." *United States v. Hurt*, 527 F.3d 1347, 1356 (D.C. Cir. 2008) (citation omitted).  "Judicial scrutiny of counsel's performance must be highly deferential. It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence." *Strickland v. Washington*, 466 U.S. 668, 689 (1984).  It is the petitioner's burden to show that counsel's errors were "so serious" that counsel could not be said to be functioning as the counsel guaranteed by the Sixth Amendment.  *Harrington v. Richter*, 562 U.S. 86, 104 (2011).  "The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions . . . . [I]nquiry into counsel's conversations with the defendant may be critical to a proper assessment of . . . counsel's other litigation decisions." *Strickland*, 466 U.S. at 691.  In evaluating ineffective assistance of counsel claims, the Court must give consideration to "counsel's overall performance," *Kimmelman v. Morrison*, 477 U.S. 365, 386 (1986), and "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance," *Strickland*, 466 U.S. at 689.  Moreover, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.  A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 694.

## III.  DISCUSSION

Mohammed raises three ineffective assistance of counsel claims, alleging his trial counsel: (1) failed to conduct a proper pre-trial investigation; (2) failed to challenge a government witness's

"interpretations" of taped evidence that was introduced at trial; and (3) failed to raise a duress argument at the time of sentencing. The Court shall address each claim in turn.

The Court notes that Mohammed was represented at trial by both Vanegas and Jahn. However, Jahn first entered her appearance in this matter on April 25, 2008, less than two weeks before jury selection commenced. She also testified that she first met with Mohammed approximately one week prior to entering her appearance and never met with Mohammed without Vanegas present. Tr. 63:9-12, 64:15-16 (Dec. 3, 2015). Jahn's role in this matter was as the junior attorney who was tasked with assisting with trial. *Id.* 64:15-16. In light of Jahn's limited role in Mohammed's representation, the Court focuses its discussion on Vanegas' representation of Mohammed.

### A. *Pretrial Investigation of Defense Witnesses*

Mohammed first alleges that his trial counsel failed to conduct any pretrial investigation of witnesses who could have impeached the testimony of government witness Jaweed and Jaweed's interpretations of the recordings admitted into evidence at trial. Def.'s Mot. to Vacate at 11, ECF No. [118]. As the D.C. Circuit explained, "[t]he key to Mohammed's claim is whether his attorney's less-than-thorough pre-trial investigation was supported by 'reasonable professional judgments.'" *Mohammed*, 693 F.3d at 203. The D.C. Circuit provided that it remanded the matter to this Court "to give fuller context to the decisions counsel made, such as what Mohammed told his attorney while preparing his defense or what his attorney may have uncovered himself during trial preparation." *Id.*

It is undisputed that Mohammed requested that Vanegas contact witnesses in Afghanistan prior to trial. Tr. 26:6-15, 81:9-11, 38:1-5, 56:12-16, 119:6-13 (Dec. 3, 2015). There are three

specific discussions regarding defense witnesses in Afghanistan that took place on the record prior to trial. When Vanegas made his first request for a continuance which was granted, Vanegas alluded to and spoke in general terms about exploring testimony from witnesses in Afghanistan. At the second request for a continuance, four specific names were discussed. Ultimately, at the evidentiary hearing post trial, Mohammed testified that he provided Vanegas with the names of three different individuals during trial preparation. In addition to these discussions, the pre-trial record also demonstrates that Vanegas explored Mohammed's allegation that Jaweed had a conviction for robbery or theft, and on April 22, 2008, Vanegas noted that Jaweed may have a vendetta against Mohammed due to the results of an election in their village. At the evidentiary hearing, Mohammed and Vanegas provided conflicting accounts as to what testimony Mohammed informed Vanegas that the witnesses might provide. Given that this Court is tasked with evaluating the reasonableness of trial counsel's performance in light of the information before him at that time, the Court shall discuss the context in which these decisions were made and Vanegas' rationale for his decisions.

First, the Court shall discuss the information in the record regarding Mohammed's request that Vanegas contact potential witnesses in Afghanistan leading up to trial. Second, the Court shall discuss new information gleaned while this issue has been on remand, from a declaration submitted by Mohammed's appellate counsel, from the declarations submitted by Mohammed's trial counsel, and from the testimony given during the evidentiary hearing held in this matter. Upon consideration of the record and the evidence before it, and for the reasons described herein, the Court has determined that Vanegas' pre-trial investigation was supported by reasonable professional judgments and that Mohammed has failed to establish that he was prejudiced by

Vanegas' failure to contact the witnesses whom he identified prior to trial.

1. *Pre-Trial Record Reflects Mohammed's Request for Defense Witnesses from Afghanistan*

On November 5, 2007, this matter came before the court for a return on a bench warrant and an arraignment. At that time, Magistrate Judge Alan Kay appointed Vanegas to represent Mohammed in this proceeding. During the early phases of Vanegas' representation of Mohammed, Mohammed participated in two unsuccessful debriefings with the government. Tr. 11:21-24, 13:1-10 (Dec 3, 2015). Mohammed then rejected a plea offer extended to him by the government. Tr. 26:14-22 (Nov. 20, 2007); Tr. 4:3-18, 5:14-25, 6:18—7:3 (Jan. 29, 2008); Tr. 4:18—8:9, 21:2—23:16 (Feb. 4, 2008); Tr. 9:14—10:10 (Feb. 25, 2008); Tr. 15:3—16:16 (Mar. 20, 2008); Tr. 48:20—50:14, 50:23—82:9 (Apr. 22, 2008); Tr. 13:3-16 (Dec. 3, 2015). On January 23, 2008, the government, after prosecutors traveled to Afghanistan, filed a superseding indictment that added the narcoterrorism charge. Tr. 13:70-10; *see also* Superseding Indictment (Jan. 23, 2008).

a. Request for a Continuance of February 25, 2008, Trial Date

The matter was originally set for trial on February 25, 2008. Min. Order (Dec. 13, 2007). However, on February 4, 2008, Vanegas, after consulting with Mohammed and with Mohammed's express agreement, requested a three-month continuance of the trial date. Tr. 32:10-13, 35:4-12 (Feb. 4, 2008). The basis for the request was to allow more time for Vanegas and Mohammed to systematically review transcripts provided as part of discovery with the assistance of a Pashto interpreter, to tend to some health issues related to Mohammed, to research and respond to Mohammed's legal questions regarding the applicability of United States' laws to foreign nationals

for conduct taking place outside of the United States, and to discuss the possibility of an *Alford* plea. *Id.* 29:12—31:12. At that hearing, Vanegas explained that he had invested a significant amount of time in trying to resolve the case short of trial but at that point he felt it prudent to focus on trial preparation. *Id.* 29:21—30:4, 31:7-12. Based on this request, the Court continued the trial until May 5, 2008.[2] *Id.* 43:7-12. As such, Mohammed's request for witnesses was not the basis for the first request for a continuance as this issue had not yet been raised by Mohammed.

### b. February 25, 2008, Status Hearing

At the next status hearing, held on February 25, 2008, Vanegas expressly brought up the issue of potentially bringing defense witnesses to the United States. Vanegas explained:

> [T]he only new issue that I see that has arisen is the issue with respect to witnesses that Mr. Mohammed would like to be at his trial. And so I will look into the practical issues and the resources available to try to find those witnesses and to bring them to the United States, and then the legal support on behalf of bringing those witnesses.

Tr. 14:1-7 (Feb. 25, 2008). During that hearing, Vanegas also indicated that he was considering filing some type of motion with respect to these witnesses, noting that "it presents very difficult obstacles in terms of finding witnesses, locating them, and then somehow bringing them to the United States under some type of parole visas," as it involved contacting witnesses in a war zone. *Id.* 9:4-7. Vanegas stated that he planned to speak with the prosecutor and the Federal Public Defender for the District of Columbia as he would likely need the government's and/or the Court's assistance in obtaining defense witnesses and needed to explore the legal basis for making such a request. *Id.* 9:8-13, 24:12-19. As such, the record reflects that Mohammed had raised this issue to

---

[2] The Court later set May 2, 2008, as the first day of voir dire. Min. Order (Mar. 20, 2008).

Vanegas at least as early as February 25, 2008, but not earlier. However, there are no specifics in the record at that time regarding what information Mohammed indicated to Vanegas that the potential witnesses might provide and, importantly, that has not been clarified post-trial. Even post-trial, the record is devoid as to what, if anything, Mohammed told Vanegas these witnesses would state. All that is in the record is that Mohammed wanted witnesses from Afghanistan.

c. Government's Motion in Limine and Mohammed's Request for *Lewis* Check

On February 22, 2008, shortly before that status hearing, the government filed a Motion in Limine to Preclude Improper Impeachment with Extrinsic Evidence. *See generally* Govt.'s Mot. in Limine to Preclude Improper Impeachment with Extrinsic Evid. ("Govt.'s Mot. in Limine"), ECF No. [21]. In the motion, the government asserted that while being held in military custody pending extradition, Mohammed made claims in an attempt to ascribe a motive for Jaweed to fabricate evidence or lie, or otherwise to impugn Jaweed's credibility. For example, the government indicated that Mohammed stated that Jaweed "had been convicted of theft, had spent several months in jail, and was set to serve an 18 year sentence when he was released after people from his village vouched for him." *Id.* at 2. The government moved the Court to exclude any allegation of theft against Jaweed at trial pursuant to Federal Rule of Evidence 608(b). In its motion, the government indicated that Jaweed denied these accusations, stating that he was accused of theft some years prior, but that he was not arrested, incarcerated, or convicted and that another man ultimately was found to have committed the offense. *Id.* at 2 n.2.

On March 10, 2008, Mohammed filed an opposition to the government's motion and

requested that the government conduct a *Lewis* criminal background check on Jaweed.[3]  In the

opposition, Vanegas represented:

> Undersigned counsel has a good faith belief that the confidential source was charged and convicted sometime during the summer or autumn of 2005. The charge and conviction were lodged and archived in the Prosecutor's Office in the city of Jalalabad in Nangarhar Province, Afghanistan.  Jalalabad is 90 miles from Kabul, the capital of Afghanistan, and accessible to United States law enforcement and military personnel who can properly investigate [Jaweed's] conviction.

Def.'s Opp'n to Govt.'s Mot. to Preclude Improper Impeachment and Request for a Lewis Crim.

Background Check of Confid. Source ("Def.'s Opp'n to Mot. in Limine") at 2, ECF No. [27].  The

government filed a reply to its motion and addressed Mohammed's request that the government

conduct a *Lewis* check on Jaweed.  In its response, the government reported:

> On Friday, March 14, 2008, DEA agents in Kabul, Afghanistan were tasked with contacting Afghan authorities in Jalalabad, Nangarhar Province, to determine what, if any, criminal record the witness in question had, including arrests, prosecutions or convictions. On April 3, 2008, the DEA reported back that a request for that information had been made through Afghan authorities, who reported that according to Colonel Asif Khan, Chief of Afghanistan's Counter Narcotics Police in Nangarhar Province, a review of the province's records was negative for any criminal history.

Govt.'s Resp. to Def.'s Opp'n to Govt.'s Mot. in Limine & His Request for a Lewis Check

("Govt.'s Resp. to Mot. in Limine") at 2, ECF No. [32].

On April 22, 2008, during a status hearing, the parties discussed the government's motion

in limine in light of the results of the *Lewis* check.  Vanegas noted that during the audio recordings

that the government sought to introduce during trial, Jaweed mentioned on two separate occasions

---

[3] As Mohammed described in his opposition, a *Lewis* check is based on the Court of Appeals for the District of Columbia's opinion in *Lewis v. United States*, 393 A.2d 109 (D.C. 1978).

that he had previously been accused with a lawsuit. Tr. 5:24—6:9 (Apr. 22, 2008). Notably, in

the presence of Mohammed, the Court specifically asked Vanegas whether Mohammed was at all

involved in the suit to which Vanegas answered, "It does not involve my client." *Id.* 6:10:13.

Vanegas mentioned the possibility that he might present evidence of Jaweed's bias towards

Mohammed. Vanegas explained:

> [W]ith respect to a personal vendetta that he may have against Mr. Mohammed, is
> that Mr. Mohammed was elected a tribal chief in the area in which both of these
> gentlemen are from. They've known each other since they were children.
>
> And as a result of an election regarding Mr. Mohammed being elected tribal chief,
> there is some issues arose from the fact that the confidential informant was
> supporting Mr. Mohammed's opponent for the position of tribal chief.

*Id.* 7:7-16. The Court noted that there was no impediment to Vanegas exploring Jaweed's potential

motivations for testifying against Mohammed. However, specifically with respect to the issue of

Jaweed's prior legal history, the Court indicated that this appeared to be separate from the bias

issue because Mohammed was not involved in the lawsuit. The Court emphasized the point that

Mohammed's direct involvement in the lawsuit would make a difference in terms of the Court's

analysis of the admissibility of this evidence. Indeed, the Court indicated, "[I]f it involved Mr.

Mohammed, it might be a different issue, even if he didn't get actually arrested or convicted, but

it sounds like he may have been accused by somebody but it never went anywhere because there's

no arrests and no convictions." *Id.* 8:13-18. The Court also noted, "But I think to present it as bias,

under the rubric of bias you have to show there's some ill feeling towards him because Mr.

Mohammed is involved in this accusation in some way, or that the prosecution or whoever is in

the prosecution's shoes would in some way be helpful with this accusation since he doesn't have

anything pending in Afghanistan." *Id.* 8:25—9:6. As such, as of April 22, 2008, it appears

Mohammed had raised with Vanegas that Jaweed may be biased against him based on the fact that Mohammed won an election over a candidate whom Jaweed supported, but Mohammed had not indicated to Vanegas that he was in any way involved in any lawsuit against Jaweed. Moreover, in Mohammed's presence, the Court stressed that if Mohammed was involved in any way with these accusations even if there was no formal arrest or conviction, it would present a different issue for trial purposes.

After reviewing the information provided by the parties, the Court required the government to provide the Court with a transcript of Jaweed's statements regarding the theft allegation in question which clearly did not include an admission of this conduct. The Court also directed defense counsel to file by April 25, 2008, an opposition setting forth a legal basis for permitting a line of inquiry into the allegations of past criminal conduct given the result of the *Lewis* check indicating that Jaweed did not have a criminal history.[4] Min. Order (Apr. 22, 2008). At the next hearing on April 28, 2008, the Court noted that Vanegas had notified chambers that he would not be filing an opposition to the government's motion in limine based on the results of the *Lewis* check and, accordingly, that he would not pursue this line of questioning at trial. Min. Order (Apr. 28. 2008); Tr. 4:19—5:1 (Apr. 28, 2008). As such, the Court issued an order granting the government's motion in limine in light of the results of the *Lewis* check and the fact that the motion was no longer opposed by Mohammed.

The Court notes that Mohammed has now raised post-trial claims that there would be

---

[4] The parties also had several discussions on the record with the Court regarding the pending motion. *See* Tr. 5:12—7:19 (Mar. 11, 2008); Tr. 3:20—5:11 (Mar 20, 2008); Tr. 5:2—14:25 (Apr. 22, 2008).

evidence of Jaweed's criminal conduct involving this alleged theft/robbery, even though he abandoned on the record his request that this allegation of a conviction for theft be used prior to trial. Moreover, Mohammed also now alleges that he had a role in the resolution of the robbery/theft accusation because he served as a mediator during the *jirga* addressing that accusation, contrary to several representations on the record that Mohammed was not involved.

### d. Mohammed's Request for a Continuance of May 2, 2008, Trial Date

On May 1, 2008, Mohammed filed a Motion to Continue Trial, asserting the government had provided discovery on April 29, 2008, that set forth a new allegation that Mohammed had a significant role in the Taliban organization. Def.'s Mot. to Cont. Trial at 3, ECF No. [47]. The basis of this allegation was that Jaweed was contacted by two leaders of the Taliban while in Pakistan and instructed that Mohammed was their point of contact in Afghanistan. *Id.* While the names of the individuals were previously provided to defense counsel, Vanegas asserted that the government had not disclosed that these people were Taliban leaders and, as such, Vanegas was not aware that the government would seek to link Taliban leaders in Pakistan to the crimes charged against Mohammed. *Id.* at 4. That same day, the Court held a conference call with the parties to determine whether or not to bring the prospective jurors in on the following day to begin jury selection. During a conference call, Vanegas indicated that he was requesting a three-month continuance in order to follow up, make requests, and investigate the issues that were not previously raised by the government. Tr. 4:1-5 (May 1, 2008). Ultimately, the Court determined that it would not call the jury for the following day in order to hold a more complete discussion on the record in Mohammed's presence regarding the request to continue the trial with the assistance of an interpreter.

Subsequently, at the status hearing held on May 2, 2008, the parties discussed Mohammed's request for a continuance at length. In the open courtroom, the Court and both parties discussed the request for a continuance of the trial. In part, Vanegas indicated that he was seeking a continuance in order to obtain an expert and a rebuttal witness to testify that under the administration in Afghanistan at that time, there were organizations outside of the Taliban that were involved in the drug trade. Tr. 14:9-20, 18:14-21, 20:11-17 (May 2, 2008).

Prior to taking a lunch recess, the Court also held a sealed, *ex parte* discussion on the record outside of the presence of government counsel. During this *ex parte* discussion, Vanegas indicated that he had numerous meetings with Mohammed to prepare for trial with the expectation that the government's evidence would be restricted to the audio and the video recordings of conversations between Jaweed and Mohammed. *Id.* 74:2-10, 76:7-12. Vanegas noted that he felt that he had done a "disservice" and had been "ineffective" in advising Mohammed based on that expectation now that it became clear that the government intended to introduce evidence of how the underlying investigation at issue was conducted, that Mohammed had prior links to the Taliban, and that Jaweed was sent to meet with Mohammed at the behest of Abdul Rahman, a former Taliban official, in addition to the audio and video recordings. *Id.* The Court indicated that it would take a recess so that Vanegas could speak with his client and that it would require specific information regarding what Vanegas would do if the request for a continuance was granted.

After the recess, the Court held another sealed, *ex parte* discussion with Mohammed and his counsel. During this discussion, the Court requested that Mohammed specifically indicate which potential witnesses in Afghanistan he wanted Vanegas to contact. Mohammed indicated that he provided Vanegas with the names of Khan Mohammed, Salam Jan, Ashekullah, and Mula

Gul Rahman as people from his village who could serve as defense witnesses. *Id.* 100:21-25. Notably, the four individuals identified by Mohammed during the May 2, 2008, hearing as potential witnesses are different from the individuals that Mohammed identified during the evidentiary hearing on December 3, 2015, as names that he provided to Vanegas in advance of trial.

Mohammed represented that these individuals could serve as character witnesses for him and against Jaweed. *Id.* 95:6-8. Specifically, Mohammed stated that the witnesses could explain that he was not associated with the Taliban and that Jaweed was known as a thief, that he had a case in Afghanistan, that he was sentenced to 18 years, that he was involved in four to five robberies, that he was fugitive, and that he went to Pakistan. *Id.* 95:14-15, 95:24—96:4. The Court notes that with respect to the discussion of Jaweed's alleged prior conviction, Mohammed had already abandoned this line of questions at the April 28, 2008, hearing. With respect to the information that Mohammed indicated that the witnesses could provide about Jaweed, the Court explained, as discussed at the April 22, 2008, hearing, that no official record of Jaweed's criminal conviction was located during the *Lewis* check and that an official record would typically be needed to introduce such evidence at trial. *See* Tr. 12:15—13:25 (Apr. 22, 2008); Tr. 96:21—97:6 (May 2, 2008).

Vanegas confirmed that Mohammed had provided him with the four names of the witnesses that Mohammed identified during this *ex parte* discussion as potential character witnesses who could testify that Mohammed was not a member of the Taliban. Tr. 113:20—114:1, 114:12-13 (May 2, 2008). During the *ex parte* discussion, Vanegas also stated that he believed that the only way to interview the witnesses would be to physically travel to Afghanistan and indicated that he

17

had not been given telephone numbers for the potential witnesses. *Id.* 115:12-17. Vanegas opined

that given Mohammed's stature in the community and the fact these witnesses may also have

information regarding Jaweed, this was an avenue that should be pursued, even though he could

not predict the result. *Id.* 116:19—117:20. Specifically, Vanegas mentioned the possibility that

the potential witnesses could state that Jaweed was known in his community as a liar. *Id.* 117:17-

20.

Vanegas indicated that he raised Mohammed's request that he interview these witnesses

with the Federal Public Defender for the District of Columbia as well as the government, given

the logistical problems in a war zone. *Id.* 113:25—114:3. As Vanegas explained with respect to

locating the witnesses:

> The next issue was, how is that accomplished? And in being presented with that
> dilemma, I spoke to Mr. Kramer [Federal Public Defender] about it, and I also
> brought it to the attention of the Government. And that is, first of all, to go to his
> district in Nangarhar province, I would need a guide, I would need a translator and
> someone to take me to these people.
>
> Then there was the issue of whether they could be brought back to the United States
> and whether they would be given some type of provisional visa or some type of
> special parole status. And those were complications that were just insurmountable,
> and I didn't pursue it. But I did bring this to the attention of Mr. Kramer. I mean, I
> didn't just keep it to myself, but I talked to different people in the office about what
> I could do. And I could not really figure out or come to a solution as to how I could
> go to his village, talk to these people when it's in a remote place and it's in the war
> zone.

*Id.* 114:15—115:7.

After the sealed, *ex parte* discussion, the Court resumed the hearing in open court with the

government present. At that time, the government indicated that it would not seek to introduce

evidence that Mohammed was involved with the Taliban in the past if the trial proceeded as

scheduled. *Id.* 128:5-11. As such, the Court presented Mohammed with a choice. Specifically, Mohammed could chose to proceed to trial the following week and the government would not bring out any alleged past history with the Taliban. The government would only be permitted to bring out evidence that Abdul Rahman knew Mohammed and sent Jaweed to talk to Mohammed, along with the information that was on the recordings. *Id.* 129:10-16. In the alternative, the trial would be continued as requested, allowing time for Vanegas to explore potential defense witnesses from Afghanistan, and the government would likely be able to admit evidence of Mohammed's alleged past history with the Taliban. *Id.* 129:18—130:2.

The Court then took another recess to allow Mohammed to discuss with his counsel the course of action he sought to take. After the break, Vanegas indicated that Mohammed wanted to proceed with trial and was no longer asking for counsel to travel to Afghanistan to locate witnesses. *Id.* 130:11-17. The Court then conducted a brief inquiry of Mohammed to confirm that this was his decision:

> THE COURT: So, all I need to know is from Mr. Mohammed, it's correct that he's agreed based on the Court's ruling and what the Government has said that at this point if we go to trial next week then we would – he is not requesting the trip to Afghanistan, is that correct?

> THE DEFENDANT: Yes.

*Id.* 130:25—131:5. Ultimately, the Court entered an order continuing the trial from May 2, 2008, until May 7, 2008, in order to allow the defense additional time to prepare and specifically noted that the government would not "introduce evidence that [Mohammed] allegedly fought with the Taliban and led a small group of Taliban fighters . . . ." Order (May 8, 2008) at 8-10, ECF No. [54].

e.  <u>Mohammed's Request for a New Attorney during May 2, 2008, Hearing</u>

At the May 2, 2008, hearing, Mohammed also made a request for a new attorney after the parties returned from the lunch recess. Tr. 83:21-24 (May 2, 2008). The Court made some general comments in open court in front of the government regarding the request for a new attorney at this stage of the proceeding and identified the various factors that it would consider when determining whether to grant the request. The Court then conducted a sealed, *ex parte* discussion with Mohammed regarding his request for new counsel in the event that any information regarding defense strategy needed to be disclosed during the discussion.

At that time, Mohammed explained that he thought Vanegas previously should have obtained information for his case from Afghanistan, *id.* 90:8-9, and that in light of the recently-provided discovery from the government, the case had changed and Vanegas stated that he needed time to contact people in Afghanistan, *id.* 91:1—91:19. The Court noted that defense counsel had discussed the evidence with Mohammed in preparation for trial. *Id.* 110:2-7. The Court also outlined several steps that Vanegas had taken on Mohammed's behalf to protect his interests including filing several motions such as the motion to exclude information in the recently-provided discovery which the government conceded it would not pursue if the request for a continuance was abandoned. *Id.* 106:25—108:17. Moreover, the Court noted that it had excluded certain evidence should the trial proceed as scheduled because there was not sufficient notice to Mohammed of the evidence. *Id.* 111:10-16. The Court further explained the factors that it would consider in determining whether to grant the request, including protecting Mohammed's rights and balancing the interests of the community and the government, which at that time had already arranged for witnesses to travel from Afghanistan for trial. *Id.* 91:23—99:23, 112:11-16. Ultimately, after

inquiry, the Court denied the request for new counsel, finding that there was no reason to replace Vanegas and noting that granting the request for new counsel would further delay the proceedings. *Id.* 118:6-9; Minute Order (May 5, 2008). If necessary, the Court agreed to a continuance of the trial to allow Vanegas to secure witnesses. However, as discussed above, Mohammed later declined to seek a continuance in light of the government's concession that it would not introduce evidence of Mohammed's alleged past involvement with the Taliban. The Court further notes that while Vanegas referenced doing a "disservice" to Mohammed and noting he had been "ineffective," this discussion was in reference to the potential evidence that the government sought to admit regarding Mohammed's alleged past allegiance to the Taliban and was not in reference to the issue of contacting witnesses in Afghanistan. The evidence at issue was ultimately excluded at trial based on Vanegas' request.

2. *Record on Remand Reflects Information Potential Witnesses May Have Provided, Conflicting Accounts Regarding Information Communicated to Vanegas about the Witnesses, and Reasons for Vanegas' Decision Not to Investigate Witnesses*

Mohammed now contends that Vanegas was ineffective in assisting him because he failed to contact witnesses in Afghanistan in advance of the May 2, 2008, hearing. It is Mohammed's contention that Vanegas could not have provided him with sound advice regarding his options to continue the trial or proceed as scheduled and that this deficiency was caused by Vanegas' complete failure to investigate potential witnesses from Afghanistan prior to the scheduled trial date. As such, Mohammed argues that Vanegas had no idea what any of these potential witnesses would say and without that knowledge, Vanegas could not properly counsel his client. Moreover, Mohammed contends that Vanegas could have easily interviewed witnesses by phone based on a

list of phone numbers recovered from Mohammed's phone and included in the discovery provided to Vanegas. Given that it is undisputed that Vanegas did not contact these witnesses, the Court next considers the evidence presented while this matter has been on remand

While on remand, the Court expanded the record as to Mohammed's ineffective assistance of counsel claim. First, the Court considers the various areas of testimony that Mohammed contends that the potential witnesses could have provided and Mohammed's and Vanegas' accounts of what information Mohammed gave Vanegas about these potential witnesses, including which specific witnesses Mohammed had identified. Next, the Court considers Vanegas' stated reasons for not contacting the potential witnesses as well as his trial strategy more generally. Finally, the Court shall make credibility determinations and explain its findings.

a. Information that Potential Witnesses Could Have Provided

On remand, Mohammed identifies several areas of testimony that the potential witnesses could have provided, including that: "(1) Jaweed was a known liar and thief, (2) Jaweed publicly swore to seek revenge against Mohammed for sitting on a *jirga* that convicted him of robbery, and (3) Mohammed was an upstanding citizen and not affiliated with the Taliban." Def.'s Sld. Reply at 7. Moreover, at the evidentiary hearing, Mohammed testified that in addition to providing information regarding the *jirga*, the potential witnesses would have provided information about a physical altercation between Jaweed and Mohammed's cousin and about the fact that Mohammed was elected over Jaweed's cousin as a representative from his village. Tr. 82:7-8, 83:20-24 (Dec. 3, 2015). Mohammed contends that these pieces of evidence would have been admissible to demonstrate Jaweed's bias towards Mohammed.

In support of his claim, Mohammed provided a sworn declaration from his former appellate

counsel, Shardul Desai. *See* Def.'s Mot. to Vacate, Ex. 11 (Desai Decl.), ECF No. [118-12]. In his declaration, Desai indicated:

> When I began working on Mohammed's appeal, I conducted an investigation by interviewing witnesses Mohammed believed had information relevant to his case. I relied on Mohammed's nephew to contact 28 witnesses in Afghanistan. Among these individuals were farmers, tribal elders, police officers, government liaison officers, marshals, a soldier in the Afghan National Army, a veterinarian, a principal, teachers, shopkeepers, a judge, religious leaders and people who served on a tribal arbitration counsel, called a *jirga*, with Mohammed.
>
> Every witness knew Mohammed for almost a decade and some had known him since childhood. All the witnesses also knew or knew of Jaweed, the government's primary witness.

*Id.* ¶¶ 9-10. Desai indicated that he conducted interviews with these witnesses over the phone with the assistance of a Pashto translator in the summer or fall of 2011, *id.* ¶ 11, and that "the information provided by these witnesses could have challenged Jaweed's testimony, have offered important background information about Mohammed, and have provided an alternative interpretation to parts of the recorded conversations between Jaweed and Mohammed that were presented at trial," *id.* ¶ 12.

Desai indicated that the interviews with these potential witnesses revealed information about Jaweed, Mohammed, and Jaweed and Mohammed's relationship. With respect to Jaweed, Desai asserts that the potential witnesses provided the following information: "Jaweed had a poor reputation in his village and surrounding areas because of criminal behavior and gangsterims, including a robbery that a *jirga* found Jaweed guilty of committing," *id.* ¶ 13; Jaweed was described as a "thief," *id.*; "people, including the police, were generally afraid of Jaweed and his gang," *id.*; Jaweed was described as "a liar and an oath-breaker," *id.* ¶ 14; and Jaweed had a reputation as "'no one knows him as a good person,'" *id.*

23

The potential witnesses also described Mohammed's participation in a *jirga* involving Jaweed. *Id.* ¶ 15. A *jirga* is a form of arbitration outside of the formal state legal system that involves the accused, the victim, witnesses, and arbitrators. *Id.* The Afghan government encourages the use of *jirgas* as a form of Alternative Dispute Resolution and generally those considered leaders in the community sit on *jirgas*. *Id.* Mohammed was asked to represent the Geratak area, where both he and Jaweed were from, during certain *jirgas*, *id.* ¶ 15, and potential witnesses noted that it was Mohammed's status as a village leader that earned him that position, *id.* ¶ 21. One potential witness, Malek Rezwan, informed Mohammed's appellate counsel that he sat on a *jirga* with Mohammed in which Jaweed was accused of stealing jewelry, opium, and money in Karazo. *Id.* ¶ 16. The *jirga* involved 18 people and lasted 6 hours. *Id.* The victim testified that he was tied to a bed and robbed of jewelry and opium, and Jaweed denied committing the crime. *Id.* The *jirga* ultimately ruled unanimously in favor of the victim, finding that Jaweed lied and requiring him to return the property. *Id.* Rezwan conveyed that Jaweed stated that Mohammed should have ruled in his favor because they were both from the Geratak area. *Id.* Moreover, Rezwan indicated that he and a few other people overhead Jaweed tell Mohammed, "[Y]ou named me. I will not leave you alone even if it takes 20 years." *Id.*

Mohammed testified that he participated in 500 to 600 *jirgas* in his lifetime as a mediator. Tr. 70:6-12 (Dec. 3, 2015). As other witnesses noted, those who served in this capacity were usually village elders with good reputations. *Id.* 71:1-2. Mohammed testified that the *jirga* involving Jaweed occurred approximately two to two and a half years before his arrest. *Id.* 80:20-81:4, 90:20-21. Mohammed indicated that after they heard argument from both sides regarding the robbery accusation against Jaweed, Mohammed stated that he found the robbery victim to be

truthful even though Jaweed was from Mohammed's village and Mohammed had known Jaweed his whole life. *Id.* 74:14-16, 74:21-75:7, 75:8-18. Mohammed testified that the elders from both villages respected his opinion and status, and ultimately, agreed with Mohammed that Jaweed had committed the robbery. *Id.* 76:16-18. Given this finding, Jaweed was presented with two options. The first was that he could put his hand on a book and take an oath as to his innocence. The second was that he could pay damages. *Id.* 75:13-16. Jaweed took the former option and took an oath as to his innocence. *Id.* 76:2. Mohammed indicated that when an accused person opts to take an oath, no written record of the proceeding is maintained. *Id.* 77:2-13.

In his declaration, Desai also noted that the witnesses stated that Mohammed was never involved with the Taliban, Desai Decl. ¶ 20, that he was poor farmer, *id.* ¶ 21, and that he spent his time working to provide for his family, *id.* The witnesses further noted that they did not know Mohammed was involved in drug trafficking and opined that if he was, it would have improved his financial situation. *Id.* During his testimony at the evidentiary hearing, Mohammed indicated that the witnesses had known him since childhood and, as such, would be able to speak about his background. Tr. 73:2-6 (Dec. 3, 2015). Specifically, Mohammed noted that the witnesses would testify that he had no connection to the Taliban and, in fact, that he escaped from his home when the Taliban was in power. *Id.*

During the evidentiary hearing, Mohammed and Vanegas provided differing testimony regarding any pre-trial discussion that they had regarding the *jirga* and Jaweed's animosity towards Mohammed. Mohammed testified that he told Vanegas about the *jirga* involving Jaweed. *Id.* 77:18-21. Specifically, Mohammed indicated that he told Vanegas that Jaweed told three people, Malek Rezwan, Sameullah, and his brother, Besmilluh, that it was only Mohammed who blamed

him at the *jirga* and that he would take revenge as a result. *Id.* 77:24-78:5, 78:7-10. Mohammed further testified that he told Vanegas that Sameullah and Rezwan would be able to discuss Jaweed's animosity towards Mohammed. While Mohammed did not remember whether he told Vanegas about his brother's ability to testify to this effect, he did give Vanegas his brother's address and told him that his brother would contact people for Vanegas. *Id.* 78:18-20. 78:2-14, 78:20-21. Mohammed also testified that he himself told Vanegas in detail about Jaweed's animosity towards him, *id.* 79:10-14, and that he provided Vanegas with a list of between seven and eleven potential witnesses, all of whom knew about the animosity between Jaweed's and Mohammed's families, *id.* 84:11-14, 84:15-17, 85:5-10. Mohammed stated that Vanegas told him that he could not contact witnesses because he was unable to travel to Afghanistan given the situation there at the time. Mohammed mentioned contacting potential witnesses by phone to Vanegas but did not provide phone numbers. *Id.* 78:20-21. However, Vanegas was unaware that he had been provided a list of phone numbers derived from Mohammed's phone during discovery, and the list included some of the potential witnesses. *Id.* 80:10-15.

Mohammed also testified post-trial that he told Vanegas that the witnesses would be able to provide information regarding two other incidents involving Jaweed and were illustrative of the animosity between Mohammed's family and Jaweed's family, not reflected in the Desai declaration. *Id.* 82:7-8, 83:20-24, 82:9-12. Mohammed testified as to the following matters. First, approximately three and a half years before Mohammed's arrest, Mohammed's cousin, Alsue Khan Mohammed, was involved in a physical altercation with Jaweed. *Id.* 81:17-19, 82:5-6, 89:10, 89:14-16. The altercation occurred because Mohammed's cousin had a dispute with a third party and learned that Jaweed was trying to make the dispute worse by going in between the two

disputing parties. *Id.* 81:5—82:4. When the cousin found out what Jaweed was doing, they had a physical altercation. *Id.* 81:17-19, 82:3-4. Second, approximately a year and a half before Mohammed's arrest, the Afghanistan government decided to select someone from Mohammed's village as a representative of the area. *Id.* 82:19-21, 83:5. The representative would serve as a liaison between the village and the government so that the government could send charity organizations to help with the needs of the village. *Id.* 85:13-16. Jaweed's cousin, Farooq, nominated himself and the people of the village nominated Mohammed. *Id.* 82:21-23. Ultimately, Mohammed was elected and Jaweed took it against Mohammed that he was elected over Jaweed's cousin. *Id.* 82:24-25, 83:16-19.

While Mohammed testified post-trial that he provided all of this information to Vanegas in advance of trial, Mohammed provides no specific timeline whatsoever regarding when this information was communicated to Vanegas. Instead, Mohammed simply stated that he emphasized his request many times that Vanegas contact these witnesses. *Id.* 81:9-11. As such, Mohammed has presented no timeline, even an approximate one, as to when these discussions with Vanegas allegedly took place. Notably, the information regarding the witnesses provided by Mohammed at the evidentiary hearing differs from that in the record prior to trial.

Indeed, on April 22, 2008, the Court specifically asked Vanegas in the presence of Mohammed if Mohammed was involved in any way in the lawsuit against Jaweed and Vanegas indicated that Mohammed was not personally involved. Tr. 6:10-13 (Apr. 22, 2008). The Court went on to discuss its view that if Mohammed had personal involvement in the accusation, that it would affect the admissibility of the evidence. Mohammed had an opportunity to change this position. At the May 2, 2008, hearing, the Court addressed Mohammed directly about witnesses

in Afghanistan and Mohammed never indicated that he was personally involved in the lawsuit. This differs from Mohammed's post-trial account in which he allegedly found during the *jirga* that the robbery victim and not Jaweed was being truthful and others on the *jirga* supported Mohammed's view of the evidence. In response, to the Court's inquiry pre-trial, Mohammed identified four specific witnesses that he wanted Vanegas to contact. At the evidentiary hearing post-trial, Mohammed indicated that he provided seven to eleven names to Vanegas and identified three different witnesses by name. Moreover, at the May 2, 2008, hearing prior to trial when asked what information these witnesses could provide, Mohammed never mentioned the *jirga*, the vow of revenge, or the altercation between Jaweed and Mohammed's cousin. Again, Mohammed has never provided pre- or post-trial even a rough timeline of when the names of the witnesses were allegedly provided to Vanegas or when he allegedly told Vanegas about the information that these witnesses could provide.

Vanegas provided a different account of the information that he was given by Mohammed with respect to the potential witnesses. Specifically, at the post-trial hearing, Vanegas testified that he did not consider that Jaweed may be biased against Mohammed given the information that he had been provided by Mohammed. Tr. 20:24-21:1 (Dec. 3, 2015). Vanegas further indicated that Mohammed never told him about the *jirga* and Vanegas testified that he would have remembered if Mohammed had brought this to his attention because he remembered reading a newspaper article about *jirgas* in the aftermath of the September 11th attacks. *Id.* 35:9-23. Moreover, Vanegas stated that Mohammed also never told him that Jaweed had threatened revenge against him. Vanegas testified that he would have viewed this information as "very important," would have followed up on it, and would have incorporated it into his cross-examination of

Jaweed. *Id.* 35:24-36:10. Vanegas further noted that if Mohammed communicated this information to him, it "would have certainly stuck in [his] mind." *Id.* 37:2. As such, Vanegas testified that when he cross-examined Jaweed, he did not know about the *jirga* and did not ask if he was biased against Mohammed because he had no such information. *Id.* 31:12-22, 32:1-4.

Vanegas also testified that Mohammed did tell him that Jaweed had a robbery conviction and that Jaweed did not have the same standing as him in the community. *Id.* 53:17-19. Specifically, Vanegas stated that Mohammed told him that Jaweed was a farmer and not a leader so he did not have the same level of prestige in the community. *Id.* 53:20-24. Vanegas also understood that Jaweed's standing in the community was affected by the fact that he had been away in Pakistan. *Id.* 53:24-25. Vanegas indicated he had a "foggy" recollection that Mohammed told him that Jaweed's mother asked Mohammed if he would consider allowing Jaweed to marry one of Mohammed's sister, but that Mohammed did not want that information to be brought out at trial because it was considered dishonorable.[5] *Id.* 54:1-12, 91:14-22.

### b. Vanegas' Trial Strategy

During the evidentiary hearing, Vanegas provided relevant information regarding his representation of Mohammed. Throughout the course of his representation of Mohammed, Vanegas testified that he scheduled meetings for either half or full days because the meetings were facilitated with the assistance of a Pashto interpreter who had to travel from New York. *Id.* 12:2-14. Vanegas indicated that not immediately after the filing of the superseding indictment, but as they approached trial, Mohammed insisted that Vanegas get in touch with potential witnesses in

---

[5] Mohammed verified that this event did occur at some point after the *jirga*. *Id.* 91:25.

Afghanistan. *Id.* 14:25—15:4. Vanegas testified that Mohammed made the request that he contact these witnesses during at least two of their extended meetings with the interpreter. *Id.* 15:7-11. Indeed, as previously mentioned, the record reflects that Vanegas first raised the issue of obtaining defense witnesses from Afghanistan with the Court during the February 25, 2008, status hearing, but did not provide any specific details about these witnesses' potential testimony and the record is devoid of testimony that the specific details were provided by Mohammed around this time.

During their meetings, Vanegas testified that he reviewed discovery with Mohammed and thought that the government had strong evidence against Mohammed. *Id.* 15:17-25, 33:13-16. With respect to the audio and video recordings, Vanegas testified that he tried to review that evidence with Mohammed because it was central to the government's case, but Mohammed was not interested in doing so. *Id.* 16:1-7. Instead, Mohammed told Vanegas that he had already heard a lot of the recordings, and denied that it was his voice on the recordings. *Id.* 40:21-25, 99:17-100:2. Vanegas testified that he did ask Mohammed about the list of names and numbers recovered from his phone and Mohammed stated that some of the people on that list knew that he was respected and knew of his role in the community. *Id.* 18:17-19. However, Vanegas testified that he did not remember the list of telephone numbers during the May 2, 2008, hearing when asked by the Court if he could contact potential witnesses by phone. *Id.* 19:15-17.

While preparing for trial, Vanegas did consider what kinds of witnesses he could call on Mohammed's behalf. *Id.* 38:1-5. However, upon review of the discovery and the facts in the case, Vanegas did not think that he could present fact witnesses given that the government's case centered around audio and video recordings that Jaweed generated capturing conversations between Mohammed and Jaweed. *Id.* 38:4-10. Vanegas testified that he also considered

presenting reputation witnesses for both Mohammed and Jaweed. *Id.* 38:11-14. With respect to Mohammed, Vanegas considered whether he could present witnesses to testify as to Mohammed's character for truthfulness or peacefulness. *Id.* 39:15-17. Generally, Vanegas testified that he did not see how a reputation witnesses could survive cross-examination when confronted with Mohammed's recorded statements. *Id.* 38:14-18. Turning first to witnesses who could testify as to Mohammed's character for truthfulness, Vanegas noted that the decision was made that Mohammed would not testify because he would be forced to explain his recorded statements which include admissions of criminal conduct, *id.* 39:18-40:2, and because Mohammed was not testifying, Vanegas could not present witnesses who would testify as to Mohammed's character for truthfulness, *id.* 40:3-8. Turning next to witnesses who could testify as to Mohammed's character for peacefulness, Vanegas thought that the peril of presenting those witnesses would be that they would be confronted with the recordings of Mohammed's damaging statements, that the statements would be played yet again, and that the witnesses would have to reconcile their view of Mohammed's character with his own statements. *Id.* 40:15-20. As such, Vanegas made the decision not pursue character witnesses to testify as to Mohammed's character for truthfulness or peacefulness.

Vanegas also indicated that he understood from Mohammed that he was a well-respected member of his community and that at one point he received a job from U.S. military government or the administration to participate in a "civilian-type" project. *Id.* 52:21—53:2. In light of this information, he specifically considered whether to present testimony that Mohammed was a respected figure in his community, that he was a good person, and that he was the head of a family of mostly women. *Id.* 39:6-7, 51:25-52:5. Vanegas decided not to pursue these potential witnesses

because, if they testified, they also would be confronted with other evidence, namely the audio and video recordings of Mohammed during which he admitted criminal conduct. *Id.* 52:4-7. During the evidentiary hearing, Vanegas conceded that it was possible that some of these witnesses also may have known Jaweed, but Vanegas did not ask Mohammed about that at the time. *Id.* 53:10-14.

Turning next to the witnesses who could testify as to Jaweed's character, Vanegas testified that he was told by Mohammed that Jaweed had a conviction for theft or robbery and that there was a record of it. *Id.* 24:2-6. Vanegas noted Mohammed believed that there was a record of Jaweed's conviction in the prosecutor's office in Jalalabad. *Id.* 35:6-8. Based on this information, Vanegas asked the government to follow up because of its presence in Afghanistan and because the government had contact with local police who were government witnesses in this case. *Id.* 24:6-12. Vanegas indicated that while he made the request for a *Lewis* check, he relied on Mohammed for information regarding what records would exist in Afghanistan as well as information from the United States government. *Id.* 23:19-24. In light of Vanegas' request, the government contacted the local police commander in Afghanistan, reviewed the records, and did not find any results. *Id.* 24:14-19. Vanegas noted it was his recollection that after the *Lewis* check was run and returned no results, it was the end of that inquiry into Jaweed's criminal history from his perspective. *Id.* 24:24-25:2. Vanegas also indicated that based on the results of the *Lewis* check, he did not think that he had any character evidence to pursue against Jaweed. *Id.* 41:14-20. Indeed, at the April 28, 2008, hearing, Vanegas indicated that he would not question Jaweed regarding the theft/robbery accusation.

At the post-trial evidentiary hearing, Vanegas also discussed his request for a continuance of the May 5, 2008, trial date, and ultimately, Mohammed's decision to proceed with the trial as scheduled. Vanegas testified that he requested the continuance in part because of new evidence that Mohammed had an allegiance to or association with the Taliban. *Id.* 42:6-11. Vanegas indicated that there had been some discovery as to this issue provided earlier which he had overlooked because the Court had excluded the testimony by Jaweed about the Taliban connection. *Id.* With respect to the request to continue the trial, Vanegas understood that Mohammed was offered the choice to proceed with the trial as scheduled or continue the trial, in which case evidence of Mohammed's alleged past allegiance to the Taliban and of Mohammed's alleged knowledge that Rahman was sending Jaweed to him would likely be admitted at trial. *Id.* 42:15-21, 43:5-7, 43:15-18.

In counseling Mohammed on his options, Vanegas and Jahn met with Mohammed in lock-up behind the courtroom. At some point during this time, Vanegas and Jahn also went back to their office and consulted with the Federal Public Defender before speaking with Mohammed again. *Id.* 45:11-17. Vanegas explained the options to Mohammed and let Mohammed decide how he wanted to proceed because, as Vanegas recognized, this was ultimately Mohammed's decision to make. *Id.* 113:2-5, 44:4-10. Vanegas noted that it was "very difficult choice," and in considering it, they weighed the benefits of possibly interviewing witnesses in Afghanistan, including character witnesses, against the risk of the new potentially damning evidence that would likely be introduced if the trial was continued. *Id.* 43:23-44:3, 119:6-13. Vanegas noted that throughout his representation of Mohammed, he asserted his right to a speedy trial. However, as trial approached, it became more difficult for Mohammed to make choices because, in Vanegas'

view, Mohammed had a lack of understanding about the legal process in the United States early on. *Id.* 44:17-23. In reaching his decision in this particular instance, Vanegas noted that Mohammed was "more thoughtful" and "took more time to think what really was in his interest and what do to." *Id.* 45:4-7. While Vanegas was counseling Mohammed, Vanegas explained the choices and Mohammed asked a few questions. *Id.* 119:14-16. In Vanegas' view, Mohammed appeared to understand the discussion. *Id.* 119:17-19. In weighing the choices, Vanegas noted the risk that the government would supplement its evidence and "make it worse" for Mohammed if he sought a continuance. *Id.* 55:12-18. Indeed, Vanegas sought the continuance to follow up on Mohammed's request. *Id.* 56:6-11. At the time of the continuance, Vanegas noted that he did not know exactly what information he would obtain from the potential witnesses because he had not spoken with them. *Id.* 56:12-16. However, Vanegas noted that a continuance would have given him time to interview witnesses in Afghanistan which Vanegas did not view as futile. Ultimately, it was Mohammed's decision to forgo investigating defense witnesses and proceed to trial. *Id.* 45:24-46:1. As Vanegas noted, this decision was not a "snap" decision on Mohammed's part.

In contrast, Mohammed testified at the evidentiary hearing that he did not remember the discussion on the record with the Court during the May 2, 2008, hearing regarding the continuance, the two options presented to him, or his decision not to seek a continuance and proceed with the trial as scheduled. *Id.* 94:15-99:8. Rather, Mohammed testified that he remembered informing the Court that he was unhappy with his lawyer because his lawyer did not interview witnesses. *Id.* 94:3-6.

3. *Court's credibility determinations and conclusions*

The Court now considers the evidence before it in light of the relevant legal standard.  In order to succeed on an ineffective assistance of counsel claim, Mohammed must satisfy the requirements of the *Strickland* test.  Specifically, Mohammed must demonstrate: "(1) that counsel's performance was deficient and (2) 'that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'"  *United States v. Shabban*, 782 F.3d 3, 7 (D.C. Cir. 2015) (quoting *Strickland*, 466 U.S. at 687, 694).  However, "[t]he Court need not address both the deficient performance and prejudice components of the inquiry if there has been an insufficient showing on one prong."  *Mansfield v. United States*, 800 F. Supp. 2d 84, 89 (D.D.C. 2011) (citing *Strickland*, 466 U.S. at 687).  The burden of establishing both prongs of the *Strickland* test rests with Mohammed.  *United States v. Reeves*, 586 F.3d 20, 26 (D.C. Cir. 2009).

In order to evaluate whether Vanegas' conduct fell within the wide range of reasonable professional assistance, the Court must consider what information was provided to him regarding the potential witnesses and when that information was provided to him.  Next, the Court shall consider the various areas of testimony that these witnesses could have provided to Vanegas.

a.  Identification of Specific Witnesses to Vanegas and Timing of Same

The Court must first resolve the factual disputes between Mohammed and Vanegas regarding what information was conveyed to Vanegas about the potential defense witnesses in Afghanistan.  The issue of calling defense witnesses from Afghanistan was first raised on the record during the February 25, 2008, status hearing.  While Vanegas noted that this was a "new issue," no specific information about the names of these witnesses or their potential testimony was placed on the record at that time.  Mohammed has presented no evidence to contradict the

timing of when the initial request to contact witnesses was first made. As such, the Court finds that Mohammed first made the request that Vanegas contact potential defense witnesses in Afghanistan shortly before the February 25, 2008, status hearing, but there is no evidence in the record that Mohammed provided any specific details which witness Vanegas was to contact or what information they would provide.[6]

The record reflects that leading up to trial, Mohammed provided Vanegas with the names of Khan Mohammed, Salam Jan, Ashekullah, and Mula Gul Rahman as people from his village who could serve as defense witnesses, at least of May 2, 2008. Tr. 94:20-25 (May 2, 2008). At the evidentiary hearing post trial, Mohammed identified three different people, Malek Rezwan, Sameullah, and his brother, Besmilluh, whose names he testified he provided to Vanegas prior to trial. Moreover, during the evidentiary hearing post trial, Mohammed indicated that he also gave Vanegas a list of seven to eleven names of potential witnesses.

The Court first notes that the witnesses identified during the evidentiary hearing post trial are those who provide the majority of information regarding the *jirga* to Desai and appear in the list of phone numbers provided during discovery. However, the record leading up to trial reflects that the Court specifically asked Mohammed to identify the potential witnesses by name and describe what information they would provide. On May 2, 2008, prior to trial, Mohammed listed four names that were different from the three names he identified post trial. Prior to trial, the

---

[6] The Court notes this finding is consistent with the information in Vanegas' declaration provided while this matter has been on remand. Govt.'s Notice, Ex. B (Vanegas Decl.), ECF No. [149]. Specifically, Vanegas indicates that he did not contact witnesses early on because he thought the matter would be resolved short of trial. *Id.* ¶ 5. However, Vanegas did not remember discussing specific witnesses, only talking in general about potential witnesses who could testify on Mohammed's behalf. *Id.*

Court also inquired of Vanegas as to the potential witnesses whom Mohammed had identified and Vanegas confirmed on May 2, 2008, that those four were the names that he was given. As such, the Court finds that Mohammed did not identify prior to trial Malek Rezwan, Sameullah, and his brother, Besmilluh, as potential witnesses who heard Jaweed vow to seek revenge against Mohammed because of the *jirga*. Moreover, while Mohammed now contends that he provided Vanegas with a list of seven to eleven potential witnesses, the record only reflects the four witnesses that he identified by name to Vanegas as of May 2, 2008. Mohammed has provided no specific testimony to the contrary regarding the timing of these alleged conversations between him and Vanegas regarding witnesses. Vanegas indicated that on two occasions during their extended meetings prior to trial, Mohammed raised the issue of witnesses in Afghanistan.

In sum, the Court concludes that Mohammed first requested that Vanegas contact potential defense witnesses in Afghanistan shortly before February 25, 2008. Moreover, the Court concludes that Mohammed only specifically identified four potential defense witnesses, Khan Mohammed, Salam Jan, Ashekullah, and Mula Gul Rahman, on the second occasion, shortly in advance of the May 2, 2008, status hearing, which was held in part to discuss Mohammed's pending request for a continuance of the trial that was later abandoned. In reaching this conclusion, the Court specifically credits the information in the pre-trial record over Mohammed's testimony post trial while this matter has been on remand. Given the Court's finding that Mohammed only identified these four specific witnesses to Vanegas prior to trial, the Court shall focus its analysis on these specific witnesses.

The Court next considers Mohammed's claim that Vanegas should have contacted these witnesses by phone. The names of the four potential witnesses appear in the official transcript

from the May 2, 2008, hearing, and in some instances are spelled phonetically. The Court compared these names to the names recovered from Mohammed's phone which was provided to Vanegas during discovery, Def.'s Mot. to Vacate, Ex. 12, ECF No. [118-13], as well as to the individuals identified in the Desai declaration, Desai Decl. ¶ 11. Based on this comparison, it appears that Desai was able to contact all four potential witnesses, Khan Mohammed (Khan Mohammed s/o Malik Faqir), Salam Jan (Mohammad Salam Jan), Ashekullah (Aeshqullah s/o Saheb Jan), and Mula Gul Rahman (Mullah Gul Rahman), presumably with the assistance of Mohammed's nephew. However, Mohammed has not shown that the four identified potential witnesses also appear on the list of phone numbers provided during discovery because there are no exact matches. As such, it does not appear that Vanegas would have been able to contact these individuals by phone prior to May 2, 2008. In addition, given the fact that the record reflects that these four witnesses were first identified shortly before trial and Mohammed waived his request that the trial be continued in order for Vanegas to travel to Afghanistan to interview potential witnesses, the Court concludes that Vanegas likely could not have reached these witnesses prior to trial either by phone or in person given the timing of this information being provided to him, the fact that the identified witnesses' phone numbers were not among those provided in discovery, and the unfeasibility of being able to physically travel to Afghanistan, an active war zone, on short notice.

       b.   <u>Potential Areas of Testimony that the Four Defense Witnesses Could Have Provided</u>

While on remand post trial, Mohammed indicated that the witnesses in Afghanistan could have provided three broad areas of testimony demonstrating: (1) Jaweed was a known liar and

thief; (2) Mohammed was an upstanding citizen and not affiliated with the Taliban; and (3) Jaweed was biased against Mohammed. Underlying the allegation of bias are three incidents: (1) Mohammed's participation in the *jirga* regarding the theft/robbery allegation against Jaweed and Jaweed's related vow of revenge; (2) the election where Mohammed was selected to represent Mohammed's and Jaweed's village over Jaweed's cousin; and (3) the physical altercation between Jaweed and Mohammed's cousin. The Court shall address each topic in turn.

i. Jaweed's Reputation as a Known Liar and Thief

The record reflects that Mohammed informed Vanegas prior to trial that Jaweed had a reputation as a thief and a liar. Indeed, during the May 2, 2008, status hearing, Mohammed represented that the four potential witnesses could testify that Jaweed was known as a thief, that he had a case in Afghanistan, that he was sentenced to 18 years, that he was involved in four to five robberies, that he was fugitive, and that he went to Pakistan. Moreover, Vanegas mentioned at that same hearing the possibility that some witnesses may be able to state that Jaweed was known within his community as a liar. As such, the Court shall first address the issue of Jaweed's alleged reputation as a liar and then shall address Jaweed's alleged reputation as a known thief.

The Court first turns to Jaweed's alleged reputation as a liar. A review of the Desai declaration reflects that while some of the potential witnesses contacted by Desai noted that Jaweed was a liar, none of the four witnesses identified on the record by Mohammed prior to trial mentioned Jaweed's reputation as a liar. As such, even if these witnesses were contacted by Vanegas prior to trial, Mohammed has not demonstrated that they would have offered information about Jaweed's reputation as a liar to Vanegas.

The Court next turns to Jaweed's alleged reputation as a thief. Vanegas indicated that he was told by Mohammed that Jaweed had a robbery conviction and that there would be a record of this conviction. Based on this information, Vanegas requested that the government conduct a *Lewis* check and after the results came back with no record, he did not further pursue this line of investigation and Mohammed agreed not to pursue it.[7] Here, the record reflects that Vanegas investigated the claim of the prior conviction for robbery/theft and when no records were returned based on the *Lewis* check, he reasonably believed there was no further investigation to complete based on this request.

ii. Mohammed as an Upstanding Citizen Unaffiliated with the Taliban

Mohammed also argues that Vanegas should have contacted witnesses who would have testified that he was an upstanding citizen who was unaffiliated with the Taliban. The Desai declaration states: "The witnesses interviewed stated unequivocally that Mohammed was never involved with the Taliban. They also said if Mohammed was affiliated with the Taliban, it would have been widely known, especially to the people in his village and surrounding areas." Desai Decl. ¶ 20. However, unlike the other statements in the declaration, this statement is not credited to any specific potential witness interviews. Rather, a review of the Desai declaration reflects that the four witnesses identified prior to trial only noted that Mohammed was a simple and poor farmer, but provided no information regarding his general reputation as an upstanding citizen. As such, Mohammed has failed to demonstrate that if Vanegas had contacted the four identified

---

[7] During the evidentiary hearing, Vanegas acknowledged the possibility that there might have been records at one point in time with the Taliban that no longer existed because the Taliban was not in power. No evidence was presented to support this speculation. *Id.* 25:8-15.

witnesses, that they would have provided information about Mohammed's lack of involvement with the Taliban or about his role as a respected member of the community.

### iii. Jaweed's Bias Towards Mohammed

Finally, Mohammed argues that the witnesses would have provided information regarding Jaweed's alleged bias towards Mohammed. At the evidentiary hearing post trial, Mohammed testified that he told Vanegas prior to trial in detail about the animosity that existed between Jaweed and Mohammed and that he told Vanegas that he sat on a *jirga* that presided over the robbery accusation against Jaweed. Mohammed further testified that he told Vanegas about two other incidents underlying Jaweed's bias against him: (1) the physical altercation between Jaweed and Mohammed's cousin; and (2) the election in which Mohammed was selected over Jaweed's cousin. Importantly, absent from evidence presented by Mohammed was any indication of when any of these alleged specific conversations occurred. Mohammed simply contended that he emphasized the importance of the witnesses to Vanegas several times prior to trial. In sum, Mohammed asserts that he informed Vanegas that the potential witnesses could testify as to Jaweed's bias towards Mohammed and three events underlying this bias – the *jirga*, the physical altercation, and the election. The Court shall address each in turn.

Before reaching this discussion, the Court shall first set forth the bases for its credibility determinations in light of the fact that Mohammed and Vanegas have provided differing accounts of what information was provided to Vanegas prior to trial. Turning first to the *jirga*, the parties dispute whether Mohammed told Vanegas about the *jirga* and relatedly, about Jaweed's vow of revenge prior to the trial. Mohammed testified at the evidentiary hearing post trial that he specifically told Vanegas that the potential witnesses could testify regarding the *jirga* and about

Jaweed's assertion that he would seek revenge against Mohammed because of his role in the *jirga*. Vanegas denied that Mohammed ever told him about the *jirga* involving Jaweed. Vanegas noted that he would have remembered if Mohammed mentioned a *jirga* because Vanegas knew about *jirgas* from reading a newspaper article in which they were discussed. Moreover, Vanegas indicated that he would have considered information of potential bias as very important and followed up if that information was presented to him.

Based on the evidence before it and after observing the demeanor of Mohammed and Vanegas and weighing their credibility, the Court credits Vanegas' testimony that he was not told by Mohammed about the *jirga* or more generally about Jaweed's purported animosity towards him, other than with respect to the election as discussed below. The Court bases this finding in part on Vanegas' forthright testimony at the evidentiary hearing, including his assertions that if he had been told this information, he would have remembered and followed up given its potential importance in preparing for his cross-examination of Jaweed. Vanegas' account of what he would have done had this information been communicated to him is supported by other steps he took in response to information provided to him by Mohammed, including requesting that the government conduct a *Lewis* check as to Jaweed's alleged criminal history and his representation that he had a good faith belief that a record of the arrest would exist. Moreover, as the Court has outlined above, despite the discussions on the record and the filings made in this case, there was no mention of either of the *jirga* or Jaweed's purported animosity towards Mohammed other than with respect to the election in any of pleadings or during the discussions on the record prior to trial. Rather, Vanegas' account of the information that Mohammed provided to him was consistent with the information reflected in the record leading up to trial. Specifically, as Vanegas

acknowledged during the evidentiary hearing post trial, Mohammed told him that he was a well-respected member of his community and that Jaweed was a thief, and provided examples to support these claims, including that Mohammed was selected to work on a civilian project and that he was not involved in the Taliban, and that Jaweed had a criminal record for robbery and had been sentenced to 18 years. Moreover, Vanegas did have a specific recollection of information Mohammed provided to him regarding Jaweed's mother's request to Mohammed that Jaweed be permitted to marry one of his sisters and Mohammed's specific request that Vanegas not bring this fact out at trial.

For the reasons described, the Court specifically credits Vanegas' account of the information that Mohammed provided to him regarding the scope of the potential witnesses' testimony over that provided by Mohammed at the evidentiary hearing post trial. As such, the Court finds that Mohammed did not tell Vanegas during trial preparation about Jaweed's alleged bias against him other than in relation to the election. Furthermore, the Court finds that Mohammed did not tell Vanegas about the *jirga*, Jaweed's vow of revenge against Mohammed, or the physical altercation between Jaweed and Mohammed's cousin. Finally, it appears from the record that Mohammed's reference to the election and Vanegas' reference to a "civilian-type" project to which Mohammed had been selected reference the same incident. Moreover, the Court notes Vanegas' recollection of this incident is consistent with the record prior to trial as Vanegas specifically mentioned the election during the April 22, 2008, hearing as a reason why Jaweed could harbor a vendetta against Mohammed. The Court shall accept for the purposes of its analysis that this information was communicated to Vanegas.

As discussed, the Court finds that Vanegas was not told about the *jirga* or about Jaweed's vow of revenge in the aftermath of the *jirga*. Moreover, none of the four potential witnesses identified prior to trial indicated to Desai that Mohammed was involved in a *jirga* reviewing the robbery allegation against Jaweed or that Jaweed vowed revenge against Mohammed. Accordingly, the Court finds that Mohammed has failed to establish that Vanegas was aware of the *jirga* or the related vow of revenge prior to trial, or that any of the four witnesses identified by Mohammed prior to trial would have provided information about these topics.

Turning next to the physical altercation between Mohammed's cousin and Jaweed, Mohammed asserts that he informed Vanegas of this incident prior to trial. However, the record leading up to trial does not demonstrate that this information was communicated to Vanegas. Moreover, the Desai declaration is silent as to this allegation. As such, Mohammed has failed to establish that the four witnesses identified prior to trial would have provided Vanegas with information regarding this alleged altercation or that *any* of the witnesses contacted by Desai would have provided information about this incident.

Finally, the Court turns to Mohammed's allegation that Jaweed was biased against him because Mohammed won an election over Jaweed's cousin. The pre-trial record reflects that Vanegas was told as of April 22, 2008, that Jaweed may have a vendetta against Mohammed because Mohammed won a local election. At the evidentiary hearing post trial, Vanegas again mentioned that Mohammed told him that he was selected at one point in time to participate in a "civilian-type" project by the U.S. military government or the administration. However, the Desai declaration does not make any mention of this election at all. As such, Mohammed has not demonstrated that any potential witnesses, let alone those four specifically identified prior to trial,

would have provided information regarding the election to Vanegas if they had been contacted.

In sum, the Court finds that Vanegas was told as of April 22, 2008, about Jaweed's potential bias only as it related to the election. Moreover, a review of the Desai declaration demonstrates that none of the four witnesses identified by Mohammed prior to trial discussed Jaweed's alleged bias towards Mohammed generally, or any of the three specific incidents that Mohammed now contends formed the basis of Jaweed's bias against Mohammed.

c.  Additional Credibility Determinations and Consideration of the Evidence as Whole

The Court must next determine whether Vanegas' decision not to further investigate these witnesses prior to the scheduled trial date was reasonable under the circumstances. In order to determine whether Vanegas' decisions was reasonable, the Court shall provide a summary of the information that Mohammed has demonstrated was available to Vanegas prior to the trial. Mohammed raised the issue of Vanegas contacting potential witnesses in Afghanistan shortly before the February 25, 2008, status hearing, but did not provide any names or specific information about what testimony these witnesses might offer. On March 10, 2008, in response to the government's Motion in Limine to preclude the defense from raising the assertion that Jaweed had been convicted of theft and imprisoned, Vanegas made a request that the government conduct a *Lewis* check on Jaweed based on information from Mohammed that there were records of the conviction. The government complied with the request for a *Lewis* check and the check yielded no records of a criminal conviction. As a result, Vanegas stated on the record in open court in Mohammed's presence on April 28, 2008, that he abandoned his request to pursue this line of questioning at trial. Notably, at a hearing six days prior to this discussion, the Court emphasized

on the record that the allegations of Jaweed's prior legal history could be admitted to show bias even if there was no arrest or conviction if Mohammed had any direct involvement in the allegation. Shortly before April 22, 2008, Vanegas was informed that Jaweed may have a vendetta against Mohammed because Mohammed was elected as tribal chief over a candidate that Jaweed supported. Shortly before May 2, 2008, Mohammed provided Vanegas with the names of Khan Mohammed, Salam Jan, Ashekullah, and Mula Gul Rahman as potential witnesses. In terms of the potential testimony that these witnesses could provide, Vanegas was informed, against shortly before the May 2, 2008, hearing, that they could provide information about Mohammed and Jaweed generally and, more specifically, could testify that Mohammed was not a member of the Taliban and that Jaweed was known within the community as a liar. Mohammed also again raised the assertions regarding Jaweed's former alleged conviction that he had previously abandoned. After this information was placed on the record in open court and the government made certain concessions regarding the scope of evidence that they would seek to admit at trial, Mohammed made the express decision to abandon his request for a continuance and decided to proceed to trial. The trial commenced on May 7, 2008.

Mohammed has not established that any of the four identified witnesses' phone numbers were provided to Vanegas during discovery. Moreover, a review of the declaration submitted by Desai shows that the identified four witnesses stated during their phone interviews: (1) "Jaweed had a poor reputation in his village and surrounding areas because of criminal behavior and gangsterism, including a robbery that a *jirga* found Jaweed guilty of committing"; (2) Jaweed was a thief; (3) "[N]o one knows [Jaweed] as a good person"; (4) Jaweed was arrested, detained, convicted and sentenced with two other men for a robbery, but paid bribes to be let out and fled

46

to Pakistan; (5) Jaweed and his gang attempted to rob a house in the Karez/Kariss area and a child was killed in the process; (6) Jaweed and his gang kidnapped a boy in the Mehdi village and sold him in Peshawar, Pakistan; and (7) Mohammed was a poor farmer. As discussed *supra*, these are the only facts that Mohammed has established on remand through the Desai declaration post trial with respect to his claim.

Given that the information provided pretrial to Vanegas regarding the testimony that these potential witnesses could offer differs from the Desai declaration in large measure and the timing of this information being provided, the Court finds Vanegas' decision not to further contact the witnesses to be reasonable under prevailing professional norms. Here, at most, Mohammed has established that as of March 10, 2008, Vanegas knew about Jaweed's alleged prior theft conviction, and knew as of April 22, 2008, fifteen days before trial commenced, about Jaweed's alleged vendetta against Mohammed based on the election. As of May 2, 2008, five days before trial, Mohammed informed Vanegas that four specific witnesses would testify that he was not a member of the Taliban, that Jaweed was known within the community as a liar, and that Jaweed had a theft conviction (an issue already abandoned based on the *Lewis* check).[8] Given that Vanegas was not provided specific information regarding the identity of these witnesses and the potential scope of their testimony until shortly before the trial, the Court concludes that his decision not to contact witnesses before May 2, 2008, was reasonable under the circumstances in light of the limited information he was provided regarding the four witnesses. Moreover, the

---

[8] The information regarding Jaweed's reputation as a liar was only placed on the record on May 2, 2008, and, notably, Vanegas disclosed this information to the Court only after the Court took a recess to allow Vanegas to consult with Mohammed regarding his decision whether or not to continue the trial.

Court finds that Vanegas' conduct was well within the wide range of reasonable professional assistance. Indeed, it appears that the only piece of specific information that was provided to Vanegas at an earlier time was the allegation regarding Jaweed's alleged theft conviction and Vanegas reasonably investigated the allegation by requesting a *Lewis* check and relying on information provided to him by Mohammed.

Vanegas' testimony during the evidentiary hearing highlights that he made reasonable, strategic decisions, including the decision not to further pursue defense witnesses in Afghanistan, based on the information that was before him at that time. Prior to trial, Vanegas considered the information Mohammed claimed that these four witnesses could provide, considered the evidence in the case, and, in light of that information, made the tactical decision that pursuing that investigation would not be worthwhile. At the evidentiary hearing, Vanegas provided a sound and reasonable explanation for his decision not to pursue character witnesses who would testify on behalf of Mohammed. As Vanegas noted, he considered exploring whether there were character witnesses who would bolster Mohammed's character for truthfulness and/or his character for peacefulness. Vanegas provided very specific and reasonable explanations for his decision not to pursue these types of witnesses. First, Mohammed decided that he would not testify at trial because he would be forced to explain his statements and admissions of criminal conduct on the recordings. Second, any character witness would be subject to cross-examination regarding how his or her view of Mohammed's character could be squared with Mohammed's own admissions of criminal conduct on those recordings. Moreover, as Vanegas noted, pursuing this strategy also would allow the recordings to be played again to the jury. With respect to Jaweed, those same concerns arose that by presenting character witnesses to impugn Jaweed's credibility it would present an

opportunity for the recordings to be played again. Moreover, Vanegas believed based on the results of the *Lewis* check that he had no legal basis to present evidence of the alleged prior theft conviction. The Court finds this strategic decision to be reasonable under prevailing professional norms. Indeed, while "[c]ounsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary," *Strickland*, 466 U.S. at 691, the Court finds that Vanegas' decision not to investigate defense witnesses in Afghanistan was a reasonable one animated by the information provided to him by Mohammed.

As a practical matter, the Court also notes that the record reflects that Vanegas did make some efforts to determine the feasibility of investigating and securing defense witnesses from Afghanistan at trial. However, it appeared to be logistically difficult particularly in light of the fact that Vanegas had a short period of time, from some time in February 2008, when the issue of the witnesses was first raised, until May 2008, to conduct this investigation as well as otherwise prepare for trial. Moreover, it appears that specific information regarding the potential witnesses' testimony was only provided to Vanegas shortly before trial in late April or early May. The decision not to pursue the witnesses and focus on the recordings appears reasonable in light of the evidence in the government's case. Nonetheless, in May 2008, Vanegas indicated that if the trial was continued, he would travel to Afghanistan, which was a war zone, at Mohammed's request and investigate the identified four witnesses.

Mohammed argues that Vanegas was unable to provide him with competent counsel at the time when he was presented with the decision to proceed with trial as scheduled and have certain evidence in the government's case excluded or continue the trial at which time the evidence at issue would likely be admitted and allow Vanegas to contact witnesses in

Afghanistan. Mohammed's contention is that because Vanegas had not contacted any potential witnesses in Afghanistan prior to that time, he could not provide sound advice to Mohammed regarding the prudence of proceeding as scheduled or continuing the trial because he had no idea what information these potential witnesses would provide. This argument fails for the reasons described above. Vanegas reasonably relied on Mohammed to provide him with information about the testimony that these four witnesses might be able to provide. Based on that information, which was provided shortly before trial, Vanegas did not pursue this investigation further because it was his view that the testimony would mostly either be inadmissible or harmful because it would again draw attention to the recordings of Mohammed's criminal conduct. At that time, based on the information before him, Mohammed made a reasonable, strategic decision. *See id.* ("[W]hen a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless . . . , counsel's failure to pursue those investigations may not later be challenged as unreasonable."); *United States v. McDade*, 699 F.3d 499, 507 (D.C. Cir. 2012) ("[T]rial counsel decided not to investigate for a combination of reasons, including the minimal impact the substance of the testimony would have regardless of the credibility of the witness.").

While it now appears that Vanegas might have uncovered some evidence of Jaweed's purported bias towards Mohammed if the trial had been continued, it was reasonable for Vanegas to rely on Mohammed to inform him, which Mohammed did not do, that Jaweed was biased against him, vowed to seek revenge against him, and to provide information about specific events that would highlight this as a potential area of cross-examination. Indeed, although Mohammed identified the *jirga* as a source of animosity between him and Jaweed and Mohammed had personal knowledge of this event, he did not disclose this information to Vanegas prior to trial.

50

Moreover, during the April 22, 2008, pretrial hearing, the Court highlighted that the robbery/theft accusation might be relevant if Mohammed was involved in the incident in any way. Mohammed did not disclose pretrial that Mohammed was involved in the incident. In contrast, Mohammed did inform Vanegas about Jaweed's mother's request to marry one of his sisters and about the election which demonstrates that Vanegas and Mohammed did have discussions about Mohammed's relationship with Jaweed prior to trial. As such, it was reasonable for Vanegas to assume that Mohammed would have brought to his attention these incidents supporting his claim that Jaweed was biased. While appellate counsel uncovered evidence of potential bias on Jaweed's part, Vanegas was under no duty to investigate whether Jaweed was biased against Mohammed when the only information he had about this purported bias was the election. Indeed, the Court accepts that if Mohammed had raised the issue of the *jirga* or Jaweed's vow of revenge, which he did not disclose, Vanegas would have pursued it.

Mohammed's argument also fails because Mohammed has not demonstrated prejudice. Indeed, while Mohammed contends that at a minimum, Vanegas should have contacted potential witnesses by phone, the four witnesses Mohammed identified shortly before trial do not appear to be listed among the phone numbers provided during discovery and Mohammed has not shown that they were on this list. Moreover, even when these witnesses were contacted by appellate counsel, presumably with the assistance of Mohammed's nephew, they disclosed that Jaweed had a reputation as a liar and cited to specific alleged criminal acts that did not appear in the results of the *Lewis* check. While the information regarding Jaweed's reputation as a liar may have been admissible, Mohammed had already indicated he would not pursue that line of questioning regarding the theft/robbery accusation against Jaweed during trial. Moreover, Desai makes no

51

representation that any of the witnesses whom he contacted mentioned either the election or Jaweed's fight with Mohammed's cousin, and no representation that the four identified witnesses ever discussed the *jirga*. As such, even if Vanegas contacted these witnesses, Mohammed has not established that these witnesses would have been able to testify that any animosity existed between Mohammed and Jaweed.

Assuming *arguendo* that Mohammed had established that he identified these specific four witnesses to Vanegas some time earlier than May 2, 2008, and that Vanegas would have been able to contact them by phone (as discussed *supra,* these are two points that the Court expressly finds Mohammed has not established), Mohammed has not demonstrated that had Vanegas contacted these witnesses by phone sometime between February 2008 and May 2008, that it is reasonably likely that the results of the proceeding would have been different. Importantly, nowhere in the record has Mohammed alleged that if Vanegas contacted the potential witnesses prior to the scheduled trial date and was given this information, that he would have made a different decision regarding whether or not to continue the trial and permit time for Vanegas to travel to Afghanistan to interview witnesses or to proceed with the trial in May 2008. To the extent that Mohammed is now arguing that prior to trial Vanegas should have contacted witnesses not specifically identified to him by Mohammed, the Court finds that Vanegas' conduct did not fall below an objective standard of reasonableness, based on the following: (1) the information that was provided to him regarding the potential areas of testimony that these witnesses might provide; (2) Vanegas' own reasonable decisions about the potential impact of this testimony; (3) the prudence of presenting that testimony at trial; and (4) the timing of when this information was conveyed to him.

While Vanegas now believes that he should have insisted on a continuance of the trial and contacted potential witnesses, this is the type of "judgment call . . . which should not easily be condemned with the benefit of hindsight." *United States v. Gordon*, No. 12-3035, 2016 WL 1254687, at *2 (D.C. Cir. Mar. 10, 2016) (quoting *United States v. Mullins*, 315 F.3d 449, 453 (5th Cir. 2002)). Indeed, Vanegas noted that he would have investigated witnesses in Afghanistan as requested by Mohammed had the continuance been granted. It appears that at least in part this investigation would have been made to address evidence of Mohammed's alleged connection to the Taliban that was excluded at trial because it was not continued. As such, while it was reasonable that Vanegas had not reached out to witnesses at that point in time and while Vanegas acknowledged that he did not know what these potential witnesses would say, it does not appear that in counseling Mohammed about the decision to the continue the trial or proceed as scheduled, he had totally discounted the possibility that further investigation could be useful. Rather, Vanegas indicated both during the pretrial May 2, 2008, hearing and during the evidentiary hearing post trial that it was his view that he might have been able to glean new information, including character evidence regarding Mohammed and Jaweed, from interviews with potential witnesses in Afghanistan. Tr. 117:1-11 (May 2, 2008); Tr. 56:6-11 (Dec. 3, 2015). While the Court concludes that it was reasonable for Vanegas not to have conducted interviews prior to May 2, 2008, for the reasons described, the record reflects that during the time he was counseling Mohammed regarding the continuance request, he considered and discussed the possibility that the witnesses could provide some useful information. However, after counseling Mohammed, it was ultimately Mohammed who made the decision to proceed to trial as scheduled and expressly abandon his request that Vanegas interview witnesses in Afghanistan given this choice. Notably,

53

certain damaging evidence was excluded from trial as a result of Mohammed's decision. Vanegas counseled him based on the information that he had before him at the time and, as explained above, the Court concludes the Vanegas' decision not to interview potential witnesses in Afghanistan prior to May 2, 2008, was reasonable based on what Mohammed had disclosed up to that point.

Finally, in the interests of completeness, the Court shall briefly address an issue raised by Mohammed during his testimony at the evidentiary hearing. Mohammed testified that Vanegas advised him that even if he did not want to proceed to trial, the "police will tie you up and possibly take you to Court." Tr. 101:12-13 (Dec. 3, 2015). Mohammed asserted that this was the reason that he did not discuss further with the Court his request for witnesses and agreed to proceed with the trial as scheduled. *Id.* 101:13-14 ("And then this was the reason that I shut up my mouth and I could not say anything further."). Vanegas testified that he never advised Mohammed that he would be tied up and dragged to Court, nor did he threaten him to go to trial. *Id.* 111:11-14, 112:19-20. The Court specifically credits Vanegas' testimony that he "would never make any such statement, and . . . certainly didn't make it then." *Id.* 111:13-14. As such, the Court does not further consider this issue.

In sum, the Court finds that Vanegas' performance did not fall below an objective standard of reasonableness because, other than the information regarding the election, prior to the May 2, 2008, hearing, Vanegas was not informed that the four potential witnesses in Afghanistan could testify as to Jaweed's bias or of any underlying bases for this bias, including the *jirga*, that would have triggered Vanegas to further investigate the issue. Moreover, the Court finds Vanegas made reasonable, strategic decisions not to present testimony from the four potential witnesses

identified by Mohammed. Finally, the Court finds that Mohammed was not prejudiced by Vanegas' failure to contact the witnesses because Mohammed has not demonstrated that the result of the proceeding would have been different if Mohammed had contacted the four witness nor has Mohammed alleged that he would have made a different decision regarding the choice to continue the trial and allow Vanegas to travel to Afghanistan or proceed with the trial as scheduled and have certain evidence excluded. In reaching these findings, the Court emphasizes that Mohammed has not provided any sort of timeline as to when prior to trial he provided Vanegas with specific information regarding the witnesses, including their names and what information they could provide, nor has Mohammed established that the four witnesses he identified prior to trial would have been reachable by phone or would have provided information about the *jirga*, the vow of revenge, the election, the altercation between Jaweed and Mohammed's cousin, or more generally about Jaweed's purported animosity towards Mohammed.

### B. *Failure to Object to Jaweed's "Interpretations" of Taped Evidence*

Mohammed next contends that Vanegas provided ineffective assistance because he failed to object to Jaweed's testimony regarding the audio and video recordings during trial that consisted of his "interpretations" of recorded statements. Jaweed took the stand on the afternoon of Friday, May 9, 2008, and the government's direct examination of Jaweed concluded in the morning of Tuesday, May 13, 2008. As such, the direct examination of Jaweed spanned nearly two full days of trial. Mohammed argues that Jaweed at least 118 separate times during trial Jaweed provided "interpretations" that should have been objected to as inadmissible pursuant to Federal Rule of Evidence 701 restricting lay witness opinions and inferences. Def.'s Mot. to Vacate at 17-18.

Mohammed provides examples of such statements: Mohammed's discussion of blowing

up mines around "Dagosar" and "the Red Castle" referenced government cars; references to plans to "fire missiles toward the airport" concerned Jalalabad airfield; Mohammed's use of the word "they" meant the Taliban; and certain words used by Mohammed meant "missiles." *Id.* at 18.

At trial, Vanegas made an objection during Jaweed's testimony during direct examination:

Q. On Line 60 when Khan Mohammed says: I will, God willing, speak with them, this will be done and that, too, and the work will be ready. Who is Khan Mohammed talking about speaking with?

MR. VANEGAS: Objection, Your Honor, can we approach?

SIDEBAR ON THE RECORD AS FOLLOWS:

MR. VANEGAS: Your Honor, I think that some of these questions call for just speculation and there's no foundation leading up to it. He basically says, who's he talking about, and I think he's making a conclusion that Mr. Mohammed is actually thinking something and it doesn't seem like there's a road to it as far as -- he's just – he's asking for a speculation, and that's how it comes out.

MR. STIGLITZ [Prosecutor]: Well, two things. First, I think as a participant to this conversation the witness is in a very good position to understand exactly what Khan Mohammed was talking about. It was incumbent upon his understanding of the conversation in order for him to be having this conversation in order for him to be having this conversation with Khan Mohammed. And, further, I guess under Rule 701, a lay opinion -- he's entitled to give his opinion based on his personal knowledge of his conversation with Khan Mohammed.

THE COURT: I think, Mr. Vanegas, that this is his understanding of what Khan Mohammed is saying in terms of who he is referring to. I mean, it's his view of what's being said in terms of why he is responding the way he is. He obviously can't look into Khan Mohammed's mind, but he has an understanding of what this conversation was about since they talked about back and forth, and it's [sic] doesn't sound like he's asking him questions to explain it. So, I think it's what Jaweed understands Khan Mohammed to be saying, just as you would with any conversation. It doesn't mean that he's – I don't see it as speculative, I see it as what his understanding is. I mean, if you want to poke at this during cross-examination you can, but as they go back and forth they appear to know what each is saying to the other in response. There doesn't seem to be any question that he doesn't understand, sequentially it looks like they know what each is saying to the other. I think he's entitled to say what he understands Khan Mohammed to be

saying. If you want to word it more in the context of what do you understand that Khan Mohammed is saying, then you can do it that way, and it's his understanding, you're entitled to --

MR. VANEGAS: Okay.

SIDEBAR DISCUSSION CONCLUDED

Tr. 25:17—27:11 (May 12, 2008, a.m.). After this objection, which the Court overruled, Vanegas did not object again to Jaweed's testimony on this basis.

During the evidentiary hearing post trial, Vanegas testified that he perceived that during Jaweed's testimony regarding the recordings, Jaweed would embellish what was being said and add things in. Tr. 27:21-28:4 (Dec. 3, 2015). After Vanegas made the objection that was overruled, he made the decision not to continue objecting. *Id.* 31:5-11. Vanegas testified that he made that decision because he did not want to give the jury the impression that he was trying to keep something from being said, nor did he want to highlight Jaweed's testimony by standing up and having a bench conference. *Id.* 46:10-14. Ultimately, Vanegas believed that he was going to continue to be overruled so he stopped objecting. *Id.* 46:13-16. Vanegas indicated that in retrospect, he should have continued to object, *id.* 46:19-21, and made a standing objection to the testimony, *id.* 46:24.

Mohammed's ineffective assistance of counsel claim with respect to this issue fails for two reasons. First, Vanegas has provided a sound reason for his strategic decision not to continue to object. Specifically, Vanegas indicated that he did not want to draw more attention to Jaweed's testimony nor did he want the jury to perceive that he was trying to keep something from being heard. While Vanegas now indicates that he thinks he should have continued to object or lodged a standing objection, his decision at the time was reasoned and thought out. As such, Vanegas'

decision not to continue objecting does not fall below an objective standard of reasonableness. Second, Mohammed has not demonstrated that he was prejudiced by this alleged failure on Vanegas' part. In ruling on his objection, the Court made clear its view that the evidence at issue was admissible. This Court noted, "I think he's entitled to say what he understands Khan Mohammed to be saying," in order for Jaweed to explain his responses to the statements made by Mohammed. It was the Court's view that because Jaweed was a party to the recorded conversation, he was permitted to explain his understanding of the conversation. Indeed, this was not testimony from non-party witnesses giving an opinion as to what was being discussed. Jaweed was a party to the conversations at issue and explained his understanding of what Mohammed was saying to provide context for his own responses to Mohammed's statements. *See, e.g., United States v. McGill*, 815 F.3d 846, 882 n.4 (D.C. Cir. 2016) ("To the extent that appellants' objections turn on witnesses interpreting things that had been said to them or that they had overheard, a participant to a conversation may provide his or her own interpretation of that conversation if there is a nonspeculative basis for doing so.") (citation omitted). Generally read in context as well as considering the whole recorded conversations, Jaweed's explanations are not speculative. As such, this Court would have permitted the line of questioning to continue even over objection. Given that the testimony still would have been admitted and still submitted to the jury, the Court cannot conclude either that Vanegas' performance was deficient or that there is a reasonable probability that if Vanegas had lodged a further objection to the testimony at issue, that the results of the proceeding would have been different.

**C.  *Failure to Raise a Duress Argument at Sentencing***

Finally, Mohammed argues in his briefing that his trial counsel was ineffective for failing

to raise a duress defense at sentencing. Mohammed has provided no factual support for this claim. Mohammed presented no testimony as to this issue at the evidentiary hearing post trial and Mohammed did not address this claim in his reply brief. Tr. 134:20-24 (Dec. 3, 2015). However, the Court shall briefly discuss this issue in the interest of completeness. In his briefing, Mohammed argues that the evidence at trial demonstrated that Jaweed was fearful of the Taliban, and asserts that since Jaweed approached Mohammed at the request of members of the Taliban, Mohammed was equally fearful. Def.'s Mot. to Vacate at 20-21. Other than pointing to Jaweed's testimony regarding Jaweed's own fear of the Taliban, Mohammed has presented no evidence that Mohammed was fearful of the Taliban or that Mohammed indicated to Vanegas that he was fearful of the Taliban or acted under duress. Mohammed spoke at his sentencing and never made any statement that he was fearful of the Taliban or under duress. As such, the Court cannot conclude that Vanegas was ineffective for failing to raise a duress argument at sentencing based on the mere assertion that *Jaweed*, and not Mohammed, was fearful of the Taliban.

**D.** ***Request to Recharacterize Motion as Motion Brought Pursuant to 28. U.S.C. § 2255***

At the conclusion of the evidentiary hearing, the government requested that the Court deem Mohammed's pending Motion to Vacate His Conviction, or in the Alternative for Resentencing, Based on Ineffective Assistance of Counsel, as a motion brought pursuant to 28 U.S.C. § 2255. Tr. 149:24—150:1 (Dec. 3, 2015). At the Court's request, the parties have now fully briefed this issue. The government argues that this Court should construe the pending motion as a motion brought pursuant to 28 U.S.C. § 2255 because Mohammed in his briefing added additional grounds for his ineffective assistance of counsel claim before this Court, Govt.'s Reply to Mot. to Re-Characterize Def.'s Mot. as § 2255 at 1-2, and because his pending motion

is functionally equivalent to a § 2255 motion, *see generally* Govt.'s Mot. to Re-Characterize Def.'s Mot. as § 2255.

While the Court agrees that Mohammed's ineffective assistance of counsel claim is one that may be and often is raised pursuant to § 2255, the Court finds no basis to construe it as such in this instance. Indeed, this matter is on remand from the D.C. Circuit in order for this Court to hold an evidentiary hearing and expand the record on Mohammed's ineffective assistance of counsel claim. As the parties note, the D.C. Circuit is unique in that it is the only circuit that allows ineffective assistance of counsel claims to be raised on direct appeal, rather than only through a 28 U.S.C. § 2255 motion. *Mohammed*, 693 F.3d at 205 n.1 (Kavanaugh, J., concurring). In adopting this procedure, the D.C. Circuit has recognized its "typical practice on direct appeal . . . to remand 'colorable' claims of ineffective assistance to the district court." *United States v. Knight*, No. 14-3010, -- F.3d --, 2016 WL 3213023, at *5 (D.C. Cir. Jun. 10, 2016). In light of the D.C. Circuit's practice of permitting ineffective assistance of counsel claims to be raised on direct appeal, the Court shall deny the government's request to re-characterize the pending motion as one brought under § 2255, particularly at this late stage of the proceeding.

## IV. CONCLUSION

For the foregoing reasons, the Court finds no reason to set aside Mohammed's conviction or sentence at this time based on his ineffective assistance of counsel claim. Accordingly, Mohammed's [118] Motion to Vacate His Conviction, or in the Alternative for Resentencing, Based on Ineffective Assistance of Counsel is DENIED, Mohammed's [137] Motion for Hearing on Pending Motion to Vacate Conviction or in the Alternative for Resentencing is DENIED AS

MOOT, and the Government's [161] Motion to Re-Characterize Defendant's March 1, 2013 filing

As a Motion Pursuant to 28 U.S.C. § 2255 is DENIED.

An appropriate Order accompanies this Memorandum Opinion.


_____/s/_____
**COLLEEN KOLLAR-KOTELLY**
UNITED STATES DISTRICT JUDGE