## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>        v.<br><br>KHAN MOHAMMED,<br><br>    Defendant. | **Criminal No. 06-357 (CKK)** |

## MEMORANDUM OPINION
(December 9, 2021)

On May 15, 2008, Khan Mohammed ("Defendant" or "Mr. Mohammed") was convicted by a jury in this Court of one count of distributing one kilogram or more of heroin intending or knowing that it will be unlawfully imported into the United States (Count I) and one count of distributing a controlled substance knowing or intending to provide anything of pecuniary value to a person or organization that has engaged in terrorism or terrorist activity ("narcoterrorism") (Count II). This matter is before the Court on remand from the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") for further proceedings to determine if Defendant was prejudiced as to the narcoterrorism charge because of his counsel's deficient performance. *See United States v. Mohammed*, 863 F.3d 885, 893-894 (D.C. Cir. 2017) ("*Mohammed II*") ("On the current record, and without additional district court findings, we cannot assess what a reasonable investigation in 2008 could have found. . . . [and therefore,] [r]econstruction of what a reasonable investigation [by counsel] could have uncovered . . . [is a] step [that] must be taken on remand.")

Upon consideration of the parties' submissions in connection with this issue[1] and the entire record in this case, the Court concludes that Defendant's [200] Motion to Vacate shall be GRANTED.

## I. BACKGROUND[2]

The D.C. Circuit summarized the factual scenario leading to the indictment in the instant action:

> While living in Pakistan in 2006, a man named Jaweed, who hailed from the village of Geratak in Afghanistan's Nangarhar province, fell in with Abdul Rahman, a former Taliban official for the Jalalabad province of Afghanistan also living in Pakistan. Rahman was plotting an attack on the Jalalabad airfield, a strategic NATO airbase in eastern Afghanistan, and instructed Jaweed to return to Geratak and contact a fellow villager, Khan Mohammed, who was also involved in the plot and needed help. Jaweed did as he was told and visited Mohammed, who brought him into the planning of the attack, directing him to obtain the missiles that would be used in the strike.
>
> But Jaweed soon turned against Rahman and Mohammed and disclosed the plot to Afghan authorities. The Afghan police persuaded Jaweed to continue his role in the plot, but to become their informant. When primary responsibility for the investigation was turned over to agents of the U.S. Drug Enforcement Administration (DEA) deployed in Nangarhar, Jaweed worked with them as well.

---

[1] While the Court renders its decision today on the entire record, its consideration has focused on the following documents: Defendant's Brief for Khan Mohammed, which requests that this Court vacate Defendant's conviction on narcoterrorism and resentence Defendant on the drug-trafficking conviction, and which is docketed as a Motion to Vacate ("Def.'s Mot. to Vacate"), ECF No. [200], and the exhibits attached thereto; the Government's Response to Defendant's Brief, which is docketed as a Memorandum in Opposition to Defendant's Motion to Vacate ("Govt. Opp'n"), ECF No. [203], and the exhibits attached thereto; Defendant's [redacted] Reply to Government's Brief (Def.'s Reply"), ECF No. [205], and the exhibits attached thereto. Because this Court cites to the redacted copy of Defendant's Reply, this opinion is not sealed.

In an exercise of its discretion, the Court finds that holding oral argument in this action would not be of assistance in rendering a decision. *See* LCrR 47(f).

[2] For ease of reference, the background section is repeated from this Court's opinion in *United States v. Mohammed*, Criminal No. 06-357, 2016 WL 3982447, at *2-3.

The DEA agents wired Jaweed and recorded several of his conversations with Mohammed in August and September 2006.

In the first of those conversations, Mohammed discussed with Jaweed details of the attack on the airfield and claimed that he had not only the same purpose as Rahman, but the same authority. Hearing his plans and his boast, the DEA decided to arrest Mohammed soon after Jaweed had given him the missiles. Concern about losing control of the missiles once they were in Mohammed's hands, however, led to a different strategy. The DEA would arrest Mohammed for narcotics trafficking. Following this plan, Jaweed told Mohammed he had a friend looking for opium. Mohammed replied that he knew a source who could supply as much as Jaweed's friend needed. Jaweed and Mohammed met three more times to iron out details, such as the price for the opium and Mohammed's commission. These discussions also included plans for the attack on the airfield. For example, during one of the meetings Mohammed said they needed a car to secure the missiles. *See* Government Trial Ex. 2C (Mohammed, stating that they would "tightly and firmly load [the missiles] in our car"). Eleven days later, Mohammed announced at another meeting that he would use the profits from the drug sale to buy a car, which could help carry out more drug deals.

The opium deal went off without a hitch. Jaweed accompanied Mohammed to a local bazaar where Mohammed negotiated the sale with his source. The next day, Jaweed accompanied Mohammed to the seller's home and secretly videotaped Mohammed inspecting, paying for, and taking away the opium he then sold to Jaweed. Pleased with the results, the DEA agents told Jaweed to orchestrate another sale, this time for heroin. When Jaweed raised the idea, Mohammed readily agreed and acquired almost two kilograms of heroin, which he then sold to Jaweed. Mohammed was enthused by the prospect of how much money their newly formed drug business could make. When Jaweed told Mohammed that his friend would send the opium and heroin to the United States, Mohammed declared, "Good, may God turn all the infidels to dead-corpses." Government Trial Ex. 2H. Their "common goal," Mohammed told Jaweed, was to eliminate the "infidels" either "by opium or by shooting." *Id.*

*United States v. Mohammed*, 693 F.3d 192, 195-96 (D.C. Cir. 2012) ("*Mohammed I*").[3]

---

[3] Jaweed is a pseudonym for Jalat Khan.  The Government notes that "Haji Latif, the Chaprahar District Police Chief (now retired), informed the government that, [upon his return to Afghanistan,] Jaweed was killed by sympathizers of the defendant and approximately six months later, sympathizers of the defendant used a bomb to kill two of Jaweed's brothers."  These allegations have "not [been] investigated or verified[.]"  Govt. Opp'n, ECF No. 203, at 10. n. 6.

On December 13, 2006, a federal grand jury indicted Defendant for distributing one kilogram or more of heroin intending or knowing that it will be unlawfully imported into the United States, in violation of 21 U.S.C. §§ 959(a)(1)-(2), 960(b)(1)(A) and 18 U.S.C. § 2 ("Count I"). Indictment (Dec. 13, 2006), ECF No. [1]. Mr. Mohammed was arrested and extradited to the United States on November 5, 2007.  On January 23, 2008, the government filed a Superseding Indictment adding a second count of distributing a controlled substance knowing or intending to provide anything of pecuniary value to a person and organization that has engaged or engages in terrorism or terrorist activity, in violation of 21 U.S.C. § 841(a) ("narcoterrorism charge"). Superseding Indictment (Jan. 23, 2008), ECF No. [18].

The matter proceeded to trial in this Court, and on May 15, 2008, a jury convicted Defendant on both counts of the indictment. *See* Verdict Form, ECF No. [62].  On December 22, 2008, this Court sentenced Mr. Mohammed to concurrent terms of life imprisonment on Counts I and II.   Judgment in a Criminal Case at 3, ECF No. [84].  Mr. Mohammed currently is serving his sentence.

Defendant filed a timely appeal and as part of that appeal, Mr. Mohammed argued that his trial counsel was ineffective for failing to adequately investigate certain evidence that Defendant asserts would have strengthened his defense. *See generally Mohammed I*, 693 F.3d at 202-204. On September 4, 2012, the D.C. Circuit upheld Mr. Mohammed's conviction and sentence but remanded the case for this Court to conduct an evidentiary hearing on Defendant's claim of ineffective assistance of counsel.  *Id.* at 205.

After the matter was remanded to this Court, Mr. Mohammed filed his [118] Motion to Vacate his Conviction, or in the Alternative for Resentencing, which was premised on ineffective

4

assistance of counsel claims, and this Court held an evidentiary hearing relating to Defendant's motion to vacate and denied subsequently that motion.  Defendant appealed from that decision, and the D.C. Circuit affirmed in part, vacated in part, and remanded to this Court for "further proceedings consistent with [their] opinion."  *Mohammed II*, 863 F.3d at 894.

The D.C. Circuit determined that Mr. Mohammed's counsel was deficient because he had "failed to take the obligatory step of calling potential witnesses[,]" in Afghanistan, to try to impeach the credibility of the Government's witness and demonstrate bias, *id.* at 890, and such "failure to place calls or otherwise reach out to potential witnesses cannot be traced to any strategic decision."  *Id.* at 891.  The D.C. Circuit confirmed the Defendant's drug trafficking conviction, noting that Defendant was not prejudiced because he was "convicted based on [his] own words" on that drug trafficking charge.  *Id.* at 892.  In contrast, the D.C. Circuit indicated that "[o]n the existing record, we cannot exclude the possibility of prejudice as to the narcoterrorism conviction [as] Jaweed's testimony was the only evidence that linked Mohammed to the Taliban [and] [i]t thus provided critical support for the narcoterrorism charge."  *Id.*   Accordingly, the D.C. Circuit concluded that "it is reasonably probable that the jury would not have convicted Mohammed [on the narcoterrorism charge] if Jaweed's testimony could have been effectively undermined."  *Id.* While this Court focused previously on the four potential [impeachment] witnesses named by Mr. Mohammed, the D.C. Circuit found this was  "too limited" and charged this Court with "reconstruct[ing] what an adequate investigation in 2008 could have uncovered and how counsel could have used that information at trial (as fodder for cross-examination as well as direct testimony)."  *Id.* at 893.

5

In response to that remand decision, this Court permitted defense counsel to try to recreate what an adequate pre-trial investigation in 2008 would have shown.  As a result of their investigation, defense counsel has now provided affidavits from sixteen witnesses in Afghanistan summarizing the testimony these witnesses would have presented on behalf of the Defendant at trial.[4]  Because the D.C. Circuit found previously that trial counsel's performance was deficient, the only pending issue is whether the Defendant has shown that counsel's errors were so serious that the Defendant did not receive a fair trial with regard to the narcoterrorism charge.  Accordingly, this Court must consider the affidavits provided by defense counsel's witnesses in the context of the evidence provided by Jaweed, the Government's chief witness.

## II.  LEGAL STANDARD

A defendant claiming ineffective assistance of counsel must show (1) "that counsel's performance fell below an objective standard of reasonableness under prevailing professional norms," and (2) "that this error caused [him] prejudice."  *United States v. Hurt*, 527 F.3d 1347, 1356 (D.C. Cir. 2008) (citation omitted); *Strickland v. Washington*, 466 U.S. 668, 688 (1984).  Once the first prong has been satisfied, the defendant must show that the deficient performance resulted in prejudice.  *Porter v. McCollum*, 130 S. Ct. 447, 452 (2009).  In assessing such prejudice, "[t]he defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different" where a "reasonable

---

[4] While the Government proposed initially that foreign witnesses be deposed via videoconferencing, *see* August 21, 2019 Minute Order, "[u]pon review of the sixteen affidavits, the government withdr[ew] its request for formal depositions of the defense witnesses" and consent[ed] to the admissibility of the affidavits for the limited purpose of considering the merits of Defendant's ineffective assistance of counsel claim."  Joint Status Report, ECF No. 196, at 2.

probability is a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.  In determining whether a failure to investigate resulted in prejudice, "the focus of the inquiry must be on what information would have been obtained from such an investigation and whether such information, assuming its admissibility in court, would have produced a different result." *United States v. Askew*, 88 F.3d 1065, 1073 (D.C. Cir. 1996) (citing *Sullivan v. Fairman*, 819 F.3d 1382, 1392 (7th Cir. 1987)), *cert den.*, 519 U.S. 986 (1996).  In other words, would adequate representation have been enough "to sway even 'one juror.'" *Mohammed II*, 863 F.3d at 892 (quoting *Hope v. Cartledge*, 857 F.3d 518, 524 (4th Cir. 2017)).

### III. DISCUSSION

As noted previously, the D.C. Circuit found that "Mohammed's trial counsel gave constitutionally deficient assistance in failing to investigate Jaweed's possible bias." *Mohammed II*, 863 F. 3d at 891.  Accordingly, the sole question before this Court is whether - as to his narcoterrorism conviction - Defendant was prejudiced by his trial counsel's failure to investigate and interview potential witnesses who might have undermined the credibility of the Government's principal witness.[5] *See Mohammed I*, 693 F.3d at 197 (noting that the Government put on its case in four days and "two of th[o]se days were taken up with Jaweed's testimony"); *Mohammed II*, 863 F.3d at 888 (explaining that Jaweed's testimony was, in trial counsel's words, "the bread and

---

5 A narcoterrorism conviction requires that a defendant commit a drug trafficking offense pursuant to 21 U.S.C. §841, or attempt or conspire to do so, knowing or intending to provide, directly or indirectly, anything of pecuniary value to any person or organization that has engaged or engages in terrorist activity or terrorism.  21 U.S.C. § 960a.  Terrorist activity is defined as any activity which is unlawful under the laws of the place where it is committed which involves, *inter alia*, the use of any "explosive, firearm, or other weapon or dangerous device . . . with intent to endanger, directly or indirectly, the safety of one or more individuals or to cause substantial damage to property."  8 U.S.C. § 1182(a)(3)(B)(iii).

butter of the case").  On remand, Mr. Mohammed identifies two key areas of testimony that the potential witnesses could have provided, namely that: (1) Jaweed had a "deep-seated bias against Mohammed[;]"and (2) he had a "reputation in the community as a liar[.]"  Def.'s Mot., ECF No. 200, at 6.  The Court will address these points in turn.

### A. Evidence of Jaweed's Bias

Defendant asserts that proof of bias is relevant here because "the jury, as finder of fact, and weigher of credibility, has historically been entitled to assess all evidence which might bear on the accuracy and truth of a witness' testimony."  Def.'s Mot. to Vacate, ECF No. 200, at 16 (quoting *United States v. Abel*, 469 U.S. 45, 52 (1984)); *see also, e.g., United States v. Thompson*, 359 F.3d 470, 478-80 (7th Cir. 2004) (testimony about prior violent threats was admissible as relevant to a testifying witness's bias and motives for testifying).[6]  Defendant argues that the "sworn affidavits from multiple witnesses setting forth personal knowledge of Jaweed's deep-seated bias against Mohammed constitute powerful evidence of bias that would have been admissible at trial to undermine Jaweed's credibility."  Def.'s Mot. to Vacate, ECF No. 200, at 16; *see Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986) (a court reviewing "whether not-fully-impeached evidence might have affected the reliability of the factfinding process at trial" should consider, *inter alia*, "the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of  evidence corroborating or contradicting the testimony of the witness on material points . . .")

The Government asserts that the reinvestigation by defense counsel resulted in "sixteen

---

6 Page references refer to the page numbers assigned by the Electronic Case Filing ("ECF") system.

witness affidavits, several of which referenced an apparent feud between Jaweed and the defendant . . . which purportedly had two origins: the outcome of a local election and the ruling of a local *jirga*." Govt. Opp'n, ECF No. 203, at 9.[7]  While the Government asserts that many of the affidavits contain statements that are inadmissible hearsay, the Government acknowledges that "eight witnesses had first-hand knowledge of Jaweed threatening the defendant" and six witnesses would have testified that "after the panel, which included the defendant, [considered the claim that Jaweed stole from a neighbor and] ruled in the neighbor's favor, Jaweed threatened to seek revenge against the defendant."  *Id.* at 9-10.   Defendant asserts that the "cumulative effect of hearing multiple witnesses testify to Jaweed's bias [ ] and testify consistently to the alleged bias being rooted in the same history of public confrontations and vows of revenge, undoubtedly would have impacted the jury's decision-making." Def.'s Mot. to Vacate, ECF No. 200, at 17.  Defendant points out that all that is needed to prevail on this motion is a finding that the testimony would have "created reasonable doubt in the mind of at least one juror regarding the narcoterrorism conviction."  *Id.; see Mohammed II*, 863 F.3d at 892 (observing that "[b]ecause Jaweed's testimony provided the only unambiguous link between Mohammed and the Taliban, . . . it is reasonably probable that the jury would not have convicted Mohammed if Jaweed's testimony could have been effectively undermined").  The Court turns now to the evidence presented by both sides in support of their arguments.

### 1. Alleged Threats made during the Jirga

The first event giving rise to Jaweed's alleged bias relates to Mr. Mohammed sitting on a

---

7 A *jirga* is defined as a "council of Afghan tribal leaders." *See https://www.merriam-webster.com/dictionary/jirga*

jirga that convicted Jaweed of robbing the home of another member of their village. According to Defendant, Jaweed believed that Mr. Mohammed should have voted to acquit him and subsequently vowed revenge upon him. In support of this contention, Defendant points to statements by six affiants who could have testified to having personally witnessed Jaweed's behavior and vow of revenge against Khan Mohammed after the jirga. For example, Affiant Malek Rezwanullah – who acted as a "Malek" or village leader who is an intermediary between the people and the government – recounted that, after the jirga, "suddenly, [Jaweed] turned his face toward Khan Mohammed and told him before all the participants 'hey son of Gula Jan! I swear upon God to kill you or get you lost.'" Def.'s Mot. to Vacate, Ex. C [Malek Rezwanullah Affidavit], ECF No. 200-2, at 6.

A village leader and farmer identified as Malek Zainuddin indicated that he "was available at the jirga and witnessed that Jaweed directly threatened Khan Mohammed to death." Def.'s Mot. to Vacate, Ex. B [Malek Zainuddin Affidavit], ECF No. 200-1, at 3. Affiant Taj Mohammad – a farmer and cashier at the Community Development Council with a grocery and clothing shop in the village – explained that after the jirga's decision was announced, Jaweed "stood and told Khan Mohammad, 'now you made the decision against me, you are my claimant, and I swear I won't let you alive in Chaparhar.'" Def's Mot. to Vacate, ECF No. 200, Ex. E [Taj Mohammad Affidavit], ECF No. 200-4, at 3.

A former farmer with a real estate business identified as Haji Azizullah stated that he attended the jirga, and "after the jirga issued its decision, [Jaweed] threatened Khan Mohammed that he won't let him alive or [he would] get him lost." Def.'s Mot. to Vacate, ECF No. 200, Ex. D [Haji Azizullah Affidavit], ECF No. 200-3, at 3. A farmer identified as Muslim attended the

jirga and "saw and heard [Jaweed] threaten[ ] Khan Mohammed." Def.'s Mot. to Vacate, ECF No. 200, Ex. F [Muslim Affidavit], ECF No. 200-5, at 3.[8] Accordingly, without assessing the credibility of these affiants, this Court recognizes that there are multiple affiants with personal knowledge who all indicate that Jaweed threatened to seek revenge upon Khan Mohammed based on the jirga proceedings.[9]

### 2. Alleged Controversy regarding a Local Election for a Seat on the Community Development Council ("CDC")

Defendant asserts that "[m]ultiple witnesses also observed Jaweed threaten Mohammed following Mohammed's victory over him in a local election for a seat on the CDC." Def.'s Mot. to Vacate, ECF No. 200, at 19. Witnesses that personally observed these threats include Najibullah, a principal at a female high school, who was present the day of the elections and stated that "there in the elections, Jalat Khan threatened [Mohammed] to death by stating that he will [seek] revenge and won't let him alive." Def.'s Mot. to Vacate, ECF No. 200, Ex. K [Najibullah Affidavit], ECF No. 200-10, at 3. A village leader [Malek] identified as Shafiqullah Haqyar explained that he attended the elections and knew that Jalat "wanted to be the chairman" and heard Jalat "threaten[ ] Khan Mohammad before all participants by stating 'I won't let you alive.'" Def.'s Mot. to Vacate, ECF No. 200, Ex. J [Shafiqullah Haqyar Affidavit], ECF No. 200-9, at 4.

Affiant Malek Rezwanullah indicated that Jalat Khan "threatened Khan Mohammad before

---

[8] Defendant notes that "[f]our other affiants who did not personally witness Jaweed's threats confirmed that the incident was common knowledge in the community." Def.'s Mot. to Vacate, ECF No. 200, at 19. Defendant proffers no hearsay exception regarding such statements.
[9] The Government asserts that the affiants are not credible because they have "significant gaps in knowledge rendering them incredible" based on their statements that the Defendant was not engaged in any criminal activity. Govt. Opp'n, ECF No. 203, at 14-15 (citing statements from various affidavits indicating generally that Defendant did not do anything wrong or criminal).

all participants by telling him 'I will do whatever I can to not let you alive.'" Ex. C, ECF No. 200-2, at 7.  Taj Mohammad attended the elections and stated that when Khan Mohammad was announced as the winner, Jaweed "made these threatening statements before all villagers" and said that he "swears on God that he won't let him alive."  Ex. E, ECF No. 200-4, at 3.   Defendant alleges that "[s]till more affiants testified to having heard about Jaweed's threat after the fact." Def.'s Mot. to Vacate, ECF No. 200, at 20, but again, Defendant proffers no exception to hearsay for the persons who do not have firsthand knowledge.  Accordingly, again without assessing the credibility of the affiants, this Court finds that there are several affiants with firsthand knowledge who all indicate that Jaweed made threats against Khan Mohammed relating to the election.

### 3. Jaweed's Alleged Reputation as a Liar and Evidence of his Alleged Bad Acts

Several of the witness affidavits contain statements about Jaweed's alleged bad acts ranging from stealing jewelry to stealing and selling children.  The Government argues that "[b]ecause the statements about Jaweed's purported crimes do not relate to untruthfulness and because they reference specific acts, these witnesses would not have been permitted to testify regarding these acts." Govt. Opp'n, ECF No. 203, at 12; *see* Fed. R. Evid. 608 (impeaching a witness's character for untruthfulness is achieved by opinion and reputation evidence and not by specific acts); *see also United States v. Whitmore*, 359 F.3d 609, 618 (D.C. Cir. 2004) (excluding opinion evidence if it "amounts to no more than a conclusory observation") (quotation omitted). Defendant asserts generally that the Government's reference to Rule 609 to exclude all extrinsic evidence of Jaweed's bad acts is a "dramatic overstatement."  Def.'s Reply, ECF No. 205, at 17. While it is speculative at this point to opine on whether *all* extrinsic evidence of bad acts would be excluded, it is arguable that such evidence would be barred as the alleged bad acts do not relate

12

to untruthfulness.

In contrast, the Government acknowledges that two of the witnesses referred to Jaweed as a liar, which may be opinion or reputation evidence related to truthfulness, "assuming a proper foundation were laid." Govt. Opp'n, ECF No. 203, at 13. The Government contends however that these two opinions would have been rebutted by Agent Higgins' testimony that Jaweed did not use all the money provided by the DEA for the drug purchase and returned $50.00 to the DEA, Ex. 11 [5/9/08 a.m. trial transcript], ECF No. 203-11, at 23-24, and also by Jaweed's demeanor on the stand. Govt. Opp'n, ECF No. 203, at 13. The Court notes its impression of Jaweed as a credible witness at trial, and accordingly finds that the evidence of Jaweed's alleged reputation as a liar may likely have been rebutted both by Jaweed's demeanor and by Agent Higgins' testimony of a specific recent instance where Jaweed was truthful. That leaves standing however the numerous witnesses with firsthand knowledge regarding Jaweed's alleged bias against Defendant. The Court will next consider the effect of defense counsel's failure to introduce Jaweed's alleged bias and to challenge Jaweed's testimony, and specifically, whether this failure resulted in prejudice to Defendant with regard to his narcoterrorism conviction.

### 4. Effect of Jaweed's Alleged Bias

In the instant case, there were two alleged instances where Jaweed publicly vowed to take revenge on Mohammed, and each instance is supported by several witnesses proffering firsthand accounts. Accordingly, Defendant argues that it is reasonably probable that the weight of the evidence demonstrating Jaweed's bias, by itself, would have been enough to persuade at least one juror to vote for acquittal on the narcoterrorism charge. Def.'s Mot. to Vacate, ECF No. 200, at 20; *see United States v. Nwoye*, 824 F.3d 1129, 1135 (D.C. Cir. 2016) (Defendant "must

13

demonstrate only 'a probability sufficient to undermine confidence' in the verdict.") (quoting *Strickland*, 466 U.S. at 694); *see also Wood v. Alaska*, 957 F.2d 1544, 1554 (9th Cir. 1992) (observing that evidence of a key witness's bias can "forcefully undermine the credibility of the witness and the strength of the state's entire case").

In an attempt to undercut this evidence of bias, the Government contends that there is a "dichotomy between the defense witness testimony and the defendant's obvious trust of Jaweed, as evidenced by his own words and conduct[,]" and this makes it "highly unlikely that a reasonable juror would have [believed that they] were known enemies." Gov't Opp'n, ECF No. 203, at 11. More specifically, "defendant's own contemporaneous conduct demonstrating the trust he had in Jaweed is more credible than the statements contained in the defendant's witness affidavits." *Id.*; *see* Govt. Opp'n, Ex. 1 [Trial Exhibit 2A-recording transcript], ECF No. 203-1 at 3:12-14. 4:22 (Defendant: ": You and I are friends . . . we cannot reveal out secret to others . . . absolutely, we trust you[.]"); Ex. 2 [Trial Exhibit 2B-recording transcript], ECF No. 203-2, at 7:50-54, 8:56 (Defendant: "You, like a flower and you a flower of your father, our friendship will be continuous. . . you are my friend . . . you are my friend and with you is my secret.")[10]  The Government concludes that Defendant's words and conduct "serve[] as a powerful rebuttal to a suggestion of

---

[10] The Court notes that the Government's citation to the recording transcript cites only statements by Defendant without citing the preceding statements or responses by Jaweed, which may aid in putting the conversation in context. *See, e.g.,* Ex. 1, ECF No. 203-1, at 4:25 ( Jaweed: "The fact that I agreed to this operation, I swear that I did this because of you.  My friend, if you were not with me in here, I would not have done this work at all and I would have been working to earn my living."); Ex. 2, ECF No. 203-2, at 7:49 (Jaweed: "Hey Khan Mohammed, I swear that during my life time I would not have involved myself I this kind of work.  Were it not for your sake, I would not have taken one step in this."); at 7:53-55 (Jaweed: "I said to myself, he is someone that I can share my secret with. . . A friend keeps the secret of a friend.")

Jaweed's deep-seated bias or animosity between the parties" and as such, "[a]ny reasonable juror would have concluded that the defendant trusted Jaweed." Govt. Opp'n, ECF No. 203, at 11.

Defendant proffers however that the Government's argument is misplaced because there has been no "suggest[ion] that [Mohammed] similarly bore Jaweed any ill will[ .]" *See* Ex. 2, ECF No. 203-2, at 9:72 ("Your relationship is ruined with this government. Even if not ruined, I would have shared my secret with you for the sake of our previous friendship. God willing, we will do many things together.") In fact, it is "not mutual bias or animosity to which the witnesses [have] testif[ied] [but instead,] [t]heir testimony is that Jaweed publicly vowed on multiple occasions to exact revenge against Mohammed for perceived insults." Def.'s Reply, ECF No. 205, at 23 (citations to affidavits omitted). Furthermore, the fact that the two men entered into a transaction does not "undermine the central thread running through the multitude of witness testimony that Jaweed harbored a grudge against Mohammed – one that he swore to act upon no matter how long it took." Def.'s Reply, ECF No. 205, at 24 (citations omitted). Rather, the two men were engaged in a drug transaction and were interested in the money they were going to make. *Id.*; *see, e.g.,* Ex. 1, ECF No. 203-1, at 7:43-44 (Jaweed indicating that he is a "very poor guy" and "sick" and Defendant responding that "God willing, there is enough money in this to get you a car" and "[w]hen you do an attack, if successful then we will give you a lot of money"); Ex. 2, ECF No. 203-2, at 5:30 (Defendant: "Yes, God willing, I will take good money in this thing . . ."). Moreover, Defendant acknowledges that he may have been "naive" to trust Jaweed, but, "nothing in the record renders it inconceivable that Mr. Mohammed would willingly have [worked with Jaweed], even if it proved to be a fatal miscalculation." Def.'s Reply, ECF No. 205, at 23.

Moreover, Defendant asserts that these "statements of friendship certainly would not be

enough to overcome testimony from multiple witnesses that Jaweed had sworn to exact revenge against Mr. Mohammed, which effective counsel could have argued was the very thing [Jaweed] was doing from the stand."  Def.'s Reply, ECF No. 205, at 24 (citations omitted).  Outside of Defendant's recorded "puffery of a friendship between the two men," they were "not, in fact, friends, had no familial connections, and the only reason Jaweed came to see Mohammed was  at the alleged instruction of a third party in Pakistan"  *Id.*[11]  While on its face, it may seem unusual that Defendant would work closely with Jaweed after Jaweed allegedly vowed to seek revenge upon him, in this case, the two were connected through a third party, and they were working on drug deals and other matters where both stood to either gain significant benefit or face significant repercussions (if caught).  And, in fact, the Government acknowledges that, "[assuming] *arguendo*, that Jaweed had a grudge against the defendant and sought to cause him trouble, there is nothing inherently inconsistent about rivals working together to achieve a common goal."  Govt. Opp'n, ECF No. 203, at 11.  Furthermore, there is no indication that Defendant considered Jaweed an enemy; instead, the affidavits proffered by Defendant allege that Jaweed was angry with Defendant and vowed openly on two occasions to seek revenge upon him.

The Government takes this argument one step further and contends that there is no evidence "to corroborate the witnesses' assertions that Jaweed entrapped or ensnared the defendant in this criminal scheme," and in fact, "the recordings show that the defendant, not Jaweed, was in control of their plan."  Govt. Opp'n, ECF No. 203, at 11; *see e.g.,* Ex. 2, ECF No. 203-2, at 4:16

---

[11] Defendant submits that while the parties can "speculate ad infinitum about how all of these confrontations would have played out at trial, . . . they did not play out at all because of counsel's errors," and accordingly, the jury did not hear from any of the [ ] witnesses whose testimony is now before the Court."  Def.'s Reply, ECF No. 205, at 25.

(Defendant: "I know what to do and will take the responsibility."); Ex. 2, ECF No. 203-2, at 7:49 (Jaweed: "Were it not for your sake, I would not have taken one step in this.") The Government asserts that Defendant was "the one who had well-established and reliable sources of explosives and narcotics." *See, e.g.,* Ex. 1, ECF No. 203-1, at 3:10 (Defendant: "I have the source.  We are trying for them to get more weapons and things like that for us.  I have some weapons."); Ex. 6, ECF No. 203-6, at 3:15-4:18 (Defendant, responding to Jaweed's comments about opium: "[a]s much as he needs, we will get it for him . . . [w]e are the people of this trade , we have dealt with it and we know it.")  Accordingly, the Government concludes that the defendant's "words alone are sufficient to defeat any allegation that the defendant was entrapped or coerced by Jaweed." Govt. Opp'n, ECF No. 203, at 12.

This Court notes however that the Government's allegations about entrapment miss the mark.  Defendant does not argue that Jaweed entrapped or coerced him, but rather that introduction of Jaweed's bias against Defendant would have helped the jury to put things in perspective since Jaweed's testimony was the "only unambiguous link to the Taliban  [and] 'it is reasonably probable that the jury would not have convicted Mohammed if Jaweed's testimony could be effectively undermined.'" Def.'s Reply, ECF No. 205, at 20 (citing *Mohammed II*, 863 F.3d at 892). "Effective counsel could have used this evidence not just to undermine Jaweed's credibility, but also to present an alternative narrative to Jaweed's interpretations of Mohammed's recorded statements[.]"  Def.'s Reply, ECF No. 205, at 21.  Moreover, "presentation of the bias evidence would have had an even greater impact had trial counsel timely objected to Jaweed's "interpretations" of Mohammed's words and appropriately reframed Jaweed's testimony for the jury as *Jaweed's* understanding of Mohammed's words [.]"  Def.'s Reply, ECF No. 205, at 21

(emphasis in original).

Without weighing in on the credibility of the affiants, the Court agrees that the multitude of allegations regarding Jaweed's bias could have been used by defense counsel to undermine Jaweed's testimony, which may well have resulted in at least one juror voting against conviction on the narcoterrorism charge.  As noted by the D.C. Circuit, at trial, Government counsel repeatedly asked Jaweed "to explain Mohammed's meaning, rather than [asking for] Jaweed's understanding of what Mohammed was telling him." *Mohammed* II. 863 F.3d at 892 (citation omitted). The D.C. Circuit found further "that a proficient attorney would have promptly objected and, once it became clear the government would repeatedly solicit Jaweed's testimony about Mohammed's state of mind, lodged a standing objection." *Id.*  But this was not done, and there is no way to undo any resulting prejudice to Defendant.  Furthermore, "[h]ad Mohammed's counsel also independently sown doubt as to Jaweed's credibility, the subtle distinction between Jaweed's actual testimony (about Mohammed's state of mind) and testimony to which Jaweed should have been confined (about what he understood Mohammed to mean) could have been significant." *Mohammed II*, 863 F.2d at 892.   The Government's attempt to undercut this evidence of bias does not change the fact that defense counsel's ineffective assistance meant that no evidence of Jaweed's alleged bias was presented to the jury, and as such, Jaweed's testimony about Mr. Mohammed's meaning was wholly unrebutted.

### B. Importance of Jaweed's Testimony

In an effort to negate the prejudice resulting from defense counsel's failure to challenge Jaweed's testimony, the Government argues that even if witness testimony had been presented for purpose of demonstrating Jaweed's bias, the "testimony would have been significantly undermined

by the defendant's own conduct and his own inculpatory statements." Govt. Opp'n, ECF No. 203, at 10. More specifically, "[a]t trial, the witnesses would have been faced with the defendant's recorded admissions celebrating his own violence." Govt. Opp'n, ECF No. 203, at 15; *see* Ex. 1, ECF No. 203-1, at 8:50 (Defendant: "We fired rockets at the county-chief office and they paid us. . . ."); Ex. 1, ECF No. 203-1, at 5:30 (Defendant: "The Americans are infidels and Jihad is allowed against them. If we have to fire [the missiles] toward the airport, we will do it and if not the airport, wherever they are stationed we will fire at their base too. I mean we have to use the mines too. God willing, we and you will keep doing our Jihad."); Ex. 1, ECF No. 203-1, at 11:80 (Defendant: "We will continue our jihad, Jihad is allowed religiously against the infidels and if a Muslim is on their side and get shot, the hell with him."). The Court notes that this argument was considered by the D.C. Circuit, which found as follows:

> The government argues there is no reasonable likelihood that testimony undercutting Jaweed's credibility would have altered the verdict because the vast majority of evidence against Mohammed consisted of his own words and actions caught on tape, not Jaweed's testimony. Mohammed responds that the recordings do not speak for themselves. The government put them into evidence through Jaweed, who explained the recordings and provided context for them over two days of testimony.
>
> Mohammed has the better of this argument. . . Jaweed's testimony arguably shaped how the jury understood Mohammed's words. Without the additional information Jaweed provided that Mohammed was discussing a *government* target, a juror could conceivably conclude that Mohammed was violent, but not a terrorist as requested to convict under §960a.

*Mohammed I*, 693 F.3d at 204. Accordingly, the D.C. Circuit did not necessarily equate violent actions with terrorism.

Ignoring the D.C. Circuit's previous finding on this issue, the Government continues to insist that "the recordings speak for themselves and directly implicate the defendant through his

own unequivocal words and conduct."  Govt. Opp'n, ECF No. 203, at 17; *see* Ex. 1, ECF No. 203-1, at 4:24 (Defendant: "Them, God willing, there is money and everything in this. These are infidels[;] we will kill them and we will continue our Jihad with blessing."); Ex. 1, ECF No. 203-1, at 4-5:26 (Defendant: "We will continue our action in our country.  Whatever we do, here are a lot of [opportunities].  We can place and explode bombs and fire missiles toward the airport."); Ex. 3, ECF No. 203-3, at 7:48 (Defendant: "The Infidels need to be killed.); Ex. 6, ECF No. 203-6, at 6:36 (Defendant: "May God eliminate them right now, and we will eliminate them too. Whether it is by opium or by shooting, this is our common goal."); Ex. 7, ECF No. 203-7, at 2:8 (Defendant discussing drugs: "[T]he Jihad would be performed since they send it to America.")[12]

Defendant points out the fatal flaw in the Government's contention, which is that "the government did not present the recordings to the jury in a vacuum . . . [but] [i]nstead, it made the strategic choice to present its case against Mohammed largely through Jaweed."  *See* Def.'s Reply, ECF No. 205, at 9 ("And over the course of two full days of testimony, Jaweed narrated, explained and interpreted [the tapes] with the assistance of a translator.")  Nor can this Court now disregard that the Government relied heavily upon Jaweed's testimony in order to obtain a conviction against Defendant.  While Mr. Mohammed does repeatedly mention Jihad and killing infidels, on their own, these words fail to link Defendant to the Taliban but rather, they portray Mr. Mohammed as being violent.  In contrast, Defendant provides numerous examples of excerpts of "incriminating statements the prosecution was able to attribute to Mr. Mohammed through Jaweed's testimony."

---

[12] Defendant notes that "the government's closing argument was riddled with references to the Taliban and Mohammed's alleged connection to it, references based entirely on Jaweed's testimony."  Def.'s Mot. to Vacate, ECF No. 200, at 16 (internal citation omitted).

Def.'s Reply, ECF No. 205, at 10-11 (linking Defendant to the Taliban); *see Mohammed II*, 863 F.3d at 892 (opining that "Jaweed's testimony provided the only unambiguous link between Mohammed and the Taliban.")

The Government argues next that "defendant's own words established his connection with Rahman and [therefore,] the Taliban." Govt. Opp'n, ECF No. 203, at 18-19; *see* Ex. 12 [5/9/08 Trial Transcript p.m.], ECF No. 203-12, at 10-15 (where Jaweed [not Defendant] indicates that Abdul Rahman, who is with the Taliban, told him to work with Defendant on a plan to fire missiles at the airport.); *see also* Ex. 1, ECF No. 203-1, at 4:25 (Jaweed stated that he "agreed to this operation" because of "the instruction of these people when they told [him] to work together with Khan Mohammed" as "Khan Mohammed [was his] long time friend."); Ex. 1 at 5:26 (Defendant responded that "We can place and explode bombs and fire missiles toward the airport.") Abdul Rahman is not mentioned at this point, although Defendant later notes that his "word [is] the same" as Abdul Rahman, when Jaweed asks Defendant if he is "together in this" with Rahman. *Id.* at 7:45-46.

The Court finds that Mr. Mohammed's connection to Rahman and the Taliban is not directly evident from Defendant's own words as cited by the Government. Rather, Defendant's tie to Abdul Rahman and the Taliban was established through Jaweed's testimony and his interpretation of Defendant's words. S*ee Mohammed I*, 693 F.3d at 204 ("[Jaweed] explained the recordings and provided context for them."); *id.* ("Jaweed's testimony arguably shaped how the jury understood Mohammed's words."); *see also Mohammed II*, 863 F.3d at 888 )(observing that Jaweed was the "central witness at trial" and the "bread and butter of the case;" and that "the government repeatedly asked Jaweed to clarify the meaning of exchanges between him and

21

Mohammed;" and repeating that "Jaweed's testimony arguably shaped how the jury understood Mohammed's words").

The Government's argument that it could have made its case based solely on Defendant's words is speculative and unsupported by the record cited by the Government. "If the tapes spoke for themselves and Mr. Mohammed, as the government argues, effectively convicted himself of narcoterrorism with own words, then the government's case-in-chief would have not relied so heavily on Jaweed's testimony." Def.'s Reply, ECF No. 205, at 14. "Given the government's trial strategy, the jury's trust in Jaweed as honest narrator was essential to the outcome of the narcoterrorism verdict." *Id.* This Court agrees that the Government's reliance on Jaweed's testimony was an essential part of its case, which cannot now be discounted as that changes the entirety of the case that was presented to the jury.

Finally, the Government asserts that pursuant to 21 U.S.C. § 960a, there need not be a connection to a known terrorist organization, but instead, the "government need only prove that the defendant engaged in the drug trafficking offense and provided something of value to a person who has engaged or plans to engage in a terrorist activity." Govt. Opp'n, ECF No. 203, at 22 ; *see Mohammed I*, 693 F.3d at 199 ("The text is abundantly clear that Congress intended to target drug offenses the defendant knows will support a 'person or organization' engaged in terrorism, with no additional requirement that the defendant intend his drug trafficking to advance specific terrorist activity. In other words, Mohammed need not have planned for his drug proceeds to fund terrorist ends. It is sufficient that the proceeds went to a terrorist – him.") The Government argues that because it presented two theories to meet the elements of the narcoterrorism charge, even if one is presumably "insufficiently supported by the evidence (which the government does not concede

here), the verdict should be affirmed as long as there is at least one alternative that was sufficiently supported by the evidence." Govt. Opp'n, ECF No. 203, at 21; *see United States v. Johnson*, 216 F.3d 1162, 1165 (D.C. Cir. 2000) ("When a defendant is charged on the basis of multiple acts, a verdict cannot be overturned on the ground that the evidence is insufficient as to one of them."); *United States v. Safavian*, 644 F. Supp. 2d 1, 19 (D.D.C. 2009) ("[T]here simply is no support in the case law for setting aside a general verdict 'because one of the possible bases of conviction was neither unconstitutional . . . nor even illegal. . . but merely unsupported by sufficient evidence.'") (citing *Griffin v. United States,* 502 U.S. 46, 56)).

In its opinion, the D.C. Circuit acknowledged this argument by the Government and stated that:

> At trial, the government pursued two distinct theories for convicting Mohammed of narcoterrorism — that he had personally engaged in terrorist activity, and that he was "acting as a conduit of the Taliban," a terrorist organization. . . . It is not clear which theory the jury believed. Given the government's own emphasis on the Taliban's role in Afghan drug trafficking and its use of drug proceeds to fund terrorism, . . ., it is reasonably probable that the jury convicted Mohammed not of being a terrorist who retained drug proceeds for himself, but of using drug sales to fund the Taliban.

*Mohammed II*, 863 F.3d at 892. This Court agrees that the Government's emphasis throughout the trial on Defendant's connection to the Taliban and its reliance on Jaweed's testimony make it reasonably probable that the jury convicted Defendant based on his using the drug sales to fund the Taliban.

Furthermore, the Court finds speculative the Government's assertion that the jury would have found Defendant guilty of narcoterrorism based on the fact that proceeds of the drug sales went to Defendant (with no mention of the Taliban). To support this theory, the Government seems to rely mostly on information that was presented during its closing argument, *see* Govt.

Opp'n, ECF No. 203, at 23, where the "government argued that the defendant himself had engaged, and was planning to engage, in terrorist activity." *Id.*   But this information presented during closing was derived from the cumulative testimony, including the two days of testimony by Jaweed, the Government's chief witness. The Government appears to ask this Court to speculate now whether – independent of Jaweed's testimony, which constituted the bulk of the Government's case against Defendant – the jury would have interpreted Defendant's words that he "fired rockets at the county-chief office," *see* Ex. 1, ECF No. 203-1, at 8:50, as constituting a terrorist "attack on a government facility using explosives," Govt. Opp'n, ECF No. 203, at 23, rather than a violent act.  Furthermore, the jury would have also had to construe Defendant's words that "[w]e can place and explode bombs and fire missiles toward the airport," Ex. 1, ECF No. 203-1, at 5:26, and "if not the airport, wherever they are stationed we will fire at their base too," Ex. 1, at 5:30,  as words indicating plans to engage in terrorist activity rather than violent acts.  *But see Mohammed I*, 693 F.3d at 204 (noting that it was Jaweed who testified that "'plans to fire missiles toward the airport,' referenced the Jalalabad airfield" and as such, "Jaweed's testimony arguably shaped how the jury understood Mohammed's words.")  Asking this Court to focus solely on Defendant's own words and speculate whether the jury would have construed Defendant's words as constituting prior and intended acts of terrorism is a task that goes beyond the scope of the remand, as it involves ignoring any impact of Jaweed's testimony.

Moreover, on appeal, the D.C. Circuit noted the Government's argument that "[Defendant] provided commissions to himself, and that he had engaged and planned to engage in terrorist activity so that the jury could have convicted [him] without relying on Jaweed to link Mohammed to the Taliban." *Mohammed II*, 863 F.3d at 892-893 (internal quotation marks and citation

omitted).  The D.C. Circuit found ultimately however that "due to counsel's inadequacy, the jury had no way to factor in the missing impeachment evidence [and] accordingly, [the D.C. Circuit] [could] not safely assume that counsel's performance did not affect the verdict." *Id.* at 893. Accordingly, the Court finds that defense counsel's failure to impeach Jaweed weighs into even the Government's alternative theory of narcoterrorism, and the Court rejects the Government's contention that Defendant's own words would have outweighed any demonstration of Jaweed's bias.  Furthermore, the Government's argument that the jury could have based the narcoterrorism conviction on Defendant's identification as a terrorist is speculative, as it requires this Court to ignore testimony that was heard and considered by the jury, which goes beyond the scope of the remand.  For these reasons, the Court rejects these arguments by the Government.

## IV.  CONCLUSION

Upon consideration of the evidence provided by both sides, this Court finds Mr. Mohammed was prejudiced by ineffective assistance of counsel regarding the narcoterrorism charge.  "In assessing prejudice, the ultimate question is whether Mohammed has shown a reasonable probability that adequate investigation would have enabled trial counsel to sow sufficient doubt about Jaweed's credibility to sway even one juror." *Mohammed II*, 863 F.3d at 892 (internal quotation marks and citation omitted).  Here, the impact of Jaweed's testimony could have been undermined, at least partially, by the introduction of witness testimony regarding Jaweed's alleged bias.  Such bias is evidenced by affidavits indicating that Jaweed allegedly threatened Defendant at the jirga, and there was a controversy over the election.  These allegations of alleged bias may have swayed at least one member of the jury to (at least partially) discredit Jaweed's testimony and ultimately, to vote not to convict Mr. Mohammed on the narcoterrorism

charge.  For the foregoing reasons, the Court finds that Defendant's [200] Motion to Vacate shall

be GRANTED.  An appropriate Order accompanies this Memorandum Opinion.


_____/s/_____

COLLEEN KOLLAR-KOTELLY
UNITED STATES DISTRICT JUDGE